# No. 25-2332

In The
## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

**MATTHEW BOERMEESTER,**
*Plaintiff-Appellant,*

*v.*

**UNIVERSITY OF SOUTHERN CALIFORNIA et al.,**
*Defendants-Appellees.*

---

Appeal from the United States District Court for the Central District of California
Fernando M. Olguin, District Judge • Case No. 2:19-cv-02137-FMO-MBK

---

## REQUEST FOR JUDICIAL NOTICE

---

**HORVITZ & LEVY LLP**
SCOTT P. DIXLER
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
LACEY L. ESTUDILLO
505 SANSOME STREET, SUITE 1550
SAN FRANCISCO, CALIFORNIA 94111-3149
(415) 462-5600

**PAZZANI & SANDHU LLP**
KAREN J. PAZZANI
JOSEPH V. MARRA, III
PUNEET K. SANDHU
700 NORTH CENTRAL AVENUE, SUITE 480
GLENDALE, CALIFORNIA 91203-3226
(213) 362-1860

ATTORNEYS FOR DEFENDANTS AND APPELLEES
**UNIVERSITY OF SOUTHERN CALIFORNIA,
GRETCHEN DAHLINGER MEANS, AND AINSLEY CARRY**

# REQUEST FOR JUDICIAL NOTICE

Appellees the University of Southern California, Gretchen Dahlinger Means, and Dr. Ainsley Carry (collectively USC) request that this Court take judicial notice, pursuant to Federal Rule of Evidence 201, of the following briefs filed in Appellant Matthew Boermeester's related state court case against USC:

1. Boermeester's Appellant's Opening Brief, filed in *Boermeester v. Carry*, 263 Cal.Rptr.3d 261 (2020), *rev'd,* 15 Cal.5th 72, (2023), Court of Appeal Case No. B290675. A true and correct copy of this brief is attached as Exhibit 1.

2. USC's Respondent's Brief, filed in *Boermeester*, 263 Cal.Rptr.3d 261, Court of Appeal Case No. B290675. A true and correct copy of this brief is attached as Exhibit 2.

3. Boermeester's Reply Brief, filed in *Boermeester*, 263 Cal.Rptr.3d 261, Court of Appeal Case No. B290675. A true and correct copy of this brief is attached as Exhibit 3.

4. USC's Opening Brief on the Merits in the California Supreme Court, filed in *Boermeester v. Carry*, 15 Cal.5th 72

1

(2023), Case No. S263180. A true and correct copy of this brief is attached as Exhibit 4.

5.  Boermeester's Answer Brief on the Merits in the California Supreme Court, filed in *Boermeester*, 15 Cal.5th 72, Case No. S263180. A true and correct copy of this brief is attached as Exhibit 5.

6.  USC's Reply Brief on the Merits in the California Supreme Court, filed in *Boermeester*, 15 Cal.5th 72, Case No. S263180. A true and correct copy of this brief is attached as Exhibit 6.

7.  USC's Supplemental Brief in the Court of Appeal, filed in *Boermeester v. Carry*, 100 Cal.App.5th 383 (2024), Case No. B290675. A true and correct copy of this brief is attached as Exhibit 7.

8.  Boermeester's Appellant's Opening Supplemental Brief on Remand Issues in the Court of Appeal, filed in *Boermeester*, 100 Cal.App.5th 383, Case No. B290675. A true and correct copy of this brief is attached as Exhibit 8.

9.  Boermeester's Appellant's Supplemental Responding Brief in the Court of Appeal, filed in *Boermeester*, 100 Cal.App.5th

383, Case No. B290675. A true and correct copy of this brief
is attached as Exhibit 9.

10.   USC's Supplemental Responding Brief in the Court of
      Appeal, filed in *Boermeester*, 100 Cal.App.5th 383, Case No.
      B290675. A true and correct copy of this brief is attached as
      Exhibit 10.

This Court should take judicial notice of these briefs because they
are relevant to USC's argument that Boermeester's claims are barred
by issue preclusion. The briefs show that Boermeester litigated in state
court the fairness of USC's disciplinary process, the validity of
Boermeester's suspension and expulsion, whether substantial evidence
supported USC's determination that Boermeester violated its policy
against intimate partner violence, and whether there was bias and
state action. Issue preclusion bars him from relitigating those issues in
federal court. *See White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir.
2012).

This Court may take judicial notice of briefs filed in state court.
*Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may
take judicial notice of undisputed matters of public record, including

documents on file in federal or state courts." (citation omitted)); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

November 3, 2025

**HORVITZ & LEVY LLP**
  JEREMY B. ROSEN
  SCOTT P. DIXLER
  LACEY L. ESTUDILLO
**PAZZANI & SANDHU LLP**
  KAREN J. PAZZANI
  JOSEPH V. MARRA, III
  PUNEET K. SANDHU

By: _____
  Lacey L. Estudillo

Attorneys for Defendants and Appellees
**UNIVERSITY OF SOUTHERN CALIFORNIA,**
**GRETCHEN DAHLINGER MEANS,**
**and AINSLEY CARRY**

## DECLARATION OF LACEY L. ESTUDILLO

I, Lacey L. Estudillo declare:

1.      I am counsel of record for Appellees the University of Southern California, Gretchen Dahlinger Means, and Dr. Ainsley Carry (collectively USC).

2.      Attached as Exhibit 1 to this Declaration is a true and correct copy of Boermeester's Appellant's Opening Brief filed in *Boermeester v. Carry*, 263 Cal.Rptr.3d 261 (2020), *rev'd,* 15 Cal.5th 72, (2023), Court of Appeal Case No. B290675.

3.      Attached as Exhibit 2 is a true and correct copy of USC's Respondent's Brief, filed in *Boermeester*, 263 Cal.Rptr.3d 261, Court of Appeal Case No. B290675.

4.      Attached as Exhibit 3 is a true and correct copy of Boermeester's Reply Brief, filed in *Boermeester*, 263 Cal.Rptr.3d 261, Court of Appeal Case No. B290675.

5.      Attached as Exhibit 4 is a true and correct copy of USC's Opening Brief on the Merits, filed in *Boermeester v. Carry*, 15 Cal.5th 72 (2023), Case No. S263180.

6. Attached as Exhibit 5 is a true and correct copy of Boermeester's Answer Brief on the Merits, filed in *Boermeester*, 15 Cal.5th 72, Case No. S263180.

7. Attached as Exhibit 6 is a true and correct copy of USC's Reply Brief on the Merits, filed in *Boermeester*, 15 Cal.5th 72, Case No. S263180.

8. Attached as Exhibit 7 is a true and correct copy of USC's Supplemental Brief, filed in *Boermeester v. Carry*, 100 Cal.App.5th 383 (2024), Case No. B290675.

9. Attached as Exhibit 8 is a true and correct copy of Boermeester's Appellant's Opening Supplemental Brief on Remand Issues, filed in *Boermeester*, 100 Cal.App.5th 383, Case No. B290675.

10. Attached as Exhibit 9 is a true and correct copy of Boermeester's Appellant's Supplemental Responding Brief, filed in *Boermeester*, 100 Cal.App.5th 383, Case No. B290675.

11. Attached as Exhibit 10 is a true and correct copy of USC's Supplemental Responding Brief, filed in *Boermeester*, 100 Cal.App.5th 383, Case No. B290675.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was executed on November 3, 2025.

_____

Lacey L. Estudillo

# EXHIBIT 1

*In the*

# Court of Appeal

*of the*

# State of California

### SECOND APPELLATE DISTRICT
### DIVISION EIGHT

---

**B290675**

MATTHEW BOERMEESTER,
*Plaintiff and Appellant,*

v.

AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA,
*Defendants and Respondents.*

---

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY
HONORABLE AMY D. HOGUE · CASE NO. BS170473

## APPELLANT'S OPENING BRIEF

*Mark M. Hathaway, Esq. (151332)
Jenna E. Parker, Esq. (303560)
HATHAWAY PARKER
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
(213) 529-9000 Telephone
(213) 529-0783 Facsimile
mark@hathawayparker.com
jenna@hathawayparker.com

*Attorneys for Plaintiff and Appellant,
Matthew Boermeester*

 

# Court of Appeal

*of the*

# State of California

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Court of Appeal Case No.: B290675

Case Name: Matthew Boermeester v. Ainsley Carry et al.

☑ There are no interested entities or parties to list in this Certificate per California Rules of Court,

☐ Interested entities or parties are listed below:

| Name of Interested Entity or Person | Nature of Interest |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

/s/ Mark M. Hathaway
Signature of Attorney/Party Submitting Form

Mark M. Hathaway
Printed Name

HATHAWAY PARKER
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
Address

Party Represented: Matthew Boermeester (Appellant)
State Bar No.: 151332

2

002

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ 6

I.  INTRODUCTION .......................................................... 8

II.  STATEMENT OF APPEALABILITY ......................................... 10

III.  STATEMENT OF THE CASE AND FACTS ............................ 10

    A.  USC'S MISCONDUCT PROCEDURES ............................... 10

        1.  General Principles .................................................. 11

        2.  Procedures for Investigating Title IX Reports ............... 13

            a.  Intake ................................................... 13

            b.  Title IX Investigator Investigates ................. 13

            c.  The Parties May View, Not Possess, Evidence .......... 14

            d.  Title IX Investigator and Coordinator Hold an Evidence Hearing .......................................... 14

            e.  The Title IX Investigator Makes Factual Findings and Determines Responsibility ........................... 15

            f.  Sanctions Are Imposed by Anonymous Misconduct Sanctioning Panel ............................................ 15

            g.  Appeal to the Anonymous Appellate Panel .............. 16

            h.  Vice President for Student Affairs Accepts or Modifies Appellate Panel's Decision ..................... 16

    B.  USC'S TITLE IX PROCEEDINGS ............................... 17

        1.  First-Hand Reports and Video Evidence Indicate Non-Violent "Horseplay" on January 21, 2017 ........................ 17

        2.  Second and Third-Hand Accounts of What Supposedly Transpired on January 21, 2017. ........................ 18

        3.  Inaccurate Initial Report to USC's Title IX Office Spawns a Formal Investigation ........................ 19

        4.  Ms. Katz Is Forced to Attend a Meeting with Title IX but Is Not Told the Meeting Is an "Intake" ........................ 20

        5.  Ms. Katz Requests for the Title IX Office to Cease Their Investigation ........................ 24

3

6.  USC's Title IX Office Makes Additional Unfounded Allegations Against Mr. Boermeester .............................. 27

7.  USC Continues Its Aggressive Prosecution of Mr. Boermeester Over Ms. Katz's Objections. ....................... 28

8.  The Parties May View but Not Possess Copies of the Evidence During "Evidence Review" .............................. 29

9.  Witness MB2 Claims He Lied to the Investigator ........... 30

10. Mr. Boermeester and Ms. Katz Submit Written Responses ................................................................. 31

11. The Title IX Investigator Finds Mr. Boermeester Responsible and An Anonymous Sanctioning Panel Assigns the Sanction of Expulsion .................................... 31

12. Mr. Boermeester and Ms. Katz Appeal the Title IX Findings and Sanction to No Avail ................................... 32

13. Mr. Boermeester Petitions for Writ of Mandamus ......... 34

IV.  STANDARD OF REVIEW ........................................... 35

V.   ARGUMENT ........................................................... 37

  A.  USC FAILED TO PROVIDE A FAIR PROCESS ................. 37

    1.  Legal Standard for Fairness ................................. 37

    2.  USC Did Not Provide Proper Notice ......................... 38

    3.  Four-Month Suspension of a University Student Without Evidence or a Hearing Is Patently Unfair ....................... 40

    4.  USC's Single Investigator Adjudication Denied Mr. Boermeester and Ms. Katz a Fair Process ....................... 42

      a.  The Stakes Warrant a Fair Process ............... 43

      b.  The Findings Turned on Credibility, Requiring a Live Evidentiary Hearing and Cross-Examination of Witnesses before Impartial Adjudicators .................. 45

      c.  USC's Process Does Not Comport With Allee .......... 46

    5.  Failure to Hold a Live Evidentiary Hearing Yielded a False, Misleading Record .................................... 47

4

6.    Limited Appellate Review Compounded Investigation Issues ................................................................. 48

7.    Mr. Boermeester Was Denied a Fair Hearing in Every Sense of the Word ................................................ 50

    a.    USC's Title IX Office Unfairly Prosecuted Mr. Boermeester ................................................ 50

    b.    Investigator's Opinion Not Supported by Evidence, in Light of All Evidence in the Record ....................... 52

B.    FINDINGS ARE NOT SUPPORTED BY EVIDENCE ........ 56

1.    USC's Administrative Decision Substantially Affects a Vested Fundamental Right, Implicating De Novo Review. ................................................................. 56

    a.    Legal Standard Concerning Vested Fundamental Right. ................................................................. 57

    b.    USC's Determination Substantially Affects a Vested Fundamental Right ....................................... 58

2.    USC's Findings Are Not Supported Even by Substantial Evidence ................................................................. 61

VI.    CONCLUSION ................................................................. 63

CERTIFICATE OF WORD COUNT .................................................... 64

CERTIFICATE OF SERVICE ................................................................. 65

# TABLE OF AUTHORITIES

**Cases**

*Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392 .......58

*Bixby v. Pierno* (1971) 4 Cal.3d 130........................................36, 57, 58, 61

*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152..................35

*Doe v. Allee* (2019) 30 Cal.App.5th 1036 ..........................................*passim*

*Doe v. Baum* (6th Cir. 2018) 903 F.3d 575 ...............................................59

*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055 ..........37

*Doe v. Regents of University of California*

    (2016) 5 Cal.App.5th 1055...................................................37, 38, 43, 50

*Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44.....37

*Doe v. The Rector and Visitors of George Mason University*

    (2016) 149 F.Supp.3d 602 ................................................................59, 60

*Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393 .................59

*Doe v. University of Southern California*

    (2016) 246 Cal.App.4th 221 ..........................................................*passim*

*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212...35

*Fukuda v. City of Angels* (1999) 20 Cal. 4th 805 .....................................57

*Furey v. Temple University* (E.D. Pa. 2012) 884 F.Supp.2d 223 ............58

*Goldberg v. Regents of University of California*

    (1967) 248 Cal.App.2d 867............................................................38, 58

*Goss v. Lopez* (1975) 419 U.S. 565 ..........................................37, 38, 41, 60

*Gregory v. State Board of Control* (1999) 73 Cal.App.4th 584 ...............61

*Interstate Brands v. Unemployment Ins. Appeals Bd.*

    (1980) 26 Cal.3d 770................................................................................57

6

*JKH Enterprises, Inc. v. Dep't of Indus. Relations*

    (2006) 142 Cal.App.4th 1046 ........................................................56, 61

*Nasha L.L.C. v. City of Los Angeles* (2004) 125 Cal.App.4th 470 ...........36

*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434 ...........36, 38, 39

*Sciolino v. City of Newport News, Va.*

    (4th Cir. 2007) 480 F.3d 642 ........................................................59, 60

*Singh v. Davi* (2012) 211 Cal.App.4th 141 ..............................................36

*Telish v. California State Personnel Board*

    (2015) 234 Cal.App.4th 1479 ............................................................10

*Wisconsin v. Constantineau* (1971) 400 U.S. 433 ....................................59

**Statutes**

Code Civ. Proc. § 1094.5 ............................................................35, 36, 56

7

## I.    INTRODUCTION

On January 2, 2017, Petitioner and Appellant, Matthew Boermeester, now 24, was a senior, full-scholarship athlete at the University of Southern California ("USC") who kicked the game-winning 46-yard field goal in the final second of the 2017 Rose Bowl to give USC a 52-49 victory over Penn State.  Mr. Boermeester was on track to graduate in May 2017 and was planning to attend USC to obtain his master's degree while continuing to play USC football during the Fall 2017 semester, his final year of eligibility to play college football.  Mr. Boermeester's dream was to secure a position as a kicker in the NFL.

Those dreams were dashed when on January 26, 2017, USC ordered Mr. Boermeester escorted off campus by security and banned him from campus, classes, and the USC football team indefinitely, without notice or a hearing, due to an incident of "intimate partner violence" allegedly committed against his girlfriend, Zoe Katz,[1] a nationally ranked tennis champion and captain of the USC women's tennis team.  Throughout USC's Title IX proceedings, and to this day, Ms. Katz has vocally and ardently denied that any intimate partner violence occurred.  In a public statement made after USC's Title IX proceedings ended, Ms. Katz expressed, "I feel I was misled, harassed, threatened and

---

[1] Zoe Katz is identified by the pseudonym "Jane Roe" in the trial court briefs and Administrative Record produced by Respondents. Ms. Katz has made public statements in support of Mr. Boermeester and filed declarations in her true name in the below proceedings, therefore, Mr. Boermeester refers to Ms. Katz by her true name.

discriminated against by the Title IX office to such an extent that I had to retain my own attorney during the process to protect myself and to try to get them to listen to me. The Title IX office's response was dismissive and demeaning, 'We are sorry you feel that way.'" (CT616-617.)

This case, specifically mentioned by U.S. Secretary of Education Betsy DeVos as a shining example of the national "failed system" of Title IX sexual misconduct enforcement (CT657), comes before the Court on the heels of a rash of Appellate decisions against USC and its Title IX Officers who exercise questionable discretion in investigating and adjudicating complaints of sexual misconduct.

In USC's process, there is no live evidentiary hearing where witnesses testify before impartial adjudicators to allow them to evaluate credibility and make reasoned conclusions based on all available information and testimony. Instead, USC's Title IX investigator interviewed all witnesses, many by phone, in private and without any verbatim record of the conversations, and made all factual findings, credibility determinations, and conclusions of responsibility. The investigation was overseen by Title IX Coordinator Gretchen Dahlinger Means,[2] and the only review of the

---

[2] Ms. Means is a former sex-crimes prosecutor for the San Diego District Attorney's Office and the U.S. Marine Corps. In a similar mandamus action against USC, decided in the student's favor in the trial court, Ms. Means referred to the accused male student and his advisor as "motherfuckers" while describing the female student as "cute" "intelligent" and "a catch." The trial court in that case found such statements to "amply demonstrate an unacceptable probability

Title IX Office's actions was through a limited appeal to an anonymous Appellate Panel that met in secret.

This Court has recognized that the result of unfair university Title IX proceedings is that everyone loses. This could not be more true than in the present case, where both Ms. Katz and Mr. Boermeester have sustained immeasurable loss as a result of USC's despicably unfair process.

## II.    STATEMENT OF APPEALABILITY

This appeal is from a judgment of the Los Angeles County Superior Court denying a petition for writ of mandate and is authorized by the Code of Civil Procedure, section 904.1, subdivision (a)(1). (See *Telish v. California State Personnel Board* (2015) 234 Cal.App.4th 1479, 1482 fn. 1 ["The judgment denying the petition for writ of mandate is appealable"].)

## III.    STATEMENT OF THE CASE AND FACTS

## A.    USC'S MISCONDUCT PROCEDURES

Universities are required by Title IX to adopt and publish policies against sex discrimination and procedures for providing prompt and equitable resolution of complaints of sex discrimination. (CT70.) During the relevant time period, USC adopted and published the Student Misconduct – Sexual Interpersonal and Protected Class Misconduct policy ("Policy") to adjudicate misconduct allegations. (AR478-496.)

---

of actual bias" against the male student. (*John Doe v. Carry, et al.,* LASC Case no. BS163736, decision at CT903-904.)

## 1. General Principles

Under the Policy, an individual may report misconduct to local law enforcement, USC's Department of Public Safety ("DPS") or the Title IX Office through USC's Title IX Coordinator, Gretchen Dahlinger Means. (AR481-482.) Reporting misconduct typically initiates an investigation, however, a Reporting Party may request that the Title IX Office not investigate the incident. (AR482.) Only in "limited circumstances" will the Title IX Office be "required to investigate an incident of sexual misconduct against the choice of the Reporting Party; for example, when an incident involves a weapon or predatory drug use, when multiple victims are involved, or when there is a danger to the greater community." (*Id*.)

If a "Responsible Employee" learns of prohibited conduct, the employee must immediately report all known information about suspected misconduct to the Title IX Office or face termination. (AR483.)

A Title IX investigation is a "neutral, fact-finding process. Reports are presumed to be made in good faith. Further, Respondents are presumed not responsible." (AR487.) The presumption of non-responsibility is overcome only when a preponderance of evidence establishes that the Respondent committed the prohibited conduct. (*Id*.)

Rules of evidence and discovery do not apply to USC's Title IX investigatory process, and the investigator must consider all "information that is relevant, material, and temporally proximate to the conduct at issue." (AR488.) The Title IX Coordinator has authority to exclude information that is "not relevant or is not

11

considered credible or reliable in the investigatory process." (*Id*.) Character evidence is not admissible. (*Id*.)

During the adjudication process, the Reporting Party and Respondent are each guaranteed procedural protections, including equal treatment and "[a] fair, thorough, reliable, neutral and impartial investigation by a trained and experienced investigator." (AR488-489.)

The status of a Respondent is typically not altered during USC's Title IX proceedings; however, "In some cases, interim protective measures may be imposed when there is information that the student or student organization poses a substantial threat: (i) to the safety or well-being of anyone in the university community; (ii) to the property within the university community; or (iii) of disruption or interference with normal university life or functions." (*Id*.) If an interim measure is imposed, the Respondent will have "an opportunity for review of the measure" by the Vice President for Student Affairs, or designee. (AR490.) The imposition of an interim measure "does not relieve the student from financial obligations to the university." (*Id*.) During a suspension period, a student may not complete academic work at another institution for consideration towards a USC degree. (AR494.)

Misconduct investigations and review by the Misconduct Sanctioning Panel should be completed within 60 calendar days, though investigations may be extended for "good cause." (AR491.)

## 2. Procedures for Investigating Title IX Reports

### a. Intake

After receiving a report of prohibited conduct, the Title IX Office contacts the Reporting Party[3] to explain their rights. (AR491.) The Reporting Party may make an appointment to meet with the Title IX Office for an "intake" interview, during which the Title IX Coordinator or investigator gather information and assess the need for interim action. (*Id*.) If the Reporting Party requests not to proceed with an investigation, the Title IX Coordinator "will determine the appropriate manner of resolution," consistent with the Reporting Party's request and the health and safety of the university community. (*Id*.) The Reporting Party is not required to participate in the investigation or subsequent action taken by USC. (*Id*.) The Title IX Coordinator has ultimate authority to decide whether, how, and to what extent the university will investigate. (AR492.)

### b. Title IX Investigator Investigates

The Title IX Coordinator oversees all prohibited conduct reports and investigations. (*Id*.) If the university proceeds to a formal investigation, the Reporting Party and Respondent are each notified of the investigation and the charged policy violations. (*Id*.)

---

[3] Regardless of who reports the prohibited conduct, "[T]he individual who is reported to have experienced prohibited conduct is referred to as the Reporting Party. The Respondent is the individual who is reported to have committed the prohibited conduct." Ms. Katz was referred to as the "Reporting Party," even though she did not report the alleged prohibited conduct and made no complaint.

13

During the fact-gathering phase, the Title IX investigator meets separately with the Reporting Party, Respondent, and witnesses to discover "all information related to the alleged prohibited conduct." (*Id*.)

### c. The Parties May View, Not Possess, Evidence

At the conclusion of the investigation, the Reporting Party and Respondent separately and individually review the information collected during an "Evidence Review" held at the Title IX Office, where students may view the investigator's summaries of witness interviews and other evidence collected. (*Id*.) The parties are not provided physical copies of any evidence but may take notes using a pen/pencil and paper. (*Id*.) The Title IX Coordinator may exclude evidence from review, which will not be considered in making findings of fact or determining responsibility. (AR493.)

### d. Title IX Investigator and Coordinator Hold an Evidence Hearing

After the parties review the evidence, they are given an opportunity to respond at an "Evidence Hearing." (*Id*.) During the Evidence Hearing, the Reporting Party and the Respondent meet individually and separately at the Title IX Office with the Title IX Coordinator and Title IX investigator to respond orally or by written submission to the evidence collected during the investigation and viewed during Evidence Review. (*Id*.) Either party may submit questions for the Title IX Coordinator to ask of the other party during his/her Evidence Hearing, and responses "may be used in the findings of fact and responsibility." (*Id*.) If "new information" is shared by either party during the Evidence Hearing process, the

14

opposing party may respond. (*Id.*) The Evidence Hearing is not audio recorded, and there is no verbatim record or transcript of the Evidence Hearing. "[R]esponsive commentary or emotion" is not considered "new information." (*Id.*)

### e. The Title IX Investigator Makes Factual Findings and Determines Responsibility

At the conclusion of the Evidence Hearing process, the Title IX Office prepares a Summary Administrative Review ("SAR"), "a report that analyzes the information collected and makes findings of fact and policy violation." (AR493.) The investigator reviews all evidence and determines "what information is relevant and material to the incident," omitting information the investigator deems irrelevant, more prejudicial than probative, or immaterial to the analysis. (*Id.*) **The Title IX investigator makes all findings of fact.** (*Id.*) In consultation with the Title IX Coordinator, **the investigator also determines whether the Respondent violated the policy based on the factual findings**. (*Id.*)

### f. Sanctions Are Imposed by Anonymous Misconduct Sanctioning Panel

The SAR is provided to the Respondent and Reporting Party and forwarded to the Misconduct Sanctioning Panel. (*Id.*) The Misconduct Sanctioning Panel is composed of three anonymous individuals designated by the Provost and Senior Vice President for Academic Affairs and trained by the Title IX Coordinator. (*Id.*) The Title IX Coordinator is present during the sanctions deliberation but does not have a vote in determining sanctions. (*Id.*) The Misconduct Sanctioning Panel determines appropriate sanctions based on the Title IX investigator's factual findings and conclusions of policy

15

violations without reassessing or re-evaluating the evidence. (AR494.)  If expulsion is imposed, a permanent notation appears on the student's transcript, and the student's enrollment is immediately canceled by the university, resulting in marks of "W" in any class in which the Respondent was enrolled.  (*Id.*)

### g.  Appeal to the Anonymous Appellate Panel

The parties may appeal in writing for review by the Appellate Panel, composed of three anonymous individuals appointed by the Vice President for Student Affairs.  (*Id.*)  The Appellate Panel is trained by the Title IX Coordinator and advised by a Title IX Appellate Coordinator, who is designated by the Vice President for Student Affairs.  (*Id.*)  The Appellate Panel is "responsible for reviewing the appeal and making a recommendation to the Vice President for Student Affairs."  (*Id.*)  The appeal is "not a full rehearing of the facts or findings," and the Appellate Panel is instructed to "defer to the Title IX Office and the Misconduct Sanctioning Panel."  (*Id.*)

Appeals may be brought on four limited grounds, but the "Appellate Panel members may not substitute their judgment for that of the Title IX Office."  (AR495.)  The appeal is purely documentary.  (AR494.)  The opposing party is given an opportunity to respond in writing to the submitting party's appeal.  (AR495.)

### h.  Vice President for Student Affairs Accepts or Modifies Appellate Panel's Decision

Once the Appellate Panel reaches a decision, the Title IX Appellate Coordinator informs the Vice President for Student Affairs of the recommendations, and the Vice President for Student

16

Affairs accepts or modifies the recommendations and sanctions on a discretionary basis. (AR496.) The decision is final and binding on all parties. (*Id.*)

## B. USC'S TITLE IX PROCEEDINGS

### 1. First-Hand Reports and Video Evidence Indicate Non-Violent "Horseplay" on January 21, 2017

The Title IX administrative proceeding at USC involves an interaction between Mr. Boermeester and Ms. Katz that occurred in an alley behind Ms. Katz's off-campus duplex apartment on January 21, 2017. (AR1.) Mr. Boermeester explained that he and Ms. Katz were "playing around" in the alley around 1:00 a.m. while Ms. Katz's dog ran around. (AR171.) At one point, Mr. Boermeester jokingly put his hand on Ms. Katz's neck as they were "laughing and messing around," but he was not rough with Ms. Katz, he did not choke Ms. Katz or hit her head against a wall, and he and Ms. Katz were not arguing. (AR172-173; AR192.) Mr. Boermeester acknowledged, "I understand the seriousness of domestic violence, but this is NOT." (AR174.)

Ms. Katz agreed that Mr. Boermeester "has never hit, choked, kicked, pushed, or otherwise physically abused [her], and he did not do so on January 21, 2017." (AR192.) Ms. Katz further attested, "No one was mad at all that night. We were laughing and messing around with each other. The Title IX office jumped to wrong and unsupported conclusions and now implies that Respondent's behavior must be because he was mad at something. That is not what happened. As was evidenced by my statements that night, the fact that we spent the entire weekend together, and my clear

17

explanation of what transpired, I was never physically abused." (*Id*.)

A three-minute and 53-second surveillance video recovered by DPS from January 21, 2017 and produced to USC's Title IX Office on January 27, 2017 shows Mr. Boermeester and Ms. Katz in the alley talking, embracing, kissing, and playing with Ms. Katz's dog. (AR74; AR190.)  USC's Title IX investigator's own description of the footage confirms that the video does not depict any hitting, choking, punching, or other physical violence.  (AR44-45.)

### 2. Second and Third-Hand Accounts of What Supposedly Transpired on January 21, 2017.

According to the SAR, DH[4] briefly observed the interaction and reported the following:

> **DH saw Respondent and Reporting Party standing by the wall for about 3 seconds**. Reporting Party's dog was running around the street. That was when DH realized there was an "issue" because Reporting Party does not allow her dog to run freely. **Respondent had Reporting Party pinned against the wall with his hand around her chest/neck.** Reporting Party was trying to talk to Respondent. Respondent was holding her against the wall. DH woke TS and said "[Ms. Katz] and [Mr. Boermeester] are fighting." DH put on some clothes and ran outside.
> (AR39-40; AR95-96, emphasis added.)

Witness TS, who admittedly "never liked" Mr. Boermeester and "felt like he was hiding something," erroneously reported to USC's Title IX Office that DH had said, "We gotta go downstairs,

---

[4] In the Administrative Record ("AR") produced by Respondents, witnesses are identified only by their initials.

18

**[Mr. Boermeester] is hitting [Ms. Katz]**." (AR34; see AR124-126, emphasis added.) TS also inaccurately reported, "DH walked to the window and saw MB with his hand against Ms. Katz's throat **pushing her into the cinder block wall multiple times. Her head made contact with the wall**." (AR125, emphasis added.) In fact, DH reported that he "did not see Ms. Katz (or hear) the contact of her hitting the wall." (AR95.)

Believing that Mr. Boermeester and Ms. Katz had been "fighting," DH and TS stopped Ms. Katz before she entered her apartment duplex. (*Id*.) According to DH, he and TS tried to persuade Ms. Katz to sleep in their room, but she declined. (*Id*.) DH recalled, "He expected Ms. Katz to be bawling and freaking out but she wasn't," and when they asked her what happened, Ms. Katz said, "It's fine." (*Id*.)

In a declaration filed in the trial court, Ms. Katz explained, "DH and TS did not bring me back to their apartment I voluntarily went into their apartment while I was on my way to my apartment because they are my friends and I wanted to say, "Hi." I was not scared, worried, distressed, crying, or fearful of Matt Boermeester." (CT1070.)

### 3. Inaccurate Initial Report to USC's Title IX Office Spawns a Formal Investigation

Later that morning, witness TS recounted what he thought DH had seen to his father, USC's men's tennis coach Peter Smith, a "Responsible Employee," and Coach Smith reported by email to USC's Title IX Coordinator, Gretchen Dahlinger Means, what he understood TS thought DH had seen: "DH heard **loud banging**

19

**against the wall they shared** last night and got out of bed and went down to the women's side of the duplex where he encountered Zoe Katz.  **Ms. Katz said that her boyfriend was beating her up and throwing her against the wall and choking her**."  (AR477, emphasis added.)

DH had not seen or heard any of the interactions Coach Smith described, nor had Ms. Katz told DH any of these things.  (AR95.)  Peter Smith's report that triggered the Title IX investigation is so amiss, he described Ms. Katz and Mr. Boermeester as being *inside* the duplex on the other side of "the wall they shared," not outside in the alley.  (AR477.)

Days later, when Peter Smith realized the interaction had occurred outside in the alley, he corrected and embellished his account by reporting to the Title IX investigator (by phone), "DH heard loud banging outside their place. It woke them up. 'This is incredible because they are the farthest bedroom.' DH woke up and went down. '**He saw Matt Boermeester throwing her against the wall, pushing her hard, hard enough to wake them up. He at one point grabbed her by the throat with his hand and had her pinned against the wall with his hand in a chokehold**."  (AR140, emphasis added.)

### 4. Ms. Katz Is Forced to Attend a Meeting with Title IX but Is Not Told the Meeting Is an "Intake"

On January 21, 2017, Dr. Nohelani Lawrence, a USC staff psychologist known by Ms. Katz as a counselor for athletes at USC, called Ms. Katz to ask if she was alright.  (CT579.)  Ms. Katz "told her the truth, that I was fine and that I did not need anything."  (*Id.*)

20

On January 22, 2017, Title IX Coordinator Gretchen Dahlinger Means contacted DH and TS by phone "to confirm the report by Coach Smith." (AR1.) Ms. Means also contacted Dr. Robin Scholefield, Associate Director of Sports Psychology at USC, and Richard Gallien, USC's women's tennis coach, the team Ms. Katz captained, "[T]o ascertain the safety and wellbeing" of Ms. Katz. (*Id.*; CT578.) There is no record of what Ms. Means discussed with any of these witnesses.

On January 23, 2017, Coach Gallien informed Ms. Katz that it was mandatory for her to attend a meeting with the Title IX Office. (CT579.) Title IX Coordinator Gretchen Dahlinger Means, Title IX investigator Lauren Elan Helsper, and Dr. Lawrence were present at the meeting. (*Id.*) At the outset, Ms. Means indicated she had heard about an incident reported by Ms. Katz's neighbor, and that Ms. Means, Ms. Helsper, and Dr. Lawrence wanted to inquire if Ms. Katz needed any counseling or support. (*Id.*) No one told Ms. Katz what Peter Smith had reported, nor that USC viewed the meeting as an "intake" interview for a report of prohibited conduct against Mr. Boermeester. (CT579; AR183.) As Ms. Katz explained, "I didn't understand the purpose of the meeting or why I was there. Based on things they said and did, I believed that our discussion was like a counseling session where I was free to vent about my relationship or blow off steam." (AR67.)

During the meeting, Ms. Katz is alleged to have told USC's Title IX Coordinator and investigator that Mr. Boermeester grabbed her by the neck and pushed her against a concrete wall, causing her to hit her head, that he "hits her," and that "[s]he often has bruises

21

on her legs or arms because 'he is always doing something.'"
(AR184.)  Ms. Katz was never asked to confirm the accuracy of the
non-verbatim, summarized notes taken by the investigator during
her meeting.  (CT1071.)  Ms. Katz later vigorously disputed the
misinformation reflected in the non-verbatim notes of her interview:

> I never told the investigator that Respondent hit my head
> against a wall.  He did not.  I stated several times
> throughout the course of this investigation that
> Respondent and I were mutually rough housing and
> messing around. (Findings, p. 51).  That is the truth.  I
> also have never told the Title IX office that he hurts me
> when he is mad.
> (AR192.)

In later sworn declarations in the trial court, Ms. Katz refuted
the Title IX investigator's summary of the meeting and recounted
details that were not included in the Title IX investigator's non-
verbatim notes, including:

> When I denied being hurt or harmed, Ms. Gretchen
> Means asked if she could check for herself to see if I had
> any bruises or injuries. I said, 'Yes.' Ms. Means then
> checked me herself, moving my hair and checking my
> head, and checking my arms and legs, and she found
> nothing.

> During the meeting Gretchen Means, as well as Ms.
> Helsper and Dr. Lawrence, made numerous statements
> to the effect of, 'If you love Matt, you will tell us what
> really happened.' And 'This is in his best interest. This
> will benefit Matt.' 'It is better that he gets in trouble now
> instead of later in his life.' I now believe that they were
> making these statements to manipulate me to say things
> that they wanted to hear, but which were not true. I kept
> making it clear to them that I was not a complainant, and
> that I was not abused in any way.

22

(CT580.)

Regarding representations Ms. Katz supposedly made about other physical and verbal harm allegedly inflicted by Mr. Boermeester, Ms. Katz further attested,

> Any occasions where I described Matt Boermeester poking, kicking, shaking, or punching me were taken out of context and embellished by the Title IX investigator. Matt Boermeester has never behaved violently toward me. We are athletes and physically active people, and the roughhousing, horseplay, and play-wrestling we have engaged in is always in good fun and has never become violent, harmful, dangerous, or in any way injurious. (CT1071.)

According to investigator Helsper, during the meeting, Ms. Katz requested an Avoidance of Contact order ("AOC"). (AR1.) Ms. Katz refuted this in a sworn declaration: "I did not ask for a no contact order from Matthew Boermeester and I told the Title IX personnel that I did not want a no contact order. During the meeting, Ms. Means said that some panel would meet and decide later whether there would be a no contact order, which USC later issued on its own." (CT580.)

Ms. Katz explained that she did not understand the Title IX process and felt "pushed" into accepting other protective measures against Mr. Boermeester by the "extremely aggressive" Title IX Office. (AR168; AR193.) For instance, Gretchen Dahlinger Means insisted that Ms. Katz accept "emergency housing" at the Radisson Hotel, paid for by USC, where Ms. Means assured Ms. Katz that she "could call friends, have a slumber party, take a break, or just

23

relax."[5] (CT581; CT1071.) Ms. Katz repeatedly expressed to the Title IX Office that she did not want an investigation against Mr. Boermeester or an AOC. (CT1070.) Over Ms. Katz's protests, Ms. Means "explained that we have to investigate what happened on Friday even without her because of the witnesses and the neighbor." (AR188; see also AR1; CT1070.)

### 5. Ms. Katz Requests for the Title IX Office to Cease Their Investigation

On January 24, 2017, Ms. Katz contacted the Title IX Coordinator and investigator and asked to withdraw her purported "statement." (AR3.) The investigator's SAR indicates that the request was made "in fear of retaliation"; however, the Title IX Office provided no notes or record of their conversation with Ms. Katz on January 24, 2017. (*Id*.) In her later appeal, Ms. Katz clarified, "[T]he investigator's statements from me on January 24, 2017 are simply wrong. The report states that I wanted to withdraw my statement in fear of retaliation. (Summary of Administrative Report, p. 3). This is incorrect. I was not and never have been scared of retaliation from Respondent." (AR192.)

On January 26, 2017, Ms. Katz contacted the investigator by text message saying, "Hi Lauren I just got to the airport and pretty freaked out about today. I know I've said this a lot but I really can't emphasis [sic] enough that you guys please make it clear that I did not bring this forward that I want nothing to do with it and I'm not

---

[5] Ms. Katz stayed for one night in the Radisson Hotel by herself, after being persuaded to do so by her coach but left when she realized she was not obligated to stay. (CT581.)

24

pressing any charges." (*Id*.) Ms. Katz explained, "In text messages, I asked Lauren Elan Helsper not to blame the Title IX Office's decision to pursue an investigation on me. I wanted nothing to do with Title IX and I eventually had to get my own attorney, Ms. Shawn Holley, to protect me from the Title IX office and to enforce my rights." (CT1071-1072.)

Later that day, the Title IX Coordinator notified Mr. Boermeester that a Title IX investigation was underway into an allegation of Intimate Partner Violence,[6] "specifically, grabbing Zoe Katz by the neck, and pushing her head into a cinder block wall multiple times on/or about January 21, 2017." (AR470.)

Subsequently, Lynette S. Merriman, Assistant Vice Provost for Student Affairs, notified Mr. Boermeester that he was suspended immediately and indefinitely, that he was "not to return to any part of premise of the University of Southern California," that he was "excluded from all classes, seminars and programs," that he was not permitted involvement in football or any other University sponsored activities, and that he was not allowed to have any contact with his girlfriend, Ms. Katz. (AR472-473.) When Ms. Katz asked for the AOC to be lifted, USC's Title IX investigator accused Ms. Katz "of engaging in witness tampering, malicious dissuasion, and

---

[6] "Intimate Partner Violence" is defined under section VI.E of USC's Policy as, "[V]iolence committed against a person who is a spouse or former spouse, a cohabitant or former cohabitant, a person with whom they have a child, or with whom they have a previous or current dating, romantic, intimate, or sexual relationship. Violence means causing physical harm to the person or to their possessions. (AR486.)

retaliation," which the investigator threatened, "may ultimately affect her credibility." (AR14; AR168-169.)

On January 30, 2017, Ms. Katz requested a meeting with Title IX investigator Helsper to express that she felt "blindsided" and had been "bullied" and "manipulated" at the initial meeting. (AR4; AR168-169.) The investigator informed Ms. Katz that the Title IX Office had obtained video footage from January 21, 2017. (AR169.) Ms. Katz offered to provide commentary on the video footage as her official statement, but the investigator responded that being permitted to review the footage during the investigation "would be a 'privilege' as it is usually not seen until Ev[idence] Review." (*Id.*) Investigator Helsper also commented that Ms. Katz was probably "too emotionally sensitive and overwhelmed" to watch the video footage. (CT1072.)

At another meeting not documented by the Title IX Office, Ms. Katz insisted and appeared eager to watch the video footage, so Gretchen Dahlinger Means made an excuse as to why she could not watch it, accused Ms. Katz of harassing witnesses, and threatened to open an investigation on Ms. Katz. (CT1000; CT1072.) The Title IX Office did not show Ms. Katz or Mr. Boermeester the video footage during the investigation.

On January 30, 2017, Mr. Boermeester met investigator Helsper with his mother and recounted the events of January 21, 2017. (AR171.) Mr. Boermeester agreed that he had placed his hand on Ms. Katz's neck but explained that he and Ms. Katz were "'horsing around.' There was zero animosity." (AR179-181.) Mr. Boermeester expressed, "There was no chance of me causing

26

physical harm. If I did Zoe would be going against me and not with me." (*Id*.) Mr. Boermeester also reported that he and Ms. Katz had spent the next three nights together after January 21, 2017. (AR172.) Mr. Boermeester suggested two witnesses to be interviewed, BE and LE, but neither were interviewed during the investigation. (AR177.)

After the interview, Mr. Boermeester made a request to Respondent Ainsley Carry, Assistant Vice Provost for Student Affairs, to lift or modify the indefinite suspension. (AR443-444.) The suspension prohibited him from entering "any part of premise of the University of Southern California," precluding rehabilitative treatment he was receiving for a recent knee surgery at the McKay Center. (AR443.) Mr. Boermeester also needed to attend his remaining classes to graduate in May 2017. (AR443; CT383.) A delay in conferral of his degree would derail his plans of pursuing a master's degree and continuing to play football at USC in hopes of pursuing a professional NFL career. (AR443; CT401-402.)

The next day, on January 31, 2017, Dr. Carry responded: "I have reviewed your case. It is my conclusion that the interim suspension and avoidance of contact are both upheld." (AR442.) Mr. Boermeester was prohibited from having any contact with Ms. Katz, even to send her flowers on her senior day. (AR271.)

### 6. USC's Title IX Office Makes Additional Unfounded Allegations Against Mr. Boermeester

On February 7, 2017, media outlets reported on Mr. Boermeester's suspension, removal from the USC football team, and USC's Title IX investigation. (AR5; AR14.) In response, Ms. Katz posted on her public Twitter account, "I am the one involved in the

investigation with Matt Boermeester. The report is false. @Deadspin @latimes @ReignofTroy." (AR5; AR14; AR56.)

On February 8, 2017, Ms. Katz was summoned to a meeting by the Title IX Office and interrogated about her motives for discussing the investigation on social media. (AR14; AR102-103.) Ms. Katz explained "I felt powerless throughout this whole thing. I was pissed that this was happening and that this was out of my control. So, I wanted to be able to say something coming from me." (AR102.) When asked whether she had been in contact with Mr. Boermeester since the issuance of the AOC, Ms. Katz stated, "I am not in danger or feel threatened by him at all." (*Id*.) Regardless, investigator Helsper indicated that the AOC would not be lifted throughout the investigation. (AR103.) After the meeting, investigator Helsper accused Ms. Katz of recording their conversation or having someone "listening in." (AR422.)

On February 14, 2017, investigator Helsper notified Mr. Boermeester that the Title IX Office was adding a second violation for "contacting and communicating with Zoe Katz via text, phone call, social media, and in-person since the issuance of the Avoidance of Contact Order." (AR5; AR414.) Mr. Boermeester insisted he had complied with the AOC by not initiating contact with Ms. Katz, as he was living in San Diego and had not returned to USC or Los Angeles since the imposition of the suspension. (AR17; AR89.)

### 7. USC Continues Its Aggressive Prosecution of Mr. Boermeester Over Ms. Katz's Objections.

Although DH, and to some degree MB2, were the only witnesses besides Mr. Boermeester and Ms. Katz who had observed

28

the January 21, 2017 interaction, USC's Title IX investigator, at times accompanied by USC's Title IX Coordinator, interviewed and re-interviewed 16 witnesses, including Mr. Boermeester's ex-girlfriend who had no connection or insight into the incident that occurred on January 21, 2017 and was not a USC student. (AR2-4.) Some interviews were conducted in person, though several took place by phone. (AR84-170.) None of the interviews were audio recorded, and there is no record of questions asked, how they were asked, or the verbatim responses. None of the witnesses were permitted to view the investigator's summary of their statement for accuracy.

Due to gossip, media reports, and the public nature of Mr. Boermeester's suspension, all of the witnesses interviewed were aware of the alleged violence and knew that Mr. Boermeester had been suspended for conduct that threatened the safety of the USC community. (See AR85-164.) Most of the witnesses believed Mr. Boermeester had already been found responsible for abusing Ms. Katz on January 21, 2017. As one witness put it to Ms. Katz, "He wouldn't get suspended over nothing, so they know something happened[.]" (AR27.)

### 8. The Parties May View but Not Possess Copies of the Evidence During "Evidence Review"

On March 8 and 10, 2017, Mr. Boermeester and Ms. Katz participated in their "Evidence Reviews," where they separately viewed the information gathered or prepared by the Title IX investigator, totaling over 100 pages of documentary evidence, plus video footage and an audio recording. (AR47; AR84-191; AR357-358.) Mr. Boermeester and Ms. Katz were permitted to take only

29

"a pencil/pen and notepad" into the room as they reviewed the evidence. (AR365; AR367.)

### 9. Witness MB2 Claims He Lied to the Investigator

On March 11, 2017 witness MB2 purportedly left a phone message for investigator Helsper, alleging that he "saw everything" that happened on January 21, 2017 "and wanted to share the truth and why he originally lied." (AR6; AR85; AR191.) MB2, who is seen at the end of the DPS video throwing away his trash, originally reported during his interview with investigator Helsper conducted by phone on February 3, 2017 that on January 21, 2017, he had gone outside to take out his trash and "heard two people bickering." (AR131.) MB2 reported that he "did not see anyone touch the other. They were just talking when they got down. . . . They seemed fine as they walked back." (*Id.*) The DPS video footage confirms what MB2 originally reported. (AR190 at 12:17:57 AM.)

MB2 was supposedly interviewed by Title IX investigator Helsper and Coordinator Means a second time, again by phone, on March 14, 2017. (AR85.) MB2 changed his earlier report to Title IX and instead reported that he heard "laughing and screaming sounds" in the alley and "saw a guy standing around Ms. Katz with both of his hands around her neck. He was pushing Ms. Katz against the wall and Ms. Katz was 'gagging.' MB2 stated that he was actually able to hear the 'gagging' sounds." (*Id.*) MB2 went on to speculate that Mr. Boermeester "has a history of violence" and "domestically was abusing" Ms. Katz. (*Id.*) No one from USC's Title IX Office ever met with MB2 in person to identify that it was, in fact, MB2 making the report, or to evaluate his credibility. Mr.

30

Boermeester and Ms. Katz were permitted to view the Title IX investigator's summary of MB2's second interview, but not to question MB2 about his revised account. (AR48; AR85-86; AR315-316.)

### 10. Mr. Boermeester and Ms. Katz Submit Written Responses

On March 22, 2017, Mr. Boermeester and Ms. Katz each submitted written responses to the evidence. (AR3; AR59-69.) Mr. Boermeester denied the university's allegations against him and highlighted flaws in the university's investigation. (AR59-66.) Ms. Katz reiterated what she had maintained all along: "**First, I want to make clear that Matt Boermeester has NEVER hit, choked, kicked, pushed or otherwise physically abused me and he did not do so on January 21, 2017.**" (AR67-68, emphasis in original.)

### 11. The Title IX Investigator Finds Mr. Boermeester Responsible and An Anonymous Sanctioning Panel Assigns the Sanction of Expulsion

On April 27, 2017, USC's investigator issued her SAR, finding Mr. Boermeester "responsible for the charged violations." (AR1-80; AR257-258.) Despite recognizing that "Reporting Party and Respondent provide parallel account of the events of January 21, 2017," the investigator reasoned that "the substantial weight of information indicates that the charged conduct was a violent act." (AR51.) The investigator characterized Ms. Katz's statements made after her forced initial meeting with Title IX as "recantation," which the investigator defined, without support, as "a recognized pattern of intimate partner violence; it is expected, normative behavior for the type of relationship described by Reporting Party to Title IX[.]"

31

(AR51-53.)  Additionally, the investigator found that witness reports corroborated that Mr. Boermeester had "violated the AOC on multiple occasions" by communicating with Ms. Katz by cell phone, regardless of whether Ms. Katz had initiated the communications. (AR53-54.)

On May 2, 2017, USC's anonymous Misconduct Sanctioning Panel convened in closed session and issued the sanction of expulsion.  (AR249; AR254.)

### 12.  Mr. Boermeester and Ms. Katz Appeal the Title IX Findings and Sanction to No Avail

Mr. Boermeester and Ms. Katz each appealed the findings and decisions, urging the Appeal Panel to hold that no Policy violations had occurred.  (AR192-214.)  Ms. Katz expounded in her appeal, "Throughout this process, my voice has not been heard. I ask that, now, during this appeal, the appellate panel hears my voice. I request that you overturn Respondent's expulsion and fully reinstate him."  (AR195-196.)

Mr. Boermeester and Ms. Katz each submitted a written response to the other's appeal, expressing support and agreeing that the findings and sanctions against Mr. Boermeester should be overturned.  (AR209-214.)  Ms. Katz commented, "Instead of accepting me at my word, the investigators repeatedly belittle me in their Report and make me sound like a fragile woman who can't think for herself or make decisions on her own."  (AR213.)  Ms. Katz called for a new investigation to be performed by a neutral, investigator so that the truth could prevail.  (AR214.)

USC's anonymous Title IX Appeal Panel met on June 13, 14, and 15, 2017 in closed session to review the Title IX investigator's SAR and appeal documents. (AR216.)

On June 22, 2017, Roopali Malhotra, Senior Advisor to the Vice President for Student Affairs, issued the Title IX Appeal Panel Recommendation to Respondent Dr. Ainsley Carry. (AR215.) The Appeal Panel found investigator Helsper's conclusions were supported by substantial evidence. (AR217.) Regarding Ms. Katz's attestations that she was not a victim of abuse, the Appeal Panel reiterated investigator Helsper's demeaning finding that recantation is an "expected, normative behavior for the type of relationship initially described by the Reporting Party to Title IX." (AR220.) The Appeal Panel also determined, however, that expulsion was "grossly disproportionate to the violations found," and recommended a two-year suspension and a 52-week domestic violence batterers program in lieu of expulsion. (AR218.)

On July 7, 2017, Dr. Ainsley Carry approved the findings and conclusions reached by investigator Helsper but rejected the Appeal Panel's suspension recommendation and ordered Mr. Boermeester expelled. (AR 221-222.) Dr. Carry reasoned that Mr. Boermeester's lack of intent in causing Ms. Katz physical harm was not a mitigating factor, and expulsion was the appropriate sanction "given the nature of the harm inflicted upon the Reporting Party[.]" (AR221.)

On July 30, 2018, Ms. Katz released a public statement about USC's unjust Title IX proceedings. (CT415-416.)

33

### 13. Mr. Boermeester Petitions for Writ of Mandamus

On August 11, 2017, Mr. Boermeester filed his Petition for Writ of Mandamus pursuant to Code Civ. Proc. § 1094.5. (CT6; CT11.)

On August 18, 2017, Mr. Boermeester filed his *Ex Parte* Application for Stay of Administrative Action Pending Court Review of Petition. (CT378.) Mr. Boermeester's application included a signed declaration by Ms. Katz in support of the stay application. (CT413-416.)

On September 8, 2017, the trial court granted Mr. Boermeester's request for a temporary stay on the condition that Mr. Boermeester not enroll in classes at USC or be on campus. (CT645.) In granting the stay, but denying Appellant access to his education, the trial court noted the "relatively rudimentary due process requirements required for university disciplinary proceedings." (CT648.) The trial court further posited that "courts should therefore be cautious in issuing temporary orders that undermine or appear to undermine the integrity or finality of a university's disciplinary decisions." (CT649.)

On November 14, 2017, Mr. Boermeester filed his Opening Brief in Support of Petition for Writ of Mandamus. (CT757-777.) On December 11, 2017, Respondents filed their Response Brief in Opposition to Petition for Writ of Mandamus. (CT825-844.) On December 20, 2017, Mr. Boermeester filed his Reply to Respondent's Brief. (CT871-885.)

On March 21, 2018, the Honorable Amy D. Hogue issued the trial court's order denying Mr. Boermeester's Petition for Writ of

34

Administrative Mandate. (CT1129-1150.) The trial court decided that Appellant was provided adequate due process because he received "notice of the charges and an opportunity to respond." (CT1140.) The trial court was unconcerned about USC's lack of an accurate record and failure to hold a live evidentiary hearing before impartial adjudicators. (CT1140-1147.) Finally, the trial court found that substantial evidence supported the findings against Mr. Boermeester. (CT1148-1150.)

On April 12, 2018, the trial court issued its Judgment on Petition for Writ of Mandamus. (CT1209-1210.)

On June 14, 2018, Appellant filed his Notice of Appeal. (CT1237.)

## IV.    STANDARD OF REVIEW

On appeal from a judgement on a petition for writ of mandate under Code Civ. Proc. § 10945, the scope of this Court's review is the same as that of the trial court. (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1059, hereafter *Allee*; *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, hereafter *USC(2)*; *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239, hereafter *USC(1)*.)

Code Civ. Proc. § 1094.5 subd. (b) authorizes a trial court to issue a writ of administrative mandate where an agency has deprived an appellant of a fair hearing. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152.) In determining whether an agency provided a fair hearing, a reviewing court independently evaluates whether "the administrative proceedings were conducted

35

in a manner consistent with the minimal requisites of fair procedure demanded by established common law principles." (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1442.) Thus, on appeal, the procedural fairness of the administrative hearing is reviewed *de novo*. (*Allee*, *supra*, 30 Cal.App.5th at 1059; *USC(1)*, *supra*, 246 Cal.App.4th at 239, citing *Nasha L.L.C. v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.)

Code Civ. Proc. § 1094.5 also allows a reviewing court to inquire whether there was a prejudicial abuse of discretion in the underlying administrative hearing. Subdivision (b) "defines 'an abuse of discretion' to include instances in which the administrative order or decision 'is not supported by the findings, or the findings are not supported by the evidence.'" (*Singh v. Davi* (2012) 211 Cal.App.4th 141, 147; Code Civ. Proc. § 1094.5, subd. (b).) Where an administrative agency's decision substantially affects a vested, fundamental right, "the trial court not only examines the administrative record for errors of law but also exercises its independent judgment based upon the evidence disclosed in a limited trial de novo." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.) Where an administrative agency's decision does not substantially affect a fundamental vested right, the trial court, and thus the appellate court, reviews an appeal panel's substantive decision for substantial evidence. (Code Civ. Proc., § 1094.5, subd. (c).)

36

## V.     ARGUMENT

## A.     USC FAILED TO PROVIDE A FAIR PROCESS

### 1.  Legal Standard for Fairness.

In evaluating the fairness of student disciplinary proceeding, courts have recognized the competing interests of the university, the complaining student, and the accused student.  (See *Allee*, *supra*, 30 Cal.App.5th at 1063; *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1066, hereafter *CMC*; *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1077-1078, hereafter *UCSD*.) "With respect to student discipline, '[t]he student's interest is to avoid unfair or mistaken exclusion from the educational process, with all its unfortunate consequences. . . . Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.'" (*USC(1)*, *supra*, 246 Cal.App.4th at 240, quoting *Goss v. Lopez* (1975) 419 U.S. 565, 579-580, hereafter *Goss*; accord, *CMC*, *supra*, 25 Cal.App.5th at 1066; *UCSD*, *supra*, 5 Cal.App.5th at 1077.)

"In disciplining college students, the fundamental principles of fairness require, at a minimum, 'giving the accused students notice of the charges and an opportunity to be heard in their own defense.'" (*Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56; see *Goss*, *supra*, 419 U.S. 565 at 579, 581 [public high school students facing suspensions of fewer than ten days

37

"must be given some kind of notice and afforded some kind of hearing" under due process clause].) "[A] student disciplinary proceeding at a university does not provide the same due process protections afforded to a defendant in a criminal trial." (*UCSD*, *supra*, 5 Cal.App.5th at 1078; accord, *Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 881, hereafter *Goldberg* ["procedures for dismissing college students were not analogous to criminal proceedings"].) "However, 'to comport with due process,' the university's procedures must '"be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case."'" (*UCSD*, *supra*, 5 Cal.App.5th at 1078.)

California courts recognize, "For practical purposes, common law requirements for a fair disciplinary hearing at a private university mirror the due process protections at public universities." (*Allee*, *supra*, 30 Cal.App.5th at 1060.)

### 2. USC Did Not Provide Proper Notice

A fair process requires that before an initial disciplinary meeting, "[I]n being given an opportunity to explain his version of the facts at this discussion, the student [must] first be told what he is accused of doing and what the basis of the accusation is." (*USC(1)*, *supra*, 246 Cal.App.4th at 240, citing *Goss*, *supra*, 419 U.S. at 582.) Moreover, a fair process requires "notice reasonably calculated to apprise interested parties of the pendency of the action . . . and an opportunity to present their objections." (*Id.*; see also *Rosenblit*, *supra*, 231 Cal.App.3d at 1445 ["Notice of the charges sufficient to

38

provide a reasonable opportunity to respond is basic to the constitutional right to due process and the common law right to a fair procedure."].)  A notice that does not apprise the individual of the factual basis of the accusations against him and contains no specific policy violations is insufficient, and it is unfair to notify the respondent of additional allegations for the first time four months after the start of the university's investigation.  (*Id.* at 225, 243-44.)

On January 26, 2016, Mr. Boermeester was informed of the university's accusation that he had caused physical harm to Ms. Katz by grabbing her by the neck and "pushing her head into a cinder block wall multiple times on/or about January 21, 2017." (AR470.)  Mr. Boermeester was not provided notice that the Title IX investigation would extend to his entire relationship history with Ms. Katz, nor his relationship history with a previous girlfriend who did not attend USC.  (See *id*.)  Mr. Boermeester was not notified that investigator Helsper was collecting evidence to support her opinion about an alleged "pattern" of intimate partner violence, nor that he needed to produce evidence to combat investigator Helsper's preconceived notions about domestic violence.  (See AR53.)

Instead, based on the notice USC provided, Mr. Boermeester rightly believed the investigation was confined to verifying whether the January 21, 2017 incident of alleged physical harm had more likely than not occurred.  Because there was no credible evidence Ms. Katz had suffered any physical harm on January 21, 2017, the university's claim should not have been substantiated.  The notice in this case was not adequate to inform Mr. Boermeester of the totality of the charges against him.

39

Additionally, USC did not provide written notice of the specific acts, the date/period of time, or the location of any alleged instance of an alleged violation of the AOC, as required by USC's Policy. (AR414; AR488.)

Ms. Katz was also not provided proper notice that she was a suspected victim and intended "Reporting Party" in a case against Mr. Boermeester. Ms. Katz was not aware she was participating in an "intake" interview or providing a "statement" against Mr. Boermeester. (See AR67.) Ms. Katz believed the meeting was "like a counseling session" where any discussion would remain confidential and not used as the basis for a report against Mr. Boermeester. (*Id*.) Without notice of the report made by Peter Smith, and without knowing the Title IX Office's intention to investigate Mr. Boermeester for intimate partner violence, Ms. Katz was induced to make statements that were "greatly exaggerated or totally untrue." (*Id*.) The Title IX Office would not permit Ms. Katz to amend her inaccurate statements, and instead characterized her attempts to correct the summary of her initial "statement" as "a recognized patter of intimate partner violence[.]" (AR53.) The lack of transparency and inadequate notice provided to both Ms. Katz and Mr. Boermeester led to a groundless four-month investigation, followed by lengthy litigation, which never have should commenced in the first place.

### 3. Four-Month Suspension of a University Student Without Evidence or a Hearing Is Patently Unfair

California's Supreme Court has noted that a ten-day suspension from school is not *de minimis* and may not be imposed in

40

complete disregard for due process and fundamental fairness. (*Goss*, *supra*, 419 U.S. at 575-576 ("Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.")) At the bare minimum, due process requires that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence and an opportunity to present his defense. (*Id*.)

USC's Assistant Vice Provost for Student Affairs, Lynette S. Merriman, imposed, and the Title IX Office approved, the indefinite interim suspension of Mr. Boermeester "pending administrative review of a Title IX investigation." (AR472.) The investigation and review by the sanctioning misconduct panel, which was supposed to be completed in 60 days, lasted a total of 97 days. (AR81; AR472, 455.) Mr. Boermeester was not provided any evidence to support the imposition of an interim suspension, nor was he apprised of any of the purported representations made by Ms. Katz during her "intake" that would support imposing an interim suspension. (*Id*.) Mr. Boermeester was also precluded from contacting Ms. Katz in any manner, "including through a third party," to obtain evidence in his defense. (AR473.)

The suspension was later ratified by Respondent Ainsley Carry with no explanation for his decision beyond the phrase, "I have reviewed your case." (AR442.) Mr. Boermeester was not apprised of the information reviewed by Dr. Carry and received no evidence or witness statements to support the charges, not even a

41

summary of Ms. Katz's "intake" with the Title IX Office. (See AR442-448.) Mr. Boermeester had no opportunity to review or respond to the evidence relied upon by Dr. Carry before a 97-day interim suspension was imposed. It is patently unfair to suspend a student for four months without providing the student the evidence, a meaningful opportunity to respond, or a hearing.

### 4. USC's Single Investigator Adjudication Denied Mr. Boermeester and Ms. Katz a Fair Process

On January 4, 2019, the Second District Court of Appeal, Division Four, issued its decision in *Allee*, a case involving a similar Title IX administrative proceeding at USC. The *Allee* court held,

> [W]here credibility is central to a university's determination, a student accused of sexual misconduct has a right to cross-examine his accuser, directly or indirectly, so the fact finder can assess the accuser's credibility. (*CMC, supra*, 25 Cal.App.5th at p. 1070, 236 Cal.Rptr.3d 655; *Cincinnati, supra*, 872 F.3d at p. 401 ["[T]he opportunity to question a witness and observe her demeanor while being questioned can be just as important to the trier of fact as it is to the accused"]; *UCSB, supra*, 28 Cal.App.5th at p. 60, 238 Cal.Rptr.3d 843.)
> (*Allee, supra*, 30 Cal.App.5th at 1066.)

The *Allee* Court extended a student's right of cross-examination to witnesses in cases where witness credibility will impact the determination. (*Id.* at 1066.) Significantly, the *Allee* Court also articulated that where credibility "is essential to a finding of sexual misconduct, the stakes at issue in the adjudication are high, the interests are significant, and the accused's opportunity to confront adverse witnesses in the face of competing narratives is

42

key," a single investigator cannot be entrusted to perform cross-examination on behalf of the parties.  (*Id*. at 1067-1068.)

As this case illustrates, it is simply too perilous to allow a single individual to act in the overlapping and conflicting capacities as investigator, victim advocate, prosecutor, and tribunal, deciding credibility and relevancy of evidence, making findings, and imposing discipline.  (*Id*. at 1068.)  Likewise, delegating a single investigator/adjudicator to implement an accused student's right to cross-examination is "incompatible with adversarial questioning designed to uncover the truth. It is simply an extension of the investigation and prosecution itself."  (*Id*.)

### a.   The Stakes Warrant a Fair Process

It is well settled that " 'to comport with due process,' the university's procedures should ' "be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] ... to insure that they are given a meaningful opportunity to present their case." ' " (*Allee*, *supra*, 30 Cal.App.5th at 1062, citing *UCSD*, *supra*, 5 Cal.App.5th at 1078.)  Given the interests at stake and the nature of USC's misconduct proceedings, Mr. Boermeester was owed, at minimum, the same procedural protection as those described in *Allee*.

The parallels between *Allee* and this case are notable, in terms of the interests in question.  In both cases, USC's Title IX Office maliciously and relentlessly sought to destroy the lives of rising football stars by waging unfair Title IX proceedings against them, ultimately effectuating their dismissals from USC.  In *Allee*, an up-and-coming freshman USC football player was publicly suspended

43

from USC and removed from the football team before being found responsible for misconduct and expelled from USC. (*Id*. at 1058.)

Almost identically, USC's Title IX Office, staffed by many of the same Title IX personnel as those in *Allee*, accused famed Rose Bowl kicker, Mr. Boermeester, of engaging in misconduct against Ms. Katz, had him publicly removed from USC's campus and USC's football team, prohibited him from completing the two remaining classes he needed to obtain his undergraduate degree, and expelled him from USC. (AR54, 222.) As a result of the finding, Mr. Boermeester is humiliated, his reputation ruined, and he is prevented from obtaining an undergraduate degree,[7] pursuing a master's degree, and playing football for one of the best college teams in the nation.

Considering the stigmatizing and life-altering nature of the allegations and severity of the consequences, Mr. Boermeester should have been afforded, and was unlawfully denied, a live evidentiary hearing where he could cross-examine Ms. Katz and

---

[7] According to Hannah Stotland, one of the leading educational consultants in the United States with significant experience assisting students who have been accused or disciplined under Title IX for sexual misconduct, "Students disciplined under Title IX face greater challenges in continuing their educations than any other group of students I have served. This includes students who have served jail time for felonies and those who have admitted to unprosecuted felonious actions, such as drug trafficking." (CT600-601.) Even if Mr. Boermeester is accepted to another university, most highly ranked universities will accept a maximum of two years' worth of transfer credits, therefore, he will have to repeat two years of work in order to get a degree from another university. (*Id*.)

44

witnesses in front of impartial adjudicators.  (*Allee*, *supra*, 30
Cal.App.5th at 1067-1068.)

### b. The Findings Turned on Credibility, Requiring a Live Evidentiary Hearing and Cross-Examination of Witnesses before Impartial Adjudicators

In *Allee*, the findings and decisions were made by a single
investigator, USC's Dr. Keegan Allee, whose determination was
based on "all evidence she deemed relevant and taking into account
her determination as to the parties' credibility."  (*Allee*, *supra*, 30
Cal.App.5th at 1052-1053.)  This process, the *Allee* Court ruled, was
unfair.

Congruently, sole Title IX investigator Lauren Elan Helsper
decided that the Title IX Office's allegations against Mr. Boermeester
were validated, taking into account the evidence she deemed
relevant, and her determinations of party and witness credibility.
(AR50-54.)  Investigator Helsper's finding depended on her analysis
that Ms. Katz's purported representations made during a meeting
with the Title IX Office were more credible than statements she
made days later, when Ms. Katz realized a Title IX investigation was
forthcoming against Mr. Boermeester.  Investigator Helsper's
findings further depended on her determination that Ms. Katz was
not credible when she characterized her purported "statements" as,
"greatly exaggerated or totally untrue."  (AR67.)  Investigator
Helsper also decided that her own opinion of Ms. Katz as a victim of
domestic violence was more credible than Ms. Katz's repeated
assertions that she was not a victim and would never stand for
physical or verbal abuse perpetrated by Mr. Boermeester or anyone.

45

(AR53; AR68.)  The investigator's findings were additionally based on her determination that witness reports—even from witnesses she had never met in person and only interviewed by phone, like MB2 and Peter Smith—were more credible than Ms. Katz's and Mr. Boermeester's descriptions of their own thoughts, feelings, statements, and actions, and objective interactions depicted on a surveillance video.  (See AR51-52.)

Because there was no live evidentiary hearing before neutral adjudicators, Mr. Boermeester and Ms. Katz were denied the right to cross-examine each other and witnesses in order to bolster each other's credibility, put the evidence in the proper perspective, undermine the credibility of adverse witnesses, and demonstrate to a neutral factfinder that their version of events was truthful, accurate, and credible.

### c.  USC's Process Does Not Comport With *Allee*

USC's Policy requires a single investigator to make all factual findings in the absence of a live, in-person evidentiary hearing. (AR493.)  Respondents have acknowledged that investigator Helsper made all factual findings and determined Mr. Boermeester violated USC's Policy.  (CT717.)  USC's process unquestionably denied Mr. Boermeester and Ms. Katz a fair hearing.  (*Allee*, *supra*, 30 Cal.App.5th at 1068.)

In lieu of a live, in-person evidentiary hearing before neutral adjudicators, USC's Title IX Office conducted private, separate investigatory interviews, for which there are no verbatim recordings or transcripts, and received Ms. Katz's and Mr. Boermeester's written submissions as part of the "Evidence Hearing."  (AR59-69.)

46

USC permitted only limited, non-adversarial written cross-examination, which does not comport with *Allee*. (*Id*.; AR493; see also AR294.)

USC's process also wholly denied Mr. Boermeester and Ms. Katz the opportunity to cross-examine witnesses whose credibility was critical to the outcome, and whose accounts Mr. Boermeester and Ms. Katz pointed out were false, one-sided, taken out of context, or based on hearsay, rumors, and gossip. (See e.g. AR60-62; AR193-195.)

Cross-examination of witnesses during an in-person evidentiary hearing was additionally imperative in this case considering investigator/adjudicator Helsper interviewed several witnesses, even critical witnesses like Peter Smith and MB2, only by phone, not in person. (See AR139 (Peter Smith); AR136 (Richard Gallien); AR131, AR85 (MB2); AR115 (CR); AR92 (SS); AR87 (AB).) Not only was this contrary to USC's Policy, which "requires the Investigator to personally see and hear all parties and witnesses to the investigation, putting him/her in the best position to make determinations as to credibility and relevance"(AR219), but conducting interviews by phone precludes accurate identification of witnesses and evaluation of whether their accounts are credible. USC's process does not pass muster under *Allee*.

### 5. Failure to Hold a Live Evidentiary Hearing Yielded a False, Misleading Record

As in *Allee*, the investigation which formed the basis for investigator Helsper's findings and determinations "illustrate[s] well the significant dangers created by USC's system." (*Allee*, *supra*,

30 Cal.App.5th at 1069.) The absence of an in-person evidentiary hearing, and USC's failure to provide any mechanism to verify the accuracy of witness statements, challenge witness testimony through cross-examination, or present documentary evidence in the proper context, created an unfair process and an unreliable, unverifiable administrative record.

One of Ms. Katz's most prominent complaints about USC's proceedings is that her words were misreported, "twisted," and taken out of context. (AR192.) The most reliable fact in the record is that upon which Ms. Katz and Mr. Boermeester agree: no misconduct or intimate partner violence has ever occurred. (CT401-403; CT413-414.) The lack of a verbatim record in USC's process, the paraphrasing and editing of witness interviews, the demonstrated misreporting and inaccuracies in the record, and the lack of any process by which the parties could confront or cross-examine witnesses, all undermine the credibility of USC's factual findings, the reliability of the record, and the fairness of USC's process.

### 6. Limited Appellate Review Compounded Investigation Issues

In addition to the procedural shortcomings addressed above, the *Allee* Court took issue with the limited appeal rights USC offers students deemed responsible by the investigator under its Policy. (*Allee*, *supra*, 30 Cal.App.5th at 1069 ["[T]he harm to fundamental fairness created by USC's system is amplified by the limited review of the investigator's factual findings available in the university's appellate process."].)

48

USC's appellate processes described in *Allee* is identical to the appellate process in this case.  (Compare *Id*. at 1041-1042 with AR493-496.)  USC's Appeal Panel, a three-person, anonymous tribunal trained by the Title IX Coordinator, was instructed not to question investigator Helsper's factual findings, unless no reasonable person could come to the same conclusion.  (AR494-495.)  Following the appeal process, Dr. Ainsley Carry had unfettered discretion to make findings and impose sanctions based on his review of the record.  (AR 496.)  The appeal process did not provide any procedural protections against the unfair investigation.

Even though USC's Appeal Panel is supposed to hear procedural concerns "[t]hat the Title IX Office or the Misconduct Sanctioning Panel deviated from the process set forth in this policy," here, the Appeal Panel did not address either Ms. Katz's or Mr. Boermeester's concerns about the Title IX Office's mishandling of the Title IX investigation.  For instance, in her appeal, Ms. Katz contended, "Title IX abused its own process in this matter" by misreporting, misrepresenting, and manipulating her statements and statements made by witnesses, coercing her into accepting an AOC and emergency housing, failing to adequately explain the Title IX process to her, ignoring her requests that the Title IX Office conduct a fair investigation, trampling her rights, and demeaning her by characterizing her as a victim of domestic violence.  (AR192-196.)  Mr. Boermeester also raised significant concerns with the conduct of the investigation.  (AR197-208.)

The Appeal Panel and Dr. Carry made no effort to address any of these very serious claims about the Title IX Office's

49

mishandling of the investigation, but instead insulted Ms. Katz further by mimicking the investigator's explanation of her support for Mr. Boermeester as "expected normative behavior" for someone in an abusive relationship. (AR220.) The opportunity to be heard does not count when the adjudicators and reviewing tribunals are not neutral and refuse to listen.

### 7. Mr. Boermeester Was Denied a Fair Hearing in Every Sense of the Word

"'Where student discipline is at issue, the university must comply with its own policies and procedures.'" (*USC(1)*, *supra*, 246 Cal.App.4th at 239; accord, *UCSD*, *supra*, 5 Cal.App.5th at 1073.) USCs Policy requires investigators to presume the accused student not responsible. (AR487.) "This presumption is overcome only when a preponderance of the evidence establishes that the Respondent committed the prohibited conduct charged." (*Id*.) Respondents flouted the Policy by exercising their unfettered discretion "in questionable ways," thus precluding Mr. Boermeester and Ms. Katz from receiving a fair hearing. (*Allee*, *supra*, 30 Cal.App.5th at 1070.)

### a. USC's Title IX Office Unfairly Prosecuted Mr. Boermeester

From the outset, USC's Title IX Office set out to prosecute and punish Mr. Boermeester for misconduct, not to fairly and impartially investigate a report made by a non-percipient witness. On January 25, 2017, Title IX Coordinator Gretchen Dahlinger Means, supervisor to the investigation, ordered Mr. Boermeester suspended and

removed from campus.[8] (AR472.) In deciding that suspension was the appropriate interim measure, the Title IX Coordinator preliminarily determined Mr. Boermeester posed a "substantial threat" to the safety or well-being of the university community. (AR489; see also AR218.) The preliminary determination cannot be squared with USC's obligation to presume an accused student not responsible and to employ impartial adjudicators.

Just four days later, on January 30, 2017, Ms. Katz assured investigator Helsper, "She does not feel in danger, she does not feel unsafe because of him," and that she had been "bullied" into making a report. (AR168-169.) Ms. Katz never indicated that Mr. Boermeester's presence on campus would interfere with her safety or well-being, nor that his presence on campus would affect her access to education. (*Id*.) Nevertheless, on February 8, 2017, investigator Helsper informed Ms. Katz that the AOC would remain in place throughout the investigation, and Mr. Boermeester's suspension was not lifted. (AR102.) USC's Policy allows investigations to proceed without the reporting party's consent only in "limited circumstances . . . for example, when an incident involves a weapon or predatory drug use, when multiple victims are involved, or when there is a danger to the greater community." (AR482.) Here, in contrast, investigator Helsper continued to

---

[8] USC's Policy states, "In all cases, the final decision on whether, how, and to what extent the university will conduct an investigation, and whether other measures will be taken in connection with a report of prohibited conduct, rests solely with the Title IX Coordinator." (AR492.)

51

investigate even after Ms. Katz requested to stop the investigation and emphasized that she had been manipulated into making false representations during her interview. (AR102-103; AR168-169; AR192; AR212.) Helsper's only possible justification for proceeding with an investigation was that she presumed Mr. Boermeester was "a danger to the greater community," a presumption that cannot be reconciled with her obligation to presume Mr. Boermeester not responsible and to remain impartial. (AR482.)

Moreover, despite USC's Policy requiring "equal treatment" for the Respondent and Reporting Party, the actions taken by USC against the male Respondent, Mr. Boermeester, to deny him access to academic, athletic, and medical resources at USC stand in stark contrast to the efforts taken to provide academic accommodations and assistance to the female "Reporting Party," Ms. Katz. (See AR261-277; AR442-444; AR472-473; AR488.)

### b. Investigator's Opinion Not Supported by Evidence, in Light of All Evidence in the Record

The investigator's findings must be supported by a preponderance of evidence. (AR488.) To comply with USC's Policy, the investigator must consider all exculpatory and inculpatory evidence, weigh the evidence side by side, and decide which has the more convincing force and the greater probability of truth. (*Id.*) Findings are not supported by a preponderance of evidence when the investigator considers only evidence that supports the investigator's personal beliefs and opinions.

Investigator Helsper weighed only one piece of exculpatory evidence in her analysis: "that three of Reporting Party's

52

housemates (GS, KV, and MW) and CT (Respondent's teammate and KV's boyfriend) stated they did not believe Respondent was a physical danger to Reporting Party." (AR53.) In fact, most of the witnesses insisted they had never observed any violence or abuse by Mr. Boermeester and were not concerned about Ms. Katz's safety because they did not think Mr. Boermeester posed a threat. (See AR37 [RP did not witness any physical abuse]; AR94 (SS never witnessed abuse; Ms. Katz never described abuse]; AR96 [DH said no one expressed concerns about Mr. Boermeester and Ms. Katz, and Ms. Katz never expressed fear of Mr. Boermeester]; AR97 [TF never saw Mr. Boermeester hit or push Ms. Katz, and Ms. Katz never had bruises or expressed fear]; AR119 [CT said Mr. Boermeester and Ms. Katz were "fine 90% of the time," and never witnessed abuse or heard anyone express concerns]; AR125-126 [Ms. Katz did not mention any bruising or fear of Mr. Boermeester to TS]; AR128 [GS did not have concerns about their relationship]; AR133 [GO never saw physical abuse, but noted that the parties "play wrestled"], AR136 [Richard Gallien did not notice any bruising, and no one had expressed concerns before the alleged incident], AR151-152 [KV never saw any bruising, witnessed any violence, or heard them arguing], AR166 [MW never saw bruising and was not worried Mr. Boermeester would hurt Ms. Katz].)

Investigator Helsper approached the investigation assuming Ms. Katz had been abused by Mr. Boermeester. In her SAR, Helsper opined without any evidentiary support, "Recantation is a recognized pattern of intimate partner violence; it is expected, normative behavior for the type of relationship described by

Reporting Party to Title IX[.]" (AR53.) The supposed "recantation" occurred the day after Ms. Katz's initial interview, before the investigation began. (AR3.) The investigator's speculative, subjective lay opinions about domestic violence infected her investigation even before the investigation commenced.

The investigator's factual findings are contradicted by the DPS security footage, which does not depict Mr. Boermeester hitting Ms. Katz's head against a wall, and the statements of the only two people who know exactly what happened, Mr. Boermeester and Ms. Katz. (AR190.) The finding was supposedly supported because, according to investigator Helsper, "Two days after the incident, Reporting Party described it as threatening and forceful to the Title IX Office." (AR51.) Not only does Ms. Katz dispute the Title IX Office's non-verbatim mischaracterization of what she said during the meeting, but she was also not intending to make a report, she was ignorant of Coach Smith's erroneous reports, and she was not aware that the Title IX Office firmly believed she was a victim of abuse. (AR67.)

According to Helsper, Ms. Katz characterized the January 21, 2017 interaction as a "frightening and aggressive act" to several witnesses. (AR51.) Ms. Katz pointed out that these witnesses' statements were false and surmised that witnesses had "heard rumors, and then reported those rumors to the investigators," just as Peter Smith had done. (AR195; see CT1072.) Consistent with Ms. Katz's theory, it is evident from interview notes that as a result of USC's immediate public suspension of Mr. Boermeester and the press coverage that followed, many of the witnesses interviewed

54

were already convinced that Mr. Boermeester had behaved violently toward Ms. Katz on January 21, 2017; they also believed they were protecting Ms. Katz by reporting anything that might resemble abuse.  (See AR85, 87, 92, 95, 97, 104, 113, 115, 118, 125, 128, 133, 136, 139, 151, 164.)  Because he was banned from campus, Mr. Boermeester could not set the record straight, nor were Ms. Katz and Mr. Boermeester given an opportunity to cross-examine the witnesses to prove their accounts were fictional.

Investigator Helsper further opined, "Reporting Party's actions after the incident also indicate that what she experienced was violent, not playful."  (AR52.)  However, Helsper did not consider that Ms. Katz and Mr. Boermeester spent the next three consecutive nights together after January 21, 2017.  (AR21; AR192.)  KV heard them laughing in Ms. Katz's room, and nothing was concerning to her about their interaction.  (*Id*.)  Additionally, Ms. Katz did not request an AOC out of fear of Mr. Boermeester, and she repeatedly demanded its removal.  (AR193.)

The most compelling evidence of Mr. Boermeester's non-responsibility is the utter lack of credible evidence of responsibility. The only eyewitness to provide a consistent, credible account was DH, who, while half-asleep, caught a three-second glimpse of Mr. Boermeester's hand on Ms. Katz's neck/chest, not Mr. Boermeester hitting Ms. Katz's head against a wall.  (AR96.)  This does not substantiate the permanently life-altering charge of intimate partner violence, immediate suspension without a hearing, and permanent expulsion from USC.

55

The security video footage further corroborates that Mr. Boermeester and Ms. Katz were playfully roughhousing on January 21, 2017.  (AR190.)  The Title IX investigator's subjective interpretation of Mr. Boermeester's body language as "aggressive, determined movements by Respondent; movements inconsistent with play or light-hearted conduct," whatever that means, is contrary to the description of the video the investigator wrote in the SAR.  (Compare AR51 with AR44-45.)  The video itself does not depict any hitting, and the investigator apparently did not consider that Mr. Boermeester was limping with an injured knee on January 21, 2017, which would have affected the appearance of his movements.  (AR15, n.20; AR190.)  Critically, the investigator did not consider, and omitted from her report and notes entirely, that the Title IX Coordinator performed a physical examination of Ms. Katz during her initial meeting, and she had no bruises, injuries, or other indicia of physical harm.  (AR194; CT610.)

## B.     FINDINGS ARE NOT SUPPORTED BY EVIDENCE

### 1.   USC's Administrative Decision Substantially Affects a Vested Fundamental Right, Implicating De Novo Review.

Where it is claimed that an agency abused its discretion because its findings were not supported by the evidence, trial court review of an agency's administrative decision under Code of Civil Procedure section 1094.5 is subject to two possible standards depending on the nature of the rights involved.  (*JKH Enterprises, Inc. v. Dep't of Indus. Relations* (2006) 142 Cal.App.4th 1046, 1056–57, hereafter *JKH*.)  The standard of review on appeal of the trial court's

determination is substantial evidence; however, if the wrong standard was applied in the trial court, this Court cannot decide whether the university's findings are supported by substantial evidence. (*Fukuda v. City of Angels* (1999) 20 Cal. 4th 805, 824 [California Supreme Court could not properly review the trial court's findings and decision for substantial evidence, "because that court's findings are themselves infected by fundamental error"].)

### a. Legal Standard Concerning Vested Fundamental Right.

A court must determine on a case-by-case basis whether an administrative decision affects a vested fundamental right. (*Bixby*, *supra*, 4 Cal.3d at 144.) In a court's case-by-case analysis of the existence of a vested fundamental right, a court is to consider

> the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, whether it is possessed by, and vested in, the individual or merely sought by him. . . . [¶] In determining whether the right is fundamental, courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation. (*Id*.)

To determine whether a vested fundamental right is affected, a court considers rights beyond those determined to be fundamental in constitutional law jurisprudence.[9]

---

[9] See *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 775 [the right to be free from an erroneous charge against an unemployment insurance reserve account is a vested

### b. USC's Determination Substantially Affects a Vested Fundamental Right

California courts have described the value of higher education as "an interest of almost incalculable value, especially to those students who have already enrolled in the institution and begun the pursuit of their college training." (*Goldberg*, *supra*, 248 Cal.App.2d at 876.) The court in *Goldberg* went on to explain that "attendance at publicly financed institutions of higher education should be regarded a benefit somewhat analogous to that of public employment." (*Id*. at 877.) It is an accepted fact that, "Expulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career." (*Furey v. Temple University* (E.D. Pa. 2012) 884 F.Supp.2d 223, 245-48.)

The Sixth Circuit has found, "Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a

---

fundamental right for purposes of mandamus review]; *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 396-397 [the right to retain a driver's license is a vested fundamental right because it has "an impact on the individual sufficiently vital . . . to compel a full and independent review by the court."].) Additionally, "[T]he United States Supreme Court listed the right of the individual 'to engage in any of the common occupations of life' as one of several fundamental liberties, which also include the right of the individual 'to acquire useful knowledge...'" (*Bixby*, *supra*, 4 Cal.3d at 145 n. 12.)

58

protected liberty interest." (*Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 399.)  Moreover,

> Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life. *Miami Univ.*, 882 F.3d at 600. The student may be forced to withdraw from his classes and move out of his university housing. *Id*. His personal relationships might suffer. See *id*. And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled. *Id.*
> (*Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 582.)

USC's charge "plainly calls into question [Appellant's] 'good name, reputation, honor, or integrity.'"  (*Doe v. The Rector and Visitors of George Mason University* (2016) 149 F.Supp.3d 602, 613, hereafter *Doe v. GMU*) citing *Wisconsin v. Constantineau* (1971) 400 U.S. 433, 437 ["Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."].)  Further, Appellant's "expulsion constitutes an alteration of his legal status as a student."  (*Doe v. GMU*, *supra*, 149 F.Supp.3d at p. 613, citing *Sciolino v. City of Newport News, Va.* (4th Cir. 2007) 480 F.3d 642, 649 [termination of employment constitutes a qualifying alteration of status].)  Appellant's transcript will contain a permanent notation indicating that he was expelled from the university unrelated to his academics, which "may well lead to the public's learning that [Appellant] was expelled for misconduct" should he seek to pursue

59

future academic and employment endeavors.[10] (*Doe v. GMU, supra,* 149 F.Supp.3d at p. 613.) "Any reasonable person will conclude that a non-academic justification for an expulsion implies 'the existence of serious character defects.'" (*Id.,* citing *Sciolino v. City of Newport News, Va., supra,* 480 F.3d at p. 646, fn. 2.)

Mr. Boermeester was stripped of his full athletic scholarship and separated from the academic, athletic, and medical resources he received as a USC student. (CT401-401.) The suspension and subsequent expulsion imposed by Respondents when Mr. Boermeester was just two classes shy of earning his undergraduate degree guaranteed that Mr. Boermeester would have to expend significant time and expense applying to other universities, to which he likely will not be (and has not been) admitted due to the permanent notation of misconduct on his transcript, and even if accepted, he would have to forfeit credits earned at USC and pay for and complete additional credits at his transfer university. (CT402; CT598-602.)

Additionally, Mr. Boermeester lost the opportunity to play football for USC, a Division I college football team in conversations for a National Championship in 2017, making it impossible for him to develop his ranking as a draft-eligible college football player for the NFL, and thereby severely hindering his chances of recruitment to any professional football team. (CT402.)

---

[10] In *Goss, supra,* 419 U.S. at p. 575, the Supreme Court elaborated that "charges could seriously damage the students' standing with their fellow pupils and their teachers as well as *interfere with later opportunities for higher education and employment.*" (Emphasis added.)

60

The publicity generated by USC's Title IX investigation and his public removal from the football team also destroyed Mr. Boermeester's reputation. He will now forever be known as "the Rose Bowl kicker who got expelled for student conduct code violations." (CT403.)

USC's actions have substantially affected Mr. Boermeester's vested fundamental right and interest in his reputation, his vested contractual and property interests with USC, and his vested liberty interest in his reputation. Consequently, this Court should find that the trial court used the wrong standard of review in determining that USC's findings and decisions were supported by evidence. (See CT1148.)

### 2. USC's Findings Are Not Supported Even by Substantial Evidence

An abuse of discretion occurs where the court "determines that the findings are not supported by substantial evidence in the light of the whole record." (*USC(1)*, *supra*, 246 Cal.App.4th at 239.) The Court must scrutinize all the evidence in the record—both that supporting and that detracting from the University's findings of fact; the Court cannot sustain the agency's decision based only on the evidence supporting that decision viewed in isolation. (*Bixby, supra,* 4 Cal.3d 130 at 149.) "Substantial evidence, of course, must be of ponderable legal significance, which is reasonable in nature, credible and of solid value." (*JKH*, *supra*, 142 Cal.App.4th at 1057; see also *Gregory v. State Board of Control* (1999) 73 Cal.App.4th 584, 596-598.)

Ms. Katz disputed that she ever made statements indicating Mr. Boermeester hit her head against a wall, and to this day, she

61

denies that any alleged intimate partner violence occurred.  (AR67-69; AR192-196; AR212-214.)  The record demonstrates that Ms. Katz did not want an investigation, did not initially realize she was part of a Title IX investigation, and later clarified that she had been manipulated into making representations about her relationship with Mr. Boermeester that were "greatly exaggerated or totally untrue."  (AR67.)

There are no verbatim witness statements in the record, and there was no in-person evidentiary hearing where the parties could observe or question the witnesses to verify their statements.  A critical witness, MB2, was never interviewed in person, and he was found to be credible even though he repudiated his initial statement months later and put forth a completely new narrative that he had witnessed the alleged violence, which is not supported by the surveillance footage.  (AR85-86; AR190.)  The other "eyewitness," DH, admittedly did not see or hear the violent episode Peter Smith reported to the Title IX Office.  (AR95 ["DH did not see [Ms. Katz] (or hear) the contact of her hitting the wall."])

What's more, the declarations of Mr. Boermeester and Ms. Katz filed under penalty of perjury in the trial court, attesting that their interaction on January 21, 2017 was consensual horseplay, and their relationship has never been characterized by violence or abuse, provides considerable evidence outweighing the investigator's opinions on responsibility.  (CT401-403; CT413-414; CT577-581; CT1062-1065; CT1069-1073.)  There is simply no credible, substantial evidence in the record to support a finding of intimate partner violence.

62

Regarding the AOC violation, USC does not have authority or jurisdiction to limit out-of-school contact and communications between two consenting adults in a dating relationship, when both parties desire to have contact with each other and Ms. Katz did not request that an AOC be put in place and tried repeatedly to have it removed. The restrictions violated the rights of both students, were not in the interest of either student, and were imposed and maintained in retaliation for Ms. Katz's refusal to support the false narrative USC's Title IX Office constructed against Mr. Boermeester. The finding of a violation of the AOC order cannot be upheld.

## VI.  CONCLUSION

Based on the foregoing, Petitioner and Appellant Matthew Boermeester respectfully requests this Court to set aside USC's findings and resulting sanctions against him.

DATED: April 19, 2019  Respectfully submitted,

HATHAWAY PARKER

By:  /s/ Mark M. Hathaway
Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.
Attorneys for Petitioner
and Appellant
MATTHEW BOERMEESTER

63

## CERTIFICATE OF WORD COUNT

Pursuant to California Rules of Court, rule 8.204, subdivision (c)(1), the undersigned certifies that this brief contains 13,995 words, according to the Microsoft Word count program. The word count includes footnotes but excludes the Table of Contents, Table of Authorities and Certificates of Counsel.

DATED: April 19, 2019   Respectfully submitted,

          HATHAWAY PARKER

By: /s/ Mark M. Hathaway
    Mark M. Hathaway, Esq.
    Jenna E. Parker, Esq.
    Attorneys for Petitioner
    and Appellant
    MATTHEW BOERMEESTER

| State of California | ) | Proof of Service by: |
| County of Los Angeles | ) | ✓ US Postal Service |
| | ) | Federal Express |

I, Stephen Moore , declare that I am not a party to the action, am over 18 years of age and my business address is: 631 S Olive Street, Suite 600, Los Angeles, California 90014.

**On** 04/19/2019 declarant served the within: Appellant's Opening Brief **upon:**

Copies   FedEx   USPS

```
ELECTRONICALLY SERVED VIA TRUEFILING:
Julie Arias Young • Karen Jean Pazzani
YOUNG & ZINN LLP
1150 South Olive Street
Suite 1800
Los Angeles, California 90015
jyoung@yzllp.com • kpazzani@yzllp.com
   Attorneys for Respondents
```

1   Copies   FedEx   ✓ USPS

```
Clerk for the Honorable Amy D. Hogue
SUPERIOR COURT OF CALIFORNIA
County of Los Angeles
Spring Street Courthouse
312 North Spring Street
Los Angeles, California 90012


Trial Court Judge
```

Copies   FedEx   USPS

```
ELECTRONICALLY SERVED VIA TRUEFILING:

SUPREME COURT OF CALIFORNIA
350 McAllister Street
Room 1295
San Francisco, California 94102-4797
```

Copies   FedEx   USPS

the address(es) designated by said attorney(s) for that purpose by depositing **the number of copies indicated above,** of same, enclosed in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of California, or properly addressed wrapper in an Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of California

I further declare that this same day the **original and** copies has/have been hand delivered for filing OR the **original and** copies has/have been filed by third party commercial carrier for next business day delivery to:

ELECTRONICALLY FILED VIA TRUEFILING:

CALIFORNIA COURT OF APPEAL
Second Appellate District, Division Eight
Ronald Reagan State Building
300 South Spring Street, Second Floor
Los Angeles, California 90013

I declare under penalty of perjury that the foregoing is true and correct:

Signature: /s/ Stephen Moore, Senior Appellate Paralegal, Counsel Press Inc.

# EXHIBIT 2

Court of Appeal, Second Appellate District
Daniel P. Potter, Clerk
Electronically RECEIVED on 10/23/2019 at 1:17:42 PM

Court of Appeal, Second Appellate District
Daniel P. Potter, Clerk
Electronically FILED on 10/23/2019 by Candace Mortelliti, Deputy Clerk

2d Civil No.

# B290675

### IN THE

# Court of Appeal

STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION 8

_____

MATTHEW BOERMEESTER,

*Petitioner and Appellant,*

*v.*

AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN
CALIFORNIA,

*Defendants and Respondents.*

_____

Appeal from the Superior Court of the State of California
for the County of Los Angeles, Case No. BS170473
Hon. Amy D. Hogue

_____

### RESPONDENTS' BRIEF

_____

**YOUNG & ZINN LLP**
Julie Arias Young, SBN 168664
jyoung@yzllp.com
*Karen J. Pazzani, SBN 252133
kpazzani@yzllp.com
1150 South Olive Street, Suite 1800
Los Angeles, CA 90015
Tel: 213-362-1860
Fax: 213-362-1861

*Attorneys for Respondents,*
AINSLEY CARRY, Ed.D., and
UNIVERSITY OF SOUTHERN CALIFORNIA

TO BE FILED IN THE COURT OF APPEAL | **APP-008**

| **COURT OF APPEAL** . SECOND **APPELLATE DISTRICT, DIVISION** EIGHT | COURT OF APPEAL CASE NUMBER:<br>B290675 |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:      STATE BAR NUMBER:<br>NAME: Julie Arias Young (SBN: 168664); Karen J. Pazzani (SBN: 252133)<br>FIRM NAME: Young & Zinn LLP<br>STREET ADDRESS: 1150 South Olive Street, Suite 1800<br>CITY: Los Angeles     STATE: CA    ZIP CODE: 90015<br>TELEPHONE NO.: 213-362-1860     FAX NO.: 213-362-1861<br>E-MAIL ADDRESS: jyoung@yzllp.com; kpazzani@yzllp.com<br>ATTORNEY FOR (name):   Respondents Ainsley Carry, and University of Southern California | SUPERIOR COURT CASE NUMBER:<br>BS170473 |

| APPELLANT/  Matthew Boermeester<br>PETITIONER:<br><br>RESPONDENT/         Ainsley Carry and University of Southern California<br>REAL PARTY IN INTEREST: | |
|---|---|

| **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS** |
|---|
| (Check one):   [ X ]   INITIAL CERTIFICATE    [   ]    SUPPLEMENTAL CERTIFICATE |

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party (name ):

2. a. [ X ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [   ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| **Full name of interested<br>entity or person** | **Nature of interest<br>(Explain):** |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[   ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date: August 20, 2018

_____
Karen J. Pazzani
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF APPELLANT OR ATTORNEY)

Page 1 of 1

| Form Approved for Optional Use<br>Judicial Council of California<br>APP-008 [Rev. January 1, 2017] | **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS** | Cal. Rules of Court, rules 8.208, 8.488<br>www.courts.ca.gov |
|---|---|---|

**067**

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................... 12

STATEMENT OF FACTS ........................................ 14

    A.   Boermeester Was Observed Pushing Jane
        Roe Into A Wall ................................................ 14

    B.   USC Interviewed Jane Roe, Who Confirmed
        That Boermeester Assaulted Her On
        January 21, 2017 ....................................... 15

    C.   USC Notified Boermeester About The
        Investigation And Provided Him With Significant
        Procedural Rights During The Investigation .......... 19

    D.   USC's Investigation Uncovered Video Evidence
        That Boermeester Assaulted Jane Roe ................... 24

    E.   Documentary Evidence and Witness Statements—
        Including Boermeester's Statement—Confirmed
        That Boermeester Put His Hands On Jane Roe's
        Neck And Pushed Her ............................................ 26

3

1. The Statements Of Two Eye-Witnesses And A Witness Who Interacted With Jane Roe Immediately After The Assault...................... 26

2. Boermeester Confirmed That He Placed His Hand On Jane Roe's Neck And Pushed Her.................................................... 28

3. The Statements Of Witnesses Who Interacted With Jane Roe Shortly After The Assault .................................................. 29

4. Jane Roe's Written Statements To Her Friends................................................................ 30

5. Jane Roe's Statements Throughout The Investigation .................................................... 30

F. Jane Roe Made A Public Statement In Support Of Boermeester And Admitted That She Was Told To Do So By His Lawyers .......................................... 31

G. USC Notified Boermeester Of An Additional Allegation—That He Violated The Avoidance Of Contact Directive—And Provided Him An Opportunity To Respond ........................................... 32

H. USC Determined That Boermeester Violated Its Misconduct Policy.................................... 33

I. Boermeester Was Sanctioned By A Panel And Given The Opportunity To Appeal............................ 33

PROCEDURAL HISTORY .......................................... 36

A. The Superior Court Heard Boermeester's Petition For Writ Of Administrative Mandate...................... 36

B. Boermeester Files An Untimely Request To Augment The Administrative Record...................... 36

4

C.    The Superior Court Denies Boermeester's Petition And His Motion To Augment The Administrative Record. ................................................................ 37

STANDARD OF REVIEW ............................................................. 38

A.    Standard Of Review Applicable To The Superior Court's Denial Of Boermeester's Petition ................ 38

B.    Standard of Review Applicable To The Superior Court's Denial Of Boermeester's Motion To Augment The Administrative Record. ..................... 41

LEGAL ANALYSIS ....................................................................... 42

I.    The Court Should Disregard All Citations To Declarations That Were Not Submitted To USC During The Administrative Process And Are Not Part Of The Administrative Record ........................................................ 42

II.    Boermeester Received A Fair Hearing. .............................. 43

A.    Boermeester Received Notice Of The Allegations Against Him, Including Notice Of The Specific Code Sections At Issue. ............................................ 47

B.    Boermeester's Argument That The Interim Suspension Was Unfair Is Not Relevant To USC's Ultimate Finding; In Any Event, The Interim Suspension Was Fair And Appropriate. ................... 50

C.    USC's Investigatory Process Provided Boermeester With A Fair Hearing, Particularly Given The Video Evidence Documenting The Assault. ............. 52

5

1.     Allee Is Inapposite Because Credibility Was Not Central To USC's Adjudication Of This Intimate Partner Violence Case..................... 53

     a.     This Is Not A Sexual Misconduct Case. 54

     b.     Credibility Was Not Central To The Adjudication. .......................................... 55

2.     USC's Policy Afforded Boermeester A Fair Hearing By, Among Other Things, Providing Indirect Cross-Examination Of The Parties. . 61

3.     Boermeester Waived His Right To Question Jane Roe And Any Other "Critical Witnesses." ...................................................... 64

4.     USC's Process Created An Accurate Record ............................................................. 67

D.     USC's Internal Appeal Enhanced The Fairness Of The Overall Process ............................................. 71

E.     USC Complied With Its Own Policy. ........................ 72

1.     USC's Decision To Initiate The Investigation Was Consistent With Its Policy. .................... 73

2.     Helsper Weighed The Evidence Consistent With The Misconduct Policy........................... 75

F.     There Was No Prejudice From Any Purported Unfairness In The Administrative Process. ............. 75

III.     The Evidence Supports USC's Findings............................ 77

A.     The Trial Court Employed The Correct Standard Of Review—Substantial Evidence—To Deny The Petition. .................................................................. 77

B.     USC'S Findings Are Supported By The Evidence. ................................................................ 78

6

CONCLUSION ............................................................................. 79

CERTIFICATION ....................................................................... 80

072

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Andersen v. Regents of the Univ. of Cal.* (1972)
    22 Cal.App.3d 763 .................................................................... 67

*Applebaum v. Board of Directors* (1980)
    104 Cal.App.3d 648 ........................................................... 43, 44

*Berman v. Regents of University of California* (2014)
    229 Cal.App.4th 1265 .............................................................. 45

*C.R. v. Eugene School District 4J* (9th Cir. 2016)
    835 F.3d 1142 ........................................................................... 77

*California Indemnity Ins. Premium Finance Co. v. Fireman's
    Fund Ins. Co.* (1995)
    40 Cal.App.4th 1633 ................................................................ 50

*City of Walnut Creek v. County of Contra Costa* (1980)
    101 Cal.App.3d 1012 ................................................................ 65

*Clark v. City of Hermosa Beach* (2011)
    48 Cal.App.4th 1152 ................................................................ 50

*Coalition for Student Action v. City of Fullerton* (1984)
    153 Cal.App.3d 1194 ................................................................ 65

*Diamond Springs Lime Co. v. American
    River Constructors* (1971)
    16 Cal.App.3d 581 .................................................................... 43

*Doe v. Allee* (2019)
    30 Cal.App.5th 1036 ............ 21, 52, 53, 54, 55, 61, 62, 63, 71

*Doe v. Claremont McKenna College* (2018)
    25 Cal.App.5th 1055 ................................................. 40, 54, 63

*Doe v. Occidental College* (2019)
    37 Cal.App.5th 1003 ........................ 40, 46, 48, 52, 63, 66, 77

*Doe v. Regents of the University of California* (2016)
    5 Cal.App.5th 1055 ......................... 38, 40, 45, 48, 62, 76, 78

*Doe v. University of Cincinnati* (6th Cir. 2017)
    872 F.3d 393 ................................................................. 54, 64

*Doe v. University of Southern California* (2016)
    246 Cal.App.4th 221 ............................. 21, 39, 45, 53, 61, 77

*Doe v. University of Southern California* (2018)
    28 Cal.App.5th 26 ........................................................ 65, 77

*Doe v. University of Southern California*, (2018)
    29 Cal.App.5th 1212 .............................................. 40, 64, 66

*Doe v. Westmont College* (2019)
    34 Cal.App.5th 622 ...................................................... 62, 63

*Evans v. City of San Jose* (2005)
    128 Cal.App.4th 1123 ........................................................ 41

*Garfinkle v. Superior Court* (1978)
    21 Cal.3d 268 ..................................................................... 44

*Goodstein v. Cedars-Sinai Med. Ctr.* (1998)
    66 Cal.App.4th 1257 ......................................................... 45

*Granowitz v. Redlands Unified School Dist.* (2003)
    105 Cal.App.4th 349 .......................................................... 77

*Gupta v. Stanford University* (2004)
    124 Cal.App.4th 407 .......................................................... 38

*Harris Transportation Co. v. Air Resources Board* (1995)
    32 Cal.App.4th 1472 .......................................................... 67

*Havlik v. Johnson & Wales University* (5th Cir. 2007)
    509 F.3d 25 ........................................................................ 77

*Kaiser Foundation Hospitals v. Sacramento
County Superior Court* (2005)
    128 Cal.App.4th 85 ........................................................... 44

*Kramer v. State Bd. of Accountancy* (1962)
    200 Cal.App.2d 163 ...................................................... 71, 72

*Lugar v. Edmondson Oil Co.* (1982)
    457 U.S. 922 ............................................................... 44

*NBS Imaging Systems, Inc. v. State*
    *Bd. of Control* (1997)
    60 Cal.App.4th 328 ............................................... 65

*Ogundare v. Department of Industrial Relations, Division of*
    *Labor Standards Enforcement* (2013)
    214 Cal.App.4th 822 ..................................... 38, 39

*Owen v. Sand* (2009)
    176 Cal.App.4th 985 ..................................... 66, 67

*People v. Brown* (2004)
    33 Cal.4th 892 .................................................... 70

*Pinsker v. Pacific Coast Soc'y of Orthodontists* (1974)
    12 Cal.3d 541.................................................... 44

*Pomona College v. Superior Court* (1996)
    45 Cal.App.4th 1716 ............................... 44, 76, 77

*Regents of University of California v. Superior Court* (2018)
    4 Cal.5th 607 ................................................ 50, 51

*Saleeby v. State Bar of Cal.* (1985)
    39 Cal.3d 547........................................................ 44

*Schaer v. Brandeis University* (2000)
    432 Mass. 474.................................................... 77

*Schafer v. City of Los Angeles* (2015)
    237 Cal.App.4th 1250 ........................................ 38

*Shoemaker v. County of Los Angeles* (1995)
    37 Cal.App.4th 618 ............................................ 44

*Sweezy v. New Hampshire* (1957)
    354 U.S. 234 ...................................................... 77

*Toyota of Visalia, Inc. v. New Motor Vehicle Bd.* (1997)
    188 Cal.App.3d 872..................................... 41, 42

075

**STATUTES**

Code of Civil Procedure

Section 1094.5 ......................................................... 36, 39, 76

## INTRODUCTION

The University of Southern California does not tolerate violence against its students.  On January 21, 2017, Matthew Boermeester violated this principle when he grabbed Jane Roe[1], a fellow student, by her neck and shoved her head into a wall multiple times.

The incident was captured on a surveillance video in the alley behind Jane Roe's residence.  The Superior Court reviewed the video, and described it as follows:

> At 12:16:16 a.m., the video shows Petitioner shoving Roe from the area adjacent to the house into the alleyway.  .  . . . **At 12:17:12, Petitioner grabs Roe by the neck and pushes her toward the wall of the alley**. . . . . **Roe's head and body arch backwards . . . At 12:17:38, Petitioner moves toward Roe and appears to be pushing her against the wall**.

(6 CT 1161-62; emphasis added.)

In addition, the assault was witnessed by two male students who lived in the area (DH and MB2).  Consistent with the video evidence, each witness confirmed that the interaction appeared violent.  DH, Jane Roe's friend, tried to convince Jane

---

[1] Consistent with the underlying briefing in this matter, Respondents refer to the female student involved in this matter by the pseudonym "Jane Roe."

Roe to stay in his apartment—away from Boermeester—that evening. Jane Roe was crying but decided to return to her own apartment, expressing concern that Boermeester's conduct would escalate if she did not return to him. Fearing for Jane Roe's safety, DH and his roommate, TS, reported the altercation to USC.

As required by applicable law and its policy, USC began investigating the incident on January 23, 2017. Jane Roe initially confirmed that Boermeester caused her physical harm. Later, she appeared to forgive Boermeester, telling friends in written text messages that she did not think Boermeester would hurt her "again" and she was trying to help him avoid punishment for his conduct.

Jane Roe's willingness to forgive Boermeester does not diminish USC's responsibility to provide a safe educational environment, free from sex-based discrimination, harassment and violence, for all of its students. Thus, on May 2, 2017, after a thorough and neutral investigation, USC concluded Boermeester's conduct warranted expulsion.

Hoping to deflect attention from the overwhelming evidence supporting USC's finding, Boermeester portrays himself and Jane Roe as victims of a "failed system." Not so. Here, Boermeester appears on video grabbing Jane Roe by the neck and pushing her backwards into a wall. In addition, the parties and

13

witnesses to the key events all confirm that Boermeester put his hands on or around Jane Roe's neck and, while holding her by the neck, pushed her into a wall. Because the party and witness statements are consistent with what appears on video, credibility was not central to the adjudication of this matter. Indeed, no amount of additional process would change what can be observed on the security footage and confirmed in Boermeester's own statements. USC provided Boermeester with a fair hearing that was appropriate in light of the facts of this case by giving him notice of the allegations, an opportunity to review all of the evidence, an opportunity to respond to all of the evidence, and an opportunity to cross-examine Jane Roe through the submission of written questions (an opportunity that Boermeester declined). The Superior Court's judgment denying the petition for writ of administrative mandate should be affirmed and the writ of supersedeas, issued October 4, 2018, should be discharged.

## STATEMENT OF FACTS

### A. Boermeester Was Observed Pushing Jane Roe Into A Wall.

On January 21, 2017, two male USC students, DH and MB2, observed Boermeester physically assault Jane Roe by placing his hands around her neck and pushing her against a wall. (AR0085, 95.) Both described hearing screaming from an alley near Jane Roe's apartment and then looking outside to see

14

Boermeester pinning or pushing Jane Roe against a wall with his hands around her neck. (AR0085, 95.) Both described the encounter as aggressive, not playful. (*Id*.)

MB2 went outside to intervene. He asked Jane Roe and Boermeester how things were going, and he believed that his presence and question broke up the altercation. (AR0085.)

DH, who was friends with Jane Roe, woke up his roommate, TS, and then they both went outside to help Jane Roe. (AR0095, 125.) When they encountered Jane Roe, Boermeester had already gone back to Roe's apartment. (*Id*.) They spoke to her alone in their apartment and encouraged her to stay with them, rather than return to her own apartment. Jane Roe was crying, but stated she would return to her apartment because she did not want to "make [Boermeester] more mad." (AR0095, 126.)

Fearing for Jane Roe's safety, DH and TS reported the assault to a USC tennis coach, who reported it to USC's Title IX Coordinator, Gretchen Dahlinger Means. (*Id*.)

## B. USC Interviewed Jane Roe, Who Confirmed That Boermeester Assaulted Her On January 21, 2017.

As required by applicable law and its policy, USC began investigating the incident on January 23, 2017. (AR0001.) In a January 23, 2017 interview with USC's Title IX Investigator Lauren Elan Helsper, Jane Roe confirmed that Boermeester

15

assaulted her on January 21, 2017.

Jane Roe informed Helsper that she and Boermeester broke up in October 2016, but Boermeester continued to sleep at her house. (AR0185-186.) Jane Roe reported that she often had bruises on her legs or arms from Boermeester because he would hit her or grab her tightly when he was angry. (AR0184.) Jane Roe said she tried to downplay his conduct because she was uncomfortable and when she tried to confront him about it, he did not take her seriously. (AR0184.)

As for the January 21, 2017 assault, Jane Roe reported that it began when Boermeester grabbed the back of her hair "hard" in the alley by her apartment and told her to "drop the fucking leash," instructing her to release her dog in the alley. (AR0184.) Jane Roe said "no." Boermeester then grabbed her hair harder, which "hurt" and caused her to release the dog's leash. (*Id.*) According to Jane Roe, Boermeester then grabbed her by her neck, holding "tight" and causing her to cough. He let her go, laughed, and made a comment about the television show "Westworld," "and how you can hurt the robots because they aren't well." (*Id.*) He then grabbed her by the neck again and pushed her "hard" against a concrete wall. (*Id.*) She hit her head on the wall, which hurt her. (*Id.*) Jane Roe explained that Boermeester then let her go and did it again, grabbing her neck and pushing her head into the wall. (*Id.*)

16

Jane Roe stated that she saw three of her neighbors immediately after the assault: DH, TS, and MB2. DH and TS took her into their apartment, however, she returned to her apartment because Boermeester "wouldn't understand," if she was gone. (*Id*.)

At the end of the interview, USC offered to provide Jane Roe with emergency housing; Jane Roe wanted it for several nights "to feel safe." (AR0188.) Although Jane Roe also stated she did not want to participate in the investigation, consistent with Title IX of the Education Amendments of 1972, USC was compelled to investigate the matter because the alleged misconduct was violent and reported by eye witnesses. (AR0001, 188.)

Notwithstanding her reluctance to participate in the investigation, in the days following the interview, Jane Roe sent Helsper information to assist Helsper in contacting a witness Jane Roe identified during the interview. (AR0154.) Helsper also provided Jane Roe with information about the status of the investigation, including when Boermeester would be notified of the investigation. (*Id*.)

Jane Roe expressed concern about Boermeester's anticipated reaction to the investigation and, specifically, the fact that she provided a statement regarding his conduct. On January 26, 2017, the day Boermeester was scheduled to be

17

notified about the investigation, Jane Roe and Helsper had the following text message exchange:

>5:42 A.M.
>
>Jane Roe: **Hi Lauren I just got to the airport[2] and pretty freaked out about today**.  I know I've said this a lot but I really can't emphasis [sic] enough that you guys please please [sic] make it clear that I did not bring this forward that I want nothing to do with it and I'm not pressing any charges.  I'm sorry to bother you again.
>
>Helsper: [Jane Roe] you are not a bother.  Please don't hesitate to contact me anytime.  I stressed that to Gretchen yesterday as you requested and will do so again today.  Have a safe flight.  We will be in touch later today.
>
>Jane Roe: Ok thank you.
>
>11:25 AM
>
>Jane Roe: **He can't know I made a statement.  Can you not tell him I made a statement.  Like he can't know I met with you guys.**
>
>. . .

---

[2] USC chose to notify Boermeester about the investigation while Jane Roe was out of town.  (AR0012, fn. 18.)

18

083

> Helsper: Did something happen that you are concerned now?
>
> Jane Roe:  Well he was just told he has a meeting and he's super confused and getting kinda worked up.  I'm not really responding and everything is ok but *I need you guys not to tell him you've met with me yet*.
>
> Helsper: Have you been in touch with him or he [sic] just contacting you out of the blue?
>
> Jane Roe: I saw him at school and we are on fine terms that he knows of and *so I just act normal so he doesn't suspicious [sic].  Like most of the time we act totally fine even like friends like there haven't been any problems.*

(AR0154-156; emphasis added.)

### C.     USC Notified Boermeester About The Investigation And Provided Him With Significant Procedural Rights During The Investigation.

On January 26, 2017, Boermeester was served with: (1) notice of the investigation; (2) an avoidance of contact order, directing him to avoid contact with Jane Roe and to stay away from her residence; and (3) notice of an interim suspension. (AR0004, 470-473.)  With respect to the investigation, Boermeester was advised in writing that a report had been made

that he violated the Student Misconduct – Sexual, Interpersonal and Protected Class Misconduct Policy (Misconduct Policy) prohibiting Intimate Partner Violence.  (AR0470.)  He was further advised that the report alleged he:

> Engag[ed] in conduct that cause[d] physical harm to a person with whom you have had a previous dating, romantic, intimate, or sexual relationship; specifically, [by] grabbing [Jane Roe] by the neck, and pushing her head into a cinder block wall multiple times on/or about January 21, 2017.

(*Id*.)

Helsper then conducted a thorough investigation, including reviewing surveillance video of the incident and interviewing Jane Roe, Boermeester, and sixteen additional witnesses. Helsper also reviewed: (1) text messages and emails that Jane Roe sent or received; (2) an audio recording; and (3) written statements submitted by Boermeester and Jane Roe.  (AR0001-191.)

20

Helsper's investigation was conducted pursuant to USC's Misconduct Policy adopted August 22, 2016.[3] (AR0478.) Pursuant to the Misconduct Policy, Helsper's role was limited to: (1) investigating the allegations; (2) making findings of fact; and (3) in consultation with Title IX Coordinator Means, making a decision regarding whether the Respondent violated the Misconduct Policy. (AR0492-493.)

Before findings of fact were made, Boermeester was entitled to review the evidence collected, including witness statements, physical and documentary evidence, and audio/visual material. (AR0492.) Also before findings of fact were made, Boermeester was entitled to submit cross-examination questions to be asked of the other party by the Title IX Coordinator at an Evidence Hearing. (AR0492-493.) Boermeester was also entitled to appear at an Evidence Hearing himself. (*Ibid*.)

The Evidence Hearing is each party's separate opportunity to respond to the evidence collected. (AR0493.) At the Evidence Hearing, the Title IX Coordinator will ask each party the questions submitted by the other. (*Id*.) The Title IX

---

[3] The Misconduct Policy at issue in this matter differs from the Misconduct Policies at issue in *USC(1)* and *Allee*, which addressed sexual misconduct investigations that were conducted in 2013 and 2015, respectively. (See *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 235, hereafter *USC(1)*; *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1058, hereafter *Allee*.)

Coordinator—not the Title IX Investigator—has the responsibility to exclude any questions that are inflammatory, argumentative, or relate to character evidence or non-relevant sexual history.  As set forth in the Misconduct Policy, if "new information is shared by a party during the Evidence Hearing, the opposing party will be provided an opportunity to review and respond" to the evidence.  (*Id*.)

Here, Boermeester was afforded the substantial procedural rights set forth in USC's Misconduct Policy.  For example:

- He was promptly notified of his rights during the investigation, including the right to have an advisor present during all meetings with Helsper and the right to submit relevant information and the names of witnesses. (AR0291, 435, 437, 413-414, 451-455, 470-471.)

- He was given the opportunity to meet with Helsper, to share his side of the story, and did so, on January 30, 2017, with his mother (who is an attorney) present as his advisor.  (AR0171-182, 187.)

- He was given the opportunity to identify witnesses.  In response, he affirmed that he was not aware of any witnesses other than himself, Jane Roe, and "the two

22

guys who came to a totally wrong conclusion," i.e., DH
and TS.  (AR0435, 437.)  Contrary to Boermeester's
assertion, he did not ask Helsper to interview the
friends he spent time with before the January 21, 2017
incident occurred.  (AOB p. 27.)

- He was given access to all of the information collected by
Helsper, including witness interview notes and all
documents supplied by Jane Roe and third party
witnesses.  Specifically, over the course of two days, for a
total of approximately 3 hours, Boermeester was
permitted to and did review the evidence compiled
during the investigation.  ***His attorney,*** Mark Schamel
of Womble Carlyle Sandridge & Rice LLP***, was
physically present during the majority of the
evidence review***.  During the times when
Boermeester's attorney chose not to be physically
present, he was permitted to be on the phone with
Boermeester while Boermeester reviewed the evidence.
(AR0047-48, 84-191, 291, 301.)

- After reviewing the evidence, Boermeester was given the
opportunity to submit cross-examination questions for
Jane Roe (but chose not to do so) and again given the

opportunity to share his side of the story at an Evidence Hearing (but chose not to do so).  (AR0291-295.)

- He was given the opportunity to submit written statements to Helsper and did so on two occasions, before and after reviewing the evidence.  (AR0058-66.)

## D.  USC's Investigation Uncovered Video Evidence That Boermeester Assaulted Jane Roe.

During the investigation, USC obtained video evidence that Boermeester grabbed Jane Roe by the neck and pushed her into a wall on January 21, 2017.  The Superior Court reviewed the video, and described it as follows:

> At 12:16:16 a.m., the video shows Petitioner shoving Roe from the area adjacent to the house into the alleyway.  . . . . **At 12:17:12, Petitioner grabs Roe by the neck and pushes her toward the wall of the alley**. . . . . **Roe's head and body arch backwards . . .  At 12:17:38, Petitioner moves toward Roe and appears to be pushing her against the wall**.

(6 CT 1161-62; emphasis added.)

Indeed, the video depicts Boermeester repeatedly grabbing, pushing, and shoving Jane Roe, including pushing her backwards

into a wall twice while holding her by the neck. As described by the Superior Court, the video shows Boermeester pushing Jane Roe at 12:16:16 a.m. on January 21, 2017. (AR0190.) She stumbles backward for several steps. (*Id.*) Boermeester then walks away. Jane Roe briefly stands still and then walks toward Boermeester. When he turns toward her again, she runs from him. (*Id.*) Boermeester walks toward her and then the two can be seen standing face-to-face and possibly touching. (*Id.*) At approximately 12:16:49 a.m., Boermeester can be seen with his arms on or near the front of Jane Roe's neck. (*Id.*) The two are facing one another and he pushes her back several steps and then drops his arms. (*Id.*) The two stand close to one another and Boermeester appears to have his hands on Jane Roe's neck at various times. (*Id.*)

At 12:17:12 a.m., Boermeester grabs Jane Roe by the front of the neck while facing her and forcefully pushes her backwards for approximately seven steps. (*Id.*) He pushes her into a wall and out of the camera's view. (*Id.*) Jane Roe's head and body lean backward from the force of Boermeester's movement. (*Id.*) Boermeester makes forceful, rapid steps and pushes Jane Roe backwards while holding her by the neck. (*Id.*) At 12:17:26 a.m., Boermeester and Jane Roe re-enter the camera's view. (*Id.*) Jane Roe appears to be pushing Boermeester off of her. (*Id.*) At 12:17:38 a.m., Boermeester moves toward Jane Roe again, puts

25

his hands around her neck again, and pushes her toward the wall, where she is again out of the camera's view. (*Id*.)

### E. Documentary Evidence and Witness Statements—Including Boermeester's Statement—Confirmed That Boermeester Put His Hands On Jane Roe's Neck And Pushed Her.

The documentary evidence and witness statements also confirmed that on the night of January 21, 2017, Boermeester put his hands around Jane Roe's neck and pushed her toward a wall.

#### 1. The Statements Of Two Eye-Witnesses And A Witness Who Interacted With Jane Roe Immediately After The Assault.

DH and MB2 each separately observed the January 21, 2017 assault and DH and TS interacted with Jane Roe immediately after the assault.

DH told Helsper that he heard a male yelling loudly and a woman talking. He looked out his window to see what was happening and saw that "[Boermeester] had pinned [Jane Roe] against the wall with his hand on her chest/neck." (AR0095.) Jane Roe's dog was running around the street, which is "when DH knew that there was an issue because she doesn't let her dog run around." (*Id*.) DH alerted his roommate, TS, who was asleep, telling him "[Jane Roe] and [Boermeester] are fighting,"

and went outside. (*Id*.)

DH and TS spoke to Jane Roe alone in their apartment and encouraged her to stay with them, rather than return to her own apartment. DH reported that Jane Roe "seemed pretty scared," but said "No, it's going to be fine, I don't want to make him more mad, I will go back there." (AR0095.) TS stated Jane Roe was "crying and tried to wipe away the tears. She didn't want [Boermeester] to know and said that he was going to be suspicious that she was there for so long [in DH and TS's apartment]." (AR00126.)

MB2, who also observed the altercation, initially reported that he heard an argument, which may have been about a dog, but did not see anything. (AR0131.) About a month later, while the investigation was still ongoing, he contacted Helsper to explain that, despite his earlier statement, he actually "saw everything." (AR0085, 191.) He explained that he initially told Helsper that he had not seen anything to protect Jane Roe. About two days after the incident, Jane Roe told MB2 that she wanted to "let this whole thing go," so MB2 initially tried to downplay the incident to respect Jane Roe's desire to "keep it on the down low." (AR0085.) He then explained that on the night of January 21, 2017, he heard laughing and then screaming sounds in the alley. The sounds were playful at first, but then the male was "asserting his dominance" over the female. (*Id*.) MB2 then

27

saw a man standing with "both of his hands" around Jane Roe's neck, pushing her against a wall. (*Id*.) He heard Jane Roe "gagging."

Based on what he observed, MB2 believed that the man's behavior was "violent" and that he was "domestically abusing [Jane Roe]." He went downstairs with his trash bag and asked how things were going, which "broke it up." (*Id*.) He believed Jane Roe was scared and "could see in her eyes, she was very scared." (*Id*.)

### 2. Boermeester Confirmed That He Placed His Hand On Jane Roe's Neck And Pushed Her.

On January 30, 2017, Helsper interviewed Boermeester with his mother (who is an attorney) present as an advisor. (AR0171, 187.) Boermeester's statement was consistent with the statements provided by Jane Roe, DH, MB2, and TS.

Boermeester stated that around 1 a.m. on January 21, 2017, he and Jane Roe were playing around in the alley, and he asked her to drop her dog. (AR0172, 179.) He admitted that he put his hand on her neck while they were standing by a wall. (AR0173, 179.) In a written statement, Boermeester also confirmed that he "pushed and grabbed" Jane Roe. (AR0060.) Boermeester stated that this pushing and grabbing was a "sexual thing" and mutual playful roughhousing. (AR0060, 173.)

28

He further admitted that "a random person walked by and asked if everything was ok and [he and Jane Roe] apologized and said they didn't mean to scare him." (AR0179.)

He also admitted that DH and TS "grabbed [Jane Roe]" after the incident because they "thought it was physical harm." (*Id*.)

### 3. The Statements Of Witnesses Who Interacted With Jane Roe Shortly After The Assault.

Witnesses GO and SS interacted with Jane Roe shortly after the assault.

GO told Helsper that Jane Roe said Boermeester "came home very drunk and threw her against the wall of the apartment." (AR0133.) GO reported that Jane Roe was on the verge of tears or crying when she said this. (*Id*.) According to GO, Jane Roe also said it "hurt" when Boermeester "hit her head against the wall" and she had "bruises to prove something really did happen." (AR0113.)

SS said Jane Roe told her Boermeester "got drunk at a party and they got in an argument outside the apartment and he grabbed her by the throat and threw her against the wall." (AR0093.) According to SS, Jane Roe said she was scared when it was happening but now "wants to take that back" because she feels bad that Boermeester was suspended. (*Id*.)

### 4. Jane Roe's Written Statements To Her Friends.

Jane Roe's text messages to her friends following the altercation also revealed that her initial report to Helsper was accurate, but she had since decided to help Boermeester because she did not want him to be disciplined for his actions. For example, Jane Roe texted GO around the time Boermeester was notified of the investigation and wrote: "I know you don't understand really why **I'm being lenient** about this but I don't want anything else bad happening to him…" (AR0132.) (Emphasis added.)

Jane Roe also texted TS before TS's interview with Helsper and told him that she knew he would not agree, but she had decided to help Boermeester. Regarding TS's interview, she said "Please don't fuck him over more. I'm not in danger at all I trust him **I trust that he won't ever hurt me _again_**." (AR0121-122.) (Emphasis added.)

### 5. Jane Roe's Statements Throughout The Investigation.

As set forth above, when Jane Roe was interviewed on January 23, 2017, she provided a detailed statement confirming, among other things, that Boermeester grabbed her around the neck and pushed her into a wall twice on January 21, 2017. (AR0007-12, 183-189.) The next day, she called Helsper and

30

asked to withdraw her statement, explaining that she was afraid of retaliation and rumors that Boermeester would spread about her when he read her statement. (AR0012.) In the following days, Jane Roe continued to express concern about Boermeester's reaction to the investigation. (AR0012-13.)

On January 30, 2017, she stated that when she gave her initial statement she thought she was in a "supportive environment" so she freely shared her story. She also felt pressured to do so by friends and coaches who encouraged her to act for "the greater good." (AR0013.) Jane Roe stated she now believed the punishment was too harsh and that Boermeester should be required to go to counseling and placed on probation. (AR0013, 168-169.) In a written statement that Jane Roe submitted after reviewing all of the evidence, she again reiterated that when she first met with Helsper on January 23, 2017, she believed that their discussion "was like a counseling session where [she] was free to vent about [her] relationship or blow off steam." (AR0067.)

## F. Jane Roe Made A Public Statement In Support Of Boermeester And Admitted That She Was Told To Do So By His Lawyers.

On February 7, 2017, while the investigation was ongoing, the media reported on the investigation. (AR0005.) In response,

31

Jane Roe tweeted: "I am the one involved in the investigation with Matt Boermeester.  The report is false."  (AR0014.)

Jane Roe's friend, GO, texted Jane Roe to ask about the tweet.  Jane Roe admitted that Boermeester's lawyers told her to post the tweet and that she did so because she wanted to help Boermeester.  (AR0110.)

### G. USC Notified Boermeester Of An Additional Allegation—That He Violated The Avoidance Of Contact Directive—And Provided Him An Opportunity To Respond.

On February 14, 2017, based on information that came to light during the investigation, including Jane Roe's tweet, the Title IX Office notified Boermeester that he would also be investigated for violating the avoidance of contact order that was served on him on January 26, 2017.  (AR0413-414.)

Boermeester was given the opportunity to respond to the additional allegations, and chose to do so in writing, once before reviewing the evidence and once after reviewing all of the evidence collected as part of the investigation.  (AR0047-48, 58-66, 378.)

## H.  USC Determined That Boermeester Violated Its Misconduct Policy.

After a thorough and neutral investigation, Helsper prepared a detailed report of her factual findings and concluded that Boermeester violated USC's Misconduct Policy by engaging in intimate partner violence and continuing to contact Jane Roe after USC directed him to avoid contact with her.  (AR0001-78.)

The weight of the incontrovertible evidence, including the video, Jane Roe's statements, the statements of two eye witnesses to the assault, the statements of witnesses who interacted with Jane Roe after the assault, Boermeester's own admissions, and text messages that Jane Roe sent to her friends and Helsper, supported Helsper's finding.  (AR0050-54.)

Helsper also concluded that Boermeester violated the avoidance of contact order, which prohibited him from making "direct, indirect, or third-party contact" with Jane Roe.  (AR0053-54.)  There was significant evidence that Boermeester had been in contact with Jane Roe.  (AR0054.)

## I.  Boermeester Was Sanctioned By A Panel And Given The Opportunity To Appeal.

After Helsper reached her findings and, in consultation with the Title IX Coordinator, determined that the Misconduct Policy had been violated, her detailed report was provided to a

Misconduct Sanctioning Panel to determine appropriate sanctions. (AR0493.) The Misconduct Sanctioning Panel is composed of three individuals. (*Id*.) Two are staff or faculty designated by the Provost and Senior Vice President for Academic Affairs and one is an undergraduate student. (*Id*.) The Title IX Coordinator and Title IX Investigator are not members of the Misconduct Sanctioning Panel and do not have a vote in determining sanctions. (*Id*.)

After reviewing Helsper's findings and discussing the facts of the case and university policy, the Misconduct Sanctioning Panel imposed a sanction of expulsion. (AR0081-82.)

Thereafter, Boermeester was afforded the opportunity to appeal the findings and sanction to the Vice President for Student Affairs, Dr. Ainsley Carry. (AR0494-495.) With the help of his attorney, Boermeester submitted an appeal challenging the findings and the sanction. (AR0197-208, 228-229.)

Pursuant to the Misconduct Policy, the appeal was first considered by an Appellate Panel. (AR0215-220.) The Appellate Panel is composed of three individuals, at least one of whom is a faculty member appointed by the Vice President for Student Affairs. (AR0494.) The Title IX Coordinator and Title IX Investigator are not members of the Appellate Panel and do not advise the Appellate Panel. (*Id*.) After a careful review of the record and Petitioner's appeal, the Appellate Panel found the

34

evidence supported Helsper's findings. (AR0217.) However, the Appellate Panel did not believe expulsion was appropriate because Petitioner's conduct could have been "reckless" rather than intentional. (AR0217-218.) On that basis, the Appellate Panel recommended a two-year suspension. (*Id*.)

Dr. Carry reviewed the Appellate Panel's recommendation and the records in the case before making a final decision on Petitioner's appeal. (AR0221, 496.) Dr. Carry approved the Appellate Panel's finding that Boermeester violated the avoidance of contact order and engaged in intimate partner violence but rejected its recommendation to decrease the sanction. Instead, Dr. Carry affirmed the Misconduct Sanctioning Panel's sanction of expulsion. (AR0221.) Boermeester was found responsible for violating a provision of the Misconduct Policy that prohibits "violence committed against a person . . . with whom they have a previous or current dating, romantic, intimate, or sexual relationship." "Violence" means "causing physical harm to the person . . . ." Intent to cause physical harm is not an element. Thus, Dr. Carry reasoned that expulsion was the appropriate sanction, irrespective of whether Boermeester intended to harm Jane Roe or did so recklessly. (*Id*.) Boermeester was notified of Dr. Carry's final decision on July 7, 2017. (*Id*.)

# PROCEDURAL HISTORY

## A. The Superior Court Heard Boermeester's Petition For Writ Of Administrative Mandate.

On August 11, 2017, Boermeester filed a Petition for Writ of Mandamus seeking judicial review of USC's administrative decision pursuant to Code of Civil Procedure section 1094.5. (1 CT 6-208; 2 CT 1-303.) Boermeester then filed his opening brief on November 14, 2017. (4 CT 757-777.) On December 11, 2017, Respondents filed their response. (4 CT 825-832; 5 CT 833-844.) Boermeester filed a reply on December 20, 2017. (5 CT 871.)

The Superior Court heard argument on Boermeester's petition on January 3, 2018 and took the matter under submission, indicating it was likely to rule in Respondents' favor. (2 RT 901-968.)

## B. Boermeester Files An Untimely Request To Augment The Administrative Record.

On January 5, 2018, Boermeester appeared *ex parte* and asked the Superior Court to augment the administrative record with a declaration signed by Jane Roe on September 6, 2017. (5 CT 970-1041, 6 CT 1041-1050.) Respondents opposed the *ex parte* application. (5 CT 962-969.) At the *ex parte* hearing, the Superior Court provided the parties with its tentative ruling

36

denying the Petition. (2 RT 1201.) However, to ensure the record was clear in the event of an appeal, the Superior Court agreed to hold the tentative in abeyance and hear a noticed motion to augment the administrative record. (2 RT 1202-1203.) Per the Superior Court's ruling, the noticed motion to augment the administrative record was permitted to encompass only Jane Roe's September 6, 2017 declaration. (2 RT 1203.)

On February 27, 2018, Boermeester filed a noticed motion to augment the administrative record, seeking to augment the record with the declaration signed by Jane Roe on September 6, 2017 ***and***: (1) an additional declaration signed by Jane Roe on February 27, 2018; (2) a picture of Boermeester's knee purportedly taken on January 20, 2017; and (3) undated photographs of Boermeester and Jane Roe. (6 CT 1052-1087.) Respondents filed an opposition to Boermeester's motion on March 8, 2018. (6 CT 1088-1120.) Boermeester filed a reply on March 16, 2018. (6 CT 1121-1128.)

## C. The Superior Court Denies Boermeester's Petition And His Motion To Augment The Administrative Record.

On March 21, 2018, the Superior Court heard argument on Boermeester's motion to augment the administrative record and Boermeester's Petition. (2 RT 1501-1514.) The Superior Court

37

denied Boermeester's motion and his Petition. (2 RT 1514; 6 CT 1129-1151.)

## STANDARD OF REVIEW

### A. Standard Of Review Applicable To The Superior Court's Denial Of Boermeester's Petition.

A writ of administrative mandate is an available remedy when a student is disciplined by a private university. (See *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411.) The trial court's adjudicatory decision depends upon the nature of the right involved. (*Ogundare v. Department of Industrial Relations, Division of Labor Standards Enforcement* (2013) 214 Cal.App.4th 822, 827.) This, in turn, determines the appropriate standard of review.

The scope of review from a judgment on a petition for writ of mandate is the same as that of the Superior Court. (*Doe v. Regents of the University of California* (2016) 5 Cal.App.5th 1055, 1072, hereafter *UCSD*.) In a case not involving a fundamental vested right, the Court of Appeal reviews the university's decision, rather than the Superior Court's decision, applying the same standard of review applicable in the trial court. (*Ibid.*, citing *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.) The Court determines "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there

38

was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b); *UCSD, supra,* 5 Cal.App.5th at p. 1072.)

The Court reviews the fairness of the administrative proceeding de novo. (*Doe v. University of Southern California (2016) 246 Cal.App.4th 221, 239, hereafter USC(1)*.) The Court reviews the university's substantive decision for substantial evidence. (Code Civ. Proc., § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record"].) When the Superior Court applies the substantial evidence standard, this Court's function is the same as the Superior Court—it reviews the administrative record to determine whether the agency's decision is supported by substantial evidence, resolving all conflicts in support of the agency. (*USC(1), supra*, 246 Cal.App.4th at p. 239; *UCSD, supra,* 5 Cal.App.5th at p. 1073.)

If, however, the administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence. (*Ogundare, supra,* 214 Cal.App.4th at p. 827.) If the Superior Court applied its independent judgment, this Court would determine whether substantial evidence supported the Superior Court's decision. (*Ibid.*)

39

Here, the Superior Court correctly determined that no fundamental vested right was at issue, and thus, applied the substantial evidence test to review USC's decision. (See *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065; *USC(1), supra,* 246 Cal.App.4th at pp. 238-39; *Doe v. University of Southern California,* (2018) 29 Cal.App.5th 1212, 1231 ["A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right."], hereafter *USC(3)*; *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1018, reh'g denied (July 24, 2019), review denied (Oct. 9, 2019), hereafter *Occidental College* ["California cases reviewing colleges' disciplinary decisions concerning student sexual misconduct have repeatedly applied the substantial evidence standard because the decisions there do not involve a fundamental vested right."] (citations and quotations omitted.)) Accordingly, this Court must review USC's decision for substantial evidence, which means the Court does not weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that can be drawn from the evidence. (*UCSD, supra,* 5 Cal.App.5th at p. 1073.) Only if no reasonable person could reach the conclusion reached by the agency, based upon the entire record before the agency, will a Court conclude that the agency's findings are not supported by substantial evidence. (*Ibid.*)

**B.** **Standard of Review Applicable To The Superior Court's Denial Of Boermeester's Motion To Augment The Administrative Record.**

It is well-settled that "a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency."  (*Toyota of Visalia, Inc. v. New Motor Vehicle Bd.* (1997) 188 Cal.App.3d 872, 881.)  "A court may exercise its discretion to augment an administrative record if the evidence is relevant and if it was improperly excluded during the administrative process or it could not, in the exercise of reasonable diligence, have been presented before the administrative decision was made." (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1144.)

Where the Superior Court has denied a motion to augment the administrative record, the Court of Appeal reviews the Superior Court's decision for abuse of discretion.  (*Ibid.*)

# LEGAL ANALYSIS

## I. THE COURT SHOULD DISREGARD ALL CITATIONS TO DECLARATIONS THAT WERE NOT SUBMITTED TO USC DURING THE ADMINISTRATIVE PROCESS AND ARE NOT PART OF THE ADMINISTRATIVE RECORD

As set forth above, "a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency." (*Toyota of Visalia, Inc., supra, 188 Cal.App.3d at p. 881*.)  Here, Boermeester cites: (1) declarations signed by Jane Roe on September 6, 2017 and February 27, 2018; (2) a declaration he signed on August 17, 2017; and (3) a declaration signed by Hanna Stotland on September 5, 2017 to support his recitation of the facts and his legal argument.  (*See* AOB pp. 19, 20, 21, 22, 23, 24, 25, 26, 33, 48, 54, 56, 6 [references to 2 CT 401-402, 2 CT 413-416, 3 CT 578-580, 3 CT 598-602, 5 CT 1000, and 6 CT 1070-1072].)  All four declarations were submitted ***after*** USC issued its final decision on Boermeester's appeal.

These citations are inappropriate.  The Superior Court denied Boermeester's motion to augment the administrative record with the declarations that Jane Roe signed on September 6, 2017 and February 27, 2018.  (6 CT 1130-31.)  Boermeester did not address the Superior Court's denial of his motion to augment the administrative record in his Opening Brief and he is

42

precluded from doing so on reply. (See *Diamond Springs Lime Co. v. American River Constructors* (1971) 16 Cal.App.3d 581, 609 ["A contention made for the first time in an appellant's reply brief, unaccompanied by any reason for omission from the opening brief, may be disregarded."]) Thus, the Superior Court's decision is not encompassed by this appeal. The Court should disregard all statements and arguments based on the declarations signed by Jane Roe on September 6, 2017 and February 27, 2018.

Similarly, the Court should disregard all statements and arguments based on the declarations signed by Boermeester on August 17, 2017 and Hanna Stotland on September 5, 2017. Boermeester did not move to augment the administrative record with these declarations and failed to address the Superior Court's order sustaining Respondents' objections to the declaration of Hanna Stotland. (4 CT 627.) These declarations were not submitted to USC during the administrative process and they are not part of the administrative record.

## II.    BOERMEESTER RECEIVED A FAIR HEARING.

Under California law, a petitioner receives a fair hearing when he receives "[a]dequate notice of charges and a reasonable opportunity to respond." (*Applebaum v. Board of Directors* (1980)

104 Cal.App.3d 648, 657.)[4]  The specific requirements of a fair hearing "vary depending upon the situation under consideration and the interest involved." (*Ibid.*; *Pinsker v. Pacific Coast Soc'y of Orthodontists* (1974) 12 Cal.3d 541, 555.)  However, California law is clear that a "fair hearing" does not require a formal hearing with all the embellishments of a court trial, including the opportunity to confront and cross-examine witnesses.  (*Saleeby v. State Bar of Cal.* (1985) 39 Cal.3d 547, 565 ["A formal hearing, with full rights of confrontation and cross-examination is not necessarily required."]; *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1730 ["The use of the words 'fair trial' does not mean that [plaintiff] was entitled to a formal hearing"];

---

[4] As a private institution, USC's actions, and the actions of its employees, are not governed by due process under the Fourteenth Amendment of the United States Constitution and article 1, section 7 of the California Constitution.  (See *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 272 [private actions are "exempt from the due process constraints of the federal Constitution" and "the due process clause of the state Constitution"]; *Kaiser Foundation Hospitals v. Sacramento County Superior Court* (2005) 128 Cal.App.4th 85, 102 [holding that private hospitals are not required to provide due process in connection with their peer review process]; *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 632 [holding an employee's removal from a position at a private university does not constitute state action and does not implicate the due process clause]; *Lugar v. Edmondson Oil Co.* (1982) 457 U.S. 922, 930 ["[T]he Due Process Clause protects individuals only from governmental and not from private action."])

*Goodstein v. Cedars-Sinai Med. Ctr.* (1998) 66 Cal.App.4th 1257, 1265-66 ["The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial"].) Where student discipline is at issue, a fair administrative hearing means the student must receive notice and an opportunity to respond, and the university must comply with its own policies and procedures. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271.) The procedures must be tailored to ensure that students "are given a meaningful opportunity to present their case." (*UCSD, supra,* 5 Cal.App.5th at p. 1078.) Thus, a fair trial is provided when there is "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" (*USC(1), supra,* 246 Cal.App.4th at p. 240.)

> As this Court recently summarized:
>
> The cases do not plainly define the components or standards of a fair hearing in student disciplinary proceedings involving allegations of sexual misconduct. A fair hearing need not include all the safeguards and formalities of a criminal trial. ***The pure adversary model is not entitled to constitutionally enshrined exclusivity as the means for resolving disputes in the incredible variety of administrative mechanisms utilized in this country***. Courts have recognized competing concerns. On the one hand, an accused student has

45

an interest to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. The risk of error is not trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process. ***On the other hand, a formalized hearing process would divert both resources and attention from a university's main calling, that is education***.

(*Occidental College, supra*, 37 Cal.App.5th at p. 1014 (citations and quotations omitted, emphasis added).)

On appeal, Boermeester contends that Respondents failed to provide him adequate notice, the interim suspension was unfair, USC's investigative process was unfair because it did not include a live hearing, and USC failed to follow its procedures. Boermeester also ambiguously contends USC's appellate process "compounded investigation issues." None of these contentions are supported by the record nor do they warrant reversal. Boermeester was provided notice and a fair, robust opportunity to present his case that was appropriate under the circumstances, particularly because credibility was not central to USC's adjudication. Here, the party and witness statements are consistent with the video and uniformly support that Boermeester engaged in intimate partner violence.

46

### A. Boermeester Received Notice Of The Allegations Against Him, Including Notice Of The Specific Code Sections At Issue.

During USC's investigation, Boermeester received notice of the two charges for which he was found responsible. On January 26, 2016, Boermeester was provided with written notice of the first charge that identified the applicable section of the policy at issue. (AR0470.) The notice further stated it was alleged that Boermeester violated USC's policy against Intimate Partner Violence by:

> Engaging in conduct that causes physical harm to a person with whom you have had a previous dating, romantic, intimate, or sexual relationship; specifically, grabbing [Jane Roe] by the neck, and pushing her head into a cinder block wall multiple times on/or about January 21, 2017.

(*Ibid*.) Thus, before Boermeester was interviewed by Helsper, he was aware of the applicable policy and specific code section at issue, the nature of the alleged conduct, the date of the alleged conduct, and the alleged recipient of his prohibited conduct.

Following USC's investigation, Boermeester was found responsible for the exact conduct that was disclosed in USC's written notice. USC concluded: "There is sufficient evidence to indicate that [Boermeester] engaged in intimate partner violence

47

by grabbing [Jane Roe] by the neck and pushing her head into a wall on/about January 21, 2017." (AR0054.)

Thus, consistent with *USC(1), supra*, and *Occidental College, supra*, USC provided Boermeester with written notice that apprised him "of the pendency of the action" and provided him with sufficient details to enable him to respond. (*Occidental College, supra*, 37 Cal.App.5th at pp. 1015-16.)

In arguing that USC's notice regarding the intimate partner violence charge was deficient, Boermeester focuses on the evidence collected during the investigation, implying that USC should have provided him notice of all of the evidence it was likely to collect and investigatory leads it was likely to follow at the outset of the investigation. Boermeester's argument makes no sense. USC could not anticipate what witnesses would say before they had been interviewed. However, USC did provide Boermeester with access to *all* of the evidence it collected during the investigation and gave him the opportunity to respond to the evidence before findings were made. (AR0047-48, 59-66.) Thus, Boermeester was fully apprised of both the conduct on which USC made a finding and the evidence that supported its finding. There was no "bait and switch," that would render USC's January 26, 2016 notice regarding the intimate partner violence charge inadequate. (*Occidental College, supra*, 37 Cal.App.5th at p. 1016.)

On February 14, 2017, USC provided Boermeester with written notice of a second alleged policy violation. (AR0414.) Again, the notice identified the applicable section of the policy at issue and further stated it was alleged that Boermeester violated USC's Interim Measure by: "contacting and communicating with [Jane Roe] via text, phone call, social media, and in-person since the issuance of the Avoidance of Contact Order issued by Dr. Lynette Merriman and served on you January 26, 2017." (*Ibid*.) As with the first alleged violation of USC's policy, Boermeester was allowed to review and respond to *all* evidence collected during USC's investigation and he was found responsible for the exact conduct that was disclosed in the notice. (AR0047-48, 54, 59-66.) Thus, Boermeester's assertion that the notice was deficient is not supported by the law or the facts.

Finally, Boermeester's assertion that Jane Roe was not provided adequate notice of the investigation is a red herring. Jane Roe is not a party to this action and Boermeester did not file the Petition or this appeal in a representative capacity on behalf of Jane Roe. In any event, Jane Roe was not accused of or found responsible for misconduct and the notice provided to Jane Roe has no bearing on whether Boermeester had adequate notice of the charges against him.

49

### B. Boermeester's Argument That The Interim Suspension Was Unfair Is Not Relevant To USC's Ultimate Finding; In Any Event, The Interim Suspension Was Fair And Appropriate.

For the first time on appeal, Boermeester asserts that USC's interim suspension process was unfair. (AOB, p. 41-42.) Each of his points should be rejected outright because he did not raise them below. (*California Indemnity Ins. Premium Finance Co. v. Fireman's Fund Ins. Co.* (1995) 40 Cal.App.4th 1633, 1641; accord, *Clark v. City of Hermosa Beach* (2011) 48 Cal.App.4th 1152, 1174, fn. 23 [failure to raise issue in petition for writ of administrative mandate waives issue on appeal].)

In any event, Boermeester's assertion that the interim suspension process was unfair is a non sequitur in the context of his request that the Court of Appeal reverse the Superior Court and order USC to set aside its ultimate findings and sanctions. The interim suspension was a protective measure taken to ensure the safety of USC's students. It did not impact Boermeester's ability to participate in the investigation and present his defense.

Further, the California Supreme Court has recognized that a university has a duty "to take reasonable steps to protect students when it becomes aware of a foreseeable threat to their safety." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 633.) Here, USC received information

suggesting that Boermeester presented a threat to Jane Roe's safety.  He was observed assaulting Jane Roe on January 21, 2017.  On January 23, 2017, Jane Roe confirmed that he hurt her on January 21, 2017 and had a history of hurting her.  (AR0183-189.)  Then, on January 27, 2017, USC received a video that recorded Boermeester's January 21, 2017 assault.  (AR0074.)  After receiving this information, if USC had not acted to protect Jane Roe and Boermeester hurt her again (or hurt another student), USC would undoubtedly be facing a different type of lawsuit now.

 Consistent with *Regents of University of California, supra*, USC's Misconduct Policy permits the university to take interim protective actions, including placing a respondent on an interim suspension, when the facts warrant such action.  (AR0489-90.)  The Misconduct Policy states that when interim action is taken, the student subject to such measures is to be given prompt notice of the charges and the interim measure.  (AR0490.)  Thereafter, the student is provided "an opportunity for review of the measure . . . within 15 days notice by the Vice President for Student Affairs or a designee." (*Id.*)

 Boermeester received prompt notice of the charges and notice of the interim measure.  (AR0470-72.)  He also availed himself of the opportunity for a review of the measure by the Vice President for Student Affairs.  (AR0442-44.)  Thus, USC complied

with its policy and, as in *Doe v. Occidental College, supra*, 37 Cal.App.5th at p. 1016, USC's decision to place Boermeester on an interim suspension did not render its investigation unfair and does not warrant reversal of the Superior Court's decision.

### C. USC's Investigatory Process Provided Boermeester With A Fair Hearing, Particularly Given The Video Evidence Documenting The Assault.

The majority of Boermeester's argument is based on *Doe v. Allee,* (2019) 30 Cal.App.5th 1036, 1058. Boermeester asserts that USC's investigation was unfair because he was not provided with the explicit opportunity to cross-examine witnesses and USC did not conduct a "live hearing" in the traditional sense of the word, employing all of the formalities typically seen in a criminal proceeding. (AOB 42-48.) Boermeester's argument is based on a faulty premise. This case is not analogous to *Allee* because: (1) it does not involve sexual misconduct; (2) the credibility of witnesses was not central to USC's adjudication of the matter; and (3) USC utilized a different Misconduct Policy than the policy at issue in *Allee*. In any event, here, Boermeester specifically declined to submit questions for Jane Roe and argued against live questioning, so his argument now that he should have been given an even more robust process for submitting such questions is unpersuasive.

1. ***Allee* Is Inapposite Because Credibility Was Not Central To USC's Adjudication Of This Intimate Partner Violence Case.**

In *Allee*, the Second District Court of Appeal, Division Four reaffirmed that the opportunity to cross-examine witnesses is not required in every administrative proceeding. Analyzing the recent jurisprudence regarding university disciplinary proceedings involving sexual misconduct, *Allee* stated:

> In *Doe v. USC(1), supra*, 246 Cal.App.4th 221, 200 Cal.Rptr.3d 851, we recognized " 'the value of cross-examination as a means of uncovering the truth [citation], [but] ***reject[ed] the notion that as a matter of law every administrative appeal ... must afford the [accused] an opportunity to confront and cross-examine witnesses*.**' " (*Id.* at p. 245, 200 Cal.Rptr.3d 851.) ***We adhere to that view***.

(*Allee, supra,* 30 Cal.App.5th at p. 1067 (emphasis added).)

Thus, the Court of Appeal held that cross-examination is required in only certain cases. Specifically, the Court of Appeal held that in cases in which:

> a student faces serious discipline for ***alleged sexual misconduct***, and ***the credibility of witnesses is central to the adjudication of the charge***, fundamental fairness requires that the university must at least permit cross-examination of adverse witnesses at a hearing in which the witnesses appear in person or by some other means (such as means provided by technology like videoconferencing) before

53

one or more neutral adjudicator(s) with the power independently to judge credibility and find facts.

(*Id.* at p. 1061 (emphasis added).) The *Allee* Court's holding was consistent with *Doe v. Claremont McKenna College*, which stated:

> "[t]he ability to cross-examine is most critical when the issue is the credibility of the accuser." ***In contrast, a university might not have to permit witness questioning if the case against the accused student "d[oes] not rely on testimonial evidence" from the complainant, or when the accused student "admits the 'critical fact[s]' against him."***

(*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1069, hereafter *CMC*, (quoting *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 401, 405).)

### a. This Is Not A Sexual Misconduct Case.

The cases in which cross-examination have been required, including the cases on which *Allee* relies, all involve sexual misconduct that took place behind closed doors, with no witnesses other than the parties, and the key issue in dispute was consent. (*Allee, supra,* 30 Cal.App.5th at p. 1062 [explaining recent cases have "attempted more clearly to delineate the contours of a 'fair hearing' in university disciplinary proceedings involving allegations of sexual misconduct, where the resolution of conflicting accounts turns on witness credibility."].)

54

This is not such a case. Boermeester was not found responsible for sexual misconduct. (*Allee, supra,* 30 Cal.App.5th at fn. 5 [defining sexual misconduct] AR0484-486 [defining sexual assault and other sexual misconduct as a different violation than intimate partner violence].) Rather, he was found responsible for engaging in intimate partner violence that took place in public, was witnessed by at least two individuals, and was captured on video.

### b. Credibility Was Not Central To The Adjudication.

Moreover, the credibility of the witnesses and parties was not central to USC's adjudication of the matter. To the contrary, the video evidence showed the prohibited conduct. As set forth above, the Superior Court reviewed the video and described it as follows:

> [A]t 12:16:16 a.m., the video captured Petitioner shoving Roe into the alley. **Then, at 12:17:12 a.m., the video captured Petitioner grabbing Roe by the neck and pushing her to the wall in a manner that caused Roe's head and body to arch backwards.**

(6 CT 1176; emphasis added.)

Further, the statements made by the parties and witnesses who were present on January 21, 2017 (Boermeester, Jane Roe,

TS, DH, and MB2) are consistent with the video evidence. All witnesses and parties agree that:

- Boermeester asked Jane Roe to drop her dog's leash, which she did not want to do. *See*:
    - AR0175 (Boermeester stating: "She doesn't like the dog running around, she's always holding it. I like to see it run around, I checked behind, nothing was coming.")
    - AR0181 (Boermeester stating: "Jane Roe 'is super tight' with the dog, and [he] wanted her to let go of the leash to see the dog run around.")
    - AR0184 (Jane Roe stating: "They got out of the car and he wanted her to drop Ziggy's leash but she didn't want to.")
- Boermeester put his hands on or around Jane Roe's neck after telling her to drop her dog's leash. *See*:
    - AR0175 (Boermeester stating: "I put my hand on her after asking her to drop the dog.")
    - AR0184 (Jane Roe describing that Boermeester "grabbed her [neck] from the front. He was holding 'tight.' She could still breathe but it hurt and she coughed.")
- Boermeester pushed Jane Roe against a wall. *See:*

56

- o AR0181 (Boermeester stating: "Jane Roe was against the wall but [I] wasn't hitting her head on the wall.")

- o AR0060 (Boermeester stating: "I pushed and grabbed her as well.")

- o AR0184 (Jane Roe describing that Boermeester "grabbed her by the neck and pushed her hard against the [concrete] wall, she hit her head, he let go and then did it again. . . .Her head hurt for a little after she hit the wall.")

- o AR0095 (DH stating he "heard a female voice and so he got up and saw [Boermeester] and Jane Roe at the wall for about 3 seconds. [Boermeester] had her pinned against the wall with his hand on her chest/neck.")

- o AR0085 (MB2 stating he "saw a guy standing around Jane Roe with both of his hands around her neck. He was pushing Jane Roe against the wall and Jane Roe was 'gagging.'")

- MB2 was concerned by what he saw. He walked by and asked if everything was okay. Boermeester and Jane Roe apologized and said they did not mean to scare him. *See:*

57

- o AR0179 (Boermeester stating: "A random person walked by and asked if everything was ok and they apologized and said they didn't mean to scare him.")
- o AR0184 (Jane Roe stating: "DH and TS saw and another neighbor came out.")
- o AR0188 (Jane Roe providing name of the neighbor.)
- o AR0085 (MB2 stating he: "went downstairs with his trash bag and asked how things were going which 'broke it up.'")

- Based on what DH observed, DH and TS did not want Jane Roe to return to her apartment that night. *See:*
  - o AR0181 (Boermeester stating: "TS and DH thought she was in harm's way. They talked about it when TS and DH let her leave and she came back. Jane Roe said that they did not want her to sleep with [Boermeester] that night.")
  - o AR0184 (Jane Roe describing that "DH and TS took her into their apartment and Matt was asleep when she got back to her room.")

58

- o AR0187 (Jane Roe stating: "The next day (after the weekend incident) she tried to talk to Matt and she said that he scared DH and TS.")

- o AR0125 (TS stating: "DH said: 'I think you should sleep here tonight . . . I saw him with his arm around your throat. That's not safe.'")

- o AR0126 (TS stating TS and DH "tried to get her to stay. . . . She was crying and tried to wipe away the tears.")

- o AR0095 (DH stating: "They took Jane Roe into their room and asked what happened. Jane Roe said, 'it's fine' they told her it was not ok. They tried to get her to sleep over but she wouldn't. Jane Roe said, 'No, its going to be fine, I don't want to make him more mad, I will go back over there.'")

In light of the video evidence, which aligns with the witness statements, and Boermeester's own admissions, there is no dispute as to the events that supported USC's finding: that Boermeester put his hands on or around Jane Roe's neck and, while holding her by the neck, pushed her into a wall. Based on Boermeester's admissions, there is no dispute that he understood his conduct caused observers to fear for Jane Roe's safety. Boermeester admitted that MB2 walked by, asked if everything

59

was okay, and "they apologized and said they did not mean to scare him." (AR0179.) Further, Boermeester admitted that DH and TS did not want Jane Roe to return to her own apartment, where Boermeester was staying, after the incident. (AR0179, 181.) Since Boermeester's own statements *were consistent with* the video evidence and the statements of Jane Roe, MB2, DH and TS, witness credibility is not and was not central to USC's adjudication.

It may be true that Boermeester believes he was "roughhousing" with Jane Roe. It may also be true that Jane Roe has come to believe that Boermeester was "roughhousing" when he grabbed her by the neck and pushed her into a wall. But, the characterization as "roughhousing" is not dispositive. As Dr. Carry explained in his final decision, Boermeester's admitted conduct was, at the very least, reckless, if not intentional. Further, ***intent*** to cause physical harm is not an element of intimate partner violence pursuant to USC's Misconduct Policy. (AR0221.) Thus, irrespective of whether Boermeester intended to harm Jane Roe or did so recklessly while "roughhousing," with her, the video evidence, his own admissions, and the consistent statements of Jane Roe, MB2, DH and TS regarding the key events are sufficient to establish that he violated USC's policy.

## 2. USC's Policy Afforded Boermeester A Fair Hearing By, Among Other Things, Providing Indirect Cross-Examination Of The Parties.

Even if some form of questioning was required in this case, USC's applicable Misconduct Policy, which includes the opportunity for the parties to cross-examine each other through the submission of written questions to be asked live at the Evidence Hearing, safeguards the rights of the accused student as contemplated by the Court in *Allee* and as refined in subsequent case law. The Misconduct Policy utilized in this matter was adopted on August 22, 2016 and includes different procedural protections than the prior versions that were at issue in *USC(1)* and *Allee*. For example, here, the Title IX Investigator's role was limited to (1) investigating the allegations; (2) making findings of fact; and (3) in consultation with Title IX Coordinator Means, making a decision regarding whether the Respondent violated the Misconduct Policy. (AR0492-493.) The Title IX Investigator was not responsible for assessing sanctions. Instead, a Misconduct Sanctioning Panel of three individuals (one of whom was a student) determined appropriate sanctions. (AR0493.)

In addition, the Misconduct Policy encouraged Boermeester to "submit questions to be asked of the other party by the *Title IX*

*Coordinator* at the *Evidence Hearing*." (AR0492, emphasis in original.) Had Boermeester submitted questions, those questions would have been asked by the Title IX Coordinator at the Evidence Hearing. Thus, he had the opportunity for "material participation in submitting proposals for the questioning of critical witnesses." (*Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 639, reh'g denied (May 17, 2019), hereafter *Westmont College* [affirming that *Allee* does not require universities to allow respondents or their advisors to cross-examine the complainant or the witnesses directly, nor does it require the university to ask all of the questions suggested by the respondent]; accord *UCSD, supra*, 5 Cal.App.5th at p. 1085 [finding fair a university procedure that allowed questions submitted by the respondent to be screened and asked by the fact-finders].)

Further, because the Title IX Coordinator, not the Title IX Investigator, would have posed any questions submitted by Boermeester, the Misconduct Policy at issue here differs significantly from the policy at issue in *Allee*. In *Allee*, the Court of Appeal held that a single individual "acting in the overlapping and conflict capacities" . . . "of interviewing witnesses, gathering other evidence, and preparing a written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline" . . . "could

not effectively implement the accused student's right to question critical witnesses." (*Allee, supra*, 30 Cal.App.5th at p. 1068.) Here, the Title IX Investigator would not have been tasked with posing Boermeester's questions. Instead, *if Boermeester had submitted questions*, the Title IX Coordinator would have asked them at the Evidence Hearing. The Title IX Investigator would have been present at the Evidence Hearing, observing the responses to questions, and judging credibility to enable the Title IX Investigator to ultimately make findings of fact. (AR0493.)

The indirect questioning procedure provided for in USC's Misconduct Policy safeguards the accused student's right to pose questions while also "account[ing] for the well-being of the alleged victim." (*Occidental College, supra*, 37 Cal.App.5th at p. 1014.) Further, it complies with the jurisprudence in this area, which acknowledges that no particular form of investigatory procedure is required. (See *Westmont College, supra*, 34 Cal.App.5th at p. 640 ["Like our colleagues in Division One, 'we do not wish to limit the universe of ideas on how to accomplish' fair hearings to accommodate the competing interests of accused students, victims, and colleges." (quoting *CMC, supra*, 25 Cal.App.5th at p. 1073)]; *CMC, supra*, 25 Cal.App.5th at p. 1072 ["the school's obligation in a case turning on the complaining witness's credibility is to "provide a means for the [fact finder] to evaluate an alleged victim's credibility, not for the accused to

physically confront his accuser." (quoting *Cincinnati, supra*, 872 F.3d at p. 406)]; *USC(3), supra*, 29 Cal.App.5th at p. 1238 ["If USC proceeds with a new disciplinary proceeding, it should afford John an opportunity to submit a list of questions to ask Jane."].) Even if credibility was central to USC's adjudication (which it was not), USC's policy and investigation complied with these standards and were appropriate in light of the video evidence, text messages, and consistent witness statements all substantiating that Boermeester grabbed Jane Roe by the neck and pushed her into a wall.

### 3. Boermeester Waived His Right To Question Jane Roe And Any Other "Critical Witnesses."

Even if some form of questioning was required in this case, Boermeester has waived his right to argue that USC's decision should be overturned on this ground. As the record reflects, Boermeester was offered the opportunity to participate in preparing cross-examination questions for Jane Roe and he declined to do so.

Specifically, when asked to submit questions for Jane Roe, Boermeester's attorney stated: "I have questions. I would like to have them sent to Jane Roe and her advisor. *I am not interested in having her come in and being put on the spot yet again. I would like her to be able to review them, write*

*an answer and send them back to you to send to us so we can include them in our submission this afternoon*." (AR0293; emphasis added.)  When his attorney learned that questions would be asked live by the Title IX Coordinator, he declined to submit questions and Boermeester declined to appear in-person at the Evidence Hearing.  (AR0291-95.)

Given that Boermeester declined to submit questions for Jane Roe, and ***argued against live questioning***, he has waived any argument that USC's process was unfair because the Misconduct Policy did not afford him the right to personally cross-examine Jane Roe at a live hearing.   Indeed, the Court of Appeal recently recognized that a petitioner waives an argument not raised in the appeal of an administrative proceeding.   (*Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, pp.41-42, hereafter *USC(2)*, citing *NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, 336-337 [review of administrative proceedings is confined to the administrative record]; *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [failure to raise a defense before the administrative body waives the defense]; *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1020, [a party must present all legitimate issues before the administrative tribunal]; *Owen v. Sand* (2009) 176 Cal.App.4th

985, 995 [argument not raised in administrative proceeding or in the trial court is forfeited].)

In addition, Boermeester never sought the opportunity to question witnesses and did not aver in his internal appeal that USC's investigation was flawed because he was unable to personally question the witnesses. (AR0197-211.) Had Boermeester asked to submit questions for the other witnesses, the university would have had the opportunity to consider his request and develop a record of the rationale for its decision. He also did not allege that the investigation was unfair because certain interviews were conducted by Helsper via telephone.[5] (AR0197-211.) Particularly when he was represented by counsel, Boermeester's failure to raise these arguments in the

---

[5] In any event, here, unlike *USC(3)*, Helsper personally interviewed all of the witnesses. She did not rely on the cold notes of interviews conduct by a different investigator. She spoke to each witness. Thus, the fact that a few interviews were conducted by phone does not render USC's investigation unfair, particularly where, as here, the witnesses' credibility was not central to the adjudication of the allegations because, among other things, the witness statements align with the video and other documentary evidence. (See *Occidental College, supra*, 37 Cal.App.5th at p. 1017 [finding an investigation fair where "six witnesses, including Doe's two roommates and his friend, testified either in person or by telephone."]) Nor were the telephone interviews a violation of USC's policy, as they permitted Helsper to hear the witnesses and, thus, judge their credibility. In any event, Helsper interviewed both Jane Roe and Boermeester in person.

66

administrative proceedings effected a waiver.  (*Harris Transportation Co. v. Air Resources Board* (1995) 32 Cal.App.4th 1472, 1480.)

### 4.     USC's Process Created An Accurate Record

Boermeester avers a live hearing was required in this case because USC does not audio-record its witness interviews. Boermeester's argument is specious.

He has cited no case law holding that an administrative body must record witness interviews.  Helsper took detailed notes of her interviews and confirmed the accuracy of those notes with the witnesses.  (See, e.g., AR0124-127 ["LEH re-read statement and TS confirmed accuracy."]).  Additionally, Boermeester and Jane Roe were given an opportunity to review and comment on the notes of their interviews.  (AR0059-69.)  This procedure is more than sufficient to create a record of USC's investigation, particularly where, as here, USC's findings were based on a video of the assault and Jane Roe's own indisputable written messages to her friends, not just on the witness statements.  (*Andersen v. Regents of the Univ. of Cal.* (1972) 22 Cal.App.3d 763, 772 [four-page notes of administrative proceeding acceptable for administrative record in student discipline case].)

Indeed, Jane Roe's indisputable written messages to her friends and Helsper confirm that the record USC created is

67

accurate. As set forth above, when Jane Roe met with Helsper on January 23, 2017, Jane Roe provided Helsper a detailed account of the assault on January 21, 2017 and an overview of her turbulent, abusive relationship with Boermeester. However, as is common in cases involving intimate partner violence (6 CT 1202), shortly after providing her account, Jane Roe became concerned about Boermeester's reaction to her statement and decided to help protect Boermeester from the consequences of his actions.

Jane Roe's text messages confirm that the differing accounts she provided to USC were the product of her later desire to help Boermeester, not any inaccuracy in USC's records. Specifically, on January 25, 2017, two days after her initial interview with Helsper, Jane Roe texted Helsper to provide her with the contact information of her best friend, who Jane Roe said Helsper may "want to contact for all of this." (AR0154.) Helsper then provided Jane Roe with information about when Boermeester would be notified about the investigation. (*Ibid*.) On January 26, 2017, the date Boermeester was to be notified of the investigation, Jane Roe grew increasingly concerned. She asked Helsper repeatedly not to tell Boermeester that Jane Roe had spoken to the Title IX Office. (AR0154-155.)

These text messages cannot be reconciled with Jane Roe's later statements that she had tried to make clear from the beginning that nothing improper happened. If she had said

nothing improper happened and if she genuinely felt she had nothing to fear from Boermeester, why would she be concerned about Boermeester reading her statement or knowing that she met with the Title IX Office? And why would she lie to him and say she had only spoken briefly to a counselor and she had no idea there would be an investigation? (AR0172.)

Jane Roe's text messages to Helsper are entirely consistent with USC's record, indicating that Jane Roe provided a detailed statement regarding physical violence that occurred on January 21, 2017, and then later sought to help Boermeester escape any consequences by changing her story. Indeed, she admitted in written text messages to friends that she was trying to help Boermeester because she did not want anything bad happening to him. Jane Roe texted GO around the time Boermeester was notified of the investigation and wrote: "***I know you don't understand really why I'm being lenient about this but I don't want anything else bad happening to him…***" (AR0132.) (Emphasis added.) Notably, Jane Roe did not state that Boermeester's conduct was consensual or mutual "roughhousing." Rather, she indicated she was "being lenient" because she wanted to protect him from further consequences.

Jane Roe also texted TS before TS's interview with Helsper and told him that she knew he would not agree, but she had decided to help Boermeester. Regarding TS's interview, she said

"Please don't fuck him over more. I'm not in danger at all I trust him **I trust that he won't ever hurt me <u>again</u>**." (AR0121-122.) (Emphasis added.) Again, Jane Roe did not deny that Boermeester hurt her in the first place (indeed, she admitted he did), nor did she claim that the altercation that TS reported was consensual or just "roughhousing." She just wanted to protect Boermeester from the consequences of his actions.

As the Superior Court noted in denying Boermeester's Petition, there is a "well-known 'tendency of domestic violence victims to recant previous allegations of abuse as part of the particular behavior patterns commonly observed in abusive relations.' (*People v. Brown* (2004) 33 Cal.4th 892, 905, 907.) The tendency is so well established that it is admissible, in the form of expert testimony, in prosecutions of domestic violence cases." (6 CT 1202.)

While Boermeester makes an effort to paint USC and the Title IX Office as motivated to create a false record to "maliciously and relentlessly . . . . destroy the lives of rising football stars," (AOB p. 43), there is no evidence to support this

assertion.[6] Rather, the video evidence, Boermeester's own admissions, and Jane Roe's written messages to Helsper and her friends demonstrate that USC created an accurate record and responded appropriately to a troubling report indicating that one its students (Jane Roe) was being abused. The fact that Boermeester considers himself a "star football player," should not, and did not, entitle him to any special consideration. He was held to the same standard of conduct as any other USC student, irrespective of his status as the student "who kicked the game-winning 46-yard field goal in the final second of the 2017 Rose Bowl to give USC a 52-49 victory over Penn State." (AOB, p. 8.)

## D. USC's Internal Appeal Enhanced The Fairness Of The Overall Process

Boermeester argues USC's limited internal appeal was also unfair. However, a fair hearing requires notice and the opportunity to be heard. It does not require that an appeal be provided or that factual findings be independently evaluated by each individual involved in a multi-step process. (*Kramer v.*

---

[6] Contrary to Boemeester's assertion, the Title IX Coordinator and Title IX Investigator in this matter are different individuals than those involved in *Allee*. Dr. Kegan Allee (not Helsper) was the investigator in *Allee* and, at the time, Jody Shipper was USC's Title IX Coordinator. As Boermeester is aware, Means was hired as the Title IX Coordinator in February 2016, after the investigation at issue in *Allee* was completed. (3 CT 481.)

*State Bd. of Accountancy* (1962) 200 Cal.App.2d 163, 175 ["Due process contemplates that somewhere along the line a fair trial be had – not that there be two or three fair trials."]).

Since USC provided Boermeester with a fair investigation and was not required to afford the parties the right to an internal appeal, Boermeester's arguments regarding the limited internal appeal are another red herring. The fact that USC provides an opportunity for an internal appeal enhances (rather than detracts from) the fairness of USC's overall process.

Additionally, Boermeester's allegations are not supported by the record. The Appellate Panel analyzed all issues raised and prepared a detailed recommendation, which Dr. Carry adopted, with some modifications. (AR0217-221.) Boermeester simply disagrees with their findings, which does not establish that the process was unfair.

## E.    USC Complied With Its Own Policy.

Boermeester's argument that he was "denied a fair hearing in every sense of the word," is premised on his assertion that USC did not comply with its own policy in initiating the investigation and that Helsper did not properly weigh the evidence in reaching her conclusions. (AOB pp. 50-56.) Boermeester's arguments are unconvincing.

1. **USC's Decision To Initiate The Investigation Was Consistent With Its Policy.**

First, Boermeester alleges the Title IX Coordinator must have presumed Petitioner was responsible for misconduct because she "ordered Petitioner suspended and removed from campus immediately." (AOB p. 51.) Boermeester misrepresents the record. He was placed on interim suspension on January 25, 2017 (after Jane Roe's initial interview) by the Student Affairs Office, not the Title IX Office, and the decision was communicated to him by the Assistant Vice Provost for Student Affairs.[7] (AR0472.) In any event, the Misconduct Policy states "[i]nterim measures do not indicate the university has made a decision about the report of prohibited conduct," and Boermeester has presented no evidence that the Title IX Coordinator assumed

---

[7] Boermeester cites the portion of the Misconduct Policy that states: "[i]n all cases, the final decision on whether, how, and to what extent the university will conduct an investigation, and whether other measures will be taken in connection with a report of prohibited conduct, rests solely with the Title IX Coordinator," to imply the Title IX Coordinator made the decision to place him on an interim suspension. Boermeester mischaracterizes the Misconduct Policy. The portion he cites addresses whether an investigation should proceed. (AR0491-492.) It does not address interim measures. As described on AR0480, the university makes decisions regarding interim measures, not the Title IX Coordinator individually.

73

he was responsible for violating the Misconduct Policy from the outset of the investigation. (AR0480.)

Next, Boermeester alleges that continuing the investigation after Jane Roe stated she did not want to pursue it demonstrates the Title IX Office presumed he was responsible for misconduct. Again, Boermeester has no evidence to support his theory. Consistent with Title IX, USC's policy permits an investigation to proceed without a reporting party's[8] participation if circumstances warrant, such as when "there is a danger to the greater community." Here, because the incident was reported by eye witnesses and the charged conduct was violent, the Title IX Coordinator decided to proceed with an investigation, a decision she was entitled to make consistent with the Misconduct Policy. (AR0001, 188, 491-92[9].) The Title IX Coordinator's decision to proceed with an investigation does not establish that Boermeester was presumed responsible for misconduct.

---

[8] Pursuant to the Misconduct Policy, the Reporting Party is defined as "the individual who is reported to have experienced prohibited conduct." (AR0479.) Jane Roe was properly defined as the Reporting Party because she experienced Boermeester's prohibited conduct. (AR0001.)

[9] Boermeester mischaracterizes the Misconduct Policy when he avers USC could only proceed without the reporting party's consent in specific, limited circumstances. No such limitation appears on AR0491-92, which gives the Title IX Coordinator the discretion to make the final decision regarding whether to proceed with an investigation.

2.    **Helsper Weighed The Evidence
Consistent With The Misconduct
Policy.**

In support of his contention that USC's investigation was unfair, Boermeester includes a lengthy argument regarding the weight he contends should have been attached to the evidence collected during the investigation.  (AOB p. 52-56.) Boermeester's argument is an inappropriate attempt to obtain de novo review of the evidence, under the guise of a fairness argument.  As set forth below, Helsper's findings must be reviewed using the substantial evidence standard.

In any event, the administrative record demonstrates that Helsper *did* weigh the evidence.  (AR0051-54.)  While she did not reach the conclusion Boermeester would have preferred, this does not mean she failed to weigh the evidence.  It simply means the weight of the evidence—most significantly the video evidence, Boermeester's admissions, and third party statements— supported her conclusion that Boermeester engaged in intimate partner violence in violation of the Misconduct Policy.

F.    **There Was No Prejudice From Any
Purported Unfairness In The
Administrative Process.**

Finally, in light of the video evidence, Boermeester cannot establish that he was prejudiced by any purported deficiency in USC's process.  Put simply, this is a case in which Boermeester

appears on video grabbing Jane Roe by the neck and pushing her backwards into a wall.  Additionally, Boermeester admitted to the key facts in MB2, DH, and TS's statements, i.e., that they observed conduct that caused them to fear for Jane Roe's safety.  (AR0179, 181.)  No amount of additional process would change what can be plainly observed on the security footage and confirmed in Boermeester's own statements.

The lack of prejudice is a compelling reason to conclude that any purported shortcomings in the proceedings did not deprive Boermeester of a fair hearing.  (See *UCSD, supra*, 5 Cal.App.5th at p. 1098 [Doe has not shown he was prejudiced by UCSD's failure to provide him with notes of interview with Jane Roe; lack of the interview notes did not prohibit John from having a meaningful opportunity to present his defense].)[10]

---

[10] To the extent the Court reverses the Superior Court's decision, USC should be permitted to conduct further proceedings to adjudicate Boermeester's misconduct.  Section 1094.5 of the Civil Procedure Code states that if a petition for writ of administrative mandamus is granted, it is proper for the judgment and writ to order further proceedings and reconsideration of the case.  (Civ. Proc. Code, § 1094.5, subd. (f). ["Where the judgment commands that the order or decision be set aside, [the court] may order the reconsideration of the case in light of the court's opinion and judgment."].)  That same provision explains that "the judgment shall not limit or control in any way the discretion legally vested in the respondent."  (*Ibid.*)  This case implicates one of USC's essential freedoms—to determine for itself "who may be admitted to study," and by extension, who may obtain a degree.  (*Pomona*

### III.    THE EVIDENCE SUPPORTS USC'S FINDINGS

#### A.    The Trial Court Employed The Correct Standard Of Review—Substantial Evidence—To Deny The Petition.

Boermeester's statement of the standard of review implies that there is an open question about whether the Court reviews the administrative decision de novo or for substantial evidence. There is no doubt, however, that the standard is substantial evidence.  This issue was resolved in *USC(1), supra,* 246 Cal.App.4th at pp. 239, 248-249.  (See also *USC(2), supra,* 28 Cal.App.5th at pp. 34-35; *Occidental College, supra,* 37 Cal.App.5th at p. 1018 [rejecting the out-of-state authorities on which Boermeester relies and holding that the substantial evidence standard applies to cases involving student disciplinary decisions reached by private universities.])

---

*College, supra,* 45 Cal.App.4th at p. 1722 quoting *Sweezy v. New Hampshire* (1957) 354 U.S. 234, 263).  Thus, the Court should accord USC deference to set standards of conduct for its students and to enforce those standards. (See *Granowitz v. Redlands Unified School Dist.* (2003) 105 Cal.App.4th 349, 354 ["We recognize the deference we must accord to an administrator's decision to discipline a student"]; *C.R. v. Eugene School District 4J* (9th Cir. 2016)  835 F.3d 1142, 1148*; Havlik v. Johnson & Wales University* (5th Cir. 2007) 509 F.3d 25, 35 ["courts must accord a school some measure of deference in matters of discipline."]; *Schaer v. Brandeis University* (2000) 432 Mass. 474, 481.)

77

### B. USC'S Findings Are Supported By The Evidence.

On substantial evidence review, the Court does not weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that can be drawn from the evidence. (*UCSD, supra*, 5 Cal.App.5th at p. 1073.) Only if no reasonable person could reach the conclusion reached by the agency, based upon the entire record before the agency, will a court conclude that the agency's findings are not supported by substantial evidence. (*Ibid.*) Stated another way, this Court must uphold USC's findings unless the findings are so lacking in evidentiary support as to render them unreasonable.

None of the evidence to which Boermeester points renders USC's finding an abuse of discretion in light of the whole record. Helsper's findings were based on contemporaneous video and documentary evidence that were corroborated by eye witness accounts. Thus, neither minor discrepancies in what was initially reported to the Title IX Office by non-eyewitnesses to prompt the investigation nor the fact that certain witnesses had not observed prior abuse, undermine the findings. (AR0051-53, 85-86, 92-96, 101, 108-114, 120-130, 133-141, 154-155, 183-190.)

USC's finding that Boermeester violated the avoidance of contact order is also supported by the evidence. (AR0053-54.) In any event, Boermeester admitted in his verified Petition that he

continued to have contact with Jane Roe after USC issued a no-contact order. (1 CT 32.) Thus, Boermeester cannot reasonably dispute USC's finding. While he takes issue with USC's authority to issue a no-contact order, he has provided no legal support for his position.

## CONCLUSION

For the reasons identified above, Ainsley Carry, Ed.D. and the University of Southern California respectfully request that the Court affirm the judgment.

Dated: October 23, 2019          YOUNG & ZINN LLP


By:     /s/ Karen J. Pazzani
        Karen J. Pazzani
Attorneys for Respondents,
AINSLEY CARRY, Ed.D., in his
official capacity as Vice President for
Student Affairs; and UNIVERSITY
OF SOUTHERN CALIFORNIA

# CERTIFICATION

Appellate counsel certifies that this document contains 13,994 words.  Counsel relies on the word count of the computer program used to prepare the document.

Dated: October 23, 2019　　　　　YOUNG & ZINN LLP


By:  ___/s/ Karen J. Pazzani___
　　　　Karen J. Pazzani
Attorneys for Respondents,
AINSLEY CARRY, Ed.D., in his
official capacity as Vice President for
Student Affairs; and UNIVERSITY
OF SOUTHERN CALIFORNIA

## PROOF OF SERVICE

I am a resident of or employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within action; my business address is: 1150 South Olive Street, Suite 1800, Los Angeles, California 90015.

On this date October 23, 2019, I served the **RESPONDENTS' BRIEF** on all persons interested in said action in the manner described below and as indicated on the service list:

### SEE ATTACHED SERVICE LIST

X    By TrueFiling – I electronically transmitted the above-referenced documents pursuant to California Rules of Court, rule 8.71(a) and through the TrueFiling electronic filing system.

X    BY U.S. MAIL as follows: I am "readily familiar" with Young & Zinn LLP's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of party served, service shall be presumed invalid if postal cancellation date or postage meter is more than one (1) day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 23rd day of October, 2019.

Patty Flores

81

**146**

# SERVICE LIST

| | |
|---|---|
| Mark M. Hathaway, SBN 151332 | *Counsel for Petitioner and* |
| HATHAWAY PARKER | *Appellant* |
| 445 South Figueroa Street | |
| 31st Floor | By TrueFiling |
| Los Angeles, CA 90071 | |
| Tel.: (213) 529-9000 | |
| Fax: (213) 529-0783 | |
| Email: mark@hathawayparker.com | |
| | |
| CLERK | Superior Court Case No. |
| Los Angeles County Superior Court | BS170473 |
| 111 N. Hill Street | |
| Los Angeles, CA 90012 | By U.S. Mail |
| For: Hon. Amy D. Hogue, Dept. 86 | |
| | |
| CLERK | Electronically |
| California Supreme Court | |
| 350 McAllister Street | |
| San Francisco, CA 94102-4797 | |

# EXHIBIT 3

*In the*

# Court of Appeal

*of the*

# State of California

**SECOND APPELLATE DISTRICT**
**DIVISION EIGHT**

---

**B290675**

MATTHEW BOERMEESTER,
*Plaintiff and Appellant,*

v.

AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA,
*Defendants and Respondents.*

---

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY
HONORABLE AMY D. HOGUE · CASE NO. BS170473

## APPELLANT'S REPLY BRIEF

*Mark M. Hathaway, Esq. (151332)
Jenna E. Parker, Esq. (303560)
HATHAWAY PARKER, INC.
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
(213) 529-9000 Telephone
(213) 529-0783 Facsimile
mark@hathawayparker.com
jenna@hathawayparker.com

*Attorneys for Plaintiff and Appellant,
Matthew Boermeester*

          Printed On Recycled Paper 

Document received by the CA 2nd District Court of Appeal.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. 5

I. CORRECTING RESPONDENTS' SKEWED MISREPRESENTATIONS. ...................................................... 8

II. USC MUST PROVIDE A FAIR HEARING. ...................... 23

    A. FAIRNESS STANDARD IN STUDENT DISCIPLINARY PROCEEDING. .............................. 23

    B. THE COURT MAY CONSIDER DECLARATIONS FILED IN THE TRIAL COURT. ........................................................................ 25

III. BOERMEESTER DID NOT RECEIVE A FAIR HEARING. ............................................................... 27

    A. RESPONDENTS DID NOT PROVIDE ADEQUATE NOTICE. ................................................ 27

    B. INTERIM SUSPENSION WAS UNLAWFUL......... 33

    C. SINGLE INVESTIGATOR ADJUDICATION WAS IMPROPER UNDER *ALLEE*. .......................... 38

        1. The Stakes Warrant Adjudication By An Impartial Adjudicator, Not The Title IX Investigator. ....................................................... 40

        2. Credibility Was Central To The Adjudication. ....................................................... 42

Document received by the CA 2nd District Court of Appeal.

D.     RIGHT TO A FAIR PROCESS WAS NOT PRESERVED BY USC'S OFFER OF "INDIRECT CROSS-EXAMINATION" PERFORMED IN PRIVATE BY THE TITLE IX COORDINATOR AND INVESTIGATOR. ............................................. 48

E.     BOERMEESTER DID NOT WAIVE HIS RIGHT TO CROSS-EXAMINE KATZ AND OTHER WITNESSES. ................................................................ 51

F.     USC'S PROCESS YIELDED AN INACCURATE RECORD. .................................................................... 54

G.     USC'S INTERNAL APPEALS PROCESS DETRACTS FROM THE FAIRNESS OF THE PROCEEDINGS, AS IT DID IN *ALLEE*. .................. 58

H.     USC DID NOT COMPLY WITH ITS OWN POLICY TO PRESUME BOERMEESTER "NOT RESPONSIBLE." ......................................................... 59

I.     USC DID NOT COMPLY WITH ITS OWN POLICY TO WEIGH THE EVIDENCE IMPARTIALLY. ............................................................ 61

J.     PREJUDICE IS PRESUMED. .................................... 62

IV.     RESPONDENTS' FINDINGS ARE NOT SUPPORTED BY THE EVIDENCE. .................................... 62

A.     THE DEFERENCE ACCORDED EXECUTIVE BRANCH DECISIONS DOES NOT APPLY TO PRIVATE, NON-GOVERNMENT LITIGANTS. ..... 62

Document received by the CA 2nd District Court of Appeal.

3

    B.    EXTREMELY DEFERENTIAL 'SUBSTANTIAL EVIDENCE" STANDARD DOES NOT APPLY TO DISCIPLINARY DECISION OF PRIVATE COLLEGE. .................................................................. 64

    C.    FINDINGS ARE NOT SUPPORTED EVEN BY SUBSTANTIAL EVIDENCE. ...................................... 70

V.    CONCLUSION. ...................................................................... 72

CERTIFICATE OF COUNSEL ........................................................ 73

Document received by the CA 2nd District Court of Appeal.

# TABLE OF AUTHORITIES

## Statutes

*Alfaro v. Community Housing Improvement System &*
*Planning Assn., Inc.*
(2009) 171 Cal.App.4th 1356.................................................. 34

*Berman v. Regents of University of California*
(2014) 229 Cal.App.4th 1265................................................. 61

*Bixby v. Pierno*
(1971) 4 Cal. 3d 130.......................................................... 62, 65

*California Youth Authority v. State Personnel Bd.*
(2002) 104 Cal.App.4th 575................................................... 26

*Doe v. Allee*
(2019) 30 Cal.App.5th 1036...........................................passim

*Doe v. Claremont McKenna College*
(2018) 25 Cal.App.5th 1055................................... 8, 24, 34, 67

*Doe v. Occidental College*
(2019) 37 Cal.App.5th 1003................................................. 8, 30

*Doe v. Regents of University of California*
(2016) 5 Cal.App.5th 1055...........................................passim

*Doe v. Regents of University of California*
(2018) 28 Cal.App.5th 44................................. 8, 24, 33, 67, 68

*Doe v. University of Southern California*
(2016) 246 Cal.App.4th 221...........................................passim

*Doe v. University of Southern California*
(2018) 29 Cal.App.5th 1212................................... 8, 24, 46, 68

Document received by the CA 2nd District Court of Appeal.

*Doe v. Westmont College*
    (2019) 34 Cal.App.5th 622...............................................passim

*Fukuda v. City of Angels*
    (1999) 20 Cal.4th 805.................................................. 62, 63, 66

*Gupta v. Stanford University*
    (2004) 124 Cal.App.4th 407.................................................. 63

*Kim v. Regents of University of California*
    (2000) 80 Cal.App.4th 160.................................................. 66

*Kuhn v. Department of General Services*
    (1994) 22 Cal.App.4th 1627............................................. 18, 71

*M.N. v. Morgan Hill*
    (2018) 20 Cal.App.5th 607.................................................. 67

*Northern Inyo Hosp. v. Fair Emp. Practice Com.*
    (1974) 38 Cal.App.3d 14 ..................................................... 26

*Ogundare v. Department of Industrial Relations*
    (2013) 214 Cal.App.4th 822.................................................. 26

*People v. Brown*
    (2004) 33 Cal.4th 892........................................................ 57

*People v. Shrier*
    (2010) 190 Cal.App.4th 400.................................................. 34

*People v. Superior Court (Kaulick)*
    (2013) 215 Cal.App.4th 1279................................................ 52

*Pomona College v. Superior Court*
    (1996) 45 Cal.App.4th 1716............................................. 63, 69

Document received by the CA 2nd District Court of Appeal.

*Regents of University of California v.*
    *City of Santa Monica*
    (1978) 77 Cal. App. 3d 130 ................................................... 66

*Regents of University of California v. Superior Court*
    (2018) 4 Cal.5th 607 ................................................ 36, 37, 60

*Sarka v. Regents of University of California*
    (2006) 146 Cal.App.4th 261 ................................................. 66

## Other Authorities

Code Civ. Proc., § 1094.5 ......................................... 23, 61, 63, 65, 69

Evid. Code, § 664 ........................................................................ 63

## Constitutional Provisions

Cal Const, Art. IX § 9 ...................................................................... 66

## I.   CORRECTING RESPONDENTS' SKEWED MISREPRESENTATIONS.

The Respondents' Brief rests heavily on the dubious fiction that all witness statements, video evidence, and documentary evidence aligns, negating Respondents' obligation to provide Appellant Matthew Boermeester with a fair procedure, including a mechanism by which Boermeester and Reporting Party Zoe Katz could cross-examine witnesses, directly or indirectly, at a hearing in which the witnesses appeared in person or by other means before a neutral adjudicator with the power independently to find facts and make credibility assessments, as articulated in a slate of recent authority involving university administrative disciplinary proceedings.  (See *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003 (*Occidental*); *Doe v. Westmont College* (2019) 34 Cal.App.5th 622 (*Westmont*); *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (*Allee*); *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212 (*USC II*); *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44 (*UCSB*); *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055 (*CMC*); *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055

Document received by the CA 2nd District Court of Appeal.

(*UCSD*); *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221 (*USC I*).)

Respondents' selective highlighting of the Administrative Record demonstrates USC's practice of presenting fragmentary information and distorting evidence to promote a pre-established false narrative. Appellant must correct some of Respondents' misrepresentations to show (1) that the conflicting evidence necessitated a fair hearing that included cross-examination of witnesses at a live hearing before neutral adjudicators consistent with the above-cited authority; and (2) that USC's findings are not supported even by substantial evidence.

**Respondents' Assertion:** "On January 21, 2017, two male USC students, DH and MB2, observed Boermeester physically assault Jane Roe by placing his hands around her neck and pushing her against a wall." **Fact:** DH reported that he "did not see [Katz] (or hear) the contact of her hitting the wall." (AR95.) DH reported seeing Boermeester with ***one hand*** "on [Katz's] chest/neck," not both hands. (*Id*.) Boermeester is shown in the surveillance video carrying a McDonald's bag in the other hand. (AR179; AR190; 5 CT883.) MB2 reported, by phone, that he "was in his apartment and he heard an argument. When he

9

Document received by the CA 2nd District Court of Appeal.

came down. He saw 2 people talking and then they left[.]  MB2 did not see anyone touch the other. They were just talking when they got down. . . . They seemed fine as they walked back."  (AR131.)  Over a month later, MB2 changed his statement and supposedly reported, again by phone, "MB2 saw a guy standing around [Katz] with both of his hands around her neck. He was pushing [Katz] against the wall and [Katz] was 'gagging'."  (AR85.)  MB2's later report that Boermeester had *both hands* around Katz's neck is inconsistent with DH's account and impossible, considering Boermeester was carrying a fast-food bag in one hand.  The surveillance video shows MB2 walking out of his building at the same moment Boermeester and Katz walk away from the wall and back to Katz's duplex. (AR190 [12:15:57].)

    **Respondents' Assertion:** "Both described hearing screaming from an alley near Jane Roe's apartment."  **Fact:** MB2 initially reported, "They weren't screaming."  (AR131.)  MB2 later changed his account and reported, "The noises he heard were laughing and screaming sounds," consistent with the harmless horseplay described by Katz and Boermeester. (AR85.)

Document received by the CA 2nd District Court of Appeal.

10

**Respondents' Assertion:** "Both described the encounter as aggressive, not playful." **Fact:** DH and MB2 described an interaction they observed for, at most (if at all), only a few seconds from unknown vantage points. (AR95; AR131.) DH saw Katz and Boermeester "at the wall for about 3 seconds." (AR95.) MB2 initially reported, "When he came down. He saw 2 people talking and then they left." (AR131.) He did not describe the interaction as "aggressive." (*Id.*) In fact, he reported, "They seemed fine as they walked back." (*Id.*) The two people who were actually engaged in the interaction and witnessed the whole thing—Boermeester and Katz—agree it was not aggressive. (AR51; AR60-61; AR68.)

**Respondents' Assertion:** "In a January 23, 2017 interview with USC's Title IX Investigator Lauren Elan Helsper, Jane Roe confirmed that Boermeester assaulted her on January 21, 2017." **Fact:** Katz did not realize the January 23, 2017 meeting she was forced to attend with Title IX Investigator Helsper ("Helsper"), Title IX Coordinator Gretchen Dahlinger Means ("Means"), and psychologist Lani Lawrence was an "intake" interview for a Title IX investigation. (AR67.) The Title IX Office did not review Katz's statement with her for accuracy (AR188-189), as was done with other witnesses (see e.g., AR153 ("LEH re-read

Document received by the CA 2nd District Court of Appeal.

11

statement and KV confirmed accuracy"), and Katz described the things she said during the meeting as inaccurate, "greatly exaggerated or totally untrue." (AR67; AR71.) In her appeal of the findings and sanctions imposed against Boermeester, Katz confirmed that she never told anyone Boermeester hit her head against a wall on January 21, 2017, that Boermeester did not hit her head against a wall, and that she "was never physically abused." (AR192.) During the January 23 meeting, Katz was physically examined and there were no bruises, scratches, injuries, or any other indicia of physical harm. (AR194.) The Title IX personnel did not document that Katz was physically examined during the January 23, 2017 meeting.

**Respondents' Assertion:** "USC offered to provide Jane Roe with emergency housing; Jane Roe wanted it for several nights 'to feel safe.'" **Fact:** Katz clarified that she "was pushed into talking about these options by the Title IX office, and [she] didn't understand the procedures at the time." (AR193.) Katz thought the emergency housing and Avoidance of Contact ("AOC") measures "were both required of me to make the whole thing go away. In fact, throughout this process, I made repeated requests to remove the AOC as provided for in the

Document received by the CA 2nd District Court of Appeal.

policy to no avail. Even my attorney's request to remove it was denied." (*Id*.)

**Respondents' Assertion:** "Jane Roe expressed concern about Boermeester's anticipated reaction to the investigation and, specifically, the fact that she provided a statement regarding his conduct." **Fact:** Katz was concerned about Boermeester's reaction because "[S]he didn't trust that it would be conveyed that this [was] from [the Title IX Office] and not from her." (AR168.) Katz's worst fears were justified when USC's Title IX Office proceeded with an investigation against her express wishes and "violated [her] right to privacy and . . . subjected [her] to a great deal of embarrassment and humiliation." (AR68.)

**Respondents' Assertion:** "Although Jane Roe also stated she did not want to participate in the investigation, consistent with Title IX of the Education Amendments of 1972, USC was compelled to investigate the matter because the alleged misconduct was violent and reported by eye witnesses." **Fact:** Title IX of the Education Amendments of 1972, 20 U.S.C.A § 1681 *et. seq.* is a comprehensive federal law that prohibits discrimination on the basis of sex in any federally funded education program or activity. (CT53.) The principal objective

Document received by the CA 2nd District Court of Appeal.

13

of Title IX is to avoid the use of federal money to support sex discrimination in education programs and to provide individual citizens effective protection against those practices to ensure students' access to education. (CT54-55.) To comply with Title IX, schools must recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties. (CT55.) If there is no allegation or complaint of sexual harassment or discrimination in education programs on the basis of sex, as here, then there is no denial of access to education, no threat to the university of losing federal funding, and no wrong to investigate or resolve pursuant to Title IX. (CT55.) Likewise, if there is no hostile environment to remedy on campus, Title IX does not compel USC's administrators to interfere in the personal lives and relationships of its adult students when they engaged in consensual activity off campus in the middle of the night. (CT64.) Katz never complained of a hostile environment caused by Boermeester and consistently advocated for his return to campus. (See AR168 ("[Katz] wants AOC lifted. She does not feel in danger, she does not feel unsafe because of him.")) It is Gretchen Dahlinger Means and Lauren Helsper who created a hostile environment at USC for both Boermeester

Document received by the CA 2nd District Court of Appeal.

and Katz by subjecting them to unnecessary Title IX proceedings, allowing the spread of pernicious gossip and rumors, ordering their on- and off-campus separation against both of their wishes during the months-long Title IX proceedings, and relying on discriminatory notions of Katz as a female "victim" who was too "weak and unable to stand up for [her]self, so [she] had to recant [her] story," and Boermeester as the violent, abusive male football player.  (AR192.)

**Respondents' Assertion:** "Helsper then conducted a thorough investigation, including reviewing surveillance video of the incident and interviewing Jane Roe, Boermeester, and sixteen additional witnesses."  **Fact:** Helsper conducted an intake interview of Katz before the investigation started, did not re-interview her at any point during the investigation when the nature of the Title IX inquiry was made clear to Katz, and did not question her about inconsistencies in her earlier and later statements.  Helsper's investigation was overbroad and tangential but certainly not thorough.  Helsper spoke to six of the sixteen witnesses only by phone and did not meet with them in person to observe their demeanor in evaluating whether their statements were credible.  (See AR139; AR136; AR131, AR85; AR115; AR92; AR87.)  Helsper never met with

15

Document received by the CA 2nd District Court of Appeal.

MB2 in person before or after he changed his story and accepted his second account as more credible without even verifying that it was MB2 on the phone. (AR51-52; AR85.)

Helsper did not seek commentary from Katz or Boermeester about the surveillance video. Katz offered to provide an analysis of the footage as her official statement, but Helsper responded that being permitted to review the video during the investigation "would be a 'privilege' as it is usually not seen until Ev[idence] Review." (AR169.) Boermeester was not told of the existence of the video. (*Id*.) When Katz insisted on viewing the video, Means made an excuse as to why she could not watch it, accused Katz of harassing witnesses, and threatened to open an investigation on her. (CT1000; CT1072.) To this day, it is unclear when and into which wall Boermeester supposedly hit Katz's head, and if witness testimony agrees on that important point. USC's description of the surveillance video certainly does not clarify.[1] (AR43-45.) A thorough

Document received by the CA 2nd District Court of Appeal.

---

[1] Seizing on any evidence in support of the respondent in order to affirm the administrative decision, the trial court speculated about at least seven possible moments when Katz's head *could* have hit a wall, but the court came to no definitive conclusions about when or into which wall Katz's head actually

investigation would have left little doubt. In its haste to prove Boermeester guilty, USC did not to conduct a fair, impartial, or thorough investigation, and important factual inconsistencies have never been resolved.

**Respondents' Assertion:** "Contrary to Boermeester's assertion, he did not ask Helsper to interview the friends he spent time with before the January 21, 2017 incident occurred."

**Fact:** Helsper's summary of her meeting with Boermeester states, "[Helsper:] Are there any witnesses? [Boermeester:] The water polo dudes I guess. I hang out with BE and LE, their [sic] brothers." (AR177; AR182.)

**Respondents' Assertion:** "During the investigation, USC obtained video evidence that Boermeester grabbed Jane Roe by the neck and pushed her into a wall on January 21, 2017." **Fact:** The surveillance video does not show what USC claims— "specifically, [Boermeester] grabbing [Jane Roe] by the neck, and pushing her head into a cinder block wall multiple times on/or about January 21, 2017." (AR43-45; AR54; AR190.) The

---

made contact. (CT1162; AR190 [12:16:50], [12:17:12], [12:17:13 and 12:17:14], [between 12:17:16 and 12:17:26], [12:17:26], [12:17:28], [12:17:38].)

Document received by the CA 2nd District Court of Appeal.

trial court clarified that in describing the video, it was not independently evaluating the situation, but was inappropriately[2] "looking for substantial credible evidence" that "would corroborate what the University held." (RT944.) Even then, the descriptions provided by the trial court and USC differ significantly, undermining the value of the video evidence and the existence of even "substantial credible evidence" to be derived from it. (Compare CT1161-1162 to AR44-45.) Nevertheless, the most significant consistency is that **no one has ever reported the surveillance video showing Boermeester grabbing Katz by the neck and pushing her head into a cinder block wall multiple times**, the acts alleged and found to be true by USC's Title IX Office. (AR54.)

    **Respondents' Assertion:** "Indeed, the video depicts Boermeester repeatedly grabbing, pushing, and shoving Jane Roe, including pushing her backwards into a wall twice while holding her by the neck." **Fact:** Boermeester and Katz agree

---

    [2] See *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 ("While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence (*Bristol, supra*, 23 Cal.2d at p. 223), this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment."))

Document received by the CA 2nd District Court of Appeal.

that the video shows them both playfully grabbing, pushing, and shoving each other in a harmless, non-aggressive manner. (AR60-61; AR68; AR190 [12:16:15 to 12:16:40].)  Respondents ignore the portions of the video that show Boermeester and Katz embracing, hugging, and kissing.  (AR190 [12:16:40 to 12:17:01].)  They then continue to talk and interact playfully with each other in the middle of the alley.  (AR 190 [12:17:01 to 12:17:12].)

The video shows Katz walking backward toward either a wall or a chain link fence.  (AR190 [12:17:13 to 12:17:17].)  Of note, Boermeester had undergone knee surgery on January 10, 2017 and was receiving rehabilitation and physical therapy treatment at USC.  (See AR17, n. 22.)  He was not physically capable of taking "forceful" or "rapid" steps, or of pushing Katz into a wall against her will.  If Boermeester had forcefully pushed Katz from her chest area towards the wall, as Respondents describe, her head would have been propelled forward by the inertia, not backward.  The fact that her head leans backward indicates that she was pulling Boermeester toward the wall, not being pushed.  This aligns with Helsper's observation: "The female is backing closer to the alley wall, the male's hand is on her body."  (AR45.)

Document received by the CA 2nd District Court of Appeal.

19

The video then shows Boermeester and Katz again mutually grabbing, pushing, and shoving each other in a playful manner (AR 190 [12:17:25 to 12:17:29]), then walking back to Katz's building holding hands.  (AR190 [12:17:59 to 12:18:02].)  Helsper's decision not to ask Katz and Boermeester to describe what is depicted on video has created speculative and inconsistent accounts from viewers who were not present on January 21, 2017.

**Respondents' Assertion:** "Boermeester's statement was consistent with the statements provided by Jane Roe, DH, MB2, and TS."  **Fact:** According to Boermeester,

> There wasn't an argument that night. Me putting my hand on her neck wasn't like that at all. She does that to me too. **I wasn't choking her or slamming her head on a wall.** She would be on the other side of me [in the investigation] if I did. She doesn't feel scared, she feels safe with me. That's never been a part of our relationship, no one feels scared. (AR173, emphasis added.)

Boermeester explained, "I understand the seriousness of domestic violence, but this is NOT.  TS and DH have a misconception of what's going on.  This is the best we've ever been."  (AR174.)  Regarding USC's allegation that he hit Katz's

20

Document received by the CA 2nd District Court of Appeal.

head against the wall, Boermeester explained, "She was against it. I didn't hit her head against it." (AR175.) Regarding the suggestion by TS and DH that Katz sleep with them instead of Boermeester that night, Boermeester commented, "No, she wasn't scared. They wanted her to spend the night over there and not sleep with me which is ridiculous. They might have been drinking that night, I don't know." (AR176.)

**Respondents' Assertion:** "In a written statement, Boermeester also confirmed that he 'pushed and grabbed' Jane Roe." **Fact:** Boermeester confirmed, "[Katz] was playfully pushing me (as is seen in the video at approximately 12:17) and as I have stated, I pushed and grabbed her as well. **None of the touching was forceful, none of the touching was abusive or aggressive, at no time was either of us angry, fearful, upset, or anything close to what has been alleged against me.**" (AR60-61, emphasis added.)

**Respondents' Assertion:** "Jane Roe's text messages to her friends following the altercation also revealed that her initial report to Helsper was accurate, but she had since decided to help Boermeester because she did not want him to be disciplined for his actions." **Fact:** The text does not reveal the initial report was accurate. It is just as plausible Katz made

Document received by the CA 2nd District Court of Appeal.

inaccurate, embellished statements to Title IX and her friends, *as she said she had done*, then tried to de-escalate the situation and correct the exaggerations and inaccuracies.

**Respondents' Assertion:** "Jane Roe admitted that Boermeester's lawyers told her to post the tweet and that she did so because she wanted to help Boermeester." **Fact:** Katz confirmed to Helsper, "Nobody told her to post that, she came up with that idea all on her own." (AR102.) Boermeester did not have a lawyer when Katz posted the tweet on February 8, 2017. (See AR108-112.) Boermeester retained an attorney, who was a family friend, a week after the tweet was posted. (AR407.).

**Respondents' Assertion:** "The weight of the incontrovertible evidence, including the video, Jane Roe's statements, the statements of two eye witnesses to the assault, the statements of witnesses who interacted with Jane Roe after the assault, Boermeester's own admissions, and text messages that Jane Roe sent to her friends and Helsper, supported Helsper's finding." **Fact:** Assuming the word "incontrovertible" means "not able to be denied or disputed," Respondents' assertion is preposterous. Katz and MB2 disputed their own statements (AR67-69; AR85; AR168); the

22

Document received by the CA 2nd District Court of Appeal.

"eyewitness" statements disagreed with each other (AR85-86; AR95; AR124-127; AR131); statements made by Katz and Boermeester conflicted with other witness statements (AR59-69); text message evidence contradicted other text message evidence (AR70-72 ("I still disagree with somethings [sic] I said so to use [my statement] wouldn't be accurate"); AR109-110 ("I wasn't hurt I want this all gone"); and Katz disputed the statements of witnesses who interacted with her after January 21. (AR192-196.) The only way to find the evidence "incontrovertible" is to ignore all the evidence that shows Boermeester is not guilty, which is what Respondents did.

## II. USC MUST PROVIDE A FAIR HEARING.

### A. FAIRNESS STANDARD IN STUDENT DISCIPLINARY PROCEEDING.

A writ of administrative mandate should be issued where the petitioner has been denied a fair hearing. (Code Civ. Proc., § 1094.5 subd. (b).) The scope of review from the judgment on a petition for writ of mandate is the same as that of the trial court. (*USC I*, *supra*, 246 Cal.App.4th at p. 239.) In other words, the Appellate Court reviews the adjudicatory body's decision directly and independently determines whether the university provided the accused a fair hearing. (*Westmont*, *supra*, 34

Document received by the CA 2nd District Court of Appeal.

Cal.App.5th at pp. 634-635.) Where the case turns on witness credibility, as this case does:

> At a minimum, the college must comply with its own policies and procedures. *UCSD*, *supra*, 5 Cal.App.5th at p. 1078.) Those procedures must provide the accused student with a hearing before a neutral adjudicatory body. (*Allee*, *supra*, 30 Cal.App.5th at p. 1069.) The accused must be permitted to respond to the evidence against him or her. (*Id*. at p. 1062 *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 57–59 (*UCSB*); *USC I*, *supra*, 246 Cal.App.4th at p. 246.) The alleged victim and other critical witnesses must appear before the adjudicatory body in some form—in person, by video conference, or by some other means—so the body can observe their demeanor. (*Allee*, at p. 1069; *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1232–1237 (*USC II*); *CMC*, *supra*, 25 Cal.App.5th at pp. 1070–1073.) This is because "'the opportunity to question a witness and observe [his or her] demeanor while being questioned can be just as important to the trier of fact as it is to the accused.' [Citation.]" (*CMC*, at p. 1069.)

> (*Id*.)

Document received by the CA 2nd District Court of Appeal.

### B. THE COURT MAY CONSIDER DECLARATIONS FILED IN THE TRIAL COURT.

In determining the fairness of the USC's proceedings, the Court of Appeal may examine and consider all documents in the record of the trial court proceedings.  Declarations submitted in support of Boermeester's Motion for Stay and Motion to Augment were considered in the trial court and designated part of the record on appeal.  (CT1240-1252.) Respondents made no objection to Boermeester's designation of the record.  The Court may certainly consider Katz's and Boermeester's declarations signed under penalty of perjury attesting to their own memories, knowledge, and experience of what transpired during Respondents' administrative proceedings, particularly where, as here, the information in the administrative record was controlled and manipulated by USC's Title IX Office.  There is also no bar to the Court of Appeal considering the declaration of Hanna Stotland filed in support of Boermeester's Motion for Stay attesting to the challenges faced by students disciplined under Title IX in continuing their education.  (CT600-601.)

Even under a substantial evidence standard, "This test 'requires a review of the *entire record* to determine whether

25

Document received by the CA 2nd District Court of Appeal.

findings of an administrative decision are supported by substantial evidence.'" (*Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 829, emphasis added, citing *Northern Inyo Hosp. v. Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 23–24.) "In assessing whether substantial evidence exists, we consider all evidence presented, including that which fairly detracts from the evidence supporting the [adjudicator's] determination." (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 586; accord *UCSD*, *supra*, 5 Cal.App.5th at p. 1073 ("Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence.")) The Court may consider these documents, just as it may consider any other document in a Clerk's Transcript and a Reporter's Transcript as the official account of what went on at the hearing or the trial that is being appealed.

Nevertheless, Appellant endeavored to include only citations from the Administrative Record in its discussion of USC's misrepresentations in section I, *supra*, and the remainder of this brief.

## III. BOERMEESTER DID NOT RECEIVE A FAIR HEARING.

### A. RESPONDENTS DID NOT PROVIDE ADEQUATE NOTICE.

Boermeester was put on notice that he was accused of "grabbing Zoe Katz by the neck, and pushing her head into a cinder block wall multiple times on/or about January 21, 2017," and that this act may constitute a violation of USC's Policy and Procedures on Student Sexual, Interpersonal, and Protected Class Misconduct, section VI.E for "Intimate partner violence." (AR470.) Based on the four corners of the document, the investigation should have been confined to an inquiry into whether the charged conduct occurred, causing Katz physical harm. (*Id.*) Respondents agree in their brief that the investigations are limited to investigating the allegations. If new allegations arose during the investigation, such as "prior incidents of intimate partner violence," and if those allegations were to be used to substantiate a finding of "Intimate partner violence," Boermeester should have been put on notice of the allegations and given an opportunity to respond.

Helsper's findings are not supported by evidence that Boermeester pushed Katz's head into a wall multiple times on

Document received by the CA 2nd District Court of Appeal.

January 21 causing her to sustain physical harm. (See AR51-52 (findings include no discussion or details evidencing that Boermeester pushed Katz's head into a wall, only that he "made physical contact with Reporting Party in those early morning hours of January 21," which he and Katz do not dispute.)) Ostensibly due to the utter lack of evidence, Helsper supplemented her findings with a lengthy discussion about unsubstantiated rumors and gossip involving, as she described, "prior incidents of intimate partner violence." (AR52-53.) Boermeester was not put on notice that purported "prior incidents" would (or could) be considered in the proceedings against him. (AR470.) USC's policy did not permit Helsper to rely on vague, unsubstantiated accusations to uphold a finding as to a very specific act of physical harm that allegedly occurred on January 21. (AR486-487.)

USC disingenuously argues that it could not have provided Boermeester notice of all the evidence it was likely to collect and the investigatory leads it was likely to follow at the outset of the investigation. But Helsper was doubtlessly aware of the trajectory of her investigation when she tracked down and interviewed Boermeester's high school ex-girlfriend, who was not a USC student and had no knowledge of what had

28

occurred on January 21. Nor did most of the sixteen witnesses interviewed by Helsper have any firsthand knowledge of the January 21 events. Helsper's sole purpose in interviewing AB and other witnesses was to establish "prior incidents of intimate partner violence", which were ancillary to the alleged misconduct, and to which Boermeester should have had fair notice and a meaningful opportunity to dispute. (AR52-53.)

Respondents contend Boermeester had an opportunity to respond to all evidence collected during the investigation. This is true in the sense that Boermeester was shown into the "Evidence Room" equipped with a pad of paper and a pencil to review Helsper's voluminous summaries of her notes of what witnesses might have said during her private interviews with them. (AR297.) Boermeester did respond with objections to the investigation having "gone far off course of what should be considered relevant information under the USC student Code." (AR59.) Boermeester also objected to Helsper considering every "prejudicial and inflammatory piece of 'evidence' contained in the Title IX file" that was outside the scope of the specific factual allegation. (AR60.) Still, Boermeester was not notified that false accusations involving "prior incidents of intimate partner violence" could be considered as "a data point

Document received by the CA 2nd District Court of Appeal.

indicating that the charged conduct was a violent act." (AR53.) Because Boermeester learned the new allegations during the Evidence Review phase, after the investigation had concluded, he could not recommend additional witnesses to attest to his peaceful, non-violent nature, nor to his relationship with Katz, nor to his relationship with AB, nor could he propose additional questions to be asked of witnesses to challenge their accounts, as USC's Policy does not allow for cross-examination of witnesses. (AR492-493.)

This case is distinguishable from *Occidental*, where the accused student in that case was provided the final investigation report, including summaries of all witness interviews and other evidence, in advance of a five-hour, in-person hearing where six witnesses testified, including the complainant, and the accused student was given an opportunity to cross-examine witnesses before an impartial adjudicator who was not the investigator. (*Occidental*, *supra*, 37 Cal.App.5th at p. 1013, 1015-1017.)

Respondents do not dispute, and so concede, that Boermeester was not provided the specific dates and locations of the alleged violations of the AOC order, as required by USC's Policy. (AR414; AR488.) USC provided only the most

Document received by the CA 2nd District Court of Appeal.

basic and vague information that Boermeester was suspected of contacting *or* communicating with Katz electronically *or* in-person at unknown locations on unknown dates/times at some point after January 26, 2017.  (AR414.)  The number of contacts or communications was not specified.  This was not adequate to put Boermeester on notice of when or how he supposedly violated the AOC, an order neither he nor Katz wanted in the first place.

Respondents do not dispute that Katz—the "Reporting Party" who never intended to make a report of "Intimate partner violence" against Boermeester—did not receive proper notice of the allegations against Boermeester.  Nor do Respondents dispute that USC's Title IX Office set out to manipulate and dupe Katz into airing false grievances against Boermeester, with whom Katz wanted to strengthen her relationship, during an interview in which she had no reason to believe her statements would be used as evidence in a Title IX investigation against him.  (See AR67; AR173; AR192.)  This is a violation of USC's Policy, which does not permit an intake meeting to take place without the "Reporting Party's" knowledge.  (AR491.)  When USC's Title IX Office receives a report of prohibited conduct, it is charged with "contact[ing]

Document received by the CA 2nd District Court of Appeal.

31

the Reporting Party to explain rights under th[e] policy and reporting options on and off campus" before inviting the Reporting party to an intake meeting where the Title IX Office "gather[s] information about incident[.]" (*Id.*) Here, USC went backwards by gathering information first, then explaining Katz's rights and reporting options after deciding an investigation was needed. (AR183-189.)

Remarkably, Respondents claim not to understand how the Title IX Office's intentional decision not to provide notice to Katz of the Title IX investigation affected Boermeester. To state the obvious, USC's Title IX Office used its process to manipulate and trick Katz into making false statements about Boermeester, and those statements were later mischaracterized and inappropriately relied upon to substantiate serious, criminal level charges against Boermeester that have deprived him of the value of his education, reputation, and potential NFL career, even though Katz did not report misconduct, did not ask for or want an investigation, did not know it was forthcoming, did not want Boermeester to be disciplined or removed from USC, and did not want to be labeled a "victim" of intimate partner violence. In Katz's own words, had she received proper notice of an imminent Title IX investigation in

Document received by the CA 2nd District Court of Appeal.

which she was destined to be the Reporting Party, she "would not have said many of the things [she] said and [she] would have made a greater effort to be accurate." (AR67.) Having accurate statements by the Reporting Party from the get-go would have avoided the extensive evidentiary divergences that plague this case.

Katz was not afforded an opportunity to provide accurate statements at a fact-gathering interview during the investigation, and later meetings with the Title IX Office to stop the investigation were insultingly mislabeled forms of "recantation" by Helsper ("a recognized pattern of intimate partner violence"), without evidentiary support. (AR53; see AR192.) The Title IX Office's deception and disregard for Katz's attempts to correct the record, and their subsequent mislabeling of Katz a victim of domestic violence, most certainly affected Boermeester as the subject of the admittedly false allegations. (*UCSB*, *supra*, 28 Cal.App.5th at p. 46 ("When the accused does not receive a fair hearing, neither does the accuser."))

## B. INTERIM SUSPENSION WAS UNLAWFUL.

The impropriety of imposing a 97-day suspension on a student without a hearing, without evidence, and without affording the student an opportunity to respond to the evidence purported to be supportive of the 97-day interim

Document received by the CA 2nd District Court of Appeal.

33

suspension is a purely legal question that may be raised for the first time on appeal. (*CMC, supra*, 25 Cal.App.5th at p. 1066, n. 7 (whether a student was denied a fair hearing "is a purely legal question that may be raised for the first time on appeal."), citing *People v. Shrier* (2010) 190 Cal.App.4th 400, 419; see also *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1396-1397.)

Respondents do not dispute, and so concede, that USC denied Boermeester the opportunity to review and respond to the evidence relied upon by Respondents before they imposed a 97-day interim suspension. (AR81; AR455; AR472.) In fact, Respondents admit that the evidence relied upon to support the interim suspension decision was available but was not provided to Boermeester, and he was not given an opportunity to respond to this evidence before he was banned from campus indefinitely. Respondents also confirm that USC's Policy does not require it to provide students evidence or any meaningful opportunity to respond prior to subjecting them to lengthy indefinite suspensions. (AR442-444.)

There is no support for Respondents' contention that protective measures were necessary to ensure Katz's safety, or the safety of any other USC student. On the contrary, the

Document received by the CA 2nd District Court of Appeal.

evidence weighed heavily against such a severe protective measure, both as applied to Katz specifically and to USC's campus generally. Katz herself asked for the AOC order to be lifted and reported to the Title IX Office that "she does not feel unsafe because of him." (AR168.) Katz also engaged in behavior that showed she did not feel unsafe around Boermeester, including requesting to attend an event in Orange County where Boermeester would also be in attendance. (AR322.) Witnesses also generally reported that they had never observed any violence or abuse by Boermeester and were not concerned about Katz's safety because they did not think Boermeester posed a threat. (See AR37; AR94; AR96; AR97; AR119; AR125-126; AR151-152.) No evidence supported that Boermeester posed a threat to anyone on campus, and there was no justification to summarily ban him from his classes, his student activities, and his on-campus rehabilitation and training to assist him in recovering from knee surgery.

To the extent it is relevant, the duty of care in a cause of action for negligence against a university is limited to taking **reasonable** steps to protect "enrolled students who are at foreseeable risk of being harmed in a violent attack while participating in curricular activities at the school." (*Regents of*

Document received by the CA 2nd District Court of Appeal.

35

*University of California v. Superior Court* (2018) 4 Cal.5th 607, 633-634, hereafter *Regents*.)  The *Regents* Court further clarified,

> We emphasize that a duty of care is not the equivalent of liability. Nor should our holding be read to create an impossible requirement that colleges prevent violence on their campuses. Colleges are not the ultimate insurers of all student safety. We simply hold that they have a duty to act with reasonable care when aware of a foreseeable threat of violence in a curricular setting."

(*Id*. at p. 634.)

Banning a student from campus and preventing him from graduating and competing in his final season of football eligibility, and from seeing his girlfriend on campus or even outside of Los Angeles is not an exercise in "reasonable care"; it is an excessive, unwarranted, purely punitive disciplinary action.

USC's admission that it placed Boermeester on an indefinite interim suspension to avoid facing "a different type of lawsuit," also makes clear that Respondents, from the outset, had an agenda to avoid liability, which conflicts with the obligation to conduct neutral, fair administrative proceedings. Given Respondents' admitted conflict of interest, their manufacture of a false narrative against Boermeester to "avoid

Document received by the CA 2nd District Court of Appeal.

a different type of lawsuit" makes sense. Respondents had no intention of adjudicating this matter fairly and have acted only in their own self-interest to avoid potential liability, which *Regents* explicitly cautioned against. (*Id.*) USC's acknowledged objective also calls into question the adequacy and impartiality of Respondents' proceedings and USC's ability to neutrally adjudicate Title IX matters internally where its student conduct decisions are guided by averting lawsuits against USC. Respondent Ainsley Carry's unilateral decision to overrule the appeal panel and expel Boermeester, a sanction the appeal panel deemed "grossly disproportionate to the violations found," and did so under a strict liability standard not articulated in USC's Policy, further supports the notion the Respondents' actions were motivated to avoid liability, not to adjudicate fairly. (AR218; AR221.)

Pursuant to *Regents*, there was no evidence of a foreseeable risk that Katz, or any other student, would be harmed in a violent attack perpetrated by Boermeester while participating in curricular activities at the school. Katz "never told the investigator that Respondent hit [her] head against a wall." (AR192.) The third-hand report made by Peter Smith about Boermeester allegedly "beating [Katz] up and throwing

Document received by the CA 2nd District Court of Appeal.

37

her against the wall and choking her" (AR477) was debunked by DH, who reported having seen nothing remotely resembling an "assault." (AR95-96.) The surveillance video, which was received four days after the suspension was imposed, does not show an "assault." (AR190.) USC cannot be empowered to suspend students indefinitely without evidence to support an imminent, foreseeable violent attack in a curricular setting simply to avoid the potentiality of legal liability.

### C. SINGLE INVESTIGATOR ADJUDICATION WAS IMPROPER UNDER *ALLEE.*

Respondents readily admit that pursuant to USC's Misconduct Policy, Helsper's role included investigating the allegations, making findings of fact, and deciding whether Boermeester violated USC's Misconduct Policy. (RP Brief, p. 21; AR492-493.)

On this issue, the trial court noted, "[T]here is something that is a bit troubling about the role of the Title IX coordinator; the Title IX office, you know, and the notion of prosecutor, adjudicator and so on all in one person. I think to judges and lawyers that is troubling. You know, we're accustomed to a more formalized due process system." (RT953-954.) The trial court was not persuaded to find USC's process unfair at the

Document received by the CA 2nd District Court of Appeal.

time because "under the existing law, which is what I must follow, all that's required is a give-and-take process with a student in a university and some ability to know what the charges are against you, some opportunity to respond to the charges against you." (RT965.) Ten months later, the Second District Court of Appeal, Division Four, issued the *Allee* decision, which validated the trial court's concerns. The *Allee* Court observed,

> [T]he "'[s]pecific requirements for procedural due process vary depending upon the situation under consideration and the interests involved.' [Citation.]" (*Id.* at p. 244.) When credibility of witnesses is essential to a finding of sexual misconduct, the stakes at issue in the adjudication are high, the interests are significant, and the accused's opportunity to confront adverse witnesses in the face of competing narratives is key. "Cross-examination takes aim at credibility like no other procedural device." (*Cincinnati*, *supra*, 872 F.3d at p. 401.) Under such circumstances, the performance of this key function is simply too important to entrust to the Title IX investigator in USC's procedure.
>
> (*Allee*, 30 Cal.App.5th at pp. 1067-1068.)

Respondents argue USC's single-investigator adjudication was appropriate because (1) this case does not involve sexual misconduct, and (2) the credibility of witnesses

Document received by the CA 2nd District Court of Appeal.

was not central to USC's adjudication of the matter.
Respondents are wrong on these points.

> **1.** ***The Stakes Warrant Adjudication By An Impartial Adjudicator, Not The Title IX Investigator.***

Understanding that cross-examination and a live hearing are not warranted in every case of student discipline, the requirements for procedural due process in this case are substantial, given the situation under consideration (whether Boermeester engaged in "intimate partner violence" against Katz by pushing her head into a cinder block wall multiple times) and the interests involved (Boermeester was expelled from USC just two classes shy of graduating, lost his scholarship and final season of eligibility to play college football, lost the opportunity to attend graduate school at USC during his final football season, his reputation and prospective career in the NFL were obliterated by USC's findings and decisions, and he will forever be labeled and stigmatized as a perpetrator of domestic violence).

This case was adjudicated by USC's Title IX Office under USC's Student Misconduct – Sexual, Interpersonal and Protected Class Misconduct Policy ("Policy"). (AR2; AR80; AR478.) The violation falls under the same category of

Document received by the CA 2nd District Court of Appeal.

40

"Prohibited Conduct," as "Sexual assault and non-consensual sexual contact," requires the same procedural protections under the Policy, and carries the same potential sanctions.  (AR483-489; AR494.)  Respondents do not dispute the parallels between this case and *Allee*, both involving decisions made by a single investigator which resulted in the accused student facing the severe, life-altering consequence of expulsion from USC.  This case involves allegations that carry devastating stigma and consequences at least equivalent to those associated with sexual misconduct.  Respondents provide no reasonable explanation as to why Boermeester should be afforded less procedural due process and fairness than the accused students in *Allee* and analogous authority.

Respondents contend other factors distinguish this case from *Allee*, including that the alleged intimate partner violence took place in public, was witnessed by at least two individuals, and was captured on video.  However, one of the two "eyewitnesses," MB2, gave conflicting accounts of what he supposedly witnessed.  (AR85; AR131.)  The eyewitness, DH, did not see or hear what Helsper found Boermeester responsible for doing—hitting Katz's head against a cinder block wall multiple times.  (AR95; AR54.)  Katz admitted that

Document received by the CA 2nd District Court of Appeal.

her initial report was "not true" (AR102), and also accused USC's Title IX Office of distorting and embellishing her statements. (AR67.) The surveillance video does not show what Helsper found and does not provide definitive corroborative evidence. (AR190.) These are the exact circumstances of conflicting statements and evidence that require a hearing in which the witnesses appear in person or by other means before a neutral adjudicator with the power independently to find facts and make credibility assessments.

      2.      *Credibility Was Central To The Adjudication.*

Helsper's analysis indisputably demonstrates that credibility was central to the adjudication. (AR51-54.) In finding Boermeester responsible, Helsper relied on: (1) the investigator's notes from Katz's intake meeting; (2) Katz's later written submissions, which Helsper identified as "a recognized pattern of intimate partner violence"; (3) statements made by witnesses Peter Smith, GO, GS, SS, DH, TS, MB2, MW, RP, AB, KS, LM, KV, CT, as well as "[m]ultiple witnesses [who]

Document received by the CA 2nd District Court of Appeal.

described Reporting Party's demeanor as fearful for days after the incident"; and (4) the surveillance video.[3]  (AR51-54.)

Respondents' claim that the surveillance video shows the prohibited conduct is neither true nor what Helsper observed. (AR44-45; AR53.)  Helsper concluded, "[A]lthough taken at a distance, [the video] depicts aggressive, determined movements by Respondent; movements inconsistent with play or light-hearted conduct."  (AR53.)  Helsper's subjective opinion is not evidence, and the video does not show the prohibited conduct, which is why Helsper relied so heavily on unverified witness statements and Katz's purported "intake" statement to find Boermeester responsible.  (AR51-53.)

Respondents' recitation of supposedly corroborative witness testimony emphasizes two things (1) witness testimony does not corroborate that Boermeester pushed Katz's head into a cinder block wall multiple times on January 21; and (2) due to the conflicting nature of the witness statements, credibility was central to the adjudication.  Although there is some agreement on minor, non-critical points, there is no agreement that

---

[3] Helsper provided no explanation for her apparent finding that Boermeester's adamant denials of the charged misconduct were not credible.

Document received by the CA 2nd District Court of Appeal.

Boermeester pushed Katz's head into a cinder block wall multiple times on January 21. Moreover, conflicts in the witness statements and evidence could only have been resolved through direct or indirect cross-examination during a live evidentiary hearing during which the witnesses appeared in person or by other means before a neutral adjudicator with the power independently to find facts and make credibility assessments.

In response to Respondents' recitation of supporting evidence, Appellant provides the following conflicting exculpatory evidence:

- DH did not see Boermeester push Katz or her head into a wall. DH reported that while he was "half asleep," he saw Boermeester and Katz "at the wall for about 3 seconds." (AR95.) "DH did not see [Katz] (or hear) the contact of her hitting the wall." (*Id*.) DH saw Katz "pinned against the wall" with Boermeester's holding one hand "on her chest/neck." (*Id*.) "DH couldn't really see [Katz's] face" and only saw Boermeester "holding her against the wall," not pushing her or her head against the wall. (*Id*.)

Document received by the CA 2nd District Court of Appeal.

- Boermeester has never admitted to putting his hands around Katz's neck and pushing her head against a wall. Boermeester reported, "Me putting my hand on her neck wasn't like that at all. . . . I wasn't choking her or slamming her head on a wall. She would be on the other side of me [in the investigation] if I did." (AR173; see also AR179 "There was no chance of me causing physical harm. If I did, [Zoe] would be going against me and not with me.") Boermeester did not have a "tight grip" on Katz's neck. (AR173.) Boermeester reported that he and Katz were "standing next to [the wall]," not that he pushed Katz into a wall. (*Id.*)

- TS did not see Boermeester push Katz's head into a cinder block wall. (AR125.) Nevertheless, TS reported that he and DH "were trying to convince [Katz] that the behavior was 'bad.'" (*Id.*) Katz did not believe her interaction with Boermeester was "bad" and continued "downplaying it," but after 15-20 minutes of relentless cajoling by DH and TS, Katz "eventually said it was bad," started "crying" and "got up and left." (AR125-126.) However, 2-3 minutes later, Katz sent a text message to DH saying, "I am safe. Thanks for looking out for me." (AR126.)

Document received by the CA 2nd District Court of Appeal.

- MB2's statements are conflicting.  MB2 initially reported that he "did not see anyone touch the other. They were just talking" and "standing together at the other side of the alley. They were standing against the wall."  (AR131.)  Helsper interviewed MB2 only by phone, not in person or via a video conference technology, and could not have adequately assessed the credibility of his conflicting statements.[4]

- Katz acknowledged that to use the statements she made during her "intake" meeting "wouldn't be accurate" (AR158) because Helsper and Means "manipulated [her] into saying things about Matt and [their] relationship that were greatly exaggerated or totally untrue."  (AR67.)  Katz maintains, "[Matt] did not touch me in a way that

---

[4] See *USC II*, supre, 29 Cal.App.5th at p. 1237 (where there are conflicting witness statements and a lack of corroborating evidence, a fair hearing required the adjudicator to assess personally the credibility of critical witnesses in person or by videoconference or other technological means to give the adjudicator an opportunity to observe the witnesses' demeanor during the interview.))  Interviewing MB2 only by phone, not "personally" was contrary to USC's Policy, which "requires the Investigator to personally see and hear all parties and witnesses to the investigation, putting him/her in the best position to make determinations as to credibility and relevance."  (AR219.)

Document received by the CA 2nd District Court of Appeal.

was violent, assaultive or in any way unwanted. He did not push me into a wall or otherwise try to hurt me**. I WOULD NEVER TOLERATE THAT . . . MATT DID NOTHING TO HURT ME NOR DID HE HURT ME OR TRY TO HURT ME**."  (AR68, emphasis in original.)

Given the disputed facts and evidence, the lack of conclusive corroborative video evidence, and the absence of anything close to an admission by Boermeester that he pushed Katz's head into a cinder block wall on January 17, 2017 causing her physical harm, witness credibility is central to the adjudication.

Respondents contend that even if Boermeester and Katz were engaged in mutual, consensual roughhousing, there is still sufficient evidence to establish a policy violation.  However, under the Policy, "Intimate partner violence" requires a showing that Boermeester caused physical harm to Katz. (AR486.)  Katz asserts that she was not physically harmed by Boermeester.  (AR68.)  There is no evidence that Katz sustained any physical harm.  (See AR194 ("I was physically examined in my original meeting with the Title IX office, and there were no bruises or anything else anywhere on my body. I did not have any 'physical harm' (as required by the Code) at all from being with Respondent on January 21, 2017.")  TS, DH, and MB2 did

Document received by the CA 2nd District Court of Appeal.

47

not report Katz exhibiting signs of physical harm.  The evidence is not sufficient to establish a violation of USC's policy.

### D. RIGHT TO A FAIR PROCESS WAS NOT PRESERVED BY USC'S OFFER OF "INDIRECT CROSS-EXAMINATION" PERFORMED IN PRIVATE BY THE TITLE IX COORDINATOR AND INVESTIGATOR.

As Boermeester pointed out in his Opening Brief, USC's limited, non-adversarial process involving written cross-examination of the complainant and respondent does not comport with *Allee* and is "simply an extension of the investigation and prosecution itself."  (*Allee*, 30 Cal.App.5th at p. 1069.)  Respondents do not dispute that USC's process wholly denied Boermeester and Katz the opportunity to cross-examine witnesses whose credibility was critical to the outcome, and whose accounts Boermeester and Katz pointed out were false, one-sided, taken out of context, or based on hearsay, rumors, and gossip.  (See e.g. AR60-62; AR193-195.)

Respondents contend the process was fair because any written questions submitted by Boermeester for Katz would have been asked in private by the Title IX Coordinator, not the investigator, and a Misconduct Sanctioning Panel was responsible for determining sanctions.  Neither argument

Document received by the CA 2nd District Court of Appeal.

overcomes the inherent unfairness in USC's process, wherein a single individual investigates the allegations, makes findings of fact, and decides whether the respondent violated the Misconduct Policy in the absence of a live hearing held before impartial adjudicators. (AR0492-493.)

Having the Title IX Coordinator pose questions to the respondent and "Reporting Party" during separate, private "Evidence Hearings," where the investigator is still the factfinder and decision-maker, and where the process does not afford either party an opportunity to pose questions to witnesses does not satisfy *Allee*. (*Allee*, 30 Cal.App.5th at pp. 1070-1071 ("Deficiencies . . . are virtually unavoidable in USC's system, which places in a single individual the overlapping and inconsistent roles of investigator, prosecutor, fact finder, and sentencer. While providing a hearing at which the witnesses appear and are cross-examined before a neutral fact finder cannot ensure that such flaws do not occur, such a procedure at least provides an accused student with a fair and meaningful opportunity to confront the adverse witnesses in an attempt to expose weaknesses in the evidence.")) The process is also incompatible with *Westmont*, which held, "[W]here critical witnesses provide inconsistent accounts of an alleged incident,

Document received by the CA 2nd District Court of Appeal.

independent evaluation of witness credibility is 'pivotal to a fair adjudication.'" (*Westmont*, 34 Cal.App.5th at p. 637, quoting *Allee*, 30 Cal.App.5th at p. 1069.)

Moreover, Title IX Coordinator Gretchen Dahlinger Means was singularly unsuited to perform the cross-examination. Means was involved in the proceedings from day one after receiving the report from Peter Smith alleging that Boermeester was "beating [Katz] up and throwing her against the wall and choking her." (AR 477.) Means contacted DH and TS, not Katz, "to confirm the report by Coach Smith." (AR 1.) Means orchestrated the "intake" interview/ambush of Katz "to get [her] to say bad things about Matt so that they could use those things against him," and made the decision to move forward with an investigation against Katz's express wishes. (AR67; AR183; AR187; AR189.) Means approved the interim suspension order that banned Boermeester from campus. (AR492; AR177.) Means would not allow Katz to correct her initial statement, and Means was "unwilling to listen to anything that [Katz] or anyone else ha[d] to say which [was] inconsistent with [the University's] agenda." (AR288.) Involving Means in the "Evidence Hearing" only made the proceedings more one-sided and unfair, not less so.

Document received by the CA 2nd District Court of Appeal.

### E. BOERMEESTER DID NOT WAIVE HIS RIGHT TO CROSS-EXAMINE KATZ AND OTHER WITNESSES.

Boermeester has not waived his right to argue he was denied a fair process. Boermeester is appealing the trial court's decision to deny his Petition for Writ of Mandate on the grounds raised in the trial court, including that USC's method of single-investigator adjudication was unfair, and USC's "Evidence Hearing" does not meet the minimum requirements of fairness. (CT767-770.) These issues were properly raised and considered in the trial court without objection by Respondents. Boermeester has not forfeited these arguments.

Respondents contend Boermeester waived his right to assert a lack of fairness on the issue of cross-examination because he was offered the opportunity to submit written questions to be asked of Katz but declined to do so, and he "argued against live questioning." Respondents miss the point. Boermeester did not object to *live* questioning; he objected to any questioning that would be performed by USC's Title IX Office (Helsper and Means) with Katz in secret with no verbatim transcript or audio recording of the exact questions asked and the exact answers given, and where the evidence would not be reviewed by a neutral adjudicator. Boermeester

Document received by the CA 2nd District Court of Appeal.

asked to submit written questions to Katz so that he could obtain her verbatim "unfiltered" answers. (AR293-294.) The request was also made because Katz reported having been "harassed," "demeaned, misrepresented, and disrespected" by Helsper and Means, and her statements "manipulated" to further their Title IX "agenda." (AR67; AR196; AR212.) Cross-examination of Katz outside of USC's Title IX Office was essential to avoid "any Title IX filter" and further persecution and manipulation of Katz by Helsper and Means. (AR294.) Not surprisingly, Means rejected the request. (AR293.)

Boermeester cannot have waived rights when he requested an opportunity to submit questions, and Means' rejected his attempt to make USC's process fair, accurate, transparent, and less distressing for Katz. (See *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1301 ("A valid waiver of any right . . . presupposes an actual and demonstrable knowledge of the right being waived so that the waiver is deemed knowing and intelligent. Courts should not find a waiver by mere silence or acquiescence even when the defendant is represented by counsel."))

Respondents claim Boermeester waived the right to argue USC's Policy did not afford him the right to personally cross-

Document received by the CA 2nd District Court of Appeal.

examine Katz at a live hearing because he did not raise the issue in an appeal of the administrative proceedings. Nonsense. USC's Policy does not allow students to appeal on the ground that USC's policy is procedurally unfair or inadequate. (AR495.) Under the Policy, an appeal on procedural fairness grounds is limited to whether "the Title IX Office or the Misconduct Sanctioning Panel deviated from the process set forth in this policy and such deviation had a material impact on the outcome of the investigation." (AR495.) The Policy does not provide for cross-examination at a live hearing with neutral adjudicators, and there is no procedure in USC's Policy for students to challenge the legality and fairness of USC's Policy. (AR492-493; AR495.)

Respondents concede its policy did not allow Boermeester an opportunity to question witnesses but contends Boermeester should have "sought the opportunity to question witnesses" anyway. But "requiring [Boermeester] to request access to the evidence against him does not comply with the requirements of a fair hearing." (*USC1, supra,* 246 Cal.App.4th at p. 246.) It is the University's obligation to ensure its policies comply with the law and at least the minimum standards of fairness, not the student's. Here, Respondents were derelict in

Document received by the CA 2nd District Court of Appeal.

their commitment to "comply[] with all applicable laws and governmental regulations" and cannot blame Boermeester for their shortcomings.  (AR478.)

It would not have been fair for USC to make Boermeester request an opportunity to question witness, when no such opportunity—and no procedure for a live evidentiary hearing—appear in the policy.  There is no evidence to support that had Boermeester asked, USC would have simply changed its procedures to allow for a live hearing with cross-examination of Katz and witnesses.  On the contrary, the record shows Helsper and Means were determined to control the evidence and outcome of the proceedings, and a live hearing would have thwarted those efforts.

### F. USC'S PROCESS YIELDED AN INACCURATE RECORD.

Respondents contend the record is accurate but then unabashedly spend several pages injecting their own speculation and opinion into their discussion of what Katz might have meant in written text messages to her friends and might have believed, felt, thought, and decided during the investigation.  Respondents make Boermeester's point for him—the absence of an in-person evidentiary hearing, and

Document received by the CA 2nd District Court of Appeal.

USC's failure to provide any mechanism to verify the accuracy of witness statements, challenge witness testimony through cross-examination, or present documentary evidence in the proper context, created an unfair process and an unreliable, unverifiable administrative record, leading Respondents to guess at what Katz might have intended by her statements and actions.

Respondents contend written text messages "cannot be reconciled" with Katz's later statements.  Boermeester's point exactly—on the record before the Court, it is impossible to reconcile Katz's conflicting statements and actions.  This conflicting information may have been reconciled at an in-person evidentiary hearing where Katz was given the opportunity to explain her thoughts, feelings, and motivations, and an impartial adjudicator could decide whether her earlier or later statements were more credible.  Instead, Helsper and Means actively avoided discovering information that might benefit Boermeester by refusing to question or interview Katz after providing her proper notice of the investigation, then they ignored Katz's expressed feelings that she was "insult[ed] that the University believes that I am some sort of 'victim' who would tolerate being abused by Matt or by anyone," and

Document received by the CA 2nd District Court of Appeal.

55

203

characterized her reaction to the Title IX investigation (once she found out about it) as a "recantation" further supportive of USC's claims of "intimate partner violence." (AR51.) A live hearing before neutral adjudicators would have benefitted Katz, Boermeester, and USC alike. (See *Westmont, supra,* 34 Cal.App.5th at 640 ("compelling colleges to adhere to basic principles of fair hearings . . . benefits students accused of sexual misconduct, victims, and colleges alike."))

The hypothetical questions posed by Respondents also illustrate Boermeester's point and would have been more appropriately asked of Katz at a hearing before impartial adjudicators: "If she had said nothing improper happened and if she genuinely felt she had nothing to fear from Boermeester, why would she be concerned about Boermeester reading her statement or knowing that she met with the Title IX Office? And why would she lie to him and say she had only spoken briefly to a counselor and she had no idea there would be an investigation?" (RP Brief, p. 69.) More importantly, why didn't Helsper and Means ask Katz these questions?

Respondents note the "well-known 'tendency of domestic violence victims to recant previous allegations of abuse as part of the particular behavior patterns commonly observed in

Document received by the CA 2nd District Court of Appeal.

abusive relations.'"  (*People v. Brown* (2004) 33 Cal.4th 892, 905, 907.)  However, in *People v. Brown*, evidence of such a tendency was admissible as it related to credibility of an alleged victim of domestic violence.  (*Id*. at pp. 906-908.)  Moreover, "When the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor."  (*Id*. at p. 906.)  In other words, in relying on *People v. Brown*, Respondents and the trial court acknowledge that credibility was central to the adjudication.  Moreover, had Boermeester received a hearing before neutral adjudicators, Katz's testimony in Boermeester's favor would have allowed the adjudicator to assume there was no abusive behavior.

Even the anonymous appeal panel, which was not authorized to "substitute their judgment for that of the Title IX Office" even if they "disagree[d] with the findings or conclusions," lessened the sanction considerably after finding that Boermeester's conduct may have been "simply reckless." (AR218.)  A hearing at which Boermeester and Katz had the opportunity to confront adverse witnesses in the face of

Document received by the CA 2nd District Court of Appeal.

competing narratives was key and would have led to a starkly different outcome.

### G. USC'S INTERNAL APPEALS PROCESS DETRACTS FROM THE FAIRNESS OF THE PROCEEDINGS, AS IT DID IN *ALLEE.*

Boermeester does not contend that USC was required to provide an appeal process; he argues that USC's Policy *did* provide for an appeal process, and the process should have been fair. It was not. Respondents do not even attempt to dispute that USC's limited appeal process is identical to the appeal process in *Allee,* which the Court found "amplified" "the harm to fundamental fairness created by USC's system." (*Allee, supra,* 30 Cal.App.5th at 1069.)

Just as USC's appeal panel made no effort to address Katz's and Boermeester's concerns with USC's investigation, Respondents make no real effort to explain why USC's appeal panel did not issue findings on whether the Title IX Office had abused its own process by misreporting, misrepresenting, and manipulating Katz's statements and statements made by witnesses; coercing her into accepting an AOC and emergency housing; failing to adequately explain the Title IX process to her; ignoring her requests that the Title IX Office conduct a fair

Document received by the CA 2nd District Court of Appeal.

58

investigation; trampling her rights and demeaning her by characterizing her as a victim of domestic violence (AR192-196); and Mr. Boermeester's claims that the Title IX Office abused its process by investigating over the objections of the Reporting Party, failing to provide proper notice of the scope of the investigation, presuming Boermeester guilty, and relying on character evidence, gossip, and rumors to substantiate the charges.  (AR206-208.)

### H.    USC DID NOT COMPLY WITH ITS OWN POLICY TO PRESUME BOERMEESTER "NOT RESPONSIBLE."

USC's Title IX Office did not uphold its duty under the Policy to presume Boermeester "not responsible."  (AR487.) Respondents contend Gretchen Dahlinger Means was not involved in the decision to place Boermeester on an interim suspension, but USC's own "Timeline of Investigation" states, "The Title IX Coordinator conducted an interim action phone conference with representatives from Athletic Compliance, Student Affairs, [redacted]. It was decided that Respondent would be placed on an interim suspension pending the outcome of the investigation."  (AR74.)  Means not only participated in the decision-making process but "conducted the

59

Document received by the CA 2nd District Court of Appeal.

interim action phone conference" that led to Boermeester's immediate interim suspension.  (*Id*.)  An interim suspension could only be imposed upon a determination that Boermeester posed a "substantial threat" to the safety or well-being of the university community.  (AR489; see also AR218.)  Respondents acknowledge in their brief that Boermeester was placed on an interim suspension to avoid liability, indicating that Means believed Boermeester posed a "foreseeable threat of violence." (*Regents*, 4 Cal.5th at p. 634.)  This cannot be squared with the Title IX Office's obligation to presume Boermeester "not responsible."  (AR487.)

Respondents also concede that investigator Helsper made a preliminary determination that "there [was] a danger to the greater community" when she decided to investigate Boermeester without Katz's participation.  Respondents do not explain how Helsper's decision at the inception of the investigation that Boermeester was "a danger to the greater community" can possibly be reconciled with her duty to presume Boermeester not responsible for the alleged misconduct.

Document received by the CA 2nd District Court of Appeal.

## I. USC DID NOT COMPLY WITH ITS OWN POLICY TO WEIGH THE EVIDENCE IMPARTIALLY.

The determination of whether there was a fair trial requires the trial court and Court of Appeal to review *de novo* whether the adjudicator appropriately weighed the evidence and met the university's standard of evidence to establish a policy violation. (Code Civ. Proc., § 1094.5 subd. (b); *UCSD*, supra, 5 Cal.App.5th at p. 1073, citing *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271 ("Where student discipline is at issue, the university must comply with its own policies and procedures."))

The investigator's findings must be supported by a preponderance of evidence. (AR488.) Respondents do not dispute that Helsper failed to weigh all inculpatory and exculpatory evidence in making findings, including Katz's written admissions and corroborative evidence that Boermeester and Katz had engaged in harmless horseplay. Helsper further bolstered her analysis with speculative lay opinions about domestic violence without providing any evidentiary support. Respondents did not comply with USC's Policy to weigh the evidence fairly and find violations only if they are supported by a preponderance of evidence.

61

Document received by the CA 2nd District Court of Appeal.

**J.     PREJUDICE IS PRESUMED.**

Prejudice is presumed in this case, where critical witnesses, including the Reporting Party, provided inconsistent accounts of an alleged incident, and an independent evaluation of witness credibility was pivotal to a fair adjudication.  (See *Westmont*, 34 Cal.App.5th at p. 637, quoting *Allee*, 30 Cal.App.5th at p. 1069.)

**IV.   RESPONDENTS' FINDINGS ARE NOT SUPPORTED BY THE EVIDENCE.**

**A.     THE DEFERENCE ACCORDED EXECUTIVE BRANCH DECISIONS DOES NOT APPLY TO PRIVATE, NON-GOVERNMENT LITIGANTS.**

The deference of the judicial branch to governmental agency administrative decisions is born of the doctrine of separation of powers and the official duty presumption.  (See *Bixby v. Pierno* (1971) 4 Cal.3d 130, 140 (*Bixby*) ("The doctrine of separation of governmental powers under the California Constitution provides both independent judgment and substantial evidence review of administrative decisions."); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 812 (*Fukuda*) (findings of a state board where formal hearings are held  come before courts with a strong presumption of correctness based

Document received by the CA 2nd District Court of Appeal.

primarily on the presumption "that official duty has been regularly performed"); Evid. Code, § 664.)

> "The findings of a board where formal hearings are held should and do come before the courts with a strong presumption in their favor based primarily on the [rebuttable] presumption contained in section 1963, subsection 15, of the Code of Civil Procedure [currently Evidence Code section 664] 'That official duty has been regularly performed.' Obviously, considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing, especially in cases involving technical and scientific evidence." (*Drummey, supra*,13 Cal.2d at p. 86)

> (*Fukuda*, *supra*, 20 Cal.4th at p. 812.)

Private colleges and private universities are not governmental agencies that have been granted judicial powers by the constitution or by the Legislature, nor are their private employees entitled to the official duty presumption under Evid. Code, § 664.  Although Code Civ. Proc., § 1094.5 has been made applicable to faculty tenure and student disciplinary matters conducted by private colleges and private universities (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, (*Pomona*); *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407), neither the official duty presumption, nor presumptions based on the

63

separation of powers, apply to such private entities or private parties.

There is no justification for the courts of this state to defer to private decisions made by private entities where no judicial powers of government have been conferred and no official duty is performed. USC does not conduct full and formal hearings, and USC serves the University's own private institutional and financial interests, not the interests of the general public, nor the People of the State of California, and its administrators and Title IX personnel are not public officials. The preference given to one private litigant over the rights of the other, favoring Respondent USC over Appellant Matthew Boermeester, violates the precept of equal protection under the law embedded in the constitutions of this state and of the United States.

**B.** **EXTREMELY DEFERENTIAL "SUBSTANTIAL EVIDENCE" STANDARD DOES NOT APPLY TO DISCIPLINARY DECISION OF PRIVATE COLLEGE.**

Even in the case of judicial review of executive branch decisions, our Supreme Court recognized almost 50 years ago that the abrogation of certain individual rights are too important to relegate to exclusive administrative extinction by

Document received by the CA 2nd District Court of Appeal.

government agencies and are sufficiently vital to the individual to compel a full and independent review by the trial court under Code Civ. Proc., § 1094.5. (*Bixby*, *supra*, 4 Cal.3d at p. 144.) The Supreme Court provided no fixed formula but required trial courts to perform "a precious function in the protection of the rights of the individual" by deciding whether government agency adjudicative decisions affect vested fundamental rights on a case-by-case basis. (*Id*. at p. 146-47.)

> "The courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review. (*Merrill v. Department of Motor Vehicles*, *supra*, 71 Cal.2d 907, 915; *Beverly Hills Fed. S. L. Assn. v. Superior Court* (1968) 259 Cal.App.2d 306, 316.)"

(*Id*. at p. 144.)

Here, where there is no governmental agency decision, the distinction to defer independent review except where vested fundamental rights are affected does not apply. There is no justification whatsoever for the Court to attend to USC as if the private college were a co-equal branch of our state's government. USC is a private non-profit corporation, not a statewide administrative agency with constitutionally derived

65

Document received by the CA 2nd District Court of Appeal.

powers, such as the University of California. (See Cal Const, Art. IX § 9; *Regents of University of California v. City of Santa Monica* (1978) 77 Cal. App. 3d 130, hereafter *Santa Monica*.) University of California employees are public employees and the Regents have rulemaking and policymaking power and their policies and procedures have the force and effect of statute. (*Kim v. Regents of the University of California* (2000) 80 Cal.App.4th 160, 165.) The Regents have been characterized as "a branch of the state itself" or "a statewide administrative agency." (*Santa Monica,* 77 Cal.App.3d at p. 135.)

Prior reported opinions by this Court concerning Title IX sexual misconduct decisions are not disturbed by the obvious distinction between a statewide government agency and a private person or corporation. (See, *UCSD, supra,* 5 Cal.App.5th at p. 1073, citing *Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1489, citing in turn to *Sarka v. Regents of University of California* (2006) 146 Cal.App.4th 261, 271, which cites to *Fukuda,* 20 Cal.4th at p. 824.)

In *USC I*, Division Four of the Second District Court of Appeal found the private university's process to be unfair, and also that the university's findings were unsupported by substantial evidence. The Court, however, did not evaluate

Document received by the CA 2nd District Court of Appeal.

66

whether an independent judgment standard should have applied in the trial court because the issue was not raised at the trial court or in the Court of Appeal. (*USC I*, 246 Cal.App.4th at p. 225.)

The same is true of *M.N. v. Morgan Hill* (2018) 20 Cal.App.5th 607, hereafter *Morgan*. In *Morgan*, the Sixth District Court of Appeal did not determine whether to apply the independent judgment standard for review of a school's decision to expel a student because the petitioner in *Morgan* did not assert, either at the trial court level or on appeal, at the independent judgment standard should apply. (*Id*. at p. 616.)

In *CMC,* Division One of the Second District Court of Appeal cited the Fourth District Court of Appeal decision in *UCSD*, a mandamus matter involving a public university, for the premise that a private university's administrative decision should be reviewed for substantial evidence; however, in *CMC*, the Court decided the case on fairness grounds and did not review the evidence. (*CMC*, *supra*, 25 Cal.App. 5th at p. 1058.)[5]

---

[5] *UCSB, supra,* 28 Cal.App.5th at p. 61 (the Court may refrain from evaluating the sufficiency of evidence if there are errors in the administrative process.)

Document received by the CA 2nd District Court of Appeal.

Similarly, Division Seven recently relied on another opinion involving a public university, *UCSB*, for the proposition that a private university's findings should be reviewed for substantial evidence in light of the whole record. (*USC II*, *supra*, 29 Cal.App.5th at pp. 1231 1239, n .39.)  The *USC II* Court also decided in the student's favor on fairness grounds and did not evaluate the evidence under any standard.

In more recent Appellate decisions involving student sexual misconduct proceedings at private universities, the Second District Court of Appeal has remained silent on the issue of whether a decision in a private university sexual misconduct proceeding affects an accused student's vested fundamental rights and requires *de novo* review.  In *Allee*, Division Four of the Second District Court of Appeal ruled in the accused student's favor on fairness grounds and did not directly address whether the evidence should have been reviewed *de novo* or for substantial evidence.  However, the Court observed the negative effects of the university's use of the substantial evidence standard to review administrative appeals:

> Because a version of events provided by a single witness (assuming it is not implausible on its face)

Document received by the CA 2nd District Court of Appeal.

constitutes substantial evidence, the mere fact that the complainant's allegations of misconduct are deemed credible by the investigator constitutes substantial evidence. Thus, the SBAP will virtually never be in a position to set aside an investigator's factual findings.

(*Allee*, 30 Cal.App.5th at p. 1069.)

Division Six of the Second District Court of Appeal also did not address whether the trial court should exercise independent judgment or substantial evidence review of the private university's administrative findings. (*Westmont*, 34 Cal. App. 5th at p. 622.) The trial court is authorized to exercise its independent judgment on the evidence and may not presume USC to be correct, any more than the Court may presume Boermeester to be correct. (Code Civ. Proc., § 1094.5, subd. (c).)

Though a university has an unimpeded ability to determine who may be admitted to study, the authority is limited to *academic* determinations, not disciplinary determinations premised on allegations of serious sexual misconduct. (See *Pomona*, 45 Cal.App.4th at p. 1726.) In *Pomona*, a professor brought civil claims against the college after it failed to offer lifetime academic tenure. (*Id*. at p. 1720.) The "essential freedoms" referred to in *Pomona* are not unlimited but encompass the "'four essential freedoms' of a

Document received by the CA 2nd District Court of Appeal.

university — to determine for itself *on academic grounds* who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'"  (*Id*. at p. 1726, emphasis added.) The purpose for deference in tenure decisions arises only because "they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges."  (*Id*. at p. 1725.)  Student discipline matters do not involve issues that are "beyond the competence" of judges, nor do they involve an essential freedom of the college to determine, on academic grounds, who may be admitted to study.  Non-intervention of the trial court is neither required nor appropriate in situations involving student discipline for misconduct.

### C. FINDINGS ARE NOT SUPPORTED EVEN BY SUBSTANTIAL EVIDENCE.

In reviewing whether substantial evidence supported USC's findings in a 2016 case involving student discipline, Division Four articulated the following standard,

> When reviewing a university's disciplinary actions, "'[t]he power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will

Document received by the CA 2nd District Court of Appeal.

support the finding.' [Citation.]" (*Perlman v. Shasta Joint Jr. College Dist. Bd. of Trustees* (1970) 9 Cal.App.3d 873, 882.) "While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], **this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment**. … '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that **such evidence must be of ponderable legal significance**. Obviously **the word cannot be deemed synonymous with "any" evidence. It must be reasonable … , credible, and of solid value** … .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633, original italics & fn. omitted.)

(*USC I*, *supra*, 246 Cal.App.4th at pp. 248-249.)

As discussed in the foregoing sections, there is no evidence of any ponderable legal significance or of any reasonable, credible, solid value, that Mr. Boermeester hit Ms. Katz head against a cinder block wall multiple times on January 21, 2017. There is no evidence of any physical harm, and the written statements by Matthew Boermeester and Zoe Katz definitively establish that

Document received by the CA 2nd District Court of Appeal.

Boermeester is not the perpetrator of an "assault," and Katz is not "some sort of 'victim' who would tolerate being abused by Matt or by anyone." (See AR59-69; 192-214.) The only victims in this case are Boermeester and Katz who were subjected to a wrongful, unfair, results-driven Title IX proceeding, and "[o]nce it was wrongfully started, it became a runaway train," decimating Boermeester's education, reputation, and future. (AR196.) The evidence does not support investigator Helsper's findings.

## V.    CONCLUSION.

Based on the foregoing, Appellant Matthew Boermeester respectfully requests this Court to set aside Respondent's findings and resulting sanctions against him.

DATED: November 12, 2019   Respectfully submitted,

HATHAWAY PARKER

By:    /s/ Mark M. Hathaway
Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.
Attorneys for Appellant
MATTHEW BOERMEESTER

Document received by the CA 2nd District Court of Appeal.

72

## CERTIFICATE OF COUNSEL

Pursuant to California Rules of Court, rule 8.204, subdivision (c)(1), the undersigned certifies that this brief contains 12,382 words, according to the word count of the Microsoft Word program. The word count includes footnotes but excludes the proof of service.

DATED: November 12, 2019  Respectfully submitted,

HATHAWAY PARKER

By:   /s/ Mark M. Hathaway
      Mark M. Hathaway, Esq.
      Jenna E. Parker, Esq.
      Attorneys for Appellant
      MATTHEW BOERMEESTER

Document received by the CA 2nd District Court of Appeal.

| State of California | ) | Proof of Service by: |
|---|---|---|
| County of Los Angeles | ) | ✓ US Postal Service |
| | ) | Federal Express |

I, Kirstin Largent , declare that I am not a party to the action, am over 18 years of age and my business address is: 631 S Olive Street, Suite 600, Los Angeles, California 90014.

**On** 11/12/2019 declarant served the within: Appellant's Reply Brief **upon:**

Copies   FedEx   USPS

| ELECTRONICALLY SERVED VIA TRUEFILING: |
|---|
| Julie Arias Young • Karen Jean Pazzani |
| YOUNG & ZINN LLP |
| 1150 South Olive Street |
| Suite 1800 |
| Los Angeles, California 90015 |
| jyoung@yzllp.com • kpazzani@yzllp.com |
|    Attorneys for Respondents |

1   Copies   FedEx  ✓ USPS

| Clerk for The Honorable Amy D. Hogue |
|---|
| SUPERIOR COURT OF CALIFORNIA |
| County of Los Angeles |
| Spring Street Courthouse |
| 312 North Spring Street |
| Los Angeles, California 90012 |
| |
| Trial Court Judge |

Copies   FedEx   USPS

| ELECTRONICALLY SERVED VIA TRUEFILING: |
|---|
| |
| SUPREME COURT OF CALIFORNIA |
| 350 McAllister Street |
| Room 1295 |
| San Francisco, California 94102-4797 |

Copies   FedEx   USPS

| |
|---|
| |

the address(es) designated by said attorney(s) for that purpose by depositing **the number of copies indicated above,** of same, enclosed in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of California, or properly addressed wrapper in an Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of California

I further declare that this same day the **original and** copies has/have been hand delivered for filing OR the **original and** copies has/have been filed by third party commercial carrier for next business day delivery to:

ELECTRONICALLY FILED VIA TRUEFILING:

CALIFORNIA COURT OF APPEAL
Second Appellate District, Division Eight
Ronald Reagan State Building
300 South Spring Street, Second Floor
Los Angeles, California 90013

I declare under penalty of perjury that the foregoing is true and correct:

| Signature: /s/ Kirstin Largent, Senior Appellate Paralegal, Counsel Press Inc. |
|---|

Document received by the CA 2nd District Court of Appeal.

# EXHIBIT 4

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically RECEIVED on 12/14/2020 at 11:14:31 AM

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 12/14/2020 by Karissa Castro, Deputy Clerk

# S263180

# IN THE
# SUPREME COURT OF CALIFORNIA

---

**MATTHEW BOERMEESTER,**
*Plaintiff and Appellant,*

*v.*

**AINSLEY CARRY et al.,**
*Defendants and Respondents.*

---

AFTER A DECISION BY THE COURT OF APPEAL, SECOND APPELLATE DISTRICT, DIVISION EIGHT
CASE NO. B290675

---

# OPENING BRIEF ON THE MERITS

---

**HORVITZ & LEVY LLP**
BETH J. JAY (BAR NO. 53820)
SAN FRANCISCO OFFICE
JEREMY B. ROSEN (BAR NO. 192473)
MARK A. KRESSEL (BAR NO. 254933)
*SCOTT P. DIXLER (BAR NO. 298800)
SARAH E. HAMILL (BAR NO. 328898)
BURBANK OFFICE
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800 • FAX: (844) 497-6592
bjay@horvitzlevy.com
jrosen@horvitzlevy.com
mkressel@horvitzlevy.com
sdixler@horvitzlevy.com
shamill@horvitzlevy.com

**YOUNG & ZINN LLP**
JULIE ARIAS YOUNG (BAR NO. 168664)
KAREN J. PAZZANI (BAR NO. 252133)
1150 SOUTH OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015-3989
(213) 362-1860 • FAX: (213) 362-1861
jyoung@yzllp.com
kpazzani@yzllp.com

ATTORNEYS FOR DEFENDANTS AND RESPONDENTS
**AINSLEY CARRY AND UNIVERSITY OF SOUTHERN CALIFORNIA**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................6

ISSUES PRESENTED .................................................. 12

INTRODUCTION ........................................................ 12

STATEMENT OF THE CASE ...................................... 15

    A.    Matthew Boermeester grabs Jane Roe's neck and pushes her against a wall. ................................. 15

    B.    An eyewitness reports Boermeester's misconduct and USC opens an investigation. .......... 16

    C.    USC notifies Boermeester of the allegations against him and conducts a thorough investigation; Roe recants. ........................................ 18

    D.    USC affords Boermeester the opportunity to tell his side of the story and pose questions for Roe, but Boermeester does not request live cross-examination or appear at his hearing. ............ 19

    E.    USC concludes that Boermeester violated its domestic violence policy and, after affording Boermeester multiple layers of review, expels him. .......................................................................... 20

    F.    Boermeester petitions unsuccessfully for a writ of mandate. ............................................................... 21

    G.    The Court of Appeal reverses in a divided decision. This Court depublishes the opinion and grants review. ................................................... 21

LEGAL ARGUMENT ................................................. 24

I.    Common law fair procedure does not require live hearings with cross-examination, and the procedure by which USC investigated Boermeester's domestic violence was fair. ................................................ 24

A.    Private organizations need flexibility to conduct internal discipline, subject to the rudimentary common law requirements of notice and an opportunity to respond. ............................................ 24

B.    Common law fair procedure does not require private organizations to conduct live hearings with cross-examination............................................ 27

C.    USC provided a fair procedure to Boermeester. ...... 30

D.    California's common law fair procedure doctrine is the governing authority for private university disciplinary proceedings—not the federal Constitution's due process clause, as some appellate decisions have erroneously suggested. .................................................. 31

    1.    A private university's student disciplinary investigation is not state action. ............................................... 31

    2.    California courts should not treat due process principles applicable to state action as "instructive" or otherwise controlling as to common law fair procedure requirements. ................................. 33

    3.    This Court should disapprove the Court of Appeal decisions applying due process principles to hold that common law fair procedure requires burdensome procedures in student sexual misconduct cases................................................ 39

E.    Even if the common law requires live hearings with cross-examination in certain sexual misconduct cases, USC nonetheless provided a fair procedure in this domestic violence case.......... 42

1.    The rationale for requiring live cross-examination in certain sexual misconduct cases does not apply to domestic violence cases. ................................................ 42

2.    Alternatively, even if the common law requires a live hearing with cross-examination in some domestic violence cases, the Court of Appeal erred in imposing three additional procedural requirements. ................................... 46

II.   Boermeester waived any common law right to cross-examine witnesses at a live hearing. ................................. 49

    A.    An accused student must challenge a university's procedures at the university level in order to preserve a fair procedure challenge for appeal. ................................................ 49

    B.    Boermeester told USC he did not want to question Roe at a live hearing, and he did not ask to question other witnesses. ............................... 51

III.  Any error in failing to provide Boermeester with an opportunity to cross-examine witnesses at a live hearing was harmless. ........................................................ 54

    A.    Courts may not overturn private universities' disciplinary decisions due to inconsequential errors. ........................................................ 54

    B.    Any error here was harmless because USC's disciplinary decision did not depend primarily on assessing witness credibility, much less in the absence of supporting evidence. ......................... 55

IV.  Senate Bill No. 493 confirms, in the context of complaints of sexual misconduct or domestic violence, that private universities have the authority and flexibility to develop fair procedures for themselves. ........ 57

A. Under SB 493, universities adjudicating sexual misconduct and domestic violence complaints have discretion to determine whether hearings are necessary, and whether to allow cross-examination in such hearings. ................................. 57

B. SB 493 expressly supersedes the fair procedure cases on which the majority below relied. ................ 61

C. SB 493 provides that case law imposing new procedural requirements on private universities does not apply retroactively .................. 61

CONCLUSION ................................................................ 63

CERTIFICATE OF WORD COUNT ........................................... 64

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Anton v. San Antonio Community Hosp.*
(1977) 19 Cal.3d 802 ................................................... 26, 50, 54

*Applebaum v. Board of Directors*
(1980) 104 Cal.App.3d 648 ................................................ 34, 35

*Bartone v. Di Pietro*
(Sup.Ct. 1939) 18 N.Y.S.2d 178.............................................. 28

*Boermeester v. Carry*
(2020) 49 Cal.App.5th 682................................................*passim*

*Brooks v. Engar*
(App.Div. 1940) 19 N.Y.S.2d 114............................................. 28

*Cason v. Glass Bottle Blowers Ass'n of U.S. and Canada*
(1951) 37 Cal.2d 134 ............................................................. 28

*Caviness v. Horizon Community Learning Center, Inc.*
(9th Cir. 2010) 590 F.3d 806.................................................. 33

*Citizens for Open Government v. City of Lodi*
(2012) 205 Cal.App.4th 296................................................... 54

*Department of Homeland Security v. Thuraissigiam*
(2020) 591 U.S. __ [140 S.Ct. 1959, 207 L.Ed.2d 427] ........... 37

*Doe v. Allee*
(2019) 30 Cal.App.5th 1036............................. 39, 40, 43, 52, 61

*Doe v. Claremont McKenna College*
(2018) 25 Cal.App.5th 1055........................................ 39, 40, 46

*Doe v. Occidental College*
(2019) 37 Cal.App.5th 1003................................................ 50, 54

*Doe v. Occidental College*
(2019) 40 Cal.App.5th 208...................................... 39, 40, 50, 54

6

*Doe v. Trustees of Boston College*
(1st Cir. 2019) 942 F.3d 527 ...................................................... 38

*Doe v. University of Southern California*
(2016) 246 Cal.App.4th 221 ........................................... 39, 41, 47

*Doe v. University of Southern California*
(2018) 28 Cal.App.5th 26 .................................................... 50

*Doe v. University of Southern California*
(2018) 29 Cal.App.5th 1212 .............................................. 46, 48

*Doe v. Westmont College*
(2019) 34 Cal.App.5th 622 ........................................... 39, 40, 61

*Doers v. Golden Gate Bridge etc. Dist.*
(1979) 23 Cal.3d 180 ................................................................ 49

*Dougherty v. Haag*
(2008) 165 Cal.App.4th 315 ............................................... 30, 35

*Economy v. Sutter East Bay Hospitals*
(2019) 31 Cal.App.5th 1147 .................................................... 62

*El-Attar v. Hollywood Presbyterian Medical Center*
(2013) 56 Cal.4th 976.................................................. 25, 54, 62

*Ellis v. American Federation of Labor*
(1941) 48 Cal.App.2d 440 ...................................................... 28

*Ezekial v. Winkley*
(1977) 20 Cal.3d 267 .......................................................*passim*

*Fahlen v. Sutter Central Valley Hospitals*
(2014) 58 Cal.4th 655................................................................ 26

*Gill v. Mercy Hospital*
(1988) 199 Cal.App.3d 889 ............................................... 36, 50

*Goodstein v. Cedars-Sinai Medical Center*
(1998) 66 Cal.App.4th 1257.............................................. 36, 37

*Guilbert v. Regents of University of California*
(1979) 93 Cal.App.3d 233 ...................................................... 54

*Haidak v. University of Massachusetts-Amherst*
(1st Cir. 2019) 933 F.3d 56 ....................................................... 40

*Harmon v. Matthews*
(Sup.Ct. 1941) 27 N.Y.S.2d 656.................................................. 28

*Heineke v. Santa Clara University*
(9th Cir. 2020) 965 F.3d 1009............................................. 32, 33

*Homestead Savings v. Darmiento*
(1991) 230 Cal.App.3d 424 ................................................. 32, 36

*James v. Marinship Corp.*
(1944) 25 Cal.2d 721 ................................................................ 27

*Kaiser Foundation Hospitals v. Superior Court*
(2005) 128 Cal.App.4th 85 ........................................................ 36

*Lasko v. Valley Presbyterian Hospital*
(1986) 180 Cal.App.3d 519 ....................................................... 36

*McMillin Albany LLC v. Superior Court*
(2018) 4 Cal.5th 241................................................................. 61

*Natarajan v. Dignity Health,*
review granted February 26, 2020, S259364 .......................... 38

*Newsome v. Batavia Local School Dist.*
(6th Cir. 1988) 842 F.2d 920...................................................... 40

*Nightlife Partners v. City of Beverly Hills*
(2003) 108 Cal.App.4th 81 ........................................................ 60

*Niles Freeman Equipment v. Joseph*
(2008) 161 Cal.App.4th 765 ...................................................... 50

*Otto v. Tailors' Protective & Benevolent Union of San
Francisco*
(1888) 75 Cal. 308 ................................................................... 24

*Palm Medical Group, Inc. v. State Comp. Ins. Fund*
(2008) 161 Cal.App.4th 206...................................................... 35

8

*People v. Brown*
  (2004) 33 Cal.4th 892.................................................... 43, 44, 45

*People v. Ramirez*
  (1979) 25 Cal.3d 260 ................................................................ 35

*Pinsker v. Pacific Coast Soc. of Orthodontists*
  (1969) 1 Cal.3d 160 ............................................................ 33, 34

*Pinsker v. Pacific Coast Society of Orthodontists*
  (1974) 12 Cal.3d 541 ........................................................*passim*

*Pomona College v. Superior Court*
  (1996) 45 Cal.App.4th 1716.................................................. 27, 35

*Potvin v. Metropolitan Life Ins. Co.*
  (2000) 22 Cal.4th 1060................................................. 25, 36, 37

*Rendell-Baker v. Kohn*
  (1982) 457 U.S. 830 [102 S.Ct. 2764, 73 L.Ed.2d 418]...... 32, 33

*Rosenbilt v. Superior Court*
  (1991) 231 Cal.App.3d 1434 .................................................... 30

*Saad v. City of Berkeley*
  (1994) 24 Cal.App.4th 1206.................................................... 54

*Samann v. Trustees of Cal. State University & Colleges*
  (1983) 150 Cal.App.3d 646 .................................................... 50

*Schaer v. Brandeis University*
  (Mass. 2000) 735 N.E.2d 373.................................................. 38

*Sierra Club v. San Joaquin Local Agency Formation Com.*
  (1999) 21 Cal.4th 489............................................................ 49

*Sutton v. Providence St. Joseph Medical Center*
  (9th Cir. 1999) 192 F.3d 826............................................. 33, 37

*Taboada v. Sociedad Espanola De Beneficencia Mutua*
  (1923) 191 Cal. 187 ................................................................ 28

*Von Arx v. San Francisco Gruetli Verein*
   (1896) 113 Cal. 377 .................................................................... 27

*Wilson v. San Luis Obispo County Democratic Central
   Com.*
   (2009) 175 Cal.App.4th 489 ...................................................... 30

## Constitutions

United States Constitution
   14th Amend. .................................................................... 32, 36
   14th Amend., § 1 .................................................................... 32

Cal. Constitution
   art. I, § 7, subd. (a) .................................................................... 32
   art. VI, § 13 .................................................................... 54

## Statutes

28 U.S.C. § 1983 .................................................................... 32

Code of Civil Procedure
   § 1094.5 .................................................................... 26
   § 1094.5, subd. (b) .................................................... 26, 54

Government Code § 11340 .................................................... 60

## Miscellaneous

American Bar Association Commission on Domestic &
   Sexual Violence, Recommendations for Improving
   Campus Student Conduct Processes for Gender-Based
   Violence (2019)
   <https://www.americanbar.org/content/dam/aba/publication
   s/domestic-violence/campus.pdf> [as of Dec. 14, 2020] .......... 41, 47

Asimow et al., Cal. Practice Guide: Administrative Law
   (The Rutter Group 2020) ¶ 13:520 .......................................... 54

Beloof & Shapiro, *Let the Truth Be Told: Proposed
   Hearsay Exceptions to Admit Domestic Violence
   Victims' Out of Court Statements as Substantive
   Evidence* (2002) 11 Colum. J. Gender & L. 1 .......................... 43

10

Percival, *The Price of Silence: The Prosecution of Domestic Violence Cases in Light of* Crawford v. Washington (2005) 79 So.Cal. L.Rev. 213 ............................... 44

Senate Bill (2019-2020 Reg. Sess.)

No. 493 .................................................................*passim*
No. 493, § 1, subd. (c) ................................................ 58
No. 493, § 1, subd. (d) ............................................... 58
No. 493, § 1, subd. (e) ................................................ 58
No. 493, § 1, subd. (j) ................................................. 58
No. 493, § 1, subd. (l) ................................................. 58
No. 493, § 1, subds. (p) & (r) .................................... 59
No. 493, § 1, subd. (r) .......................................... 57, 59
No. 493, § 2, subds. (a) & (b) .................................... 59
No. 493, § 3, subd. (b) ............................................... 59
No. 493, § 3, subd. (b)(2), (4)(A)(iv), (6)(A) & (7) .................... 59
No. 493, § 3, subd. (b)(4)(A)(i) .................................. 59
No. 493, § 3, subd. (b)(4)(A)(ii), (viii), (xiii), (xiv), & (xvi) ....... 59
No. 493, § 3, subd. (b)(4)(A)(viii) ........................ 58, 59
No. 493, § 3, subd. (b)(4)(A)(viii)(I) ......................... 60
No. 493, § 3, subd. (e) ............................................... 59
No. 493, § 3, subd. (g)(1) ......................................... 61
No. 493, § 3, subd. (g)(2) ......................................... 61

Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount* (2017) 166 U.Pa. L.Rev. 1 ..................... 43

## OPENING BRIEF ON THE MERITS

### ISSUES PRESENTED

1.     Under what circumstances, if any, does the common law right to fair procedure require a private university to afford a student who is the subject of a disciplinary proceeding with the opportunity to utilize certain procedural processes, such as cross-examination of witnesses at a live hearing?

2.     Did the student who was the subject of the disciplinary proceeding in this matter waive or forfeit any right he may have had to cross-examine witnesses at a live hearing?

3.     Assuming it was error for the university to fail to provide the accused student with the opportunity to cross-examine witnesses at a live hearing in this matter, was the error harmless?

4.     What effect, if any, does Senate Bill No. 493 (2019-2020 Reg. Sess.) have on the resolution of the issues presented by this case?

### INTRODUCTION

University of Southern California (USC) student Matthew Boermeester violated USC's domestic violence policy by grabbing his ex-girlfriend, fellow USC student Jane Roe, by the neck and pushing her forcefully against a wall.  Eyewitnesses saw the incident, and it was captured on surveillance video.  USC gave Boermeester notice of the allegations against him and conducted a thorough investigation.  Boermeester had ample opportunity to review and respond to the evidence, including the opportunity to

12

pose questions for Roe. After USC considered the evidence and
provided Boermeester with multiple layers of review, USC
expelled him. USC's procedures exceeded the basic fairness
required by the common law. Nonetheless, a divided panel of the
Court of Appeal disagreed and ordered the trial court to set aside
the expulsion, concluding that the administrative hearing did not
provide sufficient procedural safeguards.

Most importantly, and of significance far beyond this case,
the Court of Appeal erred in concluding that USC violated
Boermeester's common law right to fair procedure. This Court
has long held that fair administrative hearing procedure provided
by private organizations requires only "rudimentary procedural
and substantive fairness." (*Ezekial v. Winkley* (1977) 20 Cal.3d
267, 278 (*Ezekial*).) In recent years, however, decisions of the
Court of Appeal have moved beyond that principle, importing
constitutional due process rules to regulate non-state actors and
requiring universities to provide an increasingly burdensome
array of litigation-like procedures in student discipline cases
arising from allegations of sexual misconduct. The divided
decision in this case went further still, requiring cross-
examination at a live hearing in the context of a different kind of
case: domestic violence.

These decisions are wrong, and contrary to this Court's
jurisprudence. Common law fair procedure is a flexible concept
that leaves to private organizations, not courts, the primary
responsibility for ensuring basic fairness in their internal
membership and disciplinary matters, which means notice and

13

an opportunity to respond. Principles of constitutional due process, which govern only state action, have no bearing in evaluating the fairness of private university disciplinary proceedings.

As part of its expansion of rights to be afforded to students accused of domestic violence, the Court of Appeal majority held that USC was required to provide Boermeester with live cross-examination of witnesses, including Roe. Boermeester, however, never requested a live hearing with cross-examination rights because he knew doing so would not help his case. Indeed, when USC invited him to submit written questions for Roe, Boermeester affirmatively told USC that he did not want Roe to appear for in-person questioning. Thus, even if Boermeester were entitled to additional process—which he was not—he waived this claim.

Moreover, any procedural error was harmless on this record because a live hearing with cross-examination could not have helped Boermeester's case. Boermeester himself admitted that he grabbed and pushed Roe, and intent to harm is not relevant under USC's domestic violence policy. The incident was also captured on surveillance video and seen by other eyewitnesses. A live hearing with cross-examination would have made no difference to USC's disciplinary determination or its consequences because the facts that Boermeester grabbed and pushed Roe were undisputed.

Finally, by passing Senate Bill No. 493 (2019-2020 Reg. Sess.) (SB 493), the Legislature recently recognized the

unacceptable costs of requiring universities to conduct mini-trials in sexual misconduct and domestic violence cases. SB 493 clarified that universities *themselves* must decide whether to provide live hearings with indirect cross-examination in such cases. The Legislature also expressly superseded any case law imposing requirements beyond those established in SB 493, which includes the law as provided in recent appellate decisions that have required universities to conduct adversarial hearings in sexual misconduct cases. Thus, the Legislature expressly rejected the trend of recent appellate decisions, such as the one at issue here, that have expanded the requirements of fair university hearings far beyond their common law basis. This Court should use this case to make clear that the Court of Appeal's decision here is both inconsistent with SB 493 and with the common law of fair procedure independent of SB 493.

For all of these reasons, this Court should reverse the decision of the Court of Appeal.

## STATEMENT OF THE CASE

### A. Matthew Boermeester grabs Jane Roe's neck and pushes her against a wall.

USC students Matthew Boermeester and Jane Roe[1] dated for about seven months. (1 AR 186.) After breaking up, they lived together in Roe's apartment. (1 AR 185-186.)

---

[1] Like the Court of Appeal, we refer to Roe pseudonymously. (See *Boermeester v. Carry* (2020) 49 Cal.App.5th 682, 686, fn. 1 (*Boermeester*).)

In the early hours of January 21, 2017, Boermeester called Roe because he wanted her to pick him up from a party. (1 AR 184.) She obliged. (*Ibid.*) He was the drunkest she had ever seen him. (*Ibid.*)

When they returned home, they went to a nearby alley with Roe's dog. (1 AR 184.) In the alley, Boermeester told Roe to let go of the dog's leash, but Roe refused. (*Ibid.*) Boermeester then grabbed Roe's hair hard and ordered her to " 'drop the fucking leash.' " (*Ibid.*) He grabbed her harder when she again refused, and then she dropped the leash. (*Ibid.*)

Boermeester grabbed Roe by the neck, and she coughed. (1 AR 184.) He then let go and laughed. (*Ibid.*) Boermeester again grabbed Roe by her neck and pushed her forcefully against a concrete wall. (*Ibid.*) When her head hit the wall, he let go and then grabbed and pushed her again. (*Ibid.*) A neighbor entered the alley after hearing disturbing noises; Boermeester told him they were playing around. (*Ibid.*)

### B. An eyewitness reports Boermeester's misconduct and USC opens an investigation.

Two fellow students saw the January 21 incident. (1 AR 85, 95.) One of the eyewitnesses reported it to a USC tennis coach, and USC's Title IX Office opened an investigation. (1 AR 1, 95, 126.)

USC's policy against "Student Misconduct—Sexual, Interpersonal and Protected Class Misconduct" then, as now, prohibited domestic violence, which it called intimate partner violence. (2 AR 486-487.) The policy required USC to conduct a

16

neutral investigation to evaluate whether a preponderance of the evidence overcame the presumption of non-responsibility.  (2 AR 487-488.)

USC's Title IX Investigator, Lauren Elan Helsper, began an investigation.  (1 AR 1.)  She interviewed Roe, and Roe confirmed that Boermeester grabbed her by the neck and pushed her against a wall.  (1 AR 184.)

Roe told Helsper that Boermeester had previously given her bruises, and that her father wanted her to get a restraining order against him.  (1 AR 183.)  Roe explained that when she "doesn't do what [Boermeester] wants she gets bruised."  (1 AR 184.)  Roe said that Boermeester "wouldn't leave" her apartment, and that when she asked him why he stayed with her, he responded that he could do whatever he wanted and she should shut up.  (1 AR 183.)  Roe told Helsper that Boermeester said he wouldn't feel bad if he hurt her, because " 'it would have been brought on by her.' "  (*Ibid*.)  She said his physical conduct towards her had become more frequent and " 'more hurtful' " over the course of their relationship.  (1 AR 186.)

USC offered to provide emergency housing to Roe so she could avoid contact with Boermeester, and Roe accepted the offer because she wanted "to feel safe."  (1 AR 188.)  Roe worried about Boermeester's anticipated reaction to the investigation, and she told Helsper that she was concerned that Boermeester would think she was pressing charges or that she had met with investigators.  (1 AR 154-156.)

### C. USC notifies Boermeester of the allegations against him and conducts a thorough investigation; Roe recants.

USC served Boermeester with a notice of investigation, an avoidance-of-contact order directing him to stay away from Roe, and a notice of interim suspension. (1 AR 4; 2 AR 470-473.) USC informed Boermeester in writing that a report had been made indicating that he violated the school's policy prohibiting domestic violence by grabbing Roe's neck and pushing her against a wall on January 21. (2 AR 470.)

Helsper then interviewed Boermeester, who admitted that he put his hand on Roe's neck. (1 AR 172-174, 179.) Boermeester also admitted that he "pushed and grabbed" Roe, but he claimed that the pushing and grabbing was a "sexual thing" and playful. (1 AR 60, 173.)

Shortly after USC began its investigation, Roe recanted her initial complaint. (1 AR 12-13, 168-169.) Roe was worried that Boermeester might retaliate against her. (1 AR 12.) Roe said she did not want him to be angry at her, and she asked USC to lift the avoidance of contact order. (1 AR 168-169.) She said Boermeester was " 'like my best friend,' " and she feared losing him. (1 AR 168.) She wanted the investigation dropped. (1 AR 158, 168-169.)

Roe also recanted in public. In response to media reports, she tweeted that "[t]he report is false." (1 AR 14.)

Helsper interviewed the eyewitnesses, who corroborated details from Roe's initial account. (1 AR 85, 95.) After first downplaying what he saw (1 AR 131), one eyewitness told

18

Helsper that he saw Boermeester with his hands around Roe's neck (1 AR 85). This eyewitness saw Boermeester push Roe against the wall, and he heard Roe make gagging sounds. (*Ibid.*) Another eyewitness observed Boermeester pinning Roe against the wall. (1 AR 95.)

Helsper also interviewed Roe's friends, including those with whom Roe spoke shortly after the incident. (1 AR 92-93, 133-135.) Roe's friends said she told them Boermeester threw her against the wall, hurt her, and scared her. (1 AR 93, 133.) Roe's friends confirmed that Roe and Boermeester had a volatile relationship and that they would call each other demeaning names. (1 AR 18-22, 25-30, 151-153, 165-166.) Roe told her friends that he gave her bruises. (1 AR 19, 25.) She also told her friends that she and Boermeester had been in contact even though USC had directed Boermeester to avoid such contact. (1 AR 53-54.)

In addition to conducting interviews, Helsper reviewed surveillance footage of the incident. (1 AR 43-45.) The surveillance footage corroborated Roe's initial account that Boermeester grabbed her and pushed her. (1 AR 43-45; 6 CT 1161-1162.)

### D. USC affords Boermeester the opportunity to tell his side of the story and pose questions for Roe, but Boermeester does not request live cross-examination or appear at his hearing.

Under its policy, USC presumed Boermeester was not responsible for the alleged misconduct. (2 AR 487.) That

presumption could be overcome if a preponderance of the evidence showed he committed the misconduct.  (2 AR 487-488.)

USC's policy gave Boermeester the right to review the evidence against him.  (2 AR 492-493.)  He did so with the assistance of counsel.  (1 AR 47-48, 89, 291, 301.)

USC's policy also afforded both Boermeester and Roe the opportunity to appear at separate in-person hearings, which would give them the opportunity to respond to the evidence. (2 AR 493.)  USC's policy afforded Boermeester the right to submit questions in advance for USC's Title IX Coordinator to ask Roe.  (2 AR 492-493.)  But Boermeester declined to submit any questions for Roe, nor did he request live cross-examination or any similar procedure.  (1 AR 291-295, 296.)  Boermeester's lawyer told USC that "I am not interested in having [Roe] come in and being put on the spot yet again."  (1 AR 293.)

Boermeester also never sought to pose questions to witnesses other than Roe, either in writing or in person. Boermeester declined to attend his hearing in person, electing instead to submit a written statement.  (1 AR 59-66, 291, 293.)

### E.    USC concludes that Boermeester violated its domestic violence policy and, after affording Boermeester multiple layers of review, expels him.

After considering all of the evidence, Helsper determined that Boermeester violated USC policy by (1) committing domestic violence, and (2) continuing to contact Roe after USC directed him to avoid contact with her.  (1 AR 54.)  A three-member Misconduct Sanctioning Panel recommended expulsion.

20

(1 AR 81-82; 2 AR 493.)  Boermeester appealed to USC's final decisionmaker, Vice President for Student Affairs Dr. Ainsley Carry, who reviewed the case, including the recommendation of an Appeal Panel.  (1 AR 197-208, 215-220; 2 AR 494-496.)  Dr. Carry agreed that Boermeester should be expelled.  (1 AR 221-222.)

### F. Boermeester petitions unsuccessfully for a writ of mandate.

Following his expulsion, Boermeester filed a petition for writ of mandamus in Los Angeles Superior Court.  (1 CT 6-208; 2 CT 209-309.)  The superior court denied the petition.  (2 RT 1514; 6 CT 1129-1151.)  Boermeester appealed.  (6 CT 1237.)

### G. The Court of Appeal reverses in a divided decision.  This Court depublishes the opinion and grants review.

In a divided, published opinion, the Court of Appeal majority concluded that USC deprived Boermeester of his common law right to fair procedure and directed the trial court to grant his petition for writ of mandate and set aside his expulsion. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 708-709.)  In doing so, the majority relied on recent intermediate appellate decisions imposing procedural requirements on private institutions like USC and on cases addressing procedures at public universities. (*Id*. at pp. 698-699.)

In a footnote, the majority noted a split of authority regarding the applicability of constitutional due process jurisprudence to private universities.  (*Boermeester*, *supra*, 49 Cal.App.5th at p. 698, fn. 7.)  The majority stated, without

21

**244**

further explanation, that "[i]n either case, we may rely on cases involving public university disciplinary proceedings." (*Ibid.*)

On the merits, the majority held that USC's procedures were deficient because USC did not provide Boermeester with an in-person hearing featuring cross-examination of key witnesses. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 705-706.) The majority faulted USC for not (1) giving Boermeester the opportunity to attend Roe's hearing either in person or via videoconference, (2) giving Boermeester the opportunity to cross-examine third-party witnesses, and (3) allowing Boermeester to ask Roe follow-up questions. (*Ibid.*)

The majority concluded that these procedural deficiencies were not harmless because "this case rests on witness credibility." (*Boermeester*, *supra*, 49 Cal.App.5th at p. 708.) The court so held despite the facts that Boermeester declined to seek cross-examination or submit questions for Roe; the abuse occurred in public; and the abuse was corroborated by other witnesses, including the victim in her original detailed statement, and a surveillance video. (*Ibid.*; see *id.* at pp. 686, 694, 700-703, 705-708.)

In dissent, Justice Wiley concluded that "[s]ubstantial evidence shows [Boermeester] committed domestic violence," and "USC's investigation was thorough and fair." (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 709, 713 (dis. opn. of Wiley, J.).)

He concluded that Boermeester waived the cross-examination issue because he made the strategic decision not to submit cross-examination questions for Roe. (*Boermeester*, *supra*,

49 Cal.App.5th at pp. 714-715 (dis. opn. of Wiley, J.).) This was because Roe had already recanted and cross-examination could only harm Boermeester's case. (*Id*. at pp. 714-716 (dis. opn. of Wiley, J.).) Justice Wiley also noted that Boermeester sensibly never sought to cross-examine third-party witnesses because "[t]hese witnesses offered Boermeester nothing but danger" in view of Roe's initial statement and his admission of the central facts. (*Id*. at pp. 716-717 (dis. opn. of Wiley, J.).)

In his dissent, Justice Wiley faulted the majority for relying on precedents addressing university procedures for evaluating allegations of sexual misconduct. (See *Boermeester*, *supra*, 49 Cal.App.5th at pp. 719-721 (dis. opn. of Wiley, J.).) The dissent explained that the sexual misconduct cases "involve cross-examination when a woman and a man tell conflicting stories" and "[t]he accused man want[s] cross-examination to shake the woman's story." (*Id*. at p. 719 (dis. opn. of Wiley, J.).) The dissent observed that here, by contrast, the two conflicting accounts both came from Roe herself (*ibid*.), and noted that it is common for the victim to recant in cases of domestic violence (*id*. at pp. 711-712 (dis. opn. of Wiley, J.)). Finally, Justice Wiley observed that "[t]he cases to date all concern the right of confrontation when it could possibly have done the man some good," but "[n]o precedent deals with a situation where the man wanted to *avoid* confrontation because it offered him only peril." (*Id*. at p. 721 (dis. opn. of Wiley, J.).)

Next, Justice Wiley took issue with the majority's application of constitutional due process principles to a private

institution because "[s]tate law governing private schools can depart from constitutional rules that govern state institutions." (*Boermeester*, *supra*, 49 Cal.App.5th at p. 722 (dis. opn. of Wiley, J.).)

The dissent observed that the new rules created by the majority and other recent intermediate appellate opinions could make victims less likely to report abuse. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 723-724 (dis. opn. of Wiley, J.).)

After the Court of Appeal summarily denied USC's petition for rehearing or to modify the decision, USC filed a petition for review. This Court granted the petition for review and ordered immediate depublication of the Court of Appeal's opinion.

## LEGAL ARGUMENT

**I.    Common law fair procedure does not require live hearings with cross-examination, and the procedure by which USC investigated Boermeester's domestic violence was fair.**

### A.    Private organizations need flexibility to conduct internal discipline, subject to the rudimentary common law requirements of notice and an opportunity to respond.

This Court has long recognized a common law doctrine of "fair procedure" applicable to the decisions of private organizations and associations that serve as gatekeepers to certain professions or otherwise affect their members' important economic interests. (E.g., *Otto v. Tailors' Protective & Benevolent Union of San Francisco* (1888) 75 Cal. 308, 314-315; see *Ezekial*, *supra*, 20 Cal.3d at p. 277; *Pinsker v. Pacific Coast Society of*

24

*Orthodontists* (1974) 12 Cal.3d 541, 550-551, fns. 7 & 8
(*Pinsker II*).) "The purpose of the common law right to fair
procedure is to protect, in certain situations, against arbitrary
decisions by private organizations." (*Potvin v. Metropolitan Life
Ins. Co.* (2000) 22 Cal.4th 1060, 1066 (*Potvin*).)

Inherent in the common law fair procedure doctrine (which
governs the disciplinary procedures used by private universities
and many other private associations) is that private institutions
"retain the initial and primary responsibility" for developing fair
procedures. (*Pinsker II, supra*, 12 Cal.3d at p. 555; cf. *El-Attar v.
Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976,
988-989 (*El-Attar*) [addressing procedural requirements in the
context of the statutory scheme detailing procedures for hospital
peer reviews].) "In drafting such procedure, and determining, for
example, whether an applicant is to be given an opportunity to
respond in writing or by personal appearance, *the organization*
should consider the nature of the tendered issue and should
fashion its procedure to insure a *fair* opportunity for an
[individual] to present his position." (*Pinsker II*, at pp. 555-556,
first emphasis added; accord, *Ezekial, supra*, 20 Cal.3d at p. 279.)

"[C]ourts remain available to afford relief in the event of
the abuse of such discretion." (*Pinsker II, supra*, 12 Cal.3d at p.
556.) But judicial intervention in the decisions of private
organizations is not, and should not be, routine. To the contrary,
routine judicial intervention would constitute " 'both an intrusion
into the internal affairs of [private associations] and an unwise
burden on judicial administration of the courts.' " (*Id.* at p. 557.)

Because private organizations maintain the primary responsibility for managing their internal affairs, the "common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial." (*Pinsker II*, *supra*, 12 Cal.3d at p. 555.) Such formalities are not required in recognition of "the practical limitations on the ability of private institutions to provide for the full airing of disputed factual issues." (*Ezekial*, *supra*, 20 Cal.3d at p. 278.) Common law fair procedure does not compel "adherence to a single mode of process," and courts "should not attempt to fix a rigid procedure that must invariably be observed." (*Pinsker II*, at p. 555.) Rather, fair procedure requires only "rudimentary procedural and substantive fairness." (*Ezekial*, at p. 278.) This Court has explained that rudimentary procedural fairness requires only that the accused have (1) "adequate notice of the 'charges' against him," and (2) a "reasonable opportunity to respond." (*Pinsker II*, at p. 555.)

Parties seeking to challenge the procedures employed by private organizations may bring a petition for a writ of administrative mandate under Code of Civil Procedure section 1094.5. (*Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 814-817 (*Anton*), superseded by statute on another ground as stated in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 678, fn. 11.) That provision authorizes courts to evaluate, among other issues, whether the organization provided a "fair trial." (Code Civ. Proc., § 1094.5, subd. (b).) In this context, "fair trial" means a fair administrative

26

procedure—it does not compel "a formal hearing under the due process clause." (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1730 (*Pomona College*).)

### B. Common law fair procedure does not require private organizations to conduct live hearings with cross-examination.

This Court's seminal decisions applying the common law right to fair procedure illustrate that private organizations need only provide notice and an opportunity to respond, and need not conduct live hearings with cross-examination, as the Court of Appeal below erroneously held.

In *Von Arx v. San Francisco Gruetli Verein* (1896) 113 Cal. 377, 379-380, this Court held that a private society could expel a member only if it gave "reasonable notice of the proceeding . . . and a fair opportunity of presenting [a] defense in accordance with general principles of law and justice." This Court did not require the society to conduct a live hearing with cross-examination. (See *ibid.*)

Almost half a century later, in *James v. Marinship Corp.* (1944) 25 Cal.2d 721, 724-725, 740, this Court invalidated a labor union's policy of excluding African Americans from full membership. Drawing on common law principles, this Court rejected the union's argument that it "may, for any arbitrary reason whatsoever, entirely close its membership to otherwise qualified persons and at the same time may, by enforcing a closed shop contract, demand union membership as a condition to the right to work." (*Id.* at p. 730.) This Court did not hold that labor

unions were obligated to provide live hearings with cross-examination in reaching such issues.

This Court took a different approach several years later. In *Cason v. Glass Bottle Blowers Ass'n of U.S. and Canada* (1951) 37 Cal.2d 134, 144-145 (*Cason*), this Court required a national labor union to allow an expelled local union president to cross-examine the witness against him. But *Cason*'s holding regarding cross-examination in the union context is thinly reasoned. *Cason* relied on out-of-state authorities that themselves provided scant justification for requiring cross-examination in labor union proceedings. (See *id.* at p. 144, citing *Harmon v. Matthews* (Sup.Ct. 1941) 27 N.Y.S.2d 656, *Brooks v. Engar* (App.Div. 1940) 19 N.Y.S.2d 114, and *Bartone v. Di Pietro* (Sup.Ct. 1939) 18 N.Y.S.2d 178.) And the two California cases on which *Cason* relied did not discuss cross-examination at all. (See *Cason*, at p. 144, citing *Taboada v. Sociedad Espanola De Beneficencia Mutua* (1923) 191 Cal. 187 and *Ellis v. American Federation of Labor* (1941) 48 Cal.App.2d 440.)

In any event, this Court abandoned any such live cross-examination requirement in its subsequent fair procedure cases. Notably, *Pinsker II* cited *Cason* for the proposition that fair procedure does *not* compel formal proceedings with the embellishments of a court trial. (See *Pinsker II*, *supra*, 12 Cal.3d at p. 555.)

In *Pinsker II*, a professional association rejected a dentist's membership application without providing him an opportunity to respond to the charges against him. (*Pinsker II*, *supra*, 12 Cal.3d

28

at pp. 544, 555-556.)  This Court held that "[u]nder common law principles, a 'fair procedure' requires that before the denial of an application, an applicant be notified of the reason for the proposed rejection and given a fair opportunity to defend himself." (*Id.* at p. 555, boldface omitted.)  This Court did *not* hold that the dentist was entitled to cross-examine witnesses at an in-person hearing.  (See *id.* at pp. 555-556.)  Indeed, this Court did not mandate an in-person hearing at all.  (See *ibid.*)  Instead, this Court emphasized that the association itself retained the responsibility to determine and implement a fair procedure. (*Ibid.*)

Shortly thereafter, in *Ezekial*, this Court cemented the flexible approach to fair procedure articulated in *Pinsker II*. *Ezekial* concerned "whether a surgical resident in a private teaching hospital must be accorded notice of charges and an opportunity to respond, pursuant to the 'common law right of fair procedure' [citation], prior to dismissal from the residency program." (*Ezekial*, *supra*, 20 Cal.3d at pp. 269-270.)  This Court reiterated that "rudimentary" common law fair procedure requires adequate notice of the charges and a reasonable opportunity to respond.  (*Id.* at pp. 278-279.)  As in *Pinsker II*, this Court did not mandate an in-person hearing, let alone an in-person hearing featuring cross-examination.  (*See ibid.*)  To the

29

contrary, this Court emphasized that the organization itself was responsible for developing its own fair procedures. (*Ibid.*)[2]

### C. USC provided a fair procedure to Boermeester.

Under the authorities described above, USC provided Boermeester with ample procedural safeguards—indeed, USC provided far more than the simple notice and an opportunity to respond required by *Pinsker II* and *Ezekial*.

USC provided Boermeester with notice of the specific allegations against him (2 AR 470-471), which the Court of Appeal below unanimously and properly determined was sufficient in a part of the opinion that is not on review before this Court. (See *Boermeester*, *supra*, 49 Cal.App.5th at pp. 695-696; *id*. at pp. 714-715 (dis. opn. of Wiley, J.).) USC also provided Boermeester with ample opportunity to respond to the charges against him. USC gave Boermeester multiple opportunities to review the evidence, including Roe's statements. (1 AR 47-48, 291; 2 AR 301.) USC permitted him to tell his side of the story through an interview (1 AR 171-182), written submissions

---

[2]  Several Court of Appeal decisions reflect this Court's guidance. (See, e.g., *Wilson v. San Luis Obispo County Democratic Central Com.* (2009) 175 Cal.App.4th 489, 502 [fair procedure does not require " 'a full blown adversarial process with the right to counsel and cross-examination' "]; *Dougherty v. Haag* (2008) 165 Cal.App.4th 315, 317-318 (*Dougherty*) [fair procedure requires only notice and an opportunity to respond either in writing or in person]; *Rosenbilt v. Superior Court* (1991) 231 Cal.App.3d 1434, 1445 ["What constitutes a fair procedure is not fixed or judicially prescribed" as long as an organization provides notice and an opportunity to respond].)

30

(1 AR 58-66), and an in-person hearing, the last of which he declined (1 AR 291; 2 AR 493).  USC also afforded Boermeester the opportunity to submit questions for Roe, which he declined as well.  (1 AR 291-295, 296; 2 AR 492-493.)  And USC provided Boermeester with multiple layers of review, so that the findings and decision were considered multiple times by independent decisionmakers.  (1 AR 1-78, 81-82; 197-208, 215-222; 2 AR 492-496.)

USC thus satisfied its common law duty to provide Boermeester with procedural fairness.  The Court of Appeal below erred in concluding otherwise.

> **D.   California's common law fair procedure doctrine is the governing authority for private university disciplinary proceedings—not the federal Constitution's due process clause, as some appellate decisions have erroneously suggested.**

> > **1.   A private university's student disciplinary investigation is not state action.**

In deciding what process was owed Boermeester, the Court of Appeal majority held that it could rely on cases decided under the federal Constitution's due process clause, even though USC is a private university, because other California appellate courts have assumed that constitutional due process requirements are " 'instructive' " on or " 'mirror' " California's common law fair procedure doctrine.  (*Boermeester*, *supra*, 49 Cal.App.5th at p. 698, fn. 7.)  The dissent observed that this approach is "mystif[ying]," and suggested that this Court should "trace and . . . evaluate this rule's rise in the lower California courts."

31

(*Id.* at p. 722 (dis. opn. of Wiley, J.).)  The dissent was correct on both counts.

The due process clause applies only to state action.  (See, e.g., U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a); *Rendell-Baker v. Kohn* (1982) 457 U.S. 830, 837 [102 S.Ct. 2764, 73 L.Ed.2d 418] (*Rendell-Baker*) [the Fourteenth Amendment, "which guarantees due process, applies to acts of the states, not to acts of private persons or entities"]; *Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 431-432 (*Homestead Savings*) ["The threshold question in this case as in any due process case, federal or state, [citation] is whether the challenged conduct involves state action"].)

Thus, for example, in *Rendell-Baker*, the U.S. Supreme Court held that a private school's determination whether to discharge its teachers is not state action under any of several tests.[3]  (*Rendell-Baker*, *supra*, 457 U.S. at pp. 837-843.)  Recently, the Ninth Circuit, relying on *Rendell-Baker*, held that a private California university was not required to comply with constitutional due process requirements when enforcing Title IX and state antiharassment laws by investigating a sexual harassment complaint against a professor.  (*Heineke v. Santa Clara University* (9th Cir. 2020) 965 F.3d 1009, 1014 (*Heineke*).)  The court reaffirmed that "[r]eceipt of government funds is insufficient to convert a private university into a state actor."

---

[3]   *Rendell-Baker* considered claims under 28 U.S.C. § 1983, but explained that these claims turned on the same "state action" requirement as Fourteenth Amendment due process claims. (*Rendell-Baker*, *supra*, 457 U.S. at p. 838.)

(*Id*. at p. 1013.) "Nor is compliance with generally applicable laws sufficient to convert private conduct into state action." (*Ibid*.) Even if failure to comply with these laws subjects the private actor to penalties, there is no state action where the government does not dictate the result in a particular case. (*Id*. at p. 1014.) The court concluded that a private university "does not become a state actor merely by virtue of being required by generally applicable civil rights laws to ameliorate sex (or any other form of) discrimination in educational activities as a condition of receiving state funding." (*Ibid*.; see *Caviness v. Horizon Community Learning Center, Inc.* (9th Cir. 2010) 590 F.3d 806, 808, 814-816 [charter school's publication of allegedly defamatory statements in connection with investigation of sexual harassment complaint against teacher was not state action]; *Sutton v. Providence St. Joseph Medical Center* (9th Cir. 1999) 192 F.3d 826, 835-843 (*Sutton*) [detailing application of numerous state-action tests].)

Here, it is undisputed that USC is a private university. (1 CT 12.) Under *Rendell-Baker* and *Heineke*, the due process clause does not apply to USC's investigation and decision to expel Boermeester.

> **2. California courts should not treat due process principles applicable to state action as "instructive" or otherwise controlling as to common law fair procedure requirements.**

In *Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 (*Pinsker I*), this Court held that an applicant for

membership in a private, professional certification organization "has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process." When that same case returned to this Court a few years later, however, the Court clarified that constitutional due process does not govern or inform common law fair procedure, and that this terminology should be avoided in the future:

> It is important to note that the legal duties imposed on [private] organizations arise from the common law rather than from the Constitution as such; although *Pinsker I* utilized "due process" terminology in describing defendant associations' obligations, the "due process" concept is applicable only in its broadest, nonconstitutional connotation. [Citation.] In an attempt to avoid confusing the common law doctrine involved in the instant case with constitutional principles, we shall refrain from using "due process" language and shall simply refer instead to a requirement of a "fair procedure."

(*Pinsker II*, *supra*, 12 Cal.3d at p. 550, fn. 7.)

Despite this clear instruction, decisions in the Court of Appeal soon began muddying the distinction between constitutional due process and common law fair procedure. In *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657 (*Applebaum*), the court stated that the "distinction between fair procedure and due process rights appears to be one of origin and not of the extent of protection afforded an individual; the essence of both rights is fairness. Adequate notice of charges and a reasonable opportunity to respond are basic to both sets of rights." But *Applebaum*'s pronouncement was incorrect. It was

34

like arguing that the distinction between sushi and lasagna is simply one of origin and not ingredients or flavor, because they both provide sustenance and taste delicious. *Applebaum* provided no reasoned explanation for its analysis, and cited only *Ezekial*, *supra*, 20 Cal.3d 267, in which the words "due process" do not appear, and *People v. Ramirez* (1979) 25 Cal.3d 260, which addressed what process the state owes a criminal defendant before reinstating criminal charges against him. (See *Applebaum*, at p. 657.)

Having decided in novel, unsupported fashion that due process and common law fair procedure are coterminous, the *Applebaum* court then proceeded to apply constitutional due process cases from the U.S. Supreme Court to a claim involving a private hospital's peer review procedures. The crux of the allegations was that the hearing bodies that reviewed charges against the plaintiff were not impartial and included members already prejudiced against him. (See *Applebaum*, *supra*, 104 Cal.App.3d at pp. 657-658, 659-660.) Subsequent appellate courts have parroted and then extended *Applebaum*'s conclusory analysis without questioning its underpinnings, in contravention of this Court's admonition in *Pinsker II*, compounding *Applebaum*'s error for the next 30 years.[4] (See *Palm Medical Group, Inc. v. State Comp. Ins. Fund* (2008) 161 Cal.App.4th 206,

---

[4]  Two notable exceptions are *Dougherty*, *supra*, 165 Cal.App.4th at page 317, which cited *Pinsker II* and explained that common law fair process "should not be confused with constitutional 'due process,' " and *Pomona College*, *supra*, 45 Cal.App.4th at page 1730.

218; *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 102; *Goodstein v. Cedars-Sinai Medical Center* (1998) 66 Cal.App.4th 1257, 1265 (*Goodstein*); *Lasko v. Valley Presbyterian Hospital* (1986) 180 Cal.App.3d 519, 528.)

One court went so far as to declare that "[e]ssentially there is no real difference between fair procedure and due process rights." (*Gill v. Mercy Hospital* (1988) 199 Cal.App.3d 889, 903 (*Gill*).)

This Court should confirm now what it stated long ago: Common law fair procedure and constitutional due process are not related and should not be confused. (*Pinsker II*, *supra*, 12 Cal.3d at p. 550, fn. 7.) There are important reasons courts should not use constitutional due process principles to govern, instruct, or mirror common law fair procedure.

First, the doctrines exist to serve different purposes. " '[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression." ' " (*Homestead Savings, supra*, 230 Cal.App.3d at p. 431.) " 'Its purpose was to protect the people from the State, not to ensure that the State protected [the people] from each other.' " (*Ibid*.) Common law fair procedure, in contrast, places rudimentary constraints on private organizations when their decisions can deprive individuals of their right to pursue a livelihood or other vital economic interest. (See, e.g., *Potvin*, *supra*, 22 Cal.4th at pp. 1065-1070.) Stating these doctrines differ in origin but not in practical effect, thereby subjecting a substantial amount of

36

private activity to the due process constraints, would

" 'emasculate the [state] action concept.' " (*Sutton, supra*, 192

F.3d at p. 839.)

Second, the fair procedure doctrine can be developed under
the relatively flexible and constantly evolving common law, over
which this Court is the ultimate arbiter, whereas due process is
fixed by the relatively unchanging strictures of the U.S.
Constitution, the final arbiter of which is the U.S. Supreme
Court. (Compare *Potvin, supra*, 22 Cal.4th at pp. 1070-1071 with
*Department of Homeland Security v. Thuraissigiam* (2020) 591
U.S. __ [140 S.Ct. 1959, 1963-1964, 207 L.Ed.2d 427].) This
Court can tailor the common law to meet the specific needs of
private organizations and their members in California.

Third, common law fair procedure and constitutional due
process properly allocate institutional competence differently.
While courts of law are experts in applying due process, the same
cannot necessarily be said of their competence or expertise to
manage private affairs. (See *Goodstein, supra*, 66 Cal.App.4th at
p. 1266 [" ' " '[j]udges are untrained and courts ill-equipped for
hospital administration' " ' and therefore should not second-guess
policies made rationally and in good faith unless the policy is
clearly unlawful"]; see also *Pinsker II, supra,* 12 Cal.3d at p. 555
[explaining that courts should allow private associations "the
initial and primary responsibility" for developing their internal
procedures].)

Indeed, it is largely for this last reason that the high court
of Massachusetts has also declared unequivocally that in sexual

misconduct investigations, a "university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts." (*Schaer v. Brandeis University* (Mass. 2000) 735 N.E.2d 373, 381.) "[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." (*Ibid*.) This Court should follow the lead of Massachusetts and the First Circuit, and declare that "federal due process law does not dictate to states the procedures which its private colleges must follow in administering student discipline." (*Doe v. Trustees of Boston College* (1st Cir. 2019) 942 F.3d 527, 529.)[5]

---

[5] *Natarajan v. Dignity Health*, review granted February 26, 2020, S259364, which is currently pending in this Court, presents the question whether a physician with privileges at a private hospital has the right to disqualify a hearing officer in proceedings for revocation of those privileges based on an appearance of bias, or whether the physician must show actual bias. The applicability of constitutional due process standards to the conduct of private organizations is potentially relevant to answering that question, as the doctor in that case erroneously argues that common law fair procedure and due process are coterminous. (See Opening Brief on the Merits, *Natarajan* (May 11, 2020, S259364) 2020 WL 2526764, at pp. *46-*52.) The hospital argues that due process and common law fair procedure are not the same. (Answer Brief on the Merits, *Natarajan* (Aug. 10, 2020, S259364) 2020 WL 4808340, at pp. *45-*50.)

3. **This Court should disapprove the Court of Appeal decisions applying due process principles to hold that common law fair procedure requires burdensome procedures in student sexual misconduct cases.**

In recent years, several Court of Appeal decisions have departed from this Court's precedents by relying on constitutional due process principles to impose ever-increasing common law procedural burdens on private universities investigating allegations of sexual misconduct (not domestic violence). (See *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 221, fn. 5 (*Occidental College II*); *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634 (*Westmont College*); *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061 (*Allee*); *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1067, fn. 8 (*Claremont McKenna*).)

This trend began in *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 240, 248 (*USC I*), where the Court of Appeal correctly declined to require live cross-examination in university disciplinary hearings. But *USC I* departed from *Pinsker II* and *Ezekial* by holding that common law fair procedure *also* requires the "opportunity to appear directly before the decisionmaking panel." (*USC I*, at p. 248.)

In the years since *USC I*, a series of intermediate appellate decisions have rapidly expanded fair procedure requirements even further. Far from simply requiring notice and an opportunity to respond, these courts have mandated live hearings with testimony from key witnesses. (See *Westmont College*,

39

*supra*, 34 Cal.App.5th at p. 637.) Some have required direct or indirect cross-examination of witnesses whose credibility is critical to the university's decision. (See *Occidental College II*, *supra*, 40 Cal.App.5th at p. 224; *Westmont College*, at pp. 638-639; *Allee*, *supra*, 30 Cal.App.5th at p. 1066; *Claremont McKenna*, *supra*, 25 Cal.App.5th at pp. 1057-1058.) These cases have required universities to adopt an adversarial framework, mandating "adversarial questioning at an in-person hearing at which a neutral fact finder can observe and assess the witness' credibility." (*Allee*, at p. 1068.)

Disregarding this Court's admonition that common law fair procedure does *not* require the embellishments of a court trial (*Pinsker II*, *supra*, 12 Cal.3d at p. 555), these decisions have imposed administrative procedures that are increasingly difficult to distinguish from courtroom proceedings (cf. *Haidak v. University of Massachusetts-Amherst* (1st Cir. 2019) 933 F.3d 56, 69-70 [even constitutional due process does not require direct cross-examination in a disciplinary hearing; if it did, "the mandated mimicry of a jury-waived trial would be near complete"]). They have saddled universities with rigid and costly requirements that detract from their central mission—to educate. (See *Newsome v. Batavia Local School Dist.* (6th Cir. 1988) 842 F.2d 920, 926 ["To saddle [administrators] with the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform"].)

Mandating live cross-examination in student disciplinary hearings has serious practical consequences. As the dissent below explained, in the university context, the prospect of being subject to "a scathing cross-examination can deter reporting." (*Boermeester*, *supra*, 49 Cal.App.5th at p. 723 (dis. opn. of Wiley, J.).) These concerns are particularly substantial in the university context—"In administrative cases addressing sexual assault involving students who live, work, and study on a shared college campus, cross-examination is especially fraught with potential drawbacks." (*USC I*, *supra*, 246 Cal.App.4th at p. 245.)[6]

The burdensome and inflexible requirements that the lower courts have imposed on private universities also represent inappropriate judicial micromanagement of universities' disciplinary procedures. Under the case law that has proliferated in recent years in the Court of Appeal, private universities are not permitted to "retain the initial and primary responsibility" (*Pinsker II*, *supra*, 12 Cal.3d at p. 555) for developing and implementing fair procedures. Instead, educational institutions are forced to incur the time and expense of live hearings involving multiple witnesses, even in cases where such

---

[6] Recognizing these concerns, the American Bar Association's Commission on Domestic and Sexual Violence recently recommended that universities adopt a trauma-informed approach that does not involve adversarial procedures. (American Bar Association Commission on Domestic & Sexual Violence, Recommendations for Improving Campus Student Conduct Processes for Gender-Based Violence (2019) pp. 5, 63 <https://www.americanbar.org/content/dam/aba/publications/domestic-violence/campus.pdf> [as of Dec. 14, 2020] (hereafter ABA Commission on Domestic & Sexual Violence).)

procedures do not meaningfully improve the quality and fairness of the factfinding. Indeed, requiring live hearings with cross-examination in the university setting could impede accurate factfinding because universities—unlike courts—lack the power to compel witnesses to appear and testify. Without the ability to compel witness participation, universities may be able to amass less evidence in a hearing than they would through an investigation like the one USC conducted in this case.

Accordingly, this Court should disapprove the intermediate appellate decisions that have required private universities to conduct live hearings with cross-examination in sexual misconduct cases.

### E. Even if the common law requires live hearings with cross-examination in certain sexual misconduct cases, USC nonetheless provided a fair procedure in this domestic violence case.

#### 1. The rationale for requiring live cross-examination in certain sexual misconduct cases does not apply to domestic violence cases.

To support its rejection of USC's procedure for adjudicating claims of domestic violence, the majority below relied almost entirely on cases arising from allegations of sexual misconduct. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 698-699, 703-706.) In doing so, the majority unmoored those cases from their legal and factual context. Regardless of the merits of requiring live cross-examination in certain university *sexual misconduct* cases where credibility is central to the university's decision, this Court should refuse to extend that requirement to this domestic

42

violence case, which lacks the factfinding challenges that generally accompany sexual misconduct cases.

Domestic violence cases typically depend on the truth of independently verifiable facts—i.e., did Boermeester grab Roe by the neck and push her against a wall or violate his avoidance-of-contact order—rather than on the question of consent that often is at the heart of sexual misconduct cases, in which determinations often depend solely on the parties' credibility. (See Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount* (2017) 166 U.Pa. L.Rev. 1, 1 ["Credibility is central to the legal treatment of sexual violence, as epitomized by the iconic 'he said/she said' contest"]; see also *Allee*, *supra*, 30 Cal.App.5th at pp. 1064-1065 [describing sexual misconduct case: "In light of the directly conflicting claims, and an absence of corroborative evidence to either support or refute the allegations, the review panel was forced to choose whom to believe"].) Domestic violence cases are also different because of "the tendency of victims . . . later to recant or minimize their description of that violence." (*People v. Brown* (2004) 33 Cal.4th 892, 896 (*Brown*).) Indeed, "victims' false recantations or failure to appear at trial . . . are the norm in domestic violence cases." (Beloof & Shapiro, *Let the Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims' Out of Court Statements as Substantive Evidence* (2002) 11 Colum. J. Gender & L. 1, 1.) Recanting is common in domestic violence cases because "victims frequently feel a sense of loyalty to their

43

abusers." (*Brown*, at p. 899.)  Indeed, consistent with this pattern, Roe recanted in this case.

Where, as here, the victim recants, there is little reason to mandate cross-examination of the victim in the university setting.  That is because, as the dissent below correctly observed, "when a domestic violence victim has publicly recanted, the accused already has all he wants" and therefore "[f]urther questioning offers him only hazard." (*Boermeester*, *supra*, 49 Cal.App.5th at p. 720 (dis. opn. Wiley, J.).)

Finally, requiring live cross-examination in university domestic violence cases is likely to have a particularly acute chilling effect on victims' willingness to report abuse.  Although the risk of retaliation is often present for victims of sexual misconduct, domestic violence survivors are especially vulnerable because of their ongoing relationship with the abuser.  (See Percival, *The Price of Silence: The Prosecution of Domestic Violence Cases in Light of* Crawford v. Washington (2005) 79 So.Cal. L.Rev. 213, 242 [discussing how truthful testimony against an abuser may place a victim in an "unreasonable amount of danger . . . even if the case is successful"].)  Requiring victims of domestic violence to testify before their abuser, as the majority below did here, puts victims in the untenable position of choosing between either lying or telling the truth and risking further violence.  (See *ibid.*)

The majority's reasons for applying sexual misconduct precedents to this domestic violence case do not withstand scrutiny.  The majority asserted that credibility issues can arise

in both sexual misconduct and domestic violence cases, and victims of sexual misconduct sometimes recant. (*Boermeester*, *supra*, 49 Cal.App.5th at p. 707.) But, as the facts of this very case illustrate, domestic violence cases often do not turn *solely* on "he said/she said" issues of credibility. The tendency of domestic violence victims to recant is well documented and casts a very different light on the issue of who is to be believed—and what additional evidence is presented. (See *Brown*, *supra*, 33 Cal.4th at p. 899.)

The majority also treated allegations of domestic violence in the same way as charges of sexual misconduct because USC grouped the two forms of misconduct together in its misconduct policy. (*Boermeester*, *supra*, 49 Cal.App.5th at p. 708.)[7] But the common law requirements of fair procedure should not depend on the details of a single university's policy, which is subject to change in any event.

Thus, even if this Court were to find that the common law right to fair procedure requires live hearings with cross-examination in certain sexual misconduct cases, this Court should nevertheless reject that requirement in domestic violence cases such as this one, in which no sexual misconduct is asserted and a "he said/she said" credibility determination is unnecessary.

---

[7] The Court of Appeal's reasoning proves too much, because USC's policy also covered such unrelated misconduct as racial discrimination and harassment, which present wholly different factual and legal issues from those present here. (See 2 AR 483-484, 487.)

45

### 2. Alternatively, even if the common law requires a live hearing with cross-examination in some domestic violence cases, the Court of Appeal erred in imposing three additional procedural requirements.

Even assuming the common law requires private universities to provide live hearings with cross-examination in some domestic violence cases, the majority below went even further and faulted USC for (1) not giving Boermeester the opportunity to attend Roe's hearing in person or via videoconference, (2) not giving Boermeester the opportunity to cross-examine third-party witnesses, and (3) not allowing Boermeester to ask follow-up questions of Roe. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 705-706.) These requirements represent the type of judicial second-guessing of private administration that this Court's seminal precedents forbid. At a minimum, this Court should clarify that they are not required.

**Boermeester's presence at Roe's hearing.** Prior to the decision below, some Court of Appeal decisions had required that *adjudicators* physically observe complaining witnesses and evaluate their demeanor in cases where credibility is central. (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1233 (*USC II*); *Claremont McKenna*, *supra*, 25 Cal.App.5th at p. 1070.) The rationale for this requirement is to enable adjudicators to assess the credibility of complaining witnesses. (*Ibid.*) But the majority here went further in requiring the physical or virtual presence of the *accused student* at the victim's hearing. (See *Boermeester*, *supra*, 49 Cal.App.5th at pp. 705-706.)

46

269

That holding threatens real harm to universities and their students. As discussed above (*ante*, p. 44), subjecting victims to cross-examination of any kind threatens to chill reporting in domestic violence cases, which are already severely underreported. That chilling effect is likely to be even more pronounced where the victim knows that her abuser can witness the examination in real-time. (See ABA Commission on Domestic & Sexual Violence, *supra*, at p. 63 [emphasizing importance of minimizing "contact between complainant and respondent during proceedings"].) If both are students, the possibility of ongoing contact on campus with the opposite party or his or her friends and acquaintances already may be a daunting prospect.

***Opportunity to question third party witnesses.*** The majority below also held that USC's procedure was deficient because it did not afford Boermeester an opportunity to question third-party witnesses who corroborated Roe's account. (*Boermeester*, *supra*, 49 Cal.App.5th at p. 706.) Here, too, the Court of Appeal erred. Fair procedure in university disciplinary hearings does not mandate in-person cross-examination of *any* witness, let alone witnesses other than the victim. (See *USC I*, *supra*, 246 Cal.App.4th at pp. 239, 248.)

Alternatively, even if the common law requires universities to allow questioning of third-party witnesses whose credibility is central to the university's decision, it was not required *here* because the credibility of third-party witnesses was not *central*. Boermeester's interaction with Roe was captured on a surveillance video. (1 AR 43-45; 6 CT 1161-1162.) The video

corroborated the eyewitness' account of the incident. (1 AR 32, 95.) Thus, USC did not need to rely solely on witness credibility to reach its findings as it would in a "he said/she said" case. Instead, USC could compare the witnesses' statements to the video in assessing whether the statements were accurate. Moreover, Boermeester himself admitted the key physical facts that he grabbed and pushed Roe. (1 AR 60, 172-173, 179.)

***Opportunity to pose follow-up questions at a live hearing***. Finally, the majority below held that USC's procedure was deficient because USC did not permit Boermeester to pose follow-up questions to Roe at a live hearing. (*Boermeester*, *supra*, 49 Cal.App.5th at p. 706.) This holding, too, was erroneous because the common law did not entitle Boermeester to question Roe in the first place, let alone at an in-person hearing. (See *ante*, pp. 24-30.)

At a minimum, the common law does not obligate private universities to allow follow-up questioning in addition to an initial opportunity to pose written questions. Other courts have correctly imposed no such requirement. (See *USC II*, *supra*, 29 Cal.App.5th at p. 1238 [requiring only that the university "afford John an opportunity to submit a list of questions to ask Jane" prior to the hearing].) Classrooms are not courtrooms, and a rule entitling students not only to cross-examination, but also to potentially multiple rounds of recross-examination at a live hearing, erodes the distinction between university disciplinary proceedings and trials. Moreover, a university could reasonably conclude that allowing follow-up questions would exacerbate the

trauma of domestic violence survivors by exposing them to persistent questioning by their abusers. Universities should retain the flexibility to decide for themselves whether live follow-up questioning is necessary for a fair disciplinary proceeding.

***

In sum, this Court should hold that common law fair procedure affords universities discretion to fashion student disciplinary procedures that meet the needs of their communities and further their missions as private organizations, so long as those procedures provide accused students with notice of the allegations against them and an opportunity to respond. In the alternative, and at a minimum, this Court should hold that the common law does not require universities to provide live cross-examination in domestic violence cases, particularly where the case does not turn on witness credibility because corroborative evidence supports or refutes the allegations.

## II. Boermeester waived any common law right to cross-examine witnesses at a live hearing.

### A. An accused student must challenge a university's procedures at the university level in order to preserve a fair procedure challenge for appeal.

To preserve arguments for appeal, litigants must ordinarily raise the arguments below. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1.) Under the related doctrine of issue exhaustion, a court reviewing a petition for administrative mandate cannot consider an issue unless it was raised at the administrative level. (See *Sierra Club v. San*

49

*Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 510; see also *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 787-788 [failure to raise a due process challenge to administrative procedures at the administrative level forfeits that claim].)

This rule applies to common law fair procedure cases—litigants waive or forfeit their right to demand certain procedural protections if they choose not to request or utilize them at the administrative level. (See *Anton*, *supra*, 19 Cal.3d at pp. 826-827 [plaintiff did not preserve unfair procedure claims because he did not raise them at the administrative level]; see also *Gill*, *supra*, 199 Cal.App.3d at p. 909 [rejecting challenge to purported denial of cross-examination where appellant declined the opportunity to question witnesses]; *Samann v. Trustees of Cal. State University & Colleges* (1983) 150 Cal.App.3d 646, 659 [in an administrative proceeding, "[a] person may elect to forego strict legal procedures to which he might be entitled and where he does so he cannot be permitted to speculate upon a favorable result in his chosen proceeding and then refuse to be bound by an adverse decision"].)

Courts have consistently applied this rule in challenges to university disciplinary procedures. (See *Occidental College II*, *supra*, 40 Cal.App.5th at pp. 224-225 [accused student forfeited claim by not raising it at the university level or in the trial court]; *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1017-1018 (*Occidental College I*) [same]; *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 37, 41-42 [same].)

### B.  Boermeester told USC he did not want to question Roe at a live hearing, and he did not ask to question other witnesses.

Here, Boermeester neither requested nor desired live cross-examination.  When USC asked Boermeester's lawyer to submit questions for Roe, the lawyer responded "I am not interested in having [Roe] come in and being put on the spot yet again."  (1 AR 293.)  Boermeester also never asked to cross-examine witnesses other than Roe.  And Boermeester did not even attend his own in-person hearing.  (See 1 AR 59-66, 293.)  Accordingly, he waived or forfeited any argument that he was entitled to an in-person examination of Roe and the other witnesses.

Boermeester's failure to request live cross-examination was not due to a technical oversight or an accidental forfeiture.  Rather, Boermeester, with the advice of counsel, strategically eschewed live cross-examination.  As the dissent below correctly observed (*Boermeester*, *supra*, 49 Cal.App.5th at p. 715 (dis. opn. Wiley, J.)), further questioning of Roe could only harm Boermeester's defense because Roe had already recanted to Boermeester's benefit.  Moreover, Boermeester himself admitted the physical facts that he grabbed Roe by the neck and pushed her (1 AR 60, 172-173), and the other witnesses who saw and characterized his acts as more than mere horseplay were unlikely to help his case.  Boermeester sensibly declined to question these witnesses.

The majority below speculated that asking for a live hearing with cross-examination would have been futile because USC's policy did not provide for it.  (*Boermeester*, *supra*, 49

51

Cal.App.5th at pp. 700-701.)  But, as the dissent correctly observed, "[n]othing barred Boermeester from asking for further questions for any witness."  (*Id*. at p. 718 (dis. opn. Wiley, J.).)  And Boermeester's lawyer did not simply remain silent—he told USC that Boermeester did *not* want Roe to appear for questioning at a live hearing.  (1 AR 293.)  Thus, the record contradicts the Court of Appeal's speculation that asking for live cross-examination would have been futile.

The majority below also excused Boermeester's waiver on the ground that his disciplinary proceedings in 2017 occurred before the issuance of the Court of Appeal's *Doe v. Allee* decision in 2019, which (incorrectly) recognized a common law right to a live hearing featuring cross-examination of third-party witnesses.  (*Boermeester*, *supra*, 49 Cal.App.5th at p. 701, citing *Allee*, *supra*, 30 Cal.App.5th 1036.)  That was error.  Boermeester eschewed cross-examination because it would not help his defense, not because the case law had not yet established a common law right to cross-examination.

Finally, Boermeester argued below that he did not waive the right to cross-examine Roe at a live hearing because he purportedly objected to the manner in which USC would have handled the questioning.  (ARB 51-52.)  The record shows otherwise.  Boermeester's lawyer initially told USC that Boermeester intended to submit *written* questions for Roe, and he asked for guidance on how to do so.  (1 AR 294-295.)  USC's Title IX investigator Helsper responded that "[y]ou send me the questions and we will ask them of [Roe]."  (1 AR 294.)

52

Boermeester's lawyer then wrote that he did not want USC to "filter" Roe's answers. (1 AR 293-294.) USC responded that it would not do so and that it would provide Boermeester with any new factual information in Roe's answers before Helsper issued her report. (*Ibid*.) Nonetheless, Boermeester declined to submit written questions for Roe. (See 1 AR 296.) And Boermeester's lawyer told USC that he did *not* want Roe to appear in person. (1 AR 293.) This email exchange about "filtering" did not preserve Boermeester's arguments about cross-examination.

In sum, Boermeester waived any common law right to cross-examine witnesses at a live hearing because he disavowed any interest in pursuing cross-examination. Holding otherwise, as the majority below did, would encourage gamesmanship by rewarding students accused of misconduct for withholding procedural objections from universities and then raising them for the first time in subsequent litigation. For this reason, too, this Court should reverse the decision below. However, as explained in Section I, it is nonetheless important to provide lower courts and all private associations subject to the common law fair procedure doctrine clear guidance on what the common law actually requires.

### III. Any error in failing to provide Boermeester with an opportunity to cross-examine witnesses at a live hearing was harmless.

#### A. Courts may not overturn private universities' disciplinary decisions due to inconsequential errors.

"California courts adhere to the doctrine of prejudicial error, pursuant to which an administrative decision will not be overturned for error when the error made no difference in the outcome of the case (i.e., the error was 'harmless'). It is petitioner's burden to establish that error in the lower tribunal was prejudicial." (Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2020) ¶ 13:520; see Cal. Const. art. VI, § 13; Code Civ. Proc., § 1094.5, subd. (b) [courts may examine whether "there was any prejudicial abuse of discretion"]; see also *El-Attar*, *supra*, 56 Cal.4th at pp. 990-991; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 307-308; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1215.)

This rule applies in fair procedure cases, including university discipline cases. (See *Anton*, *supra*, 19 Cal.3d at p. 826 [rejecting fair procedure challenge for failure to show prejudice]; *Occidental College II*, *supra*, 40 Cal.App.5th at pp. 225-226 [rejecting fair procedure challenge where there was "no reasonable likelihood the result would have been any different"]; *Occidental College I*, *supra*, 37 Cal.App.5th at pp. 1016-1017 [same]; *Guilbert v. Regents of University of California* (1979) 93 Cal.App.3d 233, 241-242 [" 'There is a generally accepted

54

principle that the appellant must show prejudicial error affecting his interests in order to prevail on appeal . . . and it follows that the appellate court need not and will not review errors which could not have been prejudicial to him' "].)

**B.     Any error here was harmless because USC's disciplinary decision did not depend primarily on assessing witness credibility, much less in the absence of supporting evidence.**

Even assuming USC should have afforded Boermeester the opportunity to cross-examine witnesses at a live hearing, and even assuming Boermeester has not waived this opportunity, USC's failure to do so was harmless.  Assessing witness credibility ultimately was not necessary or central to USC's determinations that Boermeester committed domestic violence against Roe and violated USC's order to avoid contact with her.

USC's policy defined domestic violence to include causing physical harm to someone with whom the accused student had a previous or current dating or romantic relationship.  (2 AR 486.) Boermeester admitted that he grabbed Roe's neck and pushed her against a wall, which video surveillance footage confirmed.  (1 AR 60, 172-173, 179; 6 CT 1161-1162.)  Two third-party witnesses independently offered corroborating testimony, which was also consistent with the surveillance footage, and Roe's friends corroborated the story based on what she told them shortly afterwards.  (1 AR 32, 85, 92-93, 95, 133-135.)  On this record, and in light of the elements of USC's domestic violence policy, there is no reasonable possibility that Boermeester would have

obtained a more favorable result if he cross-examined Roe or other witnesses at a live hearing.

The majority below nonetheless concluded that USC's alleged procedural deficiencies were prejudicial because USC faced conflicting accounts of the incident. (*Boermeester*, *supra*, 49 Cal.App.5th at p. 708.) The majority observed that (1) the surveillance video merely corroborated Roe's *initial* statement, (2) Boermeester claimed that his conduct was playful, and (3) an eyewitness initially downplayed the severity of what he saw and then changed his story. (*Ibid.*)

But the majority's conclusion that "this case rests on witness credibility" (*Boermeester*, *supra*, 49 Cal.App.5th at p. 708) was mistaken. Again, Boermeester admittedly grabbed Roe's neck and pushed her, and the surveillance video confirmed that he did so. (1 AR 43-45, 172-174, 179; 6 CT 1161-1162.) And Boermeester's intent was irrelevant under USC's policy. (1 AR 222; 2 AR 486-487.) Boermeester thus violated USC's policy against domestic violence regardless of whether he thought he was acting playfully, so USC had no need to assess the credibility of Boermeester's explanation.

Boermeester also violated USC policy by contacting Roe despite USC's instruction not to do so. (AR 53-54.) Cross-examining witnesses at a live hearing would not have changed USC's decision in this respect, either, as it did not depend solely on assessing witness credibility.

The majority below thus mandated live cross-examination of Roe and third-party witnesses in a case where it could be of no

real help to the accused student because credibility was not central to USC's determination. On this record, conclusions about what happened between victim and abuser could be resolved without further testing of their credibility, or the credibility of other witnesses, through live cross-examination. Even if USC should have afforded Boermeester the opportunity to cross-examine witnesses at a live hearing, its failure to do so was harmless.

IV. **Senate Bill No. 493 confirms, in the context of complaints of sexual misconduct or domestic violence, that private universities have the authority and flexibility to develop fair procedures for themselves.**

   A. **Under SB 493, universities adjudicating sexual misconduct and domestic violence complaints have discretion to determine whether hearings are necessary, and whether to allow cross-examination in such hearings.**

In September 2020, Governor Newsom signed Senate Bill No. 493 (2019-2020 Reg. Sess.) into law. Through SB 493, the Legislature clarified "the process for adjudicating complaints of sexual or gender-based violence, including dating or domestic violence, at postsecondary educational institutions in the State of California." (*Id.*, § 1, subd. (r).) Although SB 493's requirements did not apply at the time USC investigated Boermeester's misconduct in 2017 (and likewise do not apply to the myriad of other private organizations governed by common law fair procedure), the new law confirms that private universities have

broad flexibility to establish fair procedures that best serve the needs of their communities. (*Id.*, § 3, subd. (b)(4)(A)(viii).)

In SB 493, the Legislature recognized the devastating consequences of sexual harassment and violence on university students. (SB 493, *supra*, at § 1, subd. (c).) The Legislature found that sexual misconduct threatens students' physical safety, impedes their ability to learn, and reinforces social inequality. (*Ibid.*) Citing studies published by the American Association of University Women and the Association of American Universities, the Legislature recognized that sexual harassment and violence is "pervasive in higher education," with approximately 62 percent of women and 61 percent of men experiencing it. (*Id.*, § 1, subd. (d).) The Legislature also recognized the disparate impact that sexual harassment has on marginalized groups such as LGBTQ students and disabled students. (*Id.*, § 1, subd. (e).)

Relying on research from the National Women's Law Center, the Legislature found that survivors vastly underreport instances of sexual harassment and assault in the university context—"only 12 percent of college survivors report sexual assault to their schools or the police." (SB 493, *supra*, at § 1, subd. (j).) The Legislature also acknowledged that 34 percent of sexual harassment and violence survivors drop out of college. (*Id.*, § 1, subd. (*l*).)

To remedy these problems, the Legislature has required private universities accepting state financial assistance to adopt certain procedures for adjudicating sexual harassment and domestic violence complaints as a condition for continuing to

receive state financial assistance. (*Id.*, § 1, subds. (p) & (r); *id.*, § 3, subd. (b).) Universities must adopt these policies no later than January 1, 2022. (*Id.*, § 3, subd. (e).)[8]

The cornerstone of SB 493's procedural requirements is notice and an opportunity to respond. (See SB 493, *supra*, at § 3, subd. (b)(4)(A)(ii), (viii), (xiii), (xiv), & (xvi).) The Legislature has instructed universities to take a trauma-informed approach. (See *id.*, § 3, subd. (b)(2), (4)(A)(iv), (6)(A) & (7).) To this end, the Legislature has forbidden universities from employing adversarial procedures. (*Id.*, § 3, subd. (b)(4)(A)(i).)

The Legislature has left it up to individual universities whether to conduct hearings—"the institution shall decide whether or not a hearing is necessary to determine whether any sexual violence more likely than not occurred." (SB 493, *supra*, at § 3, subd. (b)(4)(A)(viii).) "In making this decision, an institution may consider whether the parties elected to participate in the investigation and whether each party had the opportunity to suggest questions to be asked of the other party or witnesses, or both, during the investigation." (*Ibid.*)

---

[8] The definitions of "sexual harassment" and "sexual violence" in SB 493 seem to exclude domestic violence. (See *id.*, § 2, subds. (a) & (b).) Nonetheless, the Legislature expressly provided that SB 493 is intended to govern "the process for adjudicating complaints of sexual or gender-based violence, *including dating or domestic violence*, at postsecondary educational institutions in the State of California." (*Id.*, § 1, subd. (r), emphasis added.) In light of this language, there is no reason to assume that the Legislature intended a different set of procedural requirements to govern university domestic violence cases.

Under SB 493, a university that chooses to conduct hearings on allegations of sexual misconduct may also decide for itself whether to permit cross-examination of witnesses, with the caveat that "[a]ny cross-examination of either party or any witness shall not be conducted directly by a party or a party's advisor." (SB 493, *supra*, at § 3, subd. (b)(4)(A)(viii)(I).)

Consistent with the rudimentary common law procedural fairness required by *Pinsker II* and *Ezekial*, the Legislature has now codified the proper understanding of common law fair procedure—at least for private universities investigating sexual misconduct—by simply requiring universities to provide accused students with notice and an opportunity to respond. (See *Nightlife Partners v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 91 ["the provisions of the [Administrative Procedure Act (Gov. Code, § 11340 et seq.)] are helpful as indicating what the Legislature believes are the elements of a fair and carefully thought out system of procedure for use in administrative hearings"].) Going forward, private universities retain the flexibility to select and implement fair procedures for themselves, including the decisions whether to hold a hearing and whether to permit indirect cross-examination. In light of the Legislature's codification of fair procedure in sexual misconduct and domestic violence cases, it would be anomalous for this Court to hold that the common law requires more.

60

**283**

### B. SB 493 expressly supersedes the fair procedure cases on which the majority below relied.

Section 3, subdivision (g)(2) of SB 493 provides that any "case law that conflicts with the provisions of the act that adds this section shall be superseded as of this statute's effective date." The effect of this provision is clear—to the extent some Court of Appeal decisions have mandated private universities to adopt procedures such as live hearings with cross-examination, the Legislature has abrogated that case law. (See *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249 [to show an intent to abrogate the common law, "it is enough that 'the language or evident purpose of the statute manifest a legislative intent to repeal' a common law rule"].)

### C. SB 493 provides that case law imposing new procedural requirements on private universities does not apply retroactively.

Section 3, subdivision (g)(1) of SB 493 provides that "[a]ny case law interpreting procedural requirements or process that is due to student complainants or respondents when adjudicating complaints of sexual or gender-based violence, including dating or domestic violence, at postsecondary educational institutions in the State of California shall have no retroactive effect."

Through this provision, the Legislature has disapproved the reasoning adopted by the majority below. Even though USC expelled Boermeester in 2017, the Court of Appeal faulted USC for failing to comply with fair procedure decisions issued in 2019, such as *Allee* and *Westmont College*. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 698-699, 703-706.) The Court of Appeal thus

61

applied those decisions retroactively to reverse USC's disciplinary proceedings, even though USC designed its policies to comply with the law as it existed at the time. The Court of Appeal's approach is irreconcilable with SB 493, and this Court should reject it. Even if the common law were expanded to required live cross-examination in university domestic violence cases—which it should not be—such a requirement should not be applied retroactively to prior disciplinary decisions.

***

This Court should confirm that the Court of Appeal's decision is both erroneous under the common law of fair procedure and prospectively incorrect under SB 493. (See *El-Attar*, *supra*, 56 Cal.4th at pp. 986-988 [discussing common law precedents in connection with applying statutory scheme detailing hospital peer review procedures]; *Economy v. Sutter East Bay Hospitals* (2019) 31 Cal.App.5th 1147, 1159 [after codification of hospital peer review procedures, "a physician retains a common law right to fair procedure where the hospital's act significantly impairs the physician's practice of medicine"].) Such a clear statement from the Court is essential to providing guidance to all private associations subject to the inconsistent appellate decisions applying the common law of fair procedure.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the Court of Appeal.

December 14, 2020

**HORVITZ & LEVY** LLP
  BETH J. JAY
  JEREMY B. ROSEN
  MARK A. KRESSEL
  SCOTT P. DIXLER
  SARAH E. HAMILL
**YOUNG & ZINN LLP**
  JULIE ARIAS YOUNG
  KAREN J. PAZZANI


By: _Scott P. Dixler_
      Scott P. Dixler

Attorneys for Defendants and Respondents
**AINSLEY CARRY and UNIVERSITY OF SOUTHERN CALIFORNIA**

## CERTIFICATE OF WORD COUNT
### (Cal. Rules of Court, rule 8.520(c)(1).)

      The text of this brief consists of 12,172 words as counted by the program used to generate the brief.

Dated:  December 14, 2020

_____
Scott P. Dixler

## PROOF OF SERVICE

*Boermeester v. Carry et al.*
**Case No. S263180**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 3601 West Olive Avenue, 8th Floor, Burbank, CA 91505-4681.

On December 14, 2020, I served true copies of the following document(s) described as **OPENING BRIEF ON THE MERITS** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Horvitz & Levy LLP's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission via Court's Electronic Filing System (EFS) operated by ImageSoft TrueFiling (TrueFiling) as indicated on the attached service list:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 14, 2020, at Valley Village, California.

_Serena L. Steiner_
Serena L. Steiner

**SERVICE LIST**
*Boermeester v. Carry et al.*
**Case No. S263180**

| Individual / Counsel | Party Represented |
|---|---|
| Julie Arias Young<br>Karen J. Pazzani<br>Young & Zinn LLP<br>1150 South Olive Street, Suite 1800<br>Los Angeles, CA  90015-3989<br>(213) 362-1860 • Fax: (213) 362-1861<br>jyoung@yzllp.com<br>kpazzani@yzllp.com | Defendants and Respondents<br>**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA**<br><br>*Via TrueFiling* |
| Mark M. Hathaway<br>Jenna E. Parker<br>Hathaway Parker LLP<br>445 South Figueroa Street, 31st Floor<br>Los Angeles, CA  90071<br>(213) 529-9000 • Fax: (213) 529-0783<br>mark@hathawayparker.com<br>jenna@hathawayparker.com | Plaintiff and Appellant<br>**MATTHEW BOERMEESTER**<br><br>*Via TrueFiling* |
| California Court of Appeal<br>Second Appellate District<br>Division 8<br>300 South Spring Street<br>Second Floor, North Tower<br>Los Angeles, CA  90013<br>(213) 830-7000 | [Case No. B290675]<br><br>*Via TrueFiling* |
| Clerk of the Court<br>Hon. Amy D. Hogue, Dept. 7<br>Los Angeles County Superior Court<br>Spring Street Courthouse<br>312 North Spring Street<br>Los Angeles, CA 90012<br>(213) 310-7007 | Trial Court Judge<br><br>[Case No. BS170473]<br><br>*Via U.S. Mail* |

66

289

# EXHIBIT 5

**Case No. S263180**

*In the*

# Supreme Court

*of the*

# State of California

---

MATTHEW BOERMEESTER,

*Plaintiff and Appellant,*

v.

AINSLEY CARRY et al.,

*Defendants and Respondents.*

---

AFTER A PUBLISHED DECISION OF THE COURT OF APPEAL,
SECOND APPELLATE DISTRICT, DIVISION EIGHT, CASE NO. B290675
LOS ANGELES SUPERIOR COURT, THE HONORABLE AMY D. HOGUE,
CASE NO. BS170473

## ANSWER BRIEF ON THE MERITS

\*MARK M. HATHAWAY (151332)
JENNA E. PARKER (303560)
HATHAWAY PARKER
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
(213) 529-9000 Telephone
(213) 529-0783 Facsimile
mark@hathawayparker.com
jenna@hathawayparker.com

*Attorneys for Petitioner and Appellant,
Matthew Boermeester*

 COUNSEL PRESS · (213) 680-2300     PRINTED ON RECYCLED PAPER 

Document received by the CA Supreme Court.

291

# TABLE OF CONTENTS

INTRODUCTION ........................................................ 11

STATEMENT OF THE CASE ..................................... 13

    A.    Matthew Boermeester and Zoe Katz ....................... 14

    B.    January 20, 2017 ....................................................... 15

    C.    The Interaction on January 21, 2017 ...................... 16

    D.    The Security Video.................................................... 17

    E.    What DH and MB2 Actually Said They Saw
        and Heard.................................................................. 18

        *1.*    *Witness DH*...................................................... 18

        *2.*    *Witness MB2*.................................................... 19

    F.    The USC Title IX Investigation Begins.................... 21

        *1.*    *USC Title IX Interactions with Zoe Katz*........ 22

                a.    Ms. Katz Objects to USC Title IX's
                     Misrepresentations and
                     Mischaracterizations ............................. 23

                b.    No Request for Avoidance of Contact ... 24

                c.    No Fear of Retaliation; No Recantation 25

        *2.*    *USC Title IX Interactions With
              Mr. Boermeester* ............................................. 29

                a.    Mr. Boermeester Is Summarily
                     Suspended then Charged ...................... 29

                b.    USC Issues Avoidance of Contact
                     Charges................................................... 30

        *3.*    *16 Other Witnesses Interviewed*....................... 30

    G.    USC Title IX Adjudication Process........................... 32

        *1.*    *Both Parties Participate In "Evidence
               Review"* ........................................................... 33

2

Document received by the CA Supreme Court.

2. No Cross-Examination Allowed for Any Witnesses .................................. 33

3. USC Title IX Office Issues the SAR ............... 35

4. USC's Sanctioning Panel Orders Expulsion .. 35

5. USC's Appeal Panel Denies Both Appeals but Recommends Suspension, Not Expulsion ....... 35

6. Dr. Ainsley Carry Orders Expulsion .............. 37

7. No Impartial Deciders ..................................... 37

LEGAL ANALYSIS ........................................................ 40

I. THE COMMON LAW RIGHT TO FAIR PROCEDURE REQUIRES A PRIVATE UNIVERSITY TO AFFORD STUDENTS FACING SEVERE DISCIPLINARY SANCTIONS WITH THE OPPORTUNITY TO UTILIZE CERTAIN PROCEDURAL PROCESSES, SUCH AS CROSS-EXAMINATION OF WITNESSES AT A LIVE HEARING ................................................ 40

A. Summary of Current Law ............................... 40

1. Federal Title IX ...................................... 40

2. Code Civ. Proc., § 1094.5 ...................... 43

3. California Student Discipline Cases ..... 44

4. Common Law Fair Procedure Can Require Private Organizations to Conduct Live Hearings with Cross-Examination ......................................... 48

5. Private Universities Remain Gatekeepers Under Allee, Westmont, Etc. .................. 50

B. Improper Deference to Private Institutions ..................................................... 52

II. MR. BOERMEESTER DID NOT WAIVE HIS RIGHT TO CROSS-EXAMINATION ....................... 53

Document received by the CA Supreme Court.

3

III.   THE ERROR IN FAILING TO PROVIDE A LIVE HEARING, CROSS-EXAMINATION, AND IMPARTIAL DECIDERS WAS NOT HARMLESS. .............................................................. 56

     *1.   USC's Errors Were Extremely Consequential* . 56

     *2.   Uncorroborated Hearsay Is Not Substantial Evidence* ............................................................ 59

IV.   SB-493 HAS NO EFFECT ON THE RESOLUTION OF THE ISSUES PRESENTED BY THIS CASE.... 61

     A.   SB 493 Supplements Federal Law.................. 61

     B.   Judicial Decisions Are Retrospective in Nature ........................................................ 63

V.   CONCLUSION.......................................................... 64

CERTIFICATE OF COUNSEL..................................................... 65

DECLARATION OF SERVICE.................................................... 66

Document received by the CA Supreme Court.

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Board of Curators of University of Missouri v. Horowitz*
(1978) 435 U.S. 78.......................................................................... 47

*Doe v. Baum*
(6th Cir. 2018) 903 F.3d 575 (*Baum*) ........................... 47, 53, 54

*Doe v. Brandeis Univ.*
(D.Mass. 2016) 177 F. Supp. 3d 561 .................................. 46, 47

*Doe v. Columbia Coll. Chi.*
(7th Cir. 2019) 933 F.3d 849........................................................ 13

*Doe v. Purdue University*
(7th Cir. 2019) 928 F.3d 652........................................................ 13

*Doe v. Univ. of Cincinnati*
(6th Cir. 2017) 872 F.3d 393........................................................ 46

*Doe v. Univ. of the Scis.*
(3d Cir. 2020) 961 F.3d 203 ........................................................ 13

*Furey v. Temple Univ.*
(E.D. Pa. 2012) 884 F.Supp.2d 223 ........................................... 46

*Goss v. Lopez*
(1975) 419 U.S. 565 (*Goss*)........................................................ 45

*Schwake v. Ariz. Bd. of Regents*
(9th Cir. 2020) 967 F.3d 940........................................................ 13

## California Cases

*Anton v. San Antonio Community Hospital*
(1977) 19 Cal.3d 802 .............................................. 44, 49, 55, 59

*Applebaum v. Board of Directors*
(1980) 104 Cal.App.3d 648 ......................................................... 49

Document received by the CA Supreme Court.

*Banks v. Dominican College*
(1995) 35 Cal.App.4th 1545 ............................................... 12, 51

*Berman v. Regents of University of California*
(2014) 229 Cal.App.4th 1265 ........................................... 45, 46

*Bixby v. Pierno*
(1971) 4 Cal.3d 130 ........................................................... 52

*Boermeester v. Carry*
(2020) 49 Cal.App.5th 682 ........................................ 15, 18, 45

*California Youth Authority v. State Personnel Bd.*
(2002) 104 Cal.App.4th 575 .............................................. 59

*Cason v. Glass Bottle Blowers Asso.*
(1951) 37 Cal.2d 134 ........................................................ 48

*Citizens for Open Government v. City of Lodi*
(2012) 205 Cal.App.4th 296 .............................................. 59

*Corenbaum v. Lampkin*
(2013) 215 Cal.App.4th 1308 ............................................ 55

*Doe v. Allee*
(2019) 30 Cal.App.5th 1036 ................................. 12, 50, 63, 64

*Doe v. Occidental College*
(2019) 40 Cal.App.5th 208 .......................................... 45, 46, 55

*Doe v. Regents of University of California*
(2016) 5 Cal.App.5th 1055 ................................................ 45

*Doe v. Regents of University of California*
(2018) 28 Cal.App.5th 44 .......................................... 43, 45, 52

*Doe v. University of Southern California*
(2016) 246 Cal.App.4th 221 .......................................... 12, 44

*Doe v. University of Southern California*
(2018) 28 Cal.App.5th 26 .......................................... 12, 38, 45

*Doe v. Westmont College*
(2019) 34 Cal.App.5th 622 .......................................... 45, 50, 64

Document received by the CA Supreme Court.

*Doers v. Golden Gate Bridge etc. Dist.*
(1979) 23 Cal.3d 180 ................................................................ 55

*Dougherty v. Haag*
(2008) 165 Cal.App.4th 315 ..................................................... 50

*El-Attar v. Hollywood Presbyterian Medical Center*
(2013) 56 Cal.4th 976 ......................................................... 49, 59

*Ellis v. American Fedn. Of Labor*
(1941) 48 Cal.App.2d 440 ......................................................... 50

*Ezekial v. Winkley*
(1977) 20 Cal.3d 267 ......................................................... 11, 49

*Farahani v. San Diego Community College Dist.*
(2009) 175 Cal.App.4th 1486 ................................................... 55

*Fukuda v. City of Angels*
(1999) 20 Cal.4th 805 ............................................................. 52

*Gill v. Mercy Hospital*
(1988) 199 Cal.App.3d 889 ....................................................... 48

*Goldberg v. Regents of University of Cal.*
(1967) 248 Cal.App.2d 867 ....................................................... 46

*Goodstein v. Cedars-Sinai Medical Center*
(1998) 66 Cal.App.4th 1257 ..................................................... 49

*Guilbert v. Regents of University of California*
(1979) 93 Cal.App.3d 233 ......................................................... 59

*Gupta v. Stanford University*
(2004) 124 Cal.App.4th 407 ................................................ 13, 44

*Hackethal v. California Medical Assn.,*
(1982) 138 Cal.App.3d 435 ....................................................... 37

*James v. Marinship Corp.*
(1944) 25 Cal.2d 721 ............................................................... 50

*Johnson v. City of Loma Linda*
(2000) 24 Cal.4th 61 ................................................................ 44

7

Document received by the CA Supreme Court.

*Kaiser Foundation Hospitals v. Superior Court*
    (2005) 128 Cal.App.4th 85 ....................................................... 49

*Knight v. South Orange Community College Dist.*
    (Feb. 10, 2021, No. G058644) ___Cal.App.5th___
    [2021 Cal. App. LEXIS 120] ............................................... 13, 45

*Lasko v. Valley Presbyterian Hospital*
    (1986) 180 Cal.App.3d 519 ..................................................... 49

*In re Lucero L.*
    (2000) 22 Cal.4th 1227 ............................................................ 60

*Morongo Band of Mission Indians v. State Water
    Resources Control Bd.*
    (2009) 45 Cal.4th 731 .............................................................. 52

*Natarajan v. Dignity Health*
    (2019) 42 Cal.App.5th 383 ...................................................... 37

*Niles Freeman Equipment v. Joseph*
    (2008) 161 Cal.App.4th 765 .................................................... 55

*Otto v. Journeymen Tailors' Protective & Benevolent Union*
    (1888) 75 Cal. 308 .................................................................. 50

*Palm Medical Group, Inc. v. State Comp. Ins. Fund*
    (2008) 161 Cal.App.4th 206 .................................................... 49

*Paulsen v. Golden Gate University*
    (1979) 25 Cal.3d 803 ......................................................... 12, 51

*People v. Brooks*
    (2017) 3 Cal.5th 1 ................................................................... 55

*Pinsker v. Pac. Coast Soc. of Orthodontists*
    (1969) 1 Cal.3d 160 ................................................................ 49

*Pinsker v. Pac. Coast Soc. of Orthodontists*
    (1974) 12 Cal. 3d 541 ......................................................... 48, 49

*Pomona College v. Superior Court*
    (1996) 45 Cal.App.4th 1716 ................................... 13, 43, 45, 51

Document received by the CA Supreme Court.

8

*Potvin v. Metro. Life Ins. Co.*
(2000) 22 Cal. 4th 1060............................................................ 48

*Roddenberry v. Roddenberry*
(1996) 44 Cal.App.4th 634 ...................................................... 60

*Rosenblit v. Superior Court*
(1991) 231 Cal. App. 3d 1434 ........................................... 37, 49

*Saad v. City of Berkeley*
(1994) 24 Cal.App.4th 1206...................................................... 59

*Samaan v. Trs. of Cal. State Univ. & Colleges*
(1983) 150 Cal.App.3d 646 .............................................. 54, 55

*Sierra Club v. San Joaquin Local Agency Formation Com.*
(1999) 21 Cal.4th 489................................................................ 55

*Taboada v. Sociedad Espanola de Beneficencia Mutua*
(1923) 191 Cal. 187 .................................................................. 50

*Von Arx v. San Francisco Gruetli Verein*
(1896) 113 Cal. 377 .................................................................. 50

*Wilson v. San Luis Obispo County Democratic Central Com.*
(2009) 175 Cal.App.4th 489...................................................... 50

## Federal Statutes

5 U.S.C.
§ 556(d) ...................................................................... 41

20 U.S.C.
§§ 1681-1688............................................................... 40

Civil Rights Act of 1964 Title VI .................................... 41

Title IX....................................................................*passim*

Document received by the CA Supreme Court.

## California Statutes

Code Civ. Proc.
  § 1094.5 ........................................................... 13, 43, 44, 52
  § 1094.5 subd.(b) ................................................. 44, 59
  § 1094.5 subds.(b) and (c) ........................................ 43

Ed. Code
  § 66281.8 .......................................................... 62

Evid. Code
  § 623 .............................................................. 55
  § 664 .............................................................. 53

## Constitutions

Fourteenth Amendment ............................................... 44

California Constitution .............................................. 52

## Regulations

34 C.F.R. § 106 .................................................... 41, 62

34 C.F.R. § 106.8(b) ............................................... 42

34 C.F.R. § 106.8(c) ............................................... 41

34 C.F.R. § 106.30(a) .............................................. 42

34 C.F.R. § 106.44(a) .............................................. 42

34 C.F.R. § 106.45(b)(5)(vi) ....................................... 42

34 C.F.R. § 106.45(b)(6) ........................................... 42, 63

34 C.F.R. § 106.45(b)(7)(i) ........................................ 42

34 C.F.R. § 106.71 ................................................. 41

Document received by the CA Supreme Court.

## INTRODUCTION

University of Southern California (USC) contends that decisions of the Court of Appeal regarding student discipline have moved beyond the principle that fair administrative hearing procedure provided by private organizations requires only "rudimentary procedural and substantive fairness."  (*Ezekial v. Winkley* (1977) 20 Cal.3d 267, 278.)  The decisions, according to USC, are "importing constitutional due process rules to regulate non-state actors and requiring universities to provide an increasingly burdensome array of litigation-like procedures in student discipline cases arising from allegations of sexual misconduct." (Opening Brief, p. 11.)

On the contrary, it is the universities that have moved beyond academia and research and into the investigation and adjudication of sexual misconduct in quasi-criminal proceedings and built Title IX departments that resemble prosecutorial agencies.[1]  The universities have created their own "increasingly burdensome array of litigation-like procedures in student discipline cases arising from allegations of sexual misconduct." (See, 2 AR 478-496.)  And not all private universities[2] find fairness to be burdensome.  More than others, USC has been

---

[1] Title IX Coordinator Gretchen Dahlinger Means directed USC's Title IX Office until recently.  Ms. Means is a former prosecutor in the Sex Crimes Unit of San Diego District Attorney's Office.  Ms. Means also trained and mentored U.S Marine Corps prosecutors on five west coast installations. (1 CT 33, n. 51.)

[2] Mr. Boermeester does not dispute here that USC is a private university and not a state-actor.  (1 CT 12.)

11

Document received by the CA Supreme Court.

beset by students who have successfully challenged the appearance of fairness and impartiality in USC Title IX internal regulations and administrative proceedings by judicial review.[3]

The most obvious distinction between USC and the private organization cases that USC cites is that those private societies, labor unions, and medical committees were not prosecuting sexual misconduct charges in quasi-criminal proceedings. The private organizations were generally deciding who belongs amongst their ranks and the more recent Court of Appeal cases have not imposed on private (or public) universities in that area – admissions, academic progress, tenure, etc. (See *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545; *Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803.)

Beginning in 2011, USC and other public and private universities responded with alacrity to calls to address a tide of sexual violence on American college campuses. (1 CT 13-18, 21-23.) Universities established new internal rules and administrative procedures to address any hostile environment

---

[3] See, *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26; *Doe v. Allee* (2019) 30 Cal.App.5th 1036; *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221. In the trial court, USC sought judicial notice of three trial court decisions that went against accused male USC students. (2 CT 915-958.) Two of the decisions were overturned on appeal, *Doe v. Allee, supra,* and *Doe v. Ainsley Carry, Ed.D., et al.,* (Jan. 8, 2019, No. B282164). After the third matter was fully briefed and set for oral argument, USC dismissed its Title IX findings and sanctions against the accused male student and trial court judgment was ordered reversed. *(Doe v. Ainsley Carry, Ed.D., et al.,* (Feb. 14, 2020, No. B284183).)

12

Document received by the CA Supreme Court.

due to sexual misconduct by simply expelling or suspending invariably male students.[4] This led to a significant push back by accused students and more recently cases presenting credible claims of gender discrimination in Title IX sexual misconduct proceedings on campus. (*Schwake v. Ariz. Bd. of Regents* (9th Cir. 2020) 967 F.3d 940, 946-948 (adopting the Seventh Circuit's far simpler and "straightforward pleading standard" as "hew[ing] most closely to the text of Title IX."); *Doe v. Purdue University* (7th Cir. 2019) 928 F.3d 652, 667-68; see also *Doe v. Univ. of the Scis.* (3d Cir. 2020) 961 F.3d 203, 209, citing *Doe v. Columbia Coll. Chi.* (7th Cir. 2019) 933 F.3d 849, 854-55.)

The Court of Appeal decisions have simply upheld longstanding common law principles of fairness and Due Process in narrow circumstances where the accused student faces severe disciplinary penalties and have generally treated private and public colleges and universities alike under Code Civ. Proc., § 1094.5. (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716; *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407; *Knight v. South Orange Community College Dist.* (Feb. 10, 2021, No. G058644) ___Cal.App.5th___ [2021 Cal. App. LEXIS 120].)

## STATEMENT OF THE CASE

The circumstances of this case illustrate why the common law right to fair procedure requires a private university to afford

---

[4] *Knight v. South Orange Community College Dist.* (Feb. 10, 2021, No. G058644) ___Cal.App.5th___ [2021 Cal. App. LEXIS 120].

13

Document received by the CA Supreme Court.

a student who is facing severe disciplinary sanctions with the opportunity to utilize certain procedural processes, such as cross-examination of witnesses at a live hearing.

### A. Matthew Boermeester and Zoe Katz

As of January 2017, Matthew Boermeester (hereinafter "Mr. Boermeester") and Zoe Katz[5] (hereinafter "Ms. Katz") were both undergraduate athlete-scholars attending USC. Ms. Katz was a senior, was captain of the USC women's tennis team, and a nationally ranked female singles tennis player. (2 CT 413; 1 AR 236.) Mr. Boermeester was also a senior, full-scholarship athlete who kicked the game-winning 46-yard field goal in the final second of the 2017 Rose Bowl to give USC a 52-49 victory over Penn State. (1 AR 199, n. 5; 2 AR 396.) Mr. Boermeester expected to graduate in May 2017 and planned to attend USC to obtain his master's degree while continuing to play USC football during the Fall 2017 semester, his final year of eligibility to play college football, in hopes of developing his ranking as a draft-eligible college football player for the NFL in the 2017 draft class. (2 CT 401-402.) Mr. Boermeester had undergone knee surgery on January 10, 2017 and was wearing a knee brace. (1 CT 30.) Mr. Boermeester was taking anti-inflammatory medication but had refused pain medication. (1 AR 171, 175.)

_____

[5] Zoe Katz has requested to be referred by her true name. Ms. Katz has spoken publicly about the injustice she has faced in this matter, participated in the trial court proceedings in her true name, and objects to USC's characterization of her as a "Jane Roe," a name often used for victims of sexual misconduct.

Document received by the CA Supreme Court.

Ms. Katz had an on and off relationship with Mr. Boermeester before they began seriously dating in March 2016. (2 CT 710.) They broke up in October 2016 but saw each other nearly every day. (1 AR 172-173.) After his knee surgery, Mr. Boermeester was spending nights in Ms. Katz's apartment very near the USC campus. (2 CT 413.)

### B. January 20, 2017

On January 20, 2017, at about 4:00 p.m. Ms. Katz drove Mr. Boermeester in her car and the two had dinner together for about two hours at the Cheesecake Factory, where Mr. Boermeester had "about three glasses of wine." (1 AR 15; 1 AR 171, 179.) After dinner, Ms. Katz left for another commitment and Mr. Boermeester stayed in the area and went shopping at The Grove with a friend. After shopping, Mr. Boermeester went to hang out with members of the USC water polo team at a friend's house, where Mr. Boermeester had four or five beers. (1 AR 175.) Ms. Katz later picked Mr. Boermeester up and they stopped at McDonald's on the way back to her apartment and got chicken and French fries, arriving home about 1:00 a.m. (1 AR 179.)

The spin that USC's uses to characterize Mr. Boermeester as an angry drunk and Ms. Katz as a "classic" domestic abuse victim[6] is first seen in USC's citation to the intake interviewer's notes that Mr. Boermeester "was the drunkest she has ever seen him" while omitting that he "was yelling and trying to be funny."

Document received by the CA Supreme Court.

---

[6] See, 1 AR 220, 1 AR 51-53, 2 AR 456; *Boermeester v. Carry* (2020) 49 Cal.App.5th 682, 709 (*Boermeester*) (dissent positing "a textbook case of domestic violence.")

15

(1 AR 184.)  Mr. Boermeester had been drinking and was trying to be funny, but surveillance video shows him walking on his own, albeit with his bad knee.  (1 AR 190.)  When MB2 comes out with his trash, Mr. Boermeester quiets down immediately and walks inside.  (*Id.*)

### C.  The Interaction on January 21, 2017

After picking up food from McDonald's, Ms. Katz and Mr. Boermeester arrived home about 1:00 a.m.  Ms. Katz parked in her parking space in the alley behind her duplex[7] and the two were "playing around like we always do."  (1 AR 179.)  Mr. Boermeester was not angry and had no reason to be angry; he was yelling about winning the Rose Bowl and trying to be funny. (1 AR 8.)  Mr. Boermeester can be seen limping with his knee brace, holding a white McDonald's bag of French fries in one hand.  (1 AR 171.)  Mr. Boermeester explained that he jokingly put his hand on Ms. Katz's neck as they were "laughing and messing around," but he was not rough with Ms. Katz, he did not choke Ms. Katz[8] or hit her head against a wall, and he and Ms. Katz were not arguing.  (1 AR 172-173, 192.)  This is supported by witness DH's[9] statement that he saw Mr. Boermeester's "hand [not hands] on her chest/neck" (1 AR 95) and is consistent with the security video.  (1 AR 190.)

---

[7] Ms. Katz shared one unit with other members of the women's tennis team and the other unit is occupied by several members of the men's tennis team.  (1 AR 9.)

[8] Mr. Boermeester touched Ms. Katz with one hand and was holding the McDonald's bag in his other hand.  (1 AR 179.)

[9] The University refers to witnesses by their initials in the Summary Administrative Review investigative report.

16

Document received by the CA Supreme Court.

Ms. Katz and Mr. Boermeester agree to the sequence of events and agree that there was no violence, neither was angry, and that Ms. Katz suffered no harm. (1 AR 66-69, 192-214; 2 CT 401-403, 413-416; 3 CT 580-581, 612-615; 6 CT 1061-1073.) Ms. Katz attested, "No one was mad at all that night. We were laughing and messing around with each other. The Title IX office jumped to wrong and unsupported conclusions and now implies that [Mr. Boermeester]'s behavior must be because he was mad at something. That is not what happened. As was evidenced by my statements that night, the fact that we spent the entire weekend together, and my clear explanation of what transpired, I was never physically abused." (*Id.*) Ms. Katz had no bruising, no scrapes, nor any signs of physical harm anywhere on her body just two days after the incident. During her initial interview on January 23, 2017, Ms. Katz was "physically examined [by University personnel] … and there were no bruises or anything else anywhere on my body." (1 AR 194; 3 CT 580 ¶ 15.) USC does not mention the lack of physical evidence nor Ms. Means' examination of Ms. Katz.

### D. The Security Video

Unbeknownst to Mr. Boermeester and Ms. Katz, their interaction had been recorded by a surveillance camera in the alley. (1 AR 190.) When USC finally showed them the three-minute and 53-second surveillance video, the video showed what Mr. Boermeester and Ms. Katz had described all along; how they could be seen in the alley talking, embracing, kissing, and playing with Ms. Katz's dog. (1 AR 74, 190, 203.)

Document received by the CA Supreme Court.

17

USC's Title IX investigator's summary of the security video reflects an innocuous encounter. (1 AR 44-45.) Nowhere, even in the description written by USC's Title IX investigator is there any hitting, choking, punching, or other physical violence or physical harm. (AR 44-45.)

The Court of Appeal noted that "The surveillance video is not conclusive. The picture is grainy and there is no audio. The video camera is positioned approximately two buildings away from Roe and Boermeester. They are small figures in the frame of the video. Additionally, there is a light on the left side of the frame, which renders the interaction between Boermeester and Roe when they are near the wall barely visible." (*Boermeester*, *supra*, 49 Cal.App.5th at p. 707.)

### E. What DH and MB2 Actually Said They Saw and Heard.

USC states that two fellow students saw the January 21 incident. (Opening Brief, p. 26-28; 1 AR 85, 95.) But what USC describes as the "incident" is not what the two fellow students said that they saw and heard. (Opening Brief, p. 16.)

#### 1. Witness DH

DH came back from dinner and around 1:00 to 2:00 a.m. he was half asleep. (1 AR 95.) He heard a male yelling loudly and then he heard a female talking so he went to check by looking out his window. (*Id*.) DH saw Mr. Boermeester and Ms. Katz at the wall for "about three seconds." (*Id*.) Mr Boermeester had her "pinned against the wall with his hand on her chest/neck" and "Ms. Katz was trying to talk to him." (*Id*.) DH could not see Ms.

Katz's face and could not make out what they were saying. (*Id.*) Ms. Katz's dog was running around. (*Id.*) DH did not see or hear any contact of Ms. Katz hitting the wall. (*Id.*)

DH then told his roommate TS, "[Ms. Katz] and [Mr. Boermeester] are fighting." (*Id.*) The interviewer notes report that when DH and TS spoke to Ms. Katz, she said, "[I]t's fine," but DH and TS told her "it was not ok." (*Id.*) DH said she "seemed pretty scared" but that she wasn't "bawling and freaking out" as DH had expected. (*Id.*) DH and TS both said that Ms. Katz never expressed fear of Mr. Boermeester.[10] (1 AR 96, 127.)

TS did not see or hear any of the interaction in the alley. (1 AR 125.)

### 2.    Witness MB2

MB2 was inside his apartment in a different building when he heard an argument and went down to see what was happening and to take out his trash. (1 AR 131.) MB2 vaguely knew the woman as his neighbor but had "never met the guy." (*Id.*) MB2 could not tell what they were arguing about but there was a dog there and it seemed like they were arguing over the dog. (*Id.*) There was no screaming and MB2 did not see anyone touch the other; they were just talking. (*Id.*) MB2 thinks he said hello and gave a wave and the two left after that. (*Id.*) The security video

---

[10] In a declaration filed in the trial court, Ms. Katz testified, "DH and TS did not bring me back to their apartment I voluntarily went into their apartment while I was on my way to my apartment because they are my friends and I wanted to say, "Hi." I was not scared, worried, distressed, crying, or fearful of Matt Boermeester." (CT 1070 ¶ 14.)

Document received by the CA Supreme Court.

is consistent with the information that MB2 provided over the phone on February 3, 2017.  (1 AR 190.)

Over a month later, MB2 left a voicemail for the USC Title IX investigator stating that "the truth is that I saw everything" and that now MB2 wanted to share the truth and say why he had lied to the investigator.[11]  (1 AR 85.)  The investigator's notes of MB2's second telephone interview reflect that MB2 heard "laughing and screaming" sounds from the alley, which were playful at first.  (*Id.*)  MB2 then saw a guy standing around Ms. Katz with both of his hands around her neck, pushing Ms. Katz against the wall and MB2 heard Ms. Katz make "gagging" sounds.  (*Id.*)  "I could see in her eyes, she was very scared," according to MB2.  (*Id.*)  MB2 then went downstairs with his trash bag and asked how things were going which "broke it up." (*Id.*)  Ms. Katz and Mr. Boermeester then walked back into her house.

The investigator's notes are silent about MB2's vantage point, whether MB2's apartment has window overlooking the alley, and how MB2 could see what he later claimed, and how he "could see in her eyes."  (1 AR 85.)  In his first telephone interview MB2 did not see anyone until he had left his apartment and gone downstairs.  (1 AR 131.)  In his second telephone interview MB2 witnesses the interaction before he went "downstairs with his trash bag and asked how things were going."  MB2 only vaguely knew "the woman" as his neighbor but

---

[11] MB2 said that he had also lied to Mr. Boermeester's attorney.

20

Document received by the CA Supreme Court.

said in his second telephone interview that he lied to the investigator and an attorney "out of respect to her." MB2 had never seen Mr. Boermeester before but opined "This guy is violent, he domestically was abusing her" and that he has "a history of violence." (1 AR 131.)[12]

### F. The USC Title IX Investigation Begins

On January 21, 2017, at 9:21 p.m., Peter Smith emailed USC's Title IX Coordinator Gretchen Dahlinger Means that TS reported that "Zoe Katz said that her boyfriend was beating her up and throwing her against the wall and choking her." (2 AR 477.) TS, who had not seen or heard any part of the interaction in the alley and admittedly "never liked" Mr. Boermeester (1 AR 124-126), also told Dr. Nohelani Lawrence about the incident. (1CT 456; 3 CT 579 ¶ 10.) Dr. Lawrence called Ms. Katz to ask if she was alright. (*Id*.) Ms. Katz "told her the truth, that I was fine and that I did not need anything." (*Id*.) Ms. Katz did not know how Dr. Lawrence knew about her making noise in the alley, but Ms. Katz did not think the call was significant and that whatever Dr. Lawrence wanted seemed to be resolved. (*Id*.)

On January 22, 2017, Title IX Coordinator Means spoke with Peter Smith, TS, and DH in undocumented telephone calls. (1 AR 3.) Ms. Means also contacted Dr. Robin Scholefield, Associate Director of Sports Psychology at USC, and Richard Gallien, Coach for USC's Women's Tennis Team. (1 AR 1.)

---

[12] Mr. Boermeester and Ms. Katz were not allowed to question MB2 about his revised account. (1 AR 6, 48; 2 AR 315-316.) The Title IX Office determined that MB2 was untruthful in his initial interview but truthful in his second interview. (1 AR 52.)

Document received by the CA Supreme Court.

On January 23, 20l7, women's tennis coach Richard Gallien insisted that Ms. Katz must attend a mandatory meeting with the USC Title IX Office.  (2 CT 579.)

At the time Zoe Katz met with Title IX Coordinator Means, Title IX Investigator Lauren Helsper, and Dr. Lawrence, her USC-assigned advisor for the meeting, the USC Title IX officials believed that in the early morning of January 21, 2017 Mr. Boermeester had been angry and had choked Ms. Katz and repeatedly hit her head against a wall and that she was in an abusive relationship.[13]  (2 AR 477.)

While what occurred during Title IX Office meeting on January 23, 2017 is disputed, it is undisputed that Ms. Katz never made a misconduct report against Mr. Boermeester.  (1 AR 189; 3 CT 578 ¶ 3.)

From the outset of the investigation, the USC Title IX investigation was focused on establishing their narrative, and any denial or protestation by Zoe Katz was considered confirmation that she was a "classic", "textbook" victim of domestic abuse.

USC's efforts to establish the abusive relationship narrative began with Ms. Katz.

### 1.   USC Title IX Interactions with Zoe Katz

On January 23, 2017, Coach Gallien told Ms. Katz that it was mandatory for her to attend a meeting with the Title IX

---

[13] The Title IX officials were all the decision makers against Mr. Boermeester.  (2 AR 487.)

22

Document received by the CA Supreme Court.

Office. (3 CT 579 ¶ 11.) Title IX Coordinator Means, Title IX Investigator Helsper, and counsellor Dr. Lawrence were present. (*Id.*, ¶ 12.) Ms. Means said she had heard about an incident reported by Ms. Katz's neighbor, and that Ms. Means, Ms. Helsper, and Dr. Lawrence wanted to inquire if Ms. Katz needed any counseling or support. (3 CT 580 ¶ 13.) No one told Ms. Katz what Peter Smith had reported to Ms. Means, nor that USC considered the meeting an "intake" interview for a report of prohibited conduct to bring an action against Mr. Boermeester. (*Id.*; 1 AR 183.) As Ms. Katz explained, "I didn't understand the purpose of the meeting or why I was there. Based on things they said and did, I believed that our discussion was like a counseling session where I was free to vent about my relationship or blow off steam." (1 AR 67.)

### a. Ms. Katz Objects to USC Title IX's Misrepresentations and Mischaracterizations

Ms. Katz was never asked to confirm the accuracy of the non-verbatim, summarized notes taken by Title IX Investigator Helsper during her meeting and was disgusted to learn what USC's Title IX Office was claiming she had said during the private, unrecorded meeting:

> I was never shown any writings about statements that I had supposedly made during the January 23, 2017 meeting and I was shocked and disgusted with what was written. I don't know how I can state any more clearly what I have already said publicly: "I saw that statements of witnesses, including my own statements to Gretchen Dahlinger Means and

23

Document received by the CA Supreme Court.

> Laruen Elan Helsper [sic], were misrepresented, misquoted and taken out of context in order to support Ms. Means' and Ms. Helsper's own personal opinions about what they think happened."
> (3 CT 581 ¶ 22.)

USC Title IX claims that Ms. Katz said Mr. Boermeester grabbed her by the neck and pushed her against a concrete wall, causing her to hit her head, that he "hits her," and that "[s]he often has bruises on her legs or arms because 'he is always doing something.'" (1 AR 184.) Ms. Katz vigorously disputed the misinformation reflected in the investigator's notes:

> I never told the Investigator that Respondent hit my head against a wall. He did not. I stated several times throughout the course of this investigation that Respondent and I were mutually rough housing and messing around. (Findings, p. 51.) That is the truth. I also have never told the Title IX office that he hurts me when he is mad.
> (1 AR 192.)

## b.     No Request for Avoidance of Contact

USC claims that Ms. Katz requested an Avoidance of Contact directive. (1 AR 1.) Ms. Katz refuted this: "I did not ask for a no contact order from Matthew Boermeester and I told the Title IX personnel that I did not want a no contact order. During the meeting, Ms. Means said that some panel would meet and decide later whether there would be a no contact order, which USC later issued on its own." (3 CT 580 ¶ 18.) Ms. Katz did not understand the Title IX process and felt "pushed" into accepting

Document received by the CA Supreme Court.

24

other protective measures by the "extremely aggressive" Title IX Office. (1 AR 168, 193.) For instance, Ms. Katz accepted "emergency housing" at the Radisson Hotel because Title IX Coordinator Means insisted that she accept it and advised her that it would be paid for by USC and that Ms. Katz "could call friends, have a slumber party, take a break, or just relax."[14] (3 CT 581 ¶ 19.) Ms. Katz repeatedly expressed to the Title IX Office that she did not want an investigation against Mr. Boermeester or an Avoidance of Contact order. (3 CT 580 ¶ 17; 6 CT 1070 ¶ 17.) Over Ms. Katz's protests, Title IX Coordinator Means "explained that we have to investigate[15] what happened on Friday even without her because of the witnesses and the neighbor." (1 AR 188; see also 1 AR 1.)

### c. No Fear of Retaliation; No Recantation

USC claims that on January 24, 2017, Ms. Katz contacted the Title IX Coordinator and Investigator and asked to "withdraw her statement in fear of retaliation." (1 AR 3.) Importantly,

---

[14] Ms. Katz left the Radisson after one night when she learned that she was not obligated to stay. (3 CT 581 ¶ 19.)

[15] This statement is not supported by USC Policy, which provides "individuals have the opportunity to decide whether or not they want to pursue a formal Title IX investigation. … Under most circumstances, the Title IX Office can honor the request of the Reporting Party. In limited circumstances, the Title IX Office may be required to investigate an incident of sexual misconduct against the choice of the Reporting Party; for example, when an incident involves a weapon or predatory drug use, when multiple victims are involved or when there is a danger to the greater community." (2 AR 482.) None of those "limited circumstances" existed in this matter.

Document received by the CA Supreme Court.

there are no notes or records of this telephone conversation, other than in the timeline and summary that appears in the Investigator's SAR issued at the conclusion of the Title IX process. (1 AR 3, 12.) Because there are no notes or records of this phone conversation, Ms. Katz and Mr. Boermeester had no opportunity to dispute the "evidence" that Ms. Katz supposedly "recanted" her statement in fear of retaliation prior to USC's investigator determining that she had.

Ms. Katz clarified in her appeal, "[T]he Investigator's statements from me on January 24, 2017 are simply wrong. The report states that I wanted to withdraw my statement in fear of retaliation. (Summary of Administrative Report, p. 3). This is incorrect. I was not and never have been scared of retaliation from [Mr. Boermeester]." (1 AR 192.) USC has claimed that text messages evidence a recantation (1 AR 154), but Ms. Katz explained, "In text messages, I asked Lauren Elan Helsper not to blame the Title IX Office's decision to pursue an investigation on me. I wanted nothing to do with Title IX and I eventually had to get my own attorney, Ms. Shawn Holley, to protect me from the Title IX office and to enforce my rights." (6 CT 1071-1072 ¶ 29.)

When Ms. Katz asked for the Avoidance of Contact order to be lifted, investigator Helsper accused Ms. Katz "of engaging in witness tampering, malicious dissuasion, and retaliation," which the investigator threatened, "may ultimately affect her credibility." (1 AR 14, 168-169.)

On January 30, 2017, Ms. Katz requested a meeting with investigator Helsper to express that she felt "blindsided" and had

Document received by the CA Supreme Court.

been "bullied" and "manipulated" at the initial meeting. (1 AR 4, 168-169.) Investigator Helsper told Ms. Katz about the security video from the alley. (1 AR 169.) Ms. Katz offered to provide commentary on the video footage as her official statement, but investigator Helsper responded that reviewing the footage during the investigation "would be a 'privilege' as it is usually not seen until Ev[idence] Review." (*Id*.) Investigator Helsper also patronized and infantilized Ms. Katz, saying that Ms. Katz was probably "too emotionally sensitive and overwhelmed" to watch the video footage. (6 CT 1072 ¶ 32.)

At another meeting not documented by the Title IX Office, Ms. Katz insisted and appeared eager to watch the video footage. (6 CT 1072 ¶ 32.) In response, Title IX Coordinator Means made an excuse as to why Ms. Katz could not watch the video, accused Ms. Katz of harassing witnesses, and threatened to open an investigation on Ms. Katz. (5 CT 1000; 6 CT 1072 ¶ 32.) USC refused to allow Ms. Katz and Mr. Boermeester to see the security video during the Title IX investigation, yet both students continued to maintain that the security video would show them horsing around in the alley.

On February 8, 2017, Ms. Katz publicly tweeted "The report is false." (1 AR 56.) Ms. Katz was then summoned to a meeting by the Title IX Office and interrogated about her motives for discussing the investigation on social media. (1 AR 14, 102-103.) Ms. Katz explained "I felt powerless throughout this whole thing. I was pissed that this was happening and that this was out of my control. So, I wanted to be able to say something coming

Document received by the CA Supreme Court.

27

from me." (1 AR 102.) When asked whether she had been in contact with Mr. Boermeester since the issuance of the Avoidance of Contact order, Ms. Katz stated, "I am not in danger or feel threatened by him at all." (*Id.*) Ms. Katz asked for the Avoidance of Contact order to be lifted because "he is like my best friend, so it is like you are taking that away too." (1 AR 13.)

Investigator Helsper said that the avoidance of contact directive would not be lifted. (1 AR 103.) USC effectively barred Ms. Katz, an adult woman who was (and is) perfectly capable of making her own choices and acting in her own best interest, from seeing Mr. Boermeester — even off campus and outside Los Angeles. After the meeting, Title IX Investigator Helsper accused Ms. Katz of recording their conversation or having someone "listening in." (2 AR 422.)

Expressing that it was only the University that was victimizing her, Ms. Katz stated, "it is insulting that the University believes that I am some sort of 'victim' who would tolerate being abused by Matt or by anyone." (1 AR 68.) Reiterating her position that the University process was biased and unjust, Ms. Katz stated, "**I would not tolerate [abuse]. … MATT DID NOTHING TO HURT ME NOR DID HE HURT ME OR TRY TO HURT ME.**" (1 AR 68, emphasis in original.) Ms. Katz continued:

> [M]y voice is not being heard.
>
> If anyone has been abusive to me or disrespectful of me, it has been the University, not Matt. I feel that I have been mistreated, misled, manipulated, and lied to by the

Document received by the CA Supreme Court.

28

University. It is the University and not Matt which has hurt me and caused me unbelievable pain and distress.
(1 AR 69.)

### 2. USC Title IX Interactions With Mr. Boermeester

#### a. Mr. Boermeester Is Summarily Suspended then Charged

On January 25, 2017, Mr. Boermeester was summarily suspended indefinitely without prior notice or a fair hearing and was told that he was not allowed to have any contact whatsoever with Ms. Katz. (2 AR 472-473.)

On January 26, 2017, Title IX Coordinator Gretchen Dahlinger Means notified Mr. Boermeester that a Title IX investigation was underway into an allegation of Intimate Partner Violence. (2 AR 470.)

On January 30, 2017, Mr. Boermeester and his mother, an attorney, met with investigator Helsper. (1 AR 171.) Mr. Boermeester agreed that he had placed his hand on Ms. Katz's neck but explained that he and Ms. Katz were "'horsing around.' There was zero animosity." (1 AR 179-181.) Mr. Boermeester expressed, "There was no chance of me causing physical harm. If I did Zoe would be going against me and not with me." (*Id*.) Mr. Boermeester also reported that he and Ms. Katz had spent the next three nights together after January 21, 2017. (1 AR 172.) Mr. Boermeester suggested two witnesses to be interviewed, BE and LE. (1 AR 177.) Despite interviewing over a dozen other witnesses who had no relationship to or knowledge of the

Document received by the CA Supreme Court.

29

interaction in the alley, the Title IX Office refused to interview the witnesses suggested by Mr. Boermeester. (1 AR 3-7.)

Mr. Boermeester requested that the indefinite suspension be modified or lifted so he could complete his degree and continue physical therapy for his injured and swollen knee. (2 AR 443-444; 2 CT 401 ¶¶ 6-7.) The indefinite suspension was derailing Mr. Boermeester's plans to pursue a master's degree and continuing to play football at USC in hopes of pursuing a professional NFL career. (2 CT 401 ¶¶ 6-7.) His appeal of the indefinite suspension was denied by Ainsley Carry without a hearing and without any showing that Mr. Boermeester posed a risk to the campus community. (2 AR 442.)

### b. USC Issues Avoidance of Contact Charges

Within days of Ms. Katz' February 8, 2017 public tweet and her meeting with the Title IX Office, investigator Helsper notified Mr. Boermeester that the Title IX Office was adding a second violation for "contacting and communicating with Zoe Katz via text, phone call, social media, and in-person since the issuance of the Avoidance of Contact Order." (1 AR 5; 2 AR 414.) Mr. Boermeester insisted that he had complied with the Avoidance of Contact order by not initiating contact with Ms. Katz, as he was living in San Diego and had not returned to USC or Los Angeles since the imposition of the suspension. (1 AR 17, 89.)

### 3. 16 Other Witnesses Interviewed

USC Title IX Office's efforts to establish the narrative of an ongoing abusive relationship is also seen in the extent of the Title

Document received by the CA Supreme Court.

30

IX Office's investigation. Although DH and MB2 were the only percipient witnesses to any part of the interaction in the alley, other than Mr. Boermeester and Ms. Katz, Title IX investigator Helsper, at times accompanied by Title IX Coordinator Means, interviewed and re-interviewed sixteen witnesses, including Mr. Boermeester's ex-girlfriend who had no connection or insight into the incident that occurred on January 21, 2017 and was not a USC student. (1 AR 2-4.) Some interviews were conducted in person, though many took place only by telephone.[16] (See 1 AR 87 (AB), 92 (SS), 115 (CR), 85 and 131 (MB2) 136 (Richard Gallien), 139 (Peter Smith).) None of the interviews were audio recorded, and there is no record of the actual questions asked or the verbatim responses of the witness. None of the witnesses were permitted to see the Title IX Investigator's summaries of their interview for accuracy. Without a live hearing, there was no way to confirm the accuracy of the interview notes.

Many of the witnesses interviewed were influenced by the gossip, media reports, and the public nature of Mr. Boermeester's removal from USC's campus and the USC football team. (See 1 AR 85-164.) As summarized by one witness, "He wouldn't get suspended over nothing, so they know something happened[.]" (1 AR 27.)

---

[16] Not only was this contrary to USC's Policy, which "requires the Investigator to personally see and hear all parties and witnesses to the investigation, putting him/her in the best position to make determinations as to credibility and relevance" (1 AR 219), but conducting interviews by phone precludes accurate identification of witnesses and evaluation of credibility.

Document received by the CA Supreme Court.

### G.    USC Title IX Adjudication Process

As of January 2017, USC's Title IX policy did not provide for a formal evidentiary hearing or cross-examination.  (2 AR 492-493.)  The Title IX Coordinator Gretchen Dahlinger Means oversees all reports and investigations and Title IX investigator Helsper, in consultation with Title IX Coordinator Means, conducts the investigation, makes all relevancy and credibility determinations, and makes all findings of fact, in the absence of a live, in-person evidentiary hearing.  (2 AR 488; 2 AR 492-493, section X; 4 CT 717 ¶ 80.)

At the conclusion of the initial Title IX investigation, the parties may participate in "Evidence Review." (2 AR 492.)  The parties may view the investigator's summaries of witness interviews and other evidence collected but do not receive copies. (*Id*.)  Following "Evidence Review", the policy calls for an "Evidence Hearing" where the parties each meet individually and separately with the Title IX Coordinator and Title IX investigator to respond orally or by written submission to the evidence they are permitted to view during "Evidence Review."  (2 AR 493.) Following the "Evidence Hearing," the Title IX Coordinator and the Title IX Investigator then determine whether the student violated the policy based on the investigator's factual findings.[17] (2 AR 493.)  The Title IX Investigator, in consultation with the Title IX Coordinator, prepares a Summary Administrative

---

[17] The Title IX Coordinator also sits in on the meeting of the Misconduct Sanctioning Panel.  (2 AR 493.)

Document received by the CA Supreme Court.

Review ("SAR"), "a report that analyzes the information collected and makes findings of fact and policy violation." (*Id.*)

### 1. Both Parties Participate In "Evidence Review"

On March 8 and 10, 2017, Mr. Boermeester and Ms. Katz participated in "Evidence Review," where they separately viewed the information gathered or prepared by the Title IX investigator, totaling over 100 pages of documentary evidence, plus video footage and an audio recording. (1 AR 47, 84-191; 2 AR 357-358.) Mr. Boermeester and Ms. Katz were permitted to take only "a pencil/pen and notepad" into the room as they reviewed the evidence. (2 AR 365, 367.)

On March 22, 2017, Mr. Boermeester and Ms. Katz each submitted written responses to the evidence. (1 AR 3, 59-69.) Mr. Boermeester denied the university's allegations against him and highlighted flaws in the investigation. (1 AR 59-66.) Ms. Katz reiterated what she had maintained all along:

> "**First, I want to make clear that Matt Boermeester has NEVER hit, choked, kicked, pushed or otherwise physically abused me and he did not do so on January 21, 2017.**"

(1 AR 67-68, emphasis in original.)

### 2. No Cross-Examination Allowed for Any Witnesses

On March 22, 2017, Mr. Boermeester's advisor/attorney inquired about the format for submitting questions for the other party. (1 AR 295.) Investigator Helsper responded, "You send me the questions and we will ask them of [Ms. Katz]. You will get

Document received by the CA Supreme Court.

the answers to all of her questions in the SAR (my report)." (1 AR 294.)

Mr. Boermeester's advisor/attorney, recognizing that Ms. Katz "has multiple statements where she has made clear that she is not comfortable with the way her statement has been reported," requested to have a "direct response from [Ms. Katz] without any Title IX filter" by having his questions "sent to [Ms. Katz] and her advisor," to permit Ms. Katz "to review them, write an answer and send them back to you to send to us[.]" (1 AR 293-294.) Title IX Coordinator Means responded, "The process does not afford that." (1 AR 293.)

All that the "process" afforded was for Title IX Coordinator Means to question Ms. Katz again in private with no assurance that Mr. Boermeester's questions would even be asked, or how they would be asked, and no way for Mr. Boermeester to know if Title IX Coordinator Means had accurately reported Ms. Katz's answers. (2 AR 493, section IX.A.4.)

Mr. Boermeester did not refuse to submit questions to Ms. Katz; he refused to submit questions to USC's Title IX Investigator and Title IX Coordinator to ask Ms. Katz in private with no record, given that Ms. Katz had "made clear that she [wa]s not comfortable with the way her statement ha[d] been reported." (1 AR 293-294.) The exact words of the exchanges appear in the record at 1 AR 291-294. Mr. Boermeester's advisor noted his concern that, "The failure to record or transcribe any of the interviews and the admission by at least one witness that he

Document received by the CA Supreme Court.

lied during his initial interview have shaken our confidence in the accuracy of this investigation." (1 AR 293.)

### 3. USC Title IX Office Issues the SAR

On April 27, 2017, Title IX Investigator Helsper and Title IX Coordinator Means issued the SAR, finding Mr. Boermeester "responsible for the charged violations." (1 AR 1-80, 257-258.) Investigator Helsper and Title IX Coordinator Means also found that Mr. Boermeester "violated the AOC on multiple occasions" by communicating with Ms. Katz by cell phone, regardless of whether Ms. Katz had initiated the communications. (1 AR 53-54.) In the SAR, USC raised for the first time that Zoe Katz had recanted. (1 AR 10 n. 15; 1 AR 51, 53.)

### 4. USC's Sanctioning Panel Orders Expulsion

On May 2, 2017, USC's anonymous Misconduct Sanctioning Panel convened in closed session and decided that expulsion was the appropriate sanction. (1 AR 249, 254.) The Misconduct Sanctioning Panel is trained and overseen by Title IX Coordinator Means, and Ms. Means is present during their deliberations. (2 AR 493, section XI.B)

### 5. USC's Appeal Panel Denies Both Appeals but Recommends Suspension, Not Expulsion

Mr. Boermeester and Ms. Katz each appealed the findings and decisions, urging the Appeal Panel to hold that no Policy violations had occurred. (1 AR 192-214.) Ms. Katz expounded in her appeal, "Throughout this process, my voice has not been heard. I ask that, now, during this appeal, the appellate panel

Document received by the CA Supreme Court.

hears my voice. I request that you overturn Respondent's expulsion and fully reinstate him." (1 AR 195-196.)

Mr. Boermeester and Ms. Katz each submitted a written response to the other's appeal, expressing support and agreeing that the findings and sanctions against Mr. Boermeester should be overturned.[18] (1 AR 209-214.) Ms. Katz commented, "Instead of accepting me at my word, the Investigators repeatedly belittle me in their Report and make me sound like a fragile woman who can't think for herself or make decisions on her own." (1 AR 213.) Ms. Katz called for a new investigation to be performed by a neutral investigator so that the truth could prevail. (1 AR 214.) The Appeal Panel found that the SAR conclusions were supported by substantial evidence. (1 AR 217.) Regarding Ms. Katz's attestations that she was not a domestic abuse victim, the Appeal Panel reiterated investigator Helsper's demeaning finding that recantation is an "expected, normative behavior for the type of relationship initially described by the Reporting Party to Title IX." (1 AR 220.) The Appeal Panel, however, determined that expulsion was "grossly disproportionate to the violations found," and recommended a two-year suspension and a 52-week domestic violence batterers program in lieu of expulsion. (1 AR 218.)

---

[18] According to one education consultant, "Students disciplined under Title IX face greater challenges in continuing their educations than any other group of students I have served. This includes students who have served jail time for felonies and those who have admitted to unprosecuted felonious actions, such as drug trafficking." (3 CT 601 ¶ 23.)

36

Document received by the CA Supreme Court.

### 6. Dr. Ainsley Carry Orders Expulsion

On July 7, 2017, Dr. Ainsley Carry, who had summarily denied Mr. Boermeester's appeal of his indefinite suspension five months previously, approved the findings and conclusions reached by Title IX Investigator Helsper and Title IX Coordinator Means. Dr. Carry also rejected the Appeal Panel recommendation of suspension and ordered Mr. Boermeester expelled. (1 AR 221-222.)

Despite no evidence of any physical harm to Ms. Katz, and her strenuous denials, Dr. Carry reasoned that Mr. Boermeester's lack of intent in causing Ms. Katz physical harm was not a mitigating factor, and expulsion was the appropriate sanction "given the nature of the harm inflicted upon the Reporting Party[.]" (1 AR 221.)

On July 30, 2018, Ms. Katz released a public statement about USC's unjust Title IX proceedings. (1 CT 415-416.)

### 7. No Impartial Deciders[19]

USC claims to be "committed to the timely and fair resolution of disciplinary problems in an adjudicatory process" (1

---

[19] An impartial decider is a core protection even under fair procedure. (*Natarajan v. Dignity Health* (2019) 42 Cal.App.5th 383, 389.) "Moreover, [f]airness requires a practical method of testing impartiality. (*Hackethal v. California Medical Assn., supra*, 138 Cal.App.3d 435, 444.)" (*Rosenblit v. Superior Court* (l991) 231 Cal.App.3d 1434, 1448.) USC provides no information regarding the training and qualifications of its investigators, nor of their neutrality and impartiality. (1 CT 27-28.) In another trial court case, Gretchen Dahlinger Means referred to the

AR 50) and that both parties are entitled to "A fair, thorough, reliable, neutral and impartial investigation by a trained and experienced investigator." (2 AR 454.) But the record shows that before ever speaking with Zoe Katz on January 23, 2017, all of the USC Title IX deciders believed that Mr. Boermeester had been angry, had choked Ms. Katz, had repeatedly pushed her head into a cinder block wall, that Ms. Katz was a victim of domestic violence, and that Mr. Boermeester posed a substantial threat to the safety and well-being of Ms. Katz and/or the greater USC campus community. (2 AR 477.)

After Ms. Katz refused to participate in a Title IX investigation against Mr. Boermeester, the USC Title IX Office initiated an investigation against her express wishes, contrary to USC's Title IX policy. (1 AR 1, 188; 2 AR 482.)

On January 25, 2017, USC Title IX Office summarily suspended Mr. Boermeester indefinitely from campus and football, without notice or hearing. (2 AR 472; 1 AR 16.)

On January 26, 2017, the USC Title IX Office brought charges against Mr. Boermeester for Intimate Partner Violence.

Document received by the CA Supreme Court.

---

accused male student and his advisor as "motherfuckers" while describing the female complainant as "cute" "intelligent" and "a catch." (5 CT 876, n. 4; 5 CT 901-902.) The trial court in that case found such statements to "amply demonstrate an unacceptable probability of actual bias" against the accused student. (5 CT 893-906.) A pending lawsuit against USC filed by a former employee/attorney supervised by Gretchen Dahlinger Means alleges that USC's investigatory practices include routine predetermination of outcomes and spoliation of evidence. (*Doe v. University of Southern California*, Central District, Western Division, Case No. 2:20-cv-06098.)

38

(2 AR 470.)  The next day the USC Title IX Office obtained and reviewed the security video from the alley, which was inconclusive at best and contradicted USC's theory at worst. (1 AR 74; 2 AR 469.)

On January 30, 2017, investigator Helsper told Ms. Katz about the video but said, "I don't have access to view it this point."  (1 AR 169.)  Investigator Helsper also met with Mr. Boermeester that same day but did not tell him about the video.[20] (1 AR 171-178.)

Although a review of the security video by either Ms. Katz or Mr. Boermeester might have ended Title IX investigation at that point, USC had already charged Mr. Boermeester and removed him from campus very publicly.

On January 31, 2017, Dr. Ainsley Carry summarily denied Mr. Boermeester's appeal of the indefinite suspension. (1 AR 75; 2 AR 442.)

USC's Title IX Office spent the next three months digging into the private lives of Mr. Boermeester and Ms. Katz to support the abusive relationship narrative that USC's deciders firmly believed at the outset.

Matthew Boermeester never had a chance.

Document received by the CA Supreme Court.

---

[20] USC withheld the video for another two and half months, however, neither Ms. Katz nor Mr. Boermeester changed their claims about horsing around in the alley, believing that the video would confirm what they had been saying.  (1 AR 54.)

## LEGAL ANALYSIS

I. **THE COMMON LAW RIGHT TO FAIR PROCEDURE REQUIRES A PRIVATE UNIVERSITY TO AFFORD STUDENTS FACING SEVERE DISCIPLINARY SANCTIONS WITH THE OPPORTUNITY TO UTILIZE CERTAIN PROCEDURAL PROCESSES, SUCH AS CROSS-EXAMINATION OF WITNESSES AT A LIVE HEARING.**

### A. Summary of Current Law

#### 1. Federal Title IX

At the federal level the issue of sexual misconduct on college and university campuses is primarily addressed by Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.  From Title IX's enactment in 1972 until 1997, the Department of Education (Department) never asserted jurisdiction over student-on-student sexual violence.  In March 1997, however, the Department issued regulations that required schools to have policies and procedures in place to deal with such conduct.[21]  In January 2001, the Department issued additional guidance[22] for schools to address sexual misconduct, provide Due Process, and alleviate any hostile environment on campus.  In 2011, the Department's Office for Civil Rights (OCR) issued a

---

[21] "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties." (62 Fed. Reg. 12034.)

[22] OCR, Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties – Title IX (2001) at 36 n.98 (66 Fed. Reg. 5512 (January 19, 2001)

40

"Dear Colleague Letter"[23] (now rescinded), which advised that
Title IX incorporated and adopted the procedural provisions
applicable to Title VI of the Civil Rights Act of 1964. (See 34
C.F.R. § 106.71.) The Title IX regulations, therefore, required
that university and college sexual misconduct decisions must be
"supported by and in accordance with the reliable, probative and
substantial evidence." (See 5 U.S.C. § 556(d).) 5 U.S.C. § 556(d)
also provides in relevant part:

> . . . A party is entitled to present his case or defense
> by oral or documentary evidence, to submit rebuttal
> evidence, and to conduct such cross-examination as
> may be required for a full and true disclosure of the
> facts. . .

On August 14, 2020, the Department of Education
amended the regulations implementing Title IX ("Regulations")
to specify how recipients of Federal financial assistance covered
by Title IX, like USC, must respond to allegations of sexual
harassment and misconduct consistent with Title IX's prohibition
against sex discrimination. (34 C.F.R. § 106.)

The Regulations require every college and university that
receives federal funds to adopt and publish grievance procedures
that provide for the prompt and equitable resolution of student
and employee complaints alleging sexual harassment,[24] which
encompasses sexual assault, dating violence, domestic violence,

---

[23] Ali, Russlyn. *Dear Colleague Letter*. April 4, 2011.
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf
[24] 34 C.F.R. § 106.8 (c).

and stalking.[25]  "A recipient [of federal funding] with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent."[26]  The fundamental principle of such a system is that it be "prompt and equitable."[27]

Among other things, the Regulations require universities to (1) "provide for a live hearing" at which "the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility";[28] (2) eliminate use of the "single investigator model," whereby the investigator is the sole individual who investigates and makes findings of responsibility, as in the university proceedings;[29] and (3) provide the accused an opportunity to "inspect and review" all the evidence collected during the investigation, "including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility."[30]

In supporting the Regulations, the American Civil Liberties Union ("ACLU"), stated that a fair process requires "the right to a

Document received by the CA Supreme Court.

---

[25] 34 C.F.R. § 106.30 (a).

[26] 34 C.F.R. § 106.44 (a).

[27] 34 C.F.R. § 106.8 (b).

[28] 34 C.F.R. § 106.45 (b)(6).

[29] 34 C.F.R. § 106.45(b)(7)(i).

[30] 34 C.F.R. § 106.45(b)(5)(vi).

live hearing and an opportunity for cross-examination in the university setting."[31]

## 2.    Code Civ. Proc., § 1094.5

California's procedural and substantive standards for administrative agency proceedings, including student discipline, begin with Code Civ. Proc., § 1094.5 subdivisions (b) and (c), which require that (1) there be "a fair trial," which "means that there must have been 'a fair administrative hearing'"; (2) the proceeding be conducted "in the manner required by law"; (3) the decision be "supported by the findings"; and (4) the findings be "supported by the weight of the evidence," or where an administrative action does not affect vested fundamental rights, the findings must be "supported by substantial evidence in the light of the whole record."[32]

The remedy of administrative mandamus is not limited to public agencies; rather it applies to private organizations that provide for a formal evidentiary hearing.  (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722–1723 (*Pomona College*) (§ 1094.5 applicable to private universities).)  Moreover, failure to exhaust administrative remedies is a proper basis for

---

[31]  Cole, David. *ACLU Comments in Response to Proposed Rule, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," RIN 1870-AA14.* January 30, 2019. https://www.aclu.org/sites/default/files/field_document/2019_1_30_title_ix_comments_final.pdf

[32] The Court may refrain from evaluating the sufficiency of evidence if there are errors in the administrative process. (*Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 61.)

Document received by the CA Supreme Court.

demurrer. (*Id.* at pp. 1730–1731; *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411 (*Gupta*) (Code Civ. Proc., § 1094.5 applied to student who was subject to university disciplinary proceedings); *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802.)

The doctrine of exhaustion of judicial remedies precludes any civil action by an aggrieved student unless the student first challenges the Title IX administrative decision through a petition for writ of mandamus. (*Gupta*, *supra*, 124 Cal.App.4th at p. 411; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70.)

### 3.    California Student Discipline Cases

The "fair hearing" requirements of Code Civ. Proc. § 1094.5 subd. (b) can only be satisfied through adherence to principles of procedural due process, which apply directly to public colleges and universities through the Fourteenth Amendment, and to private colleges and universities by analogy.[33] (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221 (*USC1*).) Of course, "[s]pecific requirements for procedural due process vary depending upon the situation under consideration and the interests involved." (*Id.* at p. 244, quoting *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657.) While California law does not require any specific form of disciplinary hearing, a

---

[33] USC objects that the "distinction between fair procedure and due process rights" is like arguing the distinction between sushi and lasagna (Opening Brief, p. 35), but in the narrow context of Title IX sexual misconduct cases at *public versus private universities*, the distinction is more like arguing the difference between Chicago-style pizza and deep-dish pizza.

44

Document received by the CA Supreme Court.

university is bound by its own policies and procedures. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271-72.)

The Fourth Appellate District recently summarized the consensus of the recent Title IX sexual misconduct cases to require that a student facing suspension or expulsion for nonconsensual sexual activity has the right to notice of the charges; the school must follow its own policies and procedures; the accused student must have access to the evidence; there must be an in-person hearing, including testimony from the parties and witnesses; and because most cases turn on credibility (he-said, she-said), the adjudicator or adjudicators must be able to see the parties' testimony and the testimony of important witnesses so their demeanor may be observed, and the accused student must have an opportunity for cross-examination. (*Knight v. South Orange Community College Dist.* (Feb. 10, 2021, No. G058644) ___Cal.App.5th___ [2021 Cal. App. LEXIS 120], at *18-19, citing *Goss v. Lopez* (1975) 419 U.S. 565, 583-84 (*Goss*); see also *Boermeester, supra,* 49 Cal.App.5th at pp. 698-699, citing *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061 (*Allee*), *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1232, fn. 25, *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56; *Pomona College, supra,* 45 Cal.App.4th at pp. 1729–1730; *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1104, *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 637 (*Westmont College*), *Doe v. Occidental*

Document received by the CA Supreme Court.

45

*College* (2019) 40 Cal.App.5th 208, 224; *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271-72.

California courts have also described the value of higher education as "an interest of almost incalculable value, especially to those students who have already enrolled in the institution and begun the pursuit of their college training." (*Goldberg v. Regents of University of Cal.* (1967) 248 Cal.App.2d 867, 876.) "Expulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career." (*Furey v. Temple Univ.* (E.D. Pa. 2012) 884 F.Supp.2d 223, 245-48.) The consequences of university sanctions in Title IX matters, recognized that the "stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings." *(Doe v. Brandeis Univ. (D.Mass. 2016)* 177 F. Supp. 3d 561, 602.) "Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest." (*Doe v. Univ. of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 399.) Moreover,

> Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life. *Miami Univ.*, 882 F.3d at 600. The student may be forced to withdraw from his classes and move out of

Document received by the CA Supreme Court.

46

his university housing. *Id*. His personal relationships might suffer. See *id*. And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled. *Id*.

(*Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 582 (*Baum*).)

"Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." (*Brandeis*, *supra*, 177 F.Supp.3d at p. 573.)

The United States Supreme Court has also distinguished the risk of error and value of procedural safeguards when a school makes academic decisions from the risk and value when it makes decisions about disciplining a student for misconduct. The Supreme Court held that "The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct." (*Board of Curators of University of Missouri v. Horowitz* (1978) 435 U.S. 78, 86.) The Supreme Court further stated, "Misconduct is a very different matter from failure to attain a standard of excellence in studies. A determination as to the fact involves investigation of a quite different kind." (*Id*. at p. 87.)

Document received by the CA Supreme Court.

4.    **Common Law Fair Procedure Can Require Private Organizations to Conduct Live Hearings with Cross-Examination**

Although alumni may disagree, USC has much in common with UCLA, more so than the private societies, trade unions, medical committees, and preferred providers that USC discusses at some length.  Even so, the fair procedure cases support that fair procedure can require private universities to afford accused students in Title IX sexual misconduct disciplinary proceedings an opportunity to confront and cross-examine witnesses in a live hearing with impartial deciders.  (*Cason v. Glass Bottle Blowers Asso.* (1951) 37 Cal.2d 134, 144; *Gill v. Mercy Hospital* (1988) 199 Cal.App.3d 889, 904 (fair hearing includes ample notice, opportunity to hear and cross-examine witnesses and to present evidence.)

Private entities that affect public interest (such as a university) "must comply with the common law right to fair procedure."  (*Potvin v. Metro. Life Ins. Co.* (2000) 22 Cal. 4th 1060, 1071 (one on whom an important benefit or privilege has already been conferred may enjoy legal protections not available to an initial applicant for the same benefit).)

The purpose of the common law right to fair procedure is to protect against arbitrary decisions by private organizations, which means the decision-making "must be both substantively rational and procedurally fair."  (*Pinsker v. Pac. Coast Soc. of Orthodontists* (1974) 12 Cal. 3d 541, 550.)

> The minimum requirements are described in varying ways and may depend upon the action

48

Document received by the CA Supreme Court.

contemplated by the organization and the effect of that action on the individual. If the requirements that have been announced by the cases and literature were compiled the list would closely resemble a list of the requirements of procedural due process.

(*Hackethal v. Cal. Medical Assn.* (1982) 138 Cal.App.3d 435, 442 (impartial adjudicator must be included in fair procedure of private institution.)

Adequate notice of charges and a reasonable opportunity to respond are basic to both due process and fair procedure. (*Applebaum v. Board of Directors*, (1980) 104 Cal.App.3d 648, 657); *Ezekial v. Winkley* (1977) 20 Cal.3d 267 (a surgical resident in a private teaching hospital stated a cause of action under the "fair procedure" doctrine.); *Pinsker v. Pac. Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 (fair procedure require a method that "comport[s] with the fundamentals of due process."); *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802; *Pinsker v. Pac. Coast Soc. of Orthodontists* (1974) 12 Cal. 3d 541; *Applebaum v. Board of Directors* (1980) 104 Cal. App. 3d 648; *Goodstein v. Cedars-Sinai Medical Center* (1998) 66 Cal.App.4th 1257; *Palm Medical Group, Inc. v. State Comp. Ins. Fund* (2008) 161 Cal.App.4th 206; *Rosenblit v. Superior Court* (1991) 231 Cal. App. 3d 1434; *El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, (right to neutral adjudicator among core protections under fair procedure); *Lasko v. Valley Presbyterian Hospital* (1986) 180 Cal.App.3d 519, 528–529 (impartial adjudicator must be included in fair procedure of private institution.); *Kaiser Foundation Hospitals v. Superior Court*

Document received by the CA Supreme Court.

49

(2005) 128 Cal.App.4th 85, (core protections are "fundamental to any fair administrative remedy, whether the remedy is governed by principles of 'fair procedure' or 'due process'".)

The same is true of the labor union and private society cases. When a private organization's procedures are "lacking in the essential elements of fairness, good faith, and candor, which should characterize the action of men passing upon the rights of their fellow men," courts should intervene. (*Otto v. Journeymen Tailors' Protective & Benevolent Union* (1888) 75 Cal. 308, 316; *James v. Marinship Corp.* (1944) 25 Cal.2d 721, 730; *Dougherty v. Haag* (2008) 165 Cal.App.4th 315; *Ellis v. American Fedn. Of Labor* (1941) 48 Cal.App.2d 440; *Von Arx v. San Francisco Gruetli Verein* (1896) 113 Cal. 377, 379; *Taboada v. Sociedad Espanola de Beneficencia Mutua* (1923) 191 Cal. 187 (plaintiffs are entitled to the writ of mandamus restoring them to their privileges in the society); *Wilson v. San Luis Obispo County Democratic Central Com.* (2009) 175 Cal.App.4th 489 (Plaintiff was afforded the basic requirements of common law fair procedure: adequate notice of the charges against her and a reasonable opportunity to respond.).)

The private organizations cases establish that common law fair procedure can require private universities to conduct live hearings with cross-examination.

### 5. Private Universities Remain Gatekeepers Under *Allee, Westmont,* Etc.

Private universities still remain as gatekeepers for entry to their institutions. The Court of Appeal cases regarding Title IX

Document received by the CA Supreme Court.

50

sexual misconduct discipline impose no burden on the "'four essential freedoms' of a university--to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" (*Pomona College, supra,* 45 Cal.App.4th at pp. 1726-1727 (judicial review of tenure decisions in California is limited to evaluating the fairness of the administrative hearing in an administrative mandamus action); see also *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545; *Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803.)

USC complains of burdensome procedures in student sexual misconduct cases but makes no showing of any actual harm or prejudice caused by providing accused students with fair procedures in sexual misconduct cases. In fact, the August 21, 2019 Senate Assembly Committee on Appropriations hearing on SB 493 assumed approximately 200 total sexual misconduct proceedings annually for the 767,000 students at the University of California and California State University. (See fn. 38, below.) Extrapolating for USC's 46,000 undergraduate, graduate, and professional students, USC holds approximately twelve sexual misconduct hearings each year.[34]

Title IX requires USC to take steps to address a hostile environment on campus, not severely punish accused students with suspension and expulsion. Title IX, SB 493, and the Court

Document received by the CA Supreme Court.

---

[34] https://about.usc.edu/facts/ ; https://www2.calstate.edu/csu-system/about-the-csu/facts-about-the-csu/enrollment https://www.universityofcalifornia.edu/infocenter/fall-enrollment-glance

of Appeal decisions provide flexibility, however, "[i]t is ironic that an institution[s] of higher learning, where American history and government are taught, should stray so far from the principles that underlie our democracy." (*Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 61.)

## B. Improper Deference to Private Institutions

It should be noted that USC does not object to preferential treatment afforded public universities when it comes to the presumption of correctness, presumption of impartiality,[35] and the limitations placed upon independent judgment review of government agency decisions under Code Civ. Proc., § 1094.5. This deference of the judicial branch to governmental agency administrative decisions is born of the doctrine of separation of powers and the official duty presumption. (See *Bixby v. Pierno* (1971) 4 Cal.3d 130, 140 (*Bixby*) ("The doctrine of separation of governmental powers under the California Constitution provides both independent judgment and substantial evidence review of administrative decisions."); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 812 (*Fukuda*) (findings of a state board where formal hearings are held come before courts with a strong presumption

---

[35] *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 741-742 ("[T]he presumption of impartiality can be overcome only by specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias. Unless such evidence is produced, we remain confident that state administrative agency adjudicators will evaluate factual and legal arguments on their merits, applying the law to the evidence in the record to reach fair and reasonable decisions.")

52

Document received by the CA Supreme Court.

of correctness based primarily on the presumption "that official duty has been regularly performed"); Evid. Code, § 664.)

Private colleges and private universities are not governmental agencies that have been granted judicial powers by the constitution or by the Legislature, nor are their private employees entitled to the official duty presumption under Evid. Code, § 664.  There is no justification for the courts to distinguish the process due to students at public universities versus private universities, while at the same time deferring to the decisions made by private universities as though they are governmental agencies performing an official duty.  USC serves its own private institutional and financial interests, not the interests of the general public, nor the People of the State of California, and its administrators and Title IX personnel are not public officials.  The preference given to one private litigant over the rights of the other, i.e., favoring USC over Mr. Boermeester, is inconsistent with the precept of equal protection under the law embedded in the constitutions of this state and of the United States.

## II.    MR. BOERMEESTER DID NOT WAIVE HIS RIGHT TO CROSS-EXAMINATION

Three thousand years ago King Solomon acknowledged that "in a lawsuit the first to speak seems right until someone comes forward and cross-examines." (Proverbs 18:17 (NJV).)  More recently cross-examination has been described as "the greatest legal engine ever invented" for uncovering the truth.  (*Baum, supra,* 903 F.3d at p. 581.)

Document received by the CA Supreme Court.

USC's policy, however, precluded any opportunity for accused students to cross-examine any witnesses. (2 AR 478.) Mr. Boermeester did not waive any right; the right was not permitted under USC's policy. Mr. Boermeester was following USC's established rules and procedures and USC did not allow for questioning of witnesses at an in-person hearing before impartial deciders.

In fact, Mr. Boermeester had questions for Ms. Katz and asked that his questions be provided verbatim to her, and that her complete, unfiltered answers be returned to him. (1 AR 293-294.) USC denied his request because the "process does not afford that." (1 AR 293.) Mr. Boermeester did not forego any legal procedures to which he might be entitled under USC's policy. (See, *Samaan v. Trs. of Cal. State Univ. & Colleges* (1983) 150 Cal.App.3d 646, 659.)

The cumbersome procedure of submitting questions to an adverse party,[36] to be approved and modified by the adverse party, and then posed by the adverse party to a witness in private with no record, is not at all equivalent to the back-and-forth cross-examination of a witness before a neutral/impartial adjudicator. (*Baum, supra,* 903 F.3d at p. 582.)

Mr. Boermeester had no obligation nor ability to compel USC to provide for procedures outside of USC's policies,

Document received by the CA Supreme Court.

---

[36] USC's Title IX Office was the complaining party against Mr. Boermeester and directly adverse to him. (1 AR 1.) Ms. Katz was nominally the "Reporting Party" under USC's policy. (2 AR 479.) USC Title IX Office cannot be said to be impartial under the circumstances.

especially those not supported by case or statutory law at the time. (*People v. Brooks* (2017) 3 Cal.5th 1, 92 (no requirement "to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence"); *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1334 (right to raise an issue for the first time on appeal if it is based upon a change in the law that was not reasonably foreseeable); *Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1497 (recognizing that a party is excused from exhausting applicable administrative remedies where the reviewing agency has already rejected the party's claim or announced its position on the claim).) Students should not have to ask for fair procedures during university disciplinary adjudications.

USC's cited authorities are not directly on point. (See, *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 183 (mere filing of a lawsuit does not constitute a waiver of the right to arbitrate); *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 766 (analyzing principles of estoppel and waiver under Evid. Code, § 623); *Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 510 (judicial review of a final decision of an administrative agency is not necessarily affected by the party's failure to file a request for reconsideration or rehearing before that agency); *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 826; *Samaan v. Trs. of Cal. State Univ. & Colleges* (1983) 150 Cal.App.3d 646, 659; *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 225.)

Document received by the CA Supreme Court.

### III. THE ERROR IN FAILING TO PROVIDE A LIVE HEARING, CROSS-EXAMINATION, AND IMPARTIAL DECIDERS WAS NOT HARMLESS.

#### 1. USC's Errors Were Extremely Consequential

USC's disciplinary decision depended primarily on assessing witness credibility, but the issue of cross-examination was compounded by USC's failure to provide impartial deciders under a fair procedure.  Here, the deciders were the prosecutors.

To set the record straight, Mr. Boermeester did not admit to grabbing Zoe Katz's neck.  He admitted to "putting [his] hand on her neck" in a joking way that was "normal" for him and Zoe Katz.  (1 AR 173-174, 179.)  He stated, "I wasn't choking her or slamming her head on a wall. She would be on the other side of me [in investigation] if I did."  (1 AR 173.)  Mr. Boermeester did not admit to pushing Ms. Katz against a wall but did confess to standing next to a wall while Zoe Katz was "against it."  (1 AR 173, 175, 181.)

The security video was inconclusive, but consistent with Ms. Katz' and Mr. Boermeester's account of horseplay and trying to be funny.  DH saw Mr. Boermeester and Ms. Katz at the wall for "about three seconds."  (1 AR 95.)  Mr Boermeester was "holding her against the wall" "with his hand on her chest/neck" and "Ms. Katz was trying to talk to him."  (1 AR 95.)  DH's testimony is consistent with what Mr. Boermeester told the USC Title IX Office on January 30, 2017 (1 AR 179) and consistent with the video.  (1 AR 190.)  The information that MB2 provided over the phone on February 3, 2017 was also consistent with the video and Mr. Boermeester's statement.  (1 AR 131; 1 AR 190.)

Document received by the CA Supreme Court.

As of mid-March 2017, USC's Title IX prosecutors had four witnesses and a video tape that all tended to support what Mr. Boermeester and Ms. Katz had been saying, that Mr. Boermeester had been drinking, was yelling and trying to be funny, and the two were horsing around in the alley and that Ms. Katz suffered no physical harm.

On March 14, 2017, MB2's purportedly changed statement over the telephone gave USC Title IX prosecutors what they needed. MB2 now admitted lying to USC Title IX and to Mr. Boermeester's attorney, and his new claims were at signiciant odds with his initial description of events, including his interaction with Ms. Katz a few days after. (1 AR 85-86.) MB2's lack of credibility is obvious, yet there was little inquiry in the record by the investigator and no opportunity for Mr. Boermeester to question MB2, such as, "What have you heard about the case in the previous month?" "Have you spoken with anyone about the case against Mr. Boermeester?" "What news articles have you read or seen?" "How is your apartment situated?" "Can you see the alley from inside your apartment?" "What were you doing when you heard the laughing and screaming?" "Were you wearing your contacts?" "Glasses?" "Why does the surveillance video support your version of events that you told over the phone on February 3, 2017 but not the version you told over the phone on March 14, 2017?" "Have you heard that there is surveillance video?" "What are your comments on viewing the video?" "When did you first want to 'beat the shit out of this guy?'" "How could you see fear in Ms.

Document received by the CA Supreme Court.

57

Katz' eyes from where you were?" "Did you know that DH and TS, who know Ms. Katz more than vaguely, said that Ms. Katz never expressed fear of Mr. Boermeester?" "Did you actually say the words in quotes by the interviewer, 'He domestically was abusing her'?" "Was that something the investigator suggested to you?"

Regarding the alleged violation of the Avoidance of Contact Order, both Mr. Boermeester and Ms. Katz maintained that Mr. Boermeester complied with the Avoidance of Contact Order. (1 AR 53.) Witnesses who supposedly overheard Ms. Katz speaking with Mr. Boermeester via cell phone could have easily been mistaken. Mr. Boermeester's advisor's knowledge that Ms. Katz had been shown the surveillance video during her Evidence Review more likely came from speaking with the attorney Ms. Katz hired to protect herself from the Title IX office. Emails show that Mr. Boermeester and Ms. Katz were both respectful of USC's Avoidance of Contact order. (1 AR 271, 2 AR 321-322.)

Cross-examination of Ms. Katz and MB2 in a live hearing before *impartial deciders* was crucial to Mr .Boermeester's presentation of his defense. Impartial deciders would be able to determine whether Ms. Katz was credible in her claims of mistreatment and false statements by USC Title IX Office, that she was not a "classic" "textbook" domestic abuse victim, and that she had no physical harm from the horsplay in the alley. Impartial deciders would be able to determine whether MB2 was lying the first time or the second time he spoke to USC Title IX.

Document received by the CA Supreme Court.

Mr. Boermeester faced the devastating loss of his education, his NFL prospects, professional future, and reputation in a Title IX administrative process with no rules of evidence and a low burden of proof that is often described as "50% plus a feather." While Mr. Boermeester was fighting for "feathers" of evidence to prove his innocence, USC Title IX prosecutors were working to take "feathers" away.

No reasonable person could consider that under the cicumstances, USC's denial of cross-examination in a live hearing before impartial deciders was harmless. There is more than a reasonable likelihood the result would have been different USC provided a live hearing and cross-examination. Failure to do so was a prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b); *El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 990-991; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 307-308; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1215; *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 826; *Guilbert v. Regents of University of California* (1979) 93 Cal.App.3d 233, 241-242.)

## 2. Uncorroborated Hearsay Is Not Substantial Evidence

Although the reviewing court does not assess witness credibility on substantial evidence review, the court must determine whether USC relied on "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." (*California Youth Authority v. State Personnel Bd.*

Document received by the CA Supreme Court.

(2002) 104 Cal.App.4th 575, 584.)  The Supreme Court has long recognized that "'[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence.' There must be substantial evidence to support such a . . . ruling, and hearsay, unless specially permitted by statute is not competent evidence to that end. [Citations omitted.] Except in those instances recognized by statute where the reliability of hearsay is established, 'hearsay evidence alone "is insufficient to satisfy the requirement of due process of law, and mere uncorroborated hearsay does not constitute substantial evidence. [Citation.]"'"  (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1244-1245.)

Substantial evidence review cannot rely "on isolated evidence torn from the context of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.) "[I]t is essential to the integrity of the judicial process that a judgment be supported by evidence that is at least substantial. An appellate court need not 'blindly seize any evidence . . . in order to affirm the judgment. The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.' [Citation.]" (*Id.*)

Without a live hearing, the witness testimony is uncorroborated hearsay that does not amount to substantial evidence.  Ms. Katz presented sworn testimony that disputes USC Title IX Office's interview notes of statements attributed to

Document received by the CA Supreme Court.

her.[37] (3 CT 578-581, 6 CT 1068-1073.) The security video is inconclusive but is consistent with Ms. Katz's sworn statement, as well as what Mr. Boermeester and DH told the investigator. After claiming that he had lied, MB2's over the telephone uncorroborated second hearsay version of events is not evidence that a reasonable mind might accept as adequate to support a conclusion.

In the light of the whole record, this evidence is not substantial and cannot support a finding that Mr. Boermeester was responsible for Intimate Partner Violence.

## IV. SB-493 HAS NO EFFECT ON THE RESOLUTION OF THE ISSUES PRESENTED BY THIS CASE

### A. SB 493 Supplements Federal Law

The California Legislature recognizes education as "the great equalizer in the United States." (Senate Bill No. 493 (2019-2020 Reg. Sess.) § 1, subd. (a).) "Protecting students' civil rights, including the right to an educational environment free from discrimination, is of paramount importance." (*Id.*, § 1, subd. (b).)

The legislative intent behind SB-493 is "to account for the significant individual civil consequences faced by respondents alleged to have committed sexual violence as well as the significant harm to individual complainants and to education equity more generally if sexual violence goes unaddressed" and to "provide additional civil rights protections to students in

_____

[37] USC's claim that Ms. Katz recanted was not presented until the Title IX administrative process had concluded. (1 AR 10 n. 15.)

Document received by the CA Supreme Court.

61

California institutions of higher education."[38] (*Id*. § 1, subds. (n), (q).)

SB 493 is intended to supplement the federally required grievance procedure under 34 C.F.R 106 and "to clarify the process for adjudicating complaints of sexual or gender-based violence, including dating or domestic violence, at postsecondary educational institutions in the State of California [that receive state funding]." (*Id*. § 1, subds. (n), (q).) A university's rules and procedures must provide the elements specified in both 34 C.F.R. 106 and SB 493 (codified at California Education Code § 66281.8). (*Id*.) To the extent that SB 493 and 34 C.F.R. 106 conflict, SB 493 provides that on or after the date of implementation at a postsecondary institution, any provision of SB 493 that conflicts with federal law "shall be rendered inoperative for the duration of the conflict and without affecting the whole." (*Id*. § 3, subds. (e), (f).)

SB 493 is largely consistent with the federal Title IX regulations; however, USC notes two areas where they diverge. SB 493 leaves it up to universities to decide whether to conduct hearings and prohibits cross-examination performed by parties or their advisors. (*Id*. § 3, subds. (b)(4)(A)(viii), (b)(4)(A)(viii)(I).)

---

[38] According to a Senate Assembly Committee on Appropriations hearing held on August 21, 2019, the California Community Colleges, the University of California, and the California State Universities each conduct about 100 hearings to adjudicate sexual harassment per year, and the bill is also intended to minimize costs due to increased litigation. Litigation will be unnecessary if universities conduct fair proceedings and respect the rights of students.

Document received by the CA Supreme Court.

Federal law requires live hearings with cross examination performed by the parties' advisors. (34 C.F.R. § 106.45 subd. (b)(6).) These sections of SB 493 that conflict with federal law are currently inoperative at any post-secondary institutions that have implemented SB 493.

SB 493 does not appear to have any effect on the resolution of the issues presented in this case. California law sets forth the requirements for a fair procedure at private universities. The authority bestowed upon universities by SB 493 to decide whether to hold a hearing is inoperative, but nevertheless, it would not conflict with the common law requirements for a fair hearing under Code Civ. Proc., § 1094.5. By giving universities the option to conduct hearings, and requiring that hearings include some form of cross-examination, the Legislature is allowing SB 493 and the common law to co-exist harmoniously. Universities must rely on the common law in deciding whether the circumstances of each case require a hearing. California appellate decisions do not mandate private universities to adopt procedures that include live hearings with cross-examination in all situations, but only under a very narrow set of circumstances "when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation." (*Allee*, *supra*, 30 Cal.App.5th at p. 1039.)

### B. Judicial Decisions Are Retrospective in Nature

The Legislature has not disapproved of nor reversed the reasoning adopted by the majority below. The non-retroactivity

Document received by the CA Supreme Court.

provision in SB 493 § 3, subd. (g)(1) is a mechanism to reduce costly litigation against universities besieged by a recession and pandemic-related budget cuts. Judicial decisions are, by nature, retroactive due to stare decisis. Courts, unlike the Legislature, do not make law, they find the law. The requirements of a fair process under the common law do not begin or end with *Allee* or *Westmont College*. The legal principles stated in those decisions have always existed, even if they were not authoritatively articulated when Mr. Boermeester was summarily suspended and then expelled in 2017.

## V.    CONCLUSION

Based upon the foregoing, Mr. Boermeester respectfully requests that this Court hold that the appellate court's determination that he was entitled to a live hearing with the right to cross-examine witnesses was correct and affirm the court below.

DATED: March 12, 2021                Respectfully submitted,

HATHAWAY PARKER

By:    /s/ Mark M. Hathaway
       Mark M. Hathaway, Esq.
       Jenna E. Parker, Esq.
       Attorneys for Petitioner
       MATTHEW
       BOERMEESTER

Document received by the CA Supreme Court.

## CERTIFICATE OF COUNSEL

Pursuant to California Rules of Court, rule 8.204, subdivision (c)(1), the undersigned certifies that this brief contains 13,524 words, according to the Microsoft Word word count program. The word count includes footnotes but excludes the proof of service.

DATED: March 12, 2021

Respectfully submitted,

HATHAWAY PARKER

By: /s/ Mark M. Hathaway
Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.
Attorneys for Petitioner
MATTHEW
BOERMEESTER

Document received by the CA Supreme Court.

State of California     )           Proof of Service by:
County of Los Angeles )          US Postal Service
                         )          Federal Express

---

I, Stephen Moore , declare that I am not a party to the action, am over 18 years of age and my business address is: 626 Wilshire Blvd., Suite 820, Los Angeles, California 90017; ca@counselpress.com

**On** 3/12/2021 declarant served the within: Answer Brief on the Merits **upon:**

| Copies | FedEx | USPS |
|---|---|---|

ELECTRONICALLY SERVED VIA TRUEFILING ON ALL PARTIES LISTED ON THE ATTACHED SERVICE LIST.

| Copies | FedEx | USPS |
|---|---|---|

| Copies | FedEx | USPS |
|---|---|---|

| Copies | FedEx | USPS |
|---|---|---|

the address(es) designated by said attorney(s) for that purpose by depositing **the number of copies indicated above,** of same, enclosed in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of California, or properly addressed wrapper in an Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of California

I further declare that this same day the **original and** copies has/have been hand delivered for filing OR the **original and** copies has/have been filed by third party commercial carrier for next business day delivery to:

ELECTRONICALLY FILED VIA TRUEFILING:

SUPREME COURT OF CALIFORNIA
350 McAllister Street
Room 1295
San Francisco, California 94102-4797

I declare under penalty of perjury that the foregoing is true and correct:

Signature: /s/ Stephen Moore, Senior Appellate Paralegal, Counsel Press Inc.; ca@counselpress.com

Document received by the CA Supreme Court.

# SERVICE LIST

## *Electronic Service via TrueFiling on the Following*

| | |
|---|---|
| Julie Arias Young<br>Karen Jean Pazzani<br>YOUNG & ZINN LLP<br>1150 South Olive Street, Suite 1800<br>Los Angeles, California 90015<br>jyoung@yzllp.com<br>kpazzani@yzllp.com | Beth Judith Jay<br>Jeremy Brooks Rosen<br>Mark Andrew Kressel<br>Scott P. Dixler<br>Sarah E. Hamill<br>HORVITZ & LEVY LLP<br>3601 West Olive Avenue, 8th Floor<br>Burbank, California 91505-4681<br>bjay@horvitzlevy.com<br>jrosen@horvitzlevy.com<br>mkressel@horvitzlevy.com<br>sdixler@horvitzlevy.com<br>shamill@horvitzlevy.com |
| *Attorneys for Defendants/Respondents,*<br>*Ainsley Carry and The University of*<br>*Southern California* | *Attorneys for Defendants/Respondents,*<br>*Ainsley Carry and The University of*<br>*Southern California* |

Document received by the CA Supreme Court.

# EXHIBIT 6

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically RECEIVED on 6/1/2021 at 10:38:44 AM

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 6/1/2021 by Karissa Castro, Deputy Clerk

# S263180

# IN THE
# SUPREME COURT OF CALIFORNIA

---

**MATTHEW BOERMEESTER,**
*Plaintiff and Appellant,*

*v.*

**AINSLEY CARRY et al.,**
*Defendants and Respondents.*

---

AFTER A DECISION BY THE COURT OF APPEAL, SECOND APPELLATE DISTRICT, DIVISION EIGHT
CASE NO. B290675

---

## REPLY BRIEF ON THE MERITS

---

**HORVITZ & LEVY** LLP
BETH J. JAY (BAR NO. 53820)
SAN FRANCISCO OFFICE
JEREMY B. ROSEN (BAR NO. 192473)
MARK A. KRESSEL (BAR NO. 254933)
*SCOTT P. DIXLER (BAR NO. 298800)
SARAH E. HAMILL (BAR NO. 328898)
BURBANK OFFICE
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800 · FAX: (844) 497-6592
bjay@horvitzlevy.com
jrosen@horvitzlevy.com
mkressel@horvitzlevy.com
sdixler@horvitzlevy.com
shamill@horvitzlevy.com

**YOUNG & ZINN** LLP
JULIE ARIAS YOUNG (BAR NO. 168664)
KAREN J. PAZZANI (BAR NO. 252133)
1150 SOUTH OLIVE STREET
SUITE 1800
LOS ANGELES, CALIFORNIA 90015-3989
(213) 362-1860 · FAX: (213) 362-1861
jyoung@yzllp.com
kpazzani@yzllp.com

ATTORNEYS FOR DEFENDANTS AND RESPONDENTS
**AINSLEY CARRY** AND **UNIVERSITY OF SOUTHERN CALIFORNIA**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. 4

INTRODUCTION ........................................................................ 8

LEGAL ARGUMENT ................................................................ 10

I.    USC's investigation of Boermeester satisfied USC's obligation to provide a fair procedure for addressing domestic violence. ............................................................. 10

        A.    The common law affords private organizations broad flexibility to develop and implement their own fair procedures and does not require live hearings with cross-examination of witnesses. ........ 10

        B.    Mandating live cross-examination in the university setting would harm universities and their students. ............................................................. 13

        C.    California's common law fair procedure doctrine—and not the due process clause—governs private university disciplinary proceedings. ............................................................. 15

                1.    Due process and fair procedure are distinct. ............................................................. 15

                2.    Boermeester is wrong in arguing that applying administrative mandamus review to private organizations' decisions supports application of constitutional due process standards to non-state actors............. 17

        D.    Even if cross-examination is required in certain cases, USC provided a fair procedure in this domestic violence case. ............................................. 19

1.      Boermeester fails to respond to USC's
        argument that the rationale for requiring
        live cross-examination in certain sexual
        misconduct cases does not apply to
        domestic violence cases................................... 19

2.      Boermeester fails to respond to USC's
        argument that the Court of Appeal erred
        in imposing three additional procedural
        requirements. ................................................. 20

II.     Boermeester waived any common law right to cross-
        examine witnesses at a live hearing.................................. 21

III.    Any error in failing to provide Boermeester with an
        opportunity to cross-examine witnesses at a live
        hearing was harmless.......................................... 23

IV.     Senate Bill No. 493 confirms that private universities
        have the authority and flexibility to develop fair
        procedures for themselves. .................................... 25

        A.      Under SB 493, universities adjudicating sexual
                misconduct and domestic violence complaints
                have discretion to determine whether hearings
                are necessary and whether to allow cross-
                examination............................................ 25

        B.      SB 493 provides that case law imposing new
                procedural requirements on private
                universities does not apply retroactively................. 26

        C.      Boermeester's reliance on Title IX is misplaced. ..... 28

V.      The extraneous issues raised by Boermeester are not
        properly before this Court and are meritless. ................... 29

CONCLUSION................................................................... 36

CERTIFICATE OF WORD COUNT ........................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpha Nu Association of Theta Xi v. University of
  Southern California*
  (2021) 62 Cal.App.5th 383 ...................................................... 17

*Angelucci v. Century Supper Club*
  (2007) 41 Cal.4th 160.............................................................. 33

*Boermeester v. Carry*
  (2020) 49 Cal.App.5th 682..............................................*passim*

*Breakzone Billiards v. City of Torrance*
  (2000) 81 Cal.App.4th 1205 ................................................... 31

*Cason v. Glass Bottle Blowers Ass'n of U.S. and
  Canada*
  (1951) 37 Cal.2d 134 .............................................................. 11

*Claxton v. Waters*
  (2004) 34 Cal.4th 367.............................................................. 28

*Denham v. Superior Court*
  (1970) 2 Cal.3d 557 ................................................................ 18

*Doe v. Allee*
  (2019) 30 Cal.App.5th 1036.................................................... 27

*Doe v. Occidental College*
  (2019) 37 Cal.App.5th 1003.................................................... 18

*Doe v. Regents of University of California*
  (2018) 28 Cal.App.5th 44 ....................................................... 34

*Doe v. Westmont College*
  (2019) 34 Cal.App.5th 622...................................................... 27

*Ezekial v. Winkley*
  (1977) 20 Cal.3d 267 .............................................................. 10

4

*Flannery v. Prentice*
(2001) 26 Cal.4th 572 ............................................................... 34

*Floresta, Inc. v. City Council of City of San Leandro*
(1961) 190 Cal.App.2d 599 ...................................................... 34

*Gill v. Mercy Hospital*
(1988) 199 Cal.App.3d 889 ...................................................... 11

*Gonzaga Univ. v. Doe*
(2002) 536 U.S. 273 [122 S.Ct. 2268, 153 L.Ed.2d
309] ......................................................................................... 13

*Goss v. Lopez*
(1975) 419 U.S. 565 [95 S.Ct. 729, 42 L.E.2d 725] ................. 32

*In re Marriage of Goddard*
(2004) 33 Cal.4th 49 ................................................................. 30

*Knight v. South Orange Community College District*
(2021) 60 Cal.App.5th 854 ...................................................... 12

*Li v. Yellow Cab Co.*
(1975) 13 Cal.3d 804 ................................................................ 27

*Los Angeles County v. Superior Court of Los Angeles
County*
(1965) 62 Cal.2d 839 ................................................................ 28

*Michalski v. Scripps Mercy Hospital*
(2013) 221 Cal.App.4th 1033 ................................................... 18

*Newman v. Emerson Radio Corp.*
(1989) 48 Cal.3d 973 ................................................................ 27

*People v. Brown*
(2004) 33 Cal.4th 892 ....................................................... 19, 31

*Pinheiro v. Civil Service Com. for County of Fresno*
(2016) 245 Cal.App.4th 1458 ................................................... 17

*Pinsker v. Pacific Coast Society of Orthodontists*
(1974) 12 Cal.3d 541 ..................................................... 10, 13, 15

5

*Rodriguez v. Bethlehem Steel Corp.*
(1974) 12 Cal.3d 382 ............................................................... 27

*University of California Regents v. Bakke*
(1978) 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d
750] ......................................................................................... 14

*Vazquez v. Jan-Pro Franchising International, Inc.*
(2021) 10 Cal.5th 944............................................................. 28

*Voices of the Wetlands v. State Water Resources
Control Bd.*
(2011) 52 Cal.4th 499.............................................................. 30

## Statutes

20 U.S.C. § 1232g(b)(1) & (d)........................................................ 13

Code of Civil Procedure, § 1094.5 ................................................ 17

## Rules of Court

Cal. Rules of Court
rule 8.500(c)(1) ...................................................................... 34
rule 8.500(c)(2) ...................................................................... 30
rule 8.504(b)(1)....................................................................... 30
rule 8.504(c)............................................................................ 30
rule 8.516(b) ........................................................................... 30

## Regulations

Code of Federal Regulations, title 34, § 106.44(a) ...................... 29

## Miscellaneous

Exec. Order No. 14021, 86 Fed. Reg. 13803–13804
(Mar. 8, 2021) ........................................................................ 29

Senate Bill No. 493 (2019–2020 Reg. Sess.)

§ 1, subd.(d) .................................................................... 14
§ 1, subd. (j) .................................................................... 14
§ 1, subd. (r) .................................................................... 25
§ 3, subd. (b)(3)(B) ........................................................ 28
§ 3, subd. (b)(4)(A)(i) ..................................................... 25
§ 3, subd. (b)(4)(A)(viii) ................................................. 25
§ 3, subd. (g)(1) .................................................... 26, 27, 28
§ 3, subd. (g)(2) ............................................................. 26

# REPLY BRIEF ON THE MERITS

## INTRODUCTION

Domestic violence is a serious problem among university students that cuts across the spectrum of race, gender, and socioeconomic status. USC does not tolerate domestic violence in its community. But domestic violence involving students is difficult to detect, investigate, sanction, and eliminate, in significant part because it is vastly underreported and victims often recant to appease their abusers, as occurred in this case.

The common law fair procedure doctrine requires private universities investigating allegations of sexual misconduct and domestic violence to provide accused students with basic fairness, which means notice and an opportunity to respond. The common law does not require universities to conduct mini-trials featuring cross-examination of witnesses, which would deter the reporting of abuse and divert scarce university resources away from education. The Court of Appeal below erred in holding otherwise. Indeed, through Senate Bill No. 493 (2019–2020 Reg. Sess.) (SB 493), the Legislature recently codified the rule that private universities may decide for themselves whether to provide live hearings with indirect cross-examination in sexual misconduct and domestic violence cases.

The Court of Appeal's divided opinion overturning USC's decision to expel Matthew Boermeester for domestic violence was particularly indefensible on this record for two additional reasons. First, Boermeester waived any right to cross-examination because he did not request it and his lawyer told

8

USC he did not want Jane Roe[1] to appear for in-person questioning. Second, any procedural error was harmless because Boermeester admitted to putting his hand on Roe's neck and shoving her, which was also captured on surveillance video and corroborated by multiple witnesses. No amount of additional process could have helped his defense.

Boermeester offers no persuasive response to these points in his answer brief on the merits, and he makes little effort to defend the reasoning of the Court of Appeal below. Instead, Boermeester spends most of his brief attempting to relitigate the underlying facts and advancing unfounded accusations of bias that are not properly before this Court.

In short, USC afforded Boermeester a fair procedure as required by law and the Court of Appeal's contrary decision should be reversed.

---

[1] In his answer brief on the merits, Boermeester uses Roe's real name and observes that she has identified herself in public. (ABOM 14, fn. 5.) But despite Boermeester's representation that Roe "has requested to be referred by her true name" (*ibid.*), Roe is not a party to this case. Thus, consistent with the Court of Appeal, this brief refers to Roe pseudonymously. (See *Boermeester v. Carry* (2020) 49 Cal.App.5th 682, 686, fn. 1 (*Boermeester*).)

## LEGAL ARGUMENT

**I.     USC's investigation of Boermeester satisfied USC's obligation to provide a fair procedure for addressing domestic violence.**

**A.     The common law affords private organizations broad flexibility to develop and implement their own fair procedures and does not require live hearings with cross-examination of witnesses.**

Under the common law, private institutions are primarily responsible for developing and implementing fair procedures for themselves. (OBOM 25–26; see *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 (*Pinsker II*).) Courts do not intervene routinely in the decisions of private organizations. (*Ibid.*) And courts "should not attempt to fix a rigid procedure that must invariably be observed." (*Pinsker II*, at p. 555; see OBOM 26.)

In its opening brief on the merits, USC traced the development of the common law doctrine of fair procedure and demonstrated that it does not compel private organizations to conduct live, trial-like hearings featuring the cross-examination of witnesses. (OBOM 27–30.) Instead, the common law requires basic fairness, which this Court has defined as notice and a reasonable opportunity to respond. (OBOM 26; *Ezekial v. Winkley* (1977) 20 Cal.3d 267, 278; *Pinsker II*, *supra*, 12 Cal.3d at p. 555.)

Boermeester fails to address USC's argument that this Court imposed no live cross-examination requirement in its seminal fair procedure decisions. (See OBOM 28–30.) He also

fails to address this Court's admonition that private institutions, not courts, are primarily responsible for developing their own fair procedures.  (See *ibid.*)

While Boermeester asserts that "common law fair procedure can require private universities to conduct live hearings with cross-examination" (ABOM 50), he offers little authority to support that position.  He cites *Cason v. Glass Bottle Blowers Ass'n of U.S. and Canada* (1951) 37 Cal.2d 134, 144 (ABOM 48), but as USC explained in the opening brief, that decision is thinly reasoned and this Court subsequently abandoned any live cross-examination requirement (OBOM 28).  Boermeester's reliance on *Gill v. Mercy Hospital* (1988) 199 Cal.App.3d 889, 904, is similarly misplaced.  As shown in USC's opening brief (OBOM 35–36), cases like *Gill* erroneously conflate the distinct doctrines of fair procedure and due process, and this Court should correct their error.

There similarly is no merit to Boermeester's reliance on several recent Court of Appeal decisions holding that private universities investigating claims of sexual misconduct must provide live hearings with cross-examination when witness credibility is central and the accused student faces serious sanctions.  (ABOM 44–46.)  As USC's opening brief demonstrated (OBOM 39–42), those cases have improperly expanded the common law's requirements and this Court should disapprove

them.[2]  Additionally, these decisions should not be applied to university domestic violence cases, which generally do not depend solely on weighing the credibility of witnesses.  (OBOM 42–45; see pp. 19–20, *post*.)  Recent appellate decisions imposing ever-increasing procedural requirements on private universities investigating certain sexual misconduct claims are irreconcilable with this Court's key decisions applying common law fair procedure.  Boermeester neglects to rebut, or even acknowledge, USC's challenge to these decisions.

USC's opening brief showed that USC provided Boermeester with greater procedural protections than the simple notice and an opportunity to respond required by the common law.  (See OBOM 30–31.)  In addition to providing Boermeester with detailed notice of the allegations against him, USC gave him multiple chances to review the evidence and tell his side of the story.  (*Ibid.*)  Boermeester was also afforded the opportunity to attend an in-person hearing and to present questions for Roe, but he declined.  (*Ibid.*)  USC also provided Boermeester with multiple layers of review.  (OBOM 31.)  No more was required. USC afforded Boermeester a fair process.

---

[2]   In *Knight v. South Orange Community College District* (2021) 60 Cal.App.5th 854, 858, 872, the Court of Appeal correctly held that a college need not conduct a live hearing with cross-examination of witnesses before reprimanding a student for misconduct.  However, the court stated in dicta that live cross-examination would have been required if the college had sought to impose a harsher sanction such as suspension or expulsion. (*Id.* at pp. 858, 866–867, 870; see ABOM 45 [relying on *Knight*'s dicta].)  *Knight*'s dicta is irreconcilable with this Court's precedent and this Court should disapprove it.

## B. Mandating live cross-examination in the university setting would harm universities and their students.

USC's opening brief explained that mandating live cross-examination in university sexual misconduct and domestic violence cases would deter the reporting of abuse, subject victims to fresh trauma, and divert scarce university resources away from education. (See OBOM 40–42.) In view of these heavy costs, USC reasonably elected not to adopt an adversarial disciplinary system featuring live cross-examination. Under the common law, that decision was USC's to make. (See *Pinsker II*, *supra*, 12 Cal.3d at p. 555; OBOM 25.)

Boermeester offers no response to USC's concern about subjecting victims to the trauma of live cross-examination. Nor does Boermeester address the risk of deterring victims from reporting domestic violence or other forms of abuse. Instead, Boermeester asserts that a college education is valuable and expulsion can have lasting consequences. (See ABOM 46–47.) But these observations do not support requiring private universities to conduct live hearings with cross-examination.[3] While a university must safeguard the interests of an accused student by providing notice and an opportunity to respond, it

---

[3]    Contrary to Boermeester's assertion that expulsion can tarnish a student's reputation for life (ABOM 46, 59), federal law prohibits universities from disclosing the findings of investigations into alleged misconduct to unauthorized persons without the consent of the student or, when applicable, his parent (see 20 U.S.C. § 1232g(b)(1) & (d); *Gonzaga Univ. v. Doe* (2002) 536 U.S. 273, 278–279 [122 S.Ct. 2268, 153 L.Ed.2d 309].)

must also protect the rest of its community, including its most vulnerable members. A private university has the right " ' "to determine for itself . . . who may be admitted to study." ' " (*University of California Regents v. Bakke* (1978) 438 U.S. 265, 312 [98 S.Ct. 2733, 57 L.Ed.2d 750] (opn. of Powell, J.).) Inherent in this right is the freedom to set standards of conduct for its community members and the responsibility to maintain a safe academic environment for all, including victims of domestic violence and other forms of bullying and abuse.

Boermeester also argues that USC's concerns about mandating live cross-examination are overblown based on his supposition that USC does not hold many sexual misconduct hearings each year. (ABOM 51.) But regardless whether a private university investigates two or twenty cases of misconduct per year, the problems with mandating live cross-examination are the same. University administrators are ill-equipped to preside over mini-trials, and conducting such proceedings threatens serious harm to victims and the academic community as a whole. (See OBOM 40–42, 44.) Conducting even one such mini-trial with live cross-examination could deter many other victims of sexual misconduct and domestic violence from reporting their abuse. (See SB 493, § 1, subd. (d) [recognizing that sexual harassment and violence is pervasive in higher education]; see also *id.*, § 1, subd. (j) [finding that "only 12 percent of college survivors report sexual assault to their schools or the police"].)

14

### C. California's common law fair procedure doctrine—and not the due process clause—governs private university disciplinary proceedings.

#### 1. Due process and fair procedure are distinct.

California's common law fair procedure doctrine, not constitutional due process, governs a private university's disciplinary proceedings. (OBOM 31–42; see *Pinsker II*, *supra*, 12 Cal.3d at p. 550, fn. 7 [clarifying that common law fair procedure, rather than constitutional due process, governs private organizations].) The two doctrines are not the same. (See OBOM 33–38.) Due process protects citizens from government action, and its standards are fixed by the federal Constitution as interpreted by the United States Supreme Court. (OBOM 32–33, 36–37.) By contrast, this Court can shape California's common law fair procedure doctrine to meet the evolving needs of this State's private organizations and their members. (OBOM 37.) Requiring private universities to provide basic procedural fairness, rather than resource-intensive mini-trials governed by constitutional due process, appropriately recognizes courts' lack of expertise in managing the operations of private organizations. (OBOM 37–38.) It also reflects the realities that private organizations lack the coercive power over their members that governments have over citizens, and that citizens have the free choice to determine the private organizations with which they associate.

Contrary to Boermeester's assertion (ABOM 48, 52–53), the constitutional line dividing private organizations from public institutions is both logical and doctrinally sound. Private organizations are not state actors, and they have the freedom to develop and implement fair procedures that best serve the needs of their members. Distinguishing private institutions from public institutions reflects hornbook constitutional law, not favoritism toward the private sector.[4]

Boermeester also suggests that due process applies "by analogy" to private institutions (ABOM 44), but he fails to address the key differences between the two doctrines identified by USC. Boermeester thus commits the same error as many of the Court of Appeal decisions discussed in USC's opening brief— he assumes that the requirements of due process and fair procedure are coextensive without pausing to examine the differences between the doctrines. (See OBOM 34–36, 39–42.) This Court should reject that approach and disapprove the decisions that have adopted it.

Finally, Boermeester is wrong that due process should apply because USC's disciplinary proceedings are "quasi-criminal" and USC's employees are "prosecutors." (See ABOM 11–12, 57.) Under USC's policy, investigations are "a neutral fact-finding process" (2 AR 487), and Boermeester's liberty was never in jeopardy (see 2 AR 494 [possible sanctions include

---

[4] This Court need not address whether *public* universities must conduct live hearings with cross-examination in domestic violence cases. This case does not present that issue.

16

expulsion, suspension, or revocation of a degree]).  USC's process is meant to protect its academic community, which is inseparable from USC's right to determine its membership.  Boermeester concedes that private institutions may decide "who belongs amongst their ranks."  (ABOM 12.)

> **2.  Boermeester is wrong in arguing that applying administrative mandamus review to private organizations' decisions supports application of constitutional due process standards to non-state actors.**

Contrary to Boermeester's contention (see ABOM 44), the fact that administrative mandamus review under Code of Civil Procedure section 1094.5 applies to both private and public organizations does not support applying constitutional due process standards to private actors.  Section 1094.5 is a procedural vehicle for reviewing public and private administrative decisions—it does not impose any particular standards of fair procedure.  (See *Alpha Nu Association of Theta Xi v. University of Southern California* (2021) 62 Cal.App.5th 383, 418 [" 'Fair hearing requirements [under section 1094.5] are "flexible" and entail no "rigid procedure" ' "]; *Pinheiro v. Civil Service Com. for County of Fresno* (2016) 245 Cal.App.4th 1458, 1463 ["The 'fair trial' requirement of section 1094.5 is not synonymous with constitutional due process and does not mandate 'a formal hearing under the due process clause.' [Citation.]  What is required is simply a 'fair administrative hearing' [citation], which affords the appellant a ' " 'reasonable opportunity to be heard.' " ' "].)  For private institutions like USC,

17

California's common law fair procedure doctrine, not constitutional due process, provides the governing standard. (See *ante*, pp. 15–17.)

Boermeester also appears to argue that courts should hold private institutions to *higher* procedural standards than public agencies because (he contends) doctrines applicable in mandamus actions such as the presumption of impartiality and the presumption of correctness do not apply to private institutions. (See ABOM 52–53.) He is wrong again—these doctrines apply to private institutions as well as public agencies. (See, e.g., *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1018, 1019 & fn. 3 [applying presumption of correctness to private university's administrative decision]; *Michalski v. Scripps Mercy Hospital* (2013) 221 Cal.App.4th 1033, 1042 ["In writ proceedings, the trial court 'presumes that the [administrative tribunal's] decision is supported by substantial evidence, and the petitioner bears the burden of demonstrating the contrary' "].) The applicability of these presumptions to private organizations in administrative mandamus actions simply reflects a bedrock principle of appellate review—it is the appellant's burden to show error below. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Finally, subjecting a private university's disciplinary decisions to limited judicial review would not, as Boermeester posits (ABOM 43), somehow favor USC's interests over Boermeester's. Requiring private universities such as USC to provide basic procedural fairness rather than live cross-examination reflects both the appropriate limits on judicial

18

review of private decisions and the procedural limits inherent in appellate review of any decision.

### D. Even if cross-examination is required in certain cases, USC provided a fair procedure in this domestic violence case.

#### 1. Boermeester fails to respond to USC's argument that the rationale for requiring live cross-examination in certain sexual misconduct cases does not apply to domestic violence cases.

Regardless whether the common law requires live cross-examination in certain university sexual misconduct cases where credibility is central (it does not), this Court should not extend that requirement to this domestic violence case. (OBOM 42–45.) USC provided three reasons for distinguishing university sexual misconduct cases from domestic violence cases. First, as in this case, domestic violence cases typically depend on evaluating observable evidence rather than turning primarily on the question of consent. (OBOM 43.) Second, and again as in this case, domestic violence cases are different because victims in these cases commonly recant their initial descriptions of the violence. (OBOM 43–44; *People v. Brown* (2004) 33 Cal.4th 892, 896 (*Brown*).) In these situations, cross-examination of the victim provides little, if any, assistance to the fact finder or the accused student because the victim has already disavowed her prior statements. Indeed, that is precisely why Boermeester declined to pose questions to Roe when given the chance. (OBOM 51.) Finally, requiring cross-examination in university domestic violence cases is likely to have a particularly substantial

chilling effect on victims' willingness to report abuse due to their ongoing interactions with the abuser in the university setting. (OBOM 44.) In view of these differences, mandating live cross-examination in university domestic violence cases is unlikely to improve the accuracy of the factfinding process and threatens to harm universities and their students.

Beyond the blanket assertion that the common law "can require" live cross-examination (ABOM 48), Boermeester says nothing about the differences between domestic violence and sexual misconduct that make live cross-examination particularly unnecessary and harmful in university domestic violence cases. Boermeester's silence amounts to a tacit concession that even if the common law requires private universities to provide live cross-examination in some cases, live cross-examination was not required in this domestic violence case.

### 2. Boermeester fails to respond to USC's argument that the Court of Appeal erred in imposing three additional procedural requirements.

The majority below erred in faulting USC for not (1) giving Boermeester the opportunity to attend Roe's hearing in person or via videoconference, (2) allowing Boermeester to ask Roe follow-up questions, and (3) allowing Boermeester to cross-examine third-party witnesses. (OBOM 46–49.)

These additional requirements are unjustified and unnecessary. Allowing accused abusers to witness the questioning of their victims in real-time is likely to have an especially pronounced chilling effect on reporting of domestic

20

violence in the university context without contributing to the accuracy of the factfinding process.  (See OBOM 46–47.) Similarly, allowing abusers to pepper victims with follow-up questions would exacerbate survivors' trauma and further chill reporting.  (See OBOM 48–49.)  Finally, allowing cross-examination of third parties is unlikely to aid a university's factfinding process.  Unlike courts, universities lack the power to compel witnesses to appear and testify.  (OBOM 42.)  Moreover, such a requirement would have made no difference in this case because the credibility of third-party witnesses was not central to USC's decision.  (OBOM 47–48; see pp. 23–25, *post*.)

Boermeester's answer brief is silent on these issues. Boermeester makes no effort to defend the Court of Appeal's imposition of additional procedural requirements beyond live cross-examination of the victim.  (See ABOM 48–50.) Boermeester also does not attempt to refute USC's argument that imposing these additional requirements represents the type of judicial second-guessing and micromanagement of private organizational decisions that this Court's precedents preclude. At a minimum, therefore, this Court should hold that the common law does not require the additional procedural requirements imposed by the majority below.

## II. Boermeester waived any common law right to cross-examine witnesses at a live hearing.

A student contesting the fairness of a university's disciplinary proceeding forfeits a challenge if he fails to raise it during the university proceeding.  (OBOM 49–50.)  Here, not only

did Boermeester never ask USC to allow him to cross-examine Roe and other witnesses, his lawyer affirmatively told USC that he did *not* want Roe to appear for live questioning.  (OBOM 51, citing 1 AR 293.)  Boermeester therefore waived or forfeited any claim that USC should have allowed him to conduct such cross-examination.

USC's opening brief on the merits anticipated and refuted Boermeester's counterarguments.  (See OBOM 51–53.)

First, there is no merit to Boermeester's contention that requesting live cross-examination would have been futile because USC's policy did not authorize it.  (See ABOM 54–55.) Boermeester eschewed live cross-examination for the sound tactical reason that further questioning of Roe following her recantation could only have hurt his case—not because requesting it would have been futile.  (OBOM 51.)  Boermeester offers no response to this point.  (See ABOM 53–55.)

Second, Boermeester did not simply decline to request live questioning—his lawyer affirmatively rejected it.  (OBOM 52, citing 1 AR 293.)  Boermeester's express waiver could not have been clearer, yet Boermeester fails to mention it in his answer brief.  (See ABOM 53–55.)

Third, Boermeester argues that USC's refusal to commit to provide him with Roe's "unfiltered" answers to any written questions somehow excused his waiver of live cross-examination. (ABOM 54.)  But Boermeester's argument rests on a mischaracterization of the record.  (OBOM 52–53.)  When Boermeester's counsel told USC that he did not want USC to

22

"filter" Roe's answers to written questions, USC responded that it would not do so.  (1 AR 293–294.)  Nonetheless, Boermeester declined to submit any written questions for Roe (see 1 AR 296), and his lawyer told USC that he did not want Roe to appear for live questioning (1 AR 293).

Finally, although Boermeester asserts in conclusory fashion that "USC's cited authorities are not directly on point" (ABOM 55), he does not dispute their key principle that a student accused of misconduct must raise any procedural objections at the university level in order to preserve them for appeal (see OBOM 49–50).  Because that critical principle is undisputed, any factual differences between USC's authorities and this case are immaterial.

## III.   Any error in failing to provide Boermeester with an opportunity to cross-examine witnesses at a live hearing was harmless.

Boermeester does not dispute that courts may not overturn universities' disciplinary decisions due to inconsequential errors. (OBOM 54–55; ABOM 56–61.)  Instead, he contends that cross-examination would have changed the result here because witness credibility was central to USC's decision.  (ABOM 56–58.)  The record shows otherwise, particularly in light of the surveillance footage and Boermeester's admission of the key facts:

- Boermeester's quibble that he merely admitted to " 'putting [his] hand on' " Roe's neck rather than "grabbing" her neck (ABOM 56) is semantic—the key point is that Boermeester admitted to putting his

23

hand on Roe's neck and pushing her, which violated USC's domestic violence policy (OBOM 55; 1 AR 60, 172–174, 179).

- Boermeester says the surveillance footage is "inconclusive" (ABOM 56), but both the trial court and the Court of Appeal agreed that it showed Boermeester grabbing Roe by the neck and pushing her (*Boermeester*, *supra*, 49 Cal.App.5th at p. 693; 6 CT 1135–1136).

- Boermeester's assertion that he was acting playfully is beside the point because intent is irrelevant under USC's policy. (OBOM 56; 1 AR 222; 2 AR 486–487.)

- Although Boermeester argues otherwise (ABOM 58), USC's conclusion that Boermeester violated his avoidance of contact order did not depend solely on witness credibility (see OBOM 56). For example, USC noted that Boermeester knew information about the investigation he could not have known unless Roe told him. (See 1 AR 53–54.)

- The fact that both Roe and an eyewitness changed their stories as the investigation progressed (see ABOM 56–58, 60–61) is immaterial because Roe's initial statement that Boermeester grabbed and pushed her was corroborated by surveillance footage (1 AR 43–45; 6 CT 1161–1162) and confirmed by Boermeester himself (1 AR 60, 172–174, 179).

In sum, Boermeester fails to show that a live hearing with cross-examination would have changed the outcome of USC's investigation. For this reason, too, this Court should reverse the decision below.

## IV. Senate Bill No. 493 confirms that private universities have the authority and flexibility to develop fair procedures for themselves.

### A. Under SB 493, universities adjudicating sexual misconduct and domestic violence complaints have discretion to determine whether hearings are necessary and whether to allow cross-examination.

In SB 493, the Legislature confirmed that private universities investigating sexual misconduct or domestic violence complaints possess broad discretion to establish fair procedures that best serve the needs of their communities. (SB 493, § 3, subd. (b)(4)(A)(viii); see *id.*, § 1, subd. (r) [SB 493 applies to "complaints of sexual or gender-based violence, including dating or domestic violence, at postsecondary educational institutions in the State of California"].) So long as they take a trauma-informed rather than an adversarial approach (see *id.*, § 3, subd. (b)(4)(A)(i)), private universities may decide for themselves whether to conduct hearings and whether to permit indirect cross-examination (*id.*, § 3, subd. (b)(4)(A)(viii)). The Legislature thus codified the common law in a manner consistent with this Court's interpretation, and concluded that private universities must provide basic fair procedure, but they need not conduct live hearings with cross-examination. (See OBOM 60.)

25

Section 3, subdivision (g)(2) of SB 493 abrogates any case law that conflicts with SB 493. Through this provision, the Legislature has rejected the Court of Appeal decisions requiring private universities to conduct live hearings with cross-examination in certain sexual misconduct cases. (OBOM 61.) This provision overrides the authority on which the Court of Appeal majority below relied to overturn USC's disciplinary determination in this case. (*Ibid.*) Subdivision (g)(2) also refutes Boermeester's assertion (ABOM 63) that the common law requires live hearings with cross-examination even though SB 493 does not.

Although USC discussed subdivision (g)(2) in its opening brief (OBOM 61), Boermeester fails to mention it even once in his answer brief (see ABOM 61–64). This Court should respect the Legislature's disavowal of prior case law and confirm that those cases are wrong.

### B. SB 493 provides that case law imposing new procedural requirements on private universities does not apply retroactively.

Section 3, subdivision (g)(1) of SB 493 undermines the reasoning of the majority below by providing that any case law imposing procedural requirements on universities investigating claims of sexual or gender-based violence, including domestic violence, has no retroactive effect. (See OBOM 61–62.) The majority below faulted USC for failing to comply with fair procedure decisions that had not been issued when USC expelled Boermeester. (*Ibid.*, citing *Boermeester*, *supra*, 49 Cal.App.5th at

pp. 698–699, 703–706.)  Through subdivision (g)(1), the Legislature rejected the Court of Appeal's approach.

Without analyzing subdivision (g)(1)'s language or endeavoring to explain its scope, Boermeester contends that this provision is merely "a mechanism to reduce costly litigation against universities besieged by a recession and pandemic-related budget cuts."  (ABOM 64.)  He says nothing about what the provision means or how it might achieve that goal.

Despite the plain language of subdivision (g)(1), Boermeester claims that this provision cannot restrict the retroactive application of fair procedure case law because "[j]udicial decisions are, by nature, retroactive due to stare decisis."  (ABOM 64.)  This is so, he contends, because the common law rules articulated in recent decisions such as *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634 and *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061 "have always existed."  (ABOM 64.)

Boermeester is wrong.  The common law evolves with legal and social standards.  (See *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 821–823 [discussing common law's evolution from contributory negligence to comparative negligence]; *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [courts must "remain alert to their obligation and opportunity to change the common law when reason and equity demand it"]; see also *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 979 [the notion that courts discover common law principles rather than develop them "has long been criticized as unrealistic and out of

27

touch with practical judicial realities"].) While most judicial decisions apply retroactively, some do not, even in the absence a statutory nonretroactivity provision like subdivision (g)(1). (See *Vazquez v. Jan-Pro Franchising International, Inc.* (2021) 10 Cal.5th 944, 952–953 [considerations of fairness and public policy can result in a decision being given only prospective application]; *Claxton v. Waters* (2004) 34 Cal.4th 367, 378–379 [applying holding only prospectively because it changed a settled rule on which parties relied].) Moreover, "[t]he Legislature, as well as the court, . . . is competent to define the retroactive scope of an overruling decision." (*Los Angeles County v. Superior Court of Los Angeles County* (1965) 62 Cal.2d 839, 845.) Boermeester cites no authority supporting his contention that common law decisions *must* apply retroactively even when, as here, the Legislature directs otherwise. (ABOM 63–64.)

## C. Boermeester's reliance on Title IX is misplaced.

Throughout his brief, Boermeester cites Title IX, federal case law interpreting it, and federal regulations promulgated thereunder. (See ABOM 13, 40–42.) He says that SB 493 has no effect here because it conflicts with federal Title IX regulations requiring universities to permit live cross-examination in certain circumstances. (ABOM 61–63.) But none of those federal authorities are relevant to the key issue presented here, which concerns California law.

In any event, Boermeester's reliance on Title IX is misplaced. Unlike SB 493 (*id.*, § 3, subd. (b)(3)(B)), the federal regulations do not apply to most instances of *off-campus*

28

misconduct, such as occurred here (34 C.F.R. § 106.44(a) (2020)).
Further, the Biden Administration has ordered a reassessment of
these regulations, so they may be short-lived.  (Exec. Order No.
14021, 86 Fed. Reg. 13803–13804 (Mar. 8, 2021).)

SB 493 is instructive in this case because it codifies the
proper understanding of common law fair procedure, not because
it governs USC's investigation of Boermeester's domestic
violence.  (See OBOM 60.)  Regardless of any conflict with federal
regulations, SB 493 did not apply to the disciplinary proceedings
in this case because USC investigated and expelled Boermeester
years before the Legislature enacted SB 493.  (OBOM 57.)
Nonetheless, given the Legislature's recent codification of fair
procedure in university sexual misconduct and domestic violence
cases, it would be anomalous for this Court to hold that the
common law requires private universities to adopt more
extensive procedures than the Legislature has required.
(OBOM 60.)  That is true regardless of the current federal
regulatory landscape.

***

The Court of Appeal's decision below is both erroneous
under the common law of fair procedure and inconsistent with SB
493.  (See OBOM 62.)  Boermeester offers no persuasive
response.

## V.  The extraneous issues raised by Boermeester are not properly before this Court and are meritless.

Boermeester makes multiple arguments seeking to taint
the result of his disciplinary proceeding.  He argues, for example,

29

that USC was biased against him, that USC treated Roe unfairly, and that substantial evidence did not support USC's decision to expel him. The Court of Appeal rejected some of Boermeester's arguments and did not address others. (See, e.g., *Boermeester*, *supra*, 49 Cal.App.5th at p. 694 & fn. 6.)

Boermeester's extraneous arguments are not properly before this Court for several reasons: (1) Boermeester did not dispute the contrary facts set forth in the Court of Appeal's opinion in a petition for rehearing in the Court of Appeal; (2) Boermeester did not challenge the adverse aspects of the Court of Appeal's opinion in an answer to USC's petition for review, which did not raise them; and (3) this Court did not identify them as among the issues to be reviewed. (See Cal. Rules of Court, rules 8.500(c)(2), 8.504(b)(1), 8.504(c), 8.516(b); PFR 9; see also *In re Marriage of Goddard* (2004) 33 Cal.4th 49, 53, fn. 2 [declining to consider an argument because the party advancing it failed to "petition for rehearing in the Court of Appeal calling attention to any alleged misstatement of fact in its opinion"].)

Moreover, as explained in USC's motion to strike Boermeester's answer brief (Mot. to Strike 11, 15–17), Boermeester supports these arguments with material outside the administrative record, which provides yet another reason to reject them (see *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 532 [in an administrative mandamus action, appellate review is generally "limited to the face of the administrative record"]).

30

In any event, even if this Court were to consider them, Boermeester's extraneous arguments have no merit.

1.  Boermeester contends that USC's decisionmakers were biased against him.  (ABOM 22, 30–31, 38–39, 58–59.)  The trial court found otherwise.  (6 CT 1142–1147.)  The Court of Appeal likewise rejected Boermeester's claim that USC was biased, concluding that "he has presented no legal or factual basis to support this argument other than to say its decisions were not in his favor."  (*Boermeester*, *supra*, 49 Cal.App.5th at p. 694, fn. 6.)  The dissent below similarly concluded that "USC's investigation was thorough and fair."  (*Id.* at p. 713 (dis. opn. of Wiley, J.).)

The courts below were correct—bias is never implied (*Breakzone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1237), and Boermeester fails to show that USC was biased against him.  USC's decisions to investigate and ultimately expel Boermeester were based on the severity of his misconduct as shown by the copious evidence that USC gathered.  USC's decision to pursue its investigation after Roe recanted and asked for the investigation to stop reflects USC's recognition that domestic violence victims often recant their accusations of abuse in order to avoid retaliation.  (See 6 CT 1146; see also *Brown*, *supra*, 33 Cal.4th at p. 896 [recognizing the tendency of domestic violence victims to recant].)  Moreover, as the trial court correctly found, "the University's conduct—providing temporary emergency housing and informing [Boermeester] that the investigation had been initiated by the Title IX Office rather than by Roe—provides evidence the University was motivated by a

31

desire to protect Roe rather than any bias against [Boermeester]." (6 CT 1144.) USC was not biased against Boermeester.[5]

2. Boermeester complains that, at the outset of USC's investigation, he was "summarily suspended indefinitely without prior notice or a fair hearing." (ABOM 29.) The Court of Appeal below unanimously disagreed. (*Boermeester*, *supra*, 49 Cal.App.5th at pp. 695–698; see *id.* at pp. 714–715 (dis. opn. of Wiley, J.).) Properly so. When USC placed Boermeester on an interim suspension, it notified him that it was investigating a report that he committed domestic violence by grabbing Roe by the neck and pushing her against a wall on January 21, 2017. (1 AR 4; 2 AR 470–473.) Contrary to Boermeester's unsupported contention (ABOM 29), USC was not required to conduct a hearing before placing him on interim suspension pending its investigation (see 2 AR 489–490 [USC policy authorizing interim suspension]; see also *Goss v. Lopez* (1975) 419 U.S. 565, 582 [95 S.Ct. 729, 42 L.E.2d 725] [even constitutional due process authorizes immediate suspension of a student when the student

---

[5] Boermeester claims that statements in the opinion of a trial judge in a different case involving different students illustrate USC's bias against male students generally. (ABOM 37–38, fn. 19.) As explained in USC's motion to strike (Mot. to Strike 8–11, 13–15), Boermeester's reliance on this material is improper because the trial court declined his request for judicial notice of the material (6 CT 1130–1131; 2 RT 915, 1202) and Boermeester did not challenge that ruling on appeal or before this Court. In any event, these statements from a different case are irrelevant here.

"poses a continuing danger to persons or property or an ongoing
threat of disrupting the academic process"]).

  3. Boermeester is wrong to argue that USC violated its
own policy by continuing to investigate his domestic violence
after Roe asked USC to drop the inquiry.  (See ABOM 25, fn. 15,
38.)  USC's policy permitted an investigation to proceed over a
reporting party's objection if circumstances warranted, including
when "there is a danger to the greater community."  (2 AR 482,
491–492.)  USC reasonably proceeded with its investigation
because eyewitnesses, including Roe herself, reported that
Boermeester's conduct was violent.  (E.g., 1 AR 85, 95, 184–187.)
Moreover, contrary to Boermeester's contention (see ABOM 31,
fn. 16), USC's policy did not prohibit telephonic interviews as
part of its investigation (see 1 AR 492).

  4. Boermeester asserts that USC treated *Roe* unfairly,
citing USC's decision to investigate his misconduct after Roe
recanted.  (See ABOM 24–29.)  But Roe is not a party to this case.
As the Court of Appeal below properly held, "Boermeester lacks
standing to assert Roe's rights in this matter."  (*Boermeester*,
*supra*, 49 Cal.App.5th at p. 694, fn. 6; see *Angelucci v. Century
Supper Club* (2007) 41 Cal.4th 160, 175 [to have standing, a
plaintiff must allege a violation of his own rights].)  In any event,
USC permissibly continued to investigate Boermeester's domestic
violence even after Roe asked for the investigation to be dropped.
(2 AR 482, 491–492.)

  5. There is no merit to Boermeester's contention that
USC's decision impermissibly rested on "uncorroborated

hearsay." (ABOM 59–61.) Boermeester did not raise this argument in the Court of Appeal, which is reason enough to reject it. (See *Flannery v. Prentice* (2001) 26 Cal.4th 572, 590–591 [declining to consider issue not raised in Court of Appeal]; Cal. Rules of Court, rule 8.500(c)(1).) In any event, formal evidentiary rules that apply in court are not required in administrative proceedings like USC's. (See *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56 [formal rules of evidence do not apply in university student disciplinary proceedings]; *Floresta, Inc. v. City Council of City of San Leandro* (1961) 190 Cal.App.2d 599, 608 ["rules of admissibility of evidence do not bind administrative agencies"].) Indeed, Boermeester conceded in connection with his administrative appeal that "this is not a court of law and that the rules of evidence do not apply." (1 AR 202, fn. 6.)

Moreover, the evidence against Boermeester was hardly uncorroborated. Multiple witnesses, including Roe herself, described Boermeester's misconduct (see 1 AR 85, 95, 183–185), which was confirmed by surveillance footage (1 AR 43–45; 6 CT 1161–1162) and Boermeester's own admission (1 AR 60, 172–174, 179).

6. Finally, Boermeester is wrong that the evidence supporting USC's decision to expel him "is not substantial and cannot support a finding that Mr. Boermeester was responsible for Intimate Partner Violence." (ABOM 61.) To the contrary, the evidence of Boermeester's misconduct is conclusive. Intent is irrelevant under USC's policy (1 AR 222; 2 AR 486–487), so

Boermeester's admission that he put his hand on Roe's neck and pushed her shows a violation of the policy notwithstanding his defense that he was just joking and "horsing around" (ABOM 16, 57). Eyewitnesses observed Boermeester's actions (1 AR 85, 95), which were also captured on surveillance footage (1 AR 43–45; 6 CT 1161–1162). Moreover, although Roe later recanted, she initially provided USC with a detailed account of Boermeester's misconduct that was consistent with those of other witnesses. (See 1 AR 183–189.) As the trial court properly determined (6 CT 1148–1150), USC had sufficient evidence to conclude that Boermeester violated its domestic violence policy.

## CONCLUSION

For the foregoing reasons, and the reasons in USC's opening brief on the merits, this Court should reverse the decision of the Court of Appeal.

June 1, 2021

**HORVITZ & LEVY LLP**
  BETH J. JAY
  JEREMY B. ROSEN
  MARK A. KRESSEL
  SCOTT P. DIXLER
  SARAH E. HAMILL
**YOUNG & ZINN LLP**
  JULIE ARIAS YOUNG
  KAREN J. PAZZANI

By: _____
      Scott P. Dixler

Attorneys for Defendants and Respondents
**AINSLEY CARRY and UNIVERSITY OF SOUTHERN CALIFORNIA**

36

## CERTIFICATE OF WORD COUNT
## (Cal. Rules of Court, rule 8.520(c)(1).)

      The text of this brief consists of 6,432 words as counted by the program used to generate the brief.

Dated: June 1, 2021

_____
Scott P. Dixler

## PROOF OF SERVICE

***Boermeester v. Carry et al.***
**Case No. S263180**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 3601 West Olive Avenue, 8th Floor, Burbank, CA 91505-4681.

On June 1, 2021, I served true copies of the following document(s) described as **REPLY BRIEF ON THE MERITS** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Horvitz & Levy LLP's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission via Court's Electronic Filing System (EFS) operated by ImageSoft TrueFiling (TrueFiling) as indicated on the attached service list:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 1, 2021, at Valley Village, California.

_____
Serena L. Steiner

38

396

**SERVICE LIST**
*Boermeester v. Carry et al.*
**Case No. S263180**

| Individual / Counsel | Party Represented |
|---|---|
| Julie Arias Young<br>Karen J. Pazzani<br>Young & Zinn LLP<br>1150 South Olive Street, Suite 1800<br>Los Angeles, CA 90015-3989<br>(213) 362-1860 · Fax: (213) 362-1861<br>jyoung@yzllp.com<br>kpazzani@yzllp.com | Defendants and Respondents<br>**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA**<br><br>*Via TrueFiling* |
| Mark M. Hathaway<br>Jenna E. Parker<br>Hathaway Parker LLP<br>445 South Figueroa Street<br>31st Floor<br>Los Angeles, CA 90071<br>(213) 529-9000 · Fax: (213) 529-0783<br>mark@hathawayparker.com<br>jenna@hathawayparker.com | Plaintiff and Appellant<br>**MATTHEW BOERMEESTER**<br><br>*Via TrueFiling* |
| California Court of Appeal<br>Second Appellate District<br>Division 8<br>300 South Spring Street<br>Second Floor, North Tower<br>Los Angeles, CA 90013<br>(213) 830-7000 | [Case No. B290675]<br><br>*Via TrueFiling* |
| Clerk of the Court<br>Hon. Amy D. Hogue, Dept. 7<br>Los Angeles County Superior Court<br>Spring Street Courthouse<br>312 North Spring Street<br>Los Angeles, CA 90012<br>(213) 310-7007 | Trial Court Judge<br><br>[Case No. BS170473]<br><br>*By U.S. Mail* |

# EXHIBIT 7

Court of Appeal, Second Appellate District
Eva McClintock
Electronically RECEIVED on 10/25/2023 at 8:59:33 AM

Case: 25-2332, 11/03/2025, DktEntry: 38.1, Page 409 of 522

Court of Appeal, Second Appellate District
Eva McClintock
Electronically FILED on 10/25/2023 by Sina Lui, Deputy Clerk

# B290675

# IN THE COURT OF APPEAL
# OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT, DIVISION EIGHT

### MATTHEW BOERMEESTER,
*Plaintiff and Appellant,*

*v.*

### AINSLEY CARRY et al.,
*Defendants and Respondents.*

APPEAL FROM LOS ANGELES COUNTY SUPERIOR COURT
AMY D. HOGUE, JUDGE • CASE NO. BS170473

# SUPPLEMENTAL BRIEF

**HORVITZ & LEVY LLP**
MARK A. KRESSEL (BAR NO. 254933)
*SCOTT P. DIXLER (BAR NO. 298800)
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800 • FAX: (844) 497-6592
mkressel@horvitzlevy.com
sdixler@horvitzlevy.com

**HORVITZ & LEVY LLP**
BETH J. JAY (BAR NO. 53820)
JEREMY B. ROSEN (BAR NO. 192473)
505 SANSOME STREET, SUITE 1550
SAN FRANCISCO, CALIFORNIA 94111-3149
(415) 462-5600 • FAX: (844) 497-6592
bjay@horvitzlevy.com
jrosen@horvitzlevy.com

**PAZZANI & SANDHU LLP**
KAREN J. PAZZANI (BAR NO. 252133)
700 NORTH CENTRAL AVENUE, SUITE 460
GLENDALE, CALIFORNIA 91203-3226
(213) 362-1860 • FAX: (213) 362-1861
kpazzani@psemploymentlaw.com

ATTORNEYS FOR DEFENDANTS AND RESPONDENTS
**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................3

INTRODUCTION ..........................................................................5

FACTUAL AND PROCEDURAL BACKGROUND .......................8

LEGAL ARGUMENT .................................................................. 12

I.   The investigatory model provides fair procedure for
     university disciplinary proceedings. ................................... 12

     A.   The Supreme Court's analysis of the fair
          procedure doctrine requires courts to defer to a
          university's decision to use an investigatory
          model for student disciplinary matters. ................... 12

     B.   Subsequent appellate authority does not
          prohibit the investigatory model............................... 15

     C.   Subsequent legislation also supports the use of
          an investigatory model. ............................................ 17

     D.   Amici supporting USC in the Supreme Court
          provided helpful background on the benefits of
          the investigatory model. ........................................... 18

II.  USC's appellate procedures satisfy fair procedure. ........... 20

III. Substantial evidence supports USC's findings. ................. 22

CONCLUSION.............................................................................. 25

CERTIFICATE OF WORD COUNT ........................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpha Nu Assn. of Theta XI v. University of Southern California*
(2021) 62 Cal.App.5th 383 ...................................... 15, 16, 21, 22

*Aviles-Rodriguez v. Los Angeles Community College Dist.*
(2017) 14 Cal.App.5th 981 ........................................ 14

*Boermeester v. Carry*
(2023) 15 Cal.5th 72 ..........................................*passim*

*Doe v. Allee*
(2019) 30 Cal.App.5th 1036 ............................... 13, 20

*Doe v. Regents of the University of California*
(2021) 70 Cal.App.5th 521 ................................ 16, 22

*Goss v. Lopez*
(1975) 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725] ............... 11

*Knight v. South Orange Community College District*
(2021) 60 Cal.App.5th 854 ....................................... 17

*People v. Baldwin*
(2018) 30 Cal.App.5th 648 ....................................... 14

*Pinsker v. Pacific Coast Society of Orthodontists*
(1974) 12 Cal.3d 541 ......................................... 10, 12

## Statutes

Code of Civil Procedure, § 1094.5 ............................ 9, 22

Education Code
§ 66281.8 ...................................................... 17, 18
§ 66281.8, subd. (b)(4)(A)(i) ................................... 18
§ 66281.8, subd. (b)(4)(A)(iv) .................................. 18

## Rules of Court

Cal. Rules of Court
    rule 8.200(b) ............................................................................. 5, 6
    rule 8.200(b)(2) .............................................................................6

## Miscellaneous

Senate Bill No. 493 (2019–2020 Reg. Sess.), § 3 ...........................17

# SUPPLEMENTAL BRIEF

## INTRODUCTION

This case returns to this court after reversal by the Supreme Court. Respondents University of Southern California and its Vice President of Student Affairs, Ainsley Carry (collectively, USC) expelled appellant Matthew Boermeester after conducting a two-month investigation and determining that he violated USC's policy prohibiting intimate partner violence. Boermeester petitioned for a writ of administrative mandate alleging that he was deprived of a fair trial for several reasons, including the lack of opportunity to cross-examine witnesses at a live hearing. The trial court denied the petition but this court reversed the trial court in a divided opinion. The Supreme Court then reversed this court, holding that "though private universities are required to comply with the common law doctrine of fair procedure by providing accused students with notice of the charges and a meaningful opportunity to be heard, they are not required to provide accused students the opportunity to directly or indirectly cross-examine the accuser and other witnesses at a live hearing with the accused student in attendance, either in person or virtually." (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 79 (*Boermeester*).)

The Supreme Court remanded with instructions for this court to determine in the first instance the remaining claims Boermeester raised on appeal that this court "expressly declined to reach" (*Boermeester*, *supra*, 15 Cal.5th at p. 98), which prompted USC to file this supplemental brief under California

5

Rules of Court, rule 8.200(b). This brief is thus "limited to matters arising after the previous Court of Appeal decision," (*id.*, rule 8.200(b)(2)) on the only issues that this court expressly declined to reach in its original decision: whether USC's policy was unfair because the Title IX investigator held the dual roles of investigator and adjudicator; whether USC's policy is unfair due to its appellate procedure; and whether substantial evidence supported USC's findings that Boermeester violated its interim partner violence policy. (Typed opn. 13.) The Supreme Court's opinion supports the resolution of all three of those questions in USC's favor.

As to the question of the dual roles of investigator and adjudicator (sometimes called the investigatory model), the most important new authority since the issuance of this court's original decision is the Supreme Court's opinion in this very case. Although the Supreme Court did not directly address the issue of USC's use of the investigatory model, its opinion ultimately compels the conclusion that the investigatory model satisfies the fair procedure doctrine. The Supreme Court explained that the reason the fair procedure doctrine does not require live cross-examination in a student disciplinary proceeding is that requiring universities to do so "would be contrary to [the Court's] long-standing fair procedure admonition that courts should not attempt to fix any rigid procedures that private organizations must 'invariably' adopt. [Citation.] Instead, private organizations should 'retain the initial and primary responsibility for devising a method' to ensure adequate notice and a

meaningful opportunity to be heard." (*Boermeester*, *supra*, 15 Cal.5th at pp. 79–80.) This same admonition requires this court to defer to USC's initial and primary determination that the investigatory model is sufficient to ensure what the fair doctrine procedure requires—adequate notice and a meaningful opportunity to be heard. Other appellate authority issued since this court's original decision is not to the contrary.

Furthermore, the investigatory model is the best way to both protect victims of domestic violence and to fairly investigate allegations of abuse, which is why USC uses it. Investigatory models have been shown to be less traumatizing for victims, less polarizing for students, more encouraging of reporting, and more cost-effective for universities. And, investigatory models like USC's provide notice and an opportunity to be heard, which is all fair process requires. There is no meaningful risk that having a single person perform both the investigatory and adjudicatory functions will be unfair where, as here, that person is a neutral fact-finder. This court already determined in its initial opinion that Boermeester failed to satisfy his burden on appeal to show prejudicial error from his claim that USC's investigator was biased. And, any error is also harmless because of Boermeester's admission that he put his hand on Roe and pushed her against the wall.

A similar analysis holds with respect to USC's appellate procedures, which the dissent in this court's original opinion found ample. The fair procedure doctrine permits USC to set out

its own appellate procedures, and USC's process here is adequate.

As to the third issue, there have been no major developments in the substantial evidence standard of review since this court's original decision, but the Supreme Court's discussion and application of the evidence in the administrative record further reinforces the fact that there was substantial—indeed, conclusive—evidence supporting USC's finding that Boermeester violated its policy.

Therefore, this court should find that USC's investigatory model for disciplinary proceedings and appellate process satisfy the common law fair procedure doctrine and that substantial evidence supports USC's factual findings on the merits of Boermeester's case, and affirm the superior court's judgment denying Boermeester's petition for writ of administrative mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

Detailed recitations of the facts can be found in the parties' original appellate briefing, this court's original decision, and the Supreme Court's opinion, so this brief will not repeat them here. USC's Title IX investigator found that Boermeester violated USC's student conduct code by engaging in intimate partner violence and violating the university's interim avoidance of contact order. (*Boermeester*, *supra*, 15 Cal.5th at p. 84.) After receiving decisions by a university appellate panel and then by the Vice President of Student Affairs, USC decided to expel Boermeester as a sanction for his misconduct. (*Ibid.*)

8

Boermeester petitioned for writ of mandate under Code of Civil Procedure section 1094.5, which the superior court denied. (*Ibid.*)

On appeal from the superior court's judgment, Boermeester claimed: (1) he was denied notice of the allegations against him; (2) the interim measure of a four-month suspension while the investigation continued was improperly imposed; (3) USC's investigatory model violated Boermeester's rights under the common law fair procedure doctrine; (4) USC's failure to hold a live hearing with witness cross-examination violated the fair procedure doctrine; (5) USC's appellate review system was insufficient; (6) USC's Title IX office was biased against him; and (7) USC's findings are not supported by substantial evidence. (See AOB 37–63.)

As to the first two issues, the majority found Boermeester's contentions "meritless." (Typed opn. 13.) As to Boermeester's claim that USC's Title IX office was biased against him, the majority found that Boermeester failed to meet his burden on appeal to demonstrate prejudicial error. (Typed opn. 13, fn. 6.) As to the live cross-examination issue, as discussed above, the majority agreed with Boermeester that the lack of an opportunity to cross-examine witnesses at a live hearing deprived him of a fair process, and on that basis reversed the superior court's judgment. (Typed opn. 19, 35.) Because the majority found the live cross-examination issue dispositive, it declined to "address whether USC's policy was also unfair because the Title IX investigator held the dual roles of investigator and adjudicator." (Typed opn. 13.) The majority also declined to "address

9

Boermeester's other claims of error, including whether substantial evidence supported USC's findings."[1] (*Ibid.*)

The Supreme Court reversed. The Court reiterated that " '[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], *nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures* which afford a fair opportunity for an applicant to present his position.' " (*Boermeester*, *supra*, 15 Cal.5th at p. 90, emphasis added, quoting *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 (*Pinsker II*).) And, the Court explained, "courts 'should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the "charges" against him [or her] and a reasonable opportunity to respond.' " (*Ibid.*, quoting *Pinsker II*, at p. 555.) The Court concluded that the fair procedure doctrine "requires [the Court] to give private universities primary responsibility for crafting the precise procedures meant to afford a student with notice and an

---

[1] The dissent would have found that: (1) Boermeester received full notice and an opportunity to be heard (dis. typed opn. 8); (2) the interim suspension was proper (dis. typed opn. 9); (3) universities and the courts are mixed on whether a single-investigator model is permissible (dis. typed opn. 20–21); (4) the investigation was thorough and fair (dis. typed opn. 6–7); (5) USC's appellate review system was fair (dis. typed opn. 7); and (6) substantial evidence supported USC's determination (dis. typed opn. 1, 5).

opportunity to respond." (*Ibid.*) Ultimately, "[p]rivate universities generally know best how to manage their own operations, and requiring a fixed set of procedures they must utilize in every situation when determining student discipline would constitute an improper ' "intrusion into the[ir] internal affairs." ' " (*Ibid.*, quoting *Pinsker II*, at p. 557.)

Turning its focus specifically to the university setting, the Court explained that it is "appropriate to give private universities broad discretion in formulating their disciplinary processes to ensure that they not only provide the accused student a meaningful opportunity to be heard, but also embolden victims to report incidents of sexual misconduct or intimate partner violence, encourage witnesses to participate in the disciplinary process, and allow the private university to conserve its resources so that it can remain focused on its primary mission of providing a postsecondary education." (*Boermeester*, *supra*, 15 Cal.5th at p. 93.) Our high court quoted the United States Supreme Court with favor as saying that imposing " 'even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness.' " (*Id.* at p. 94, quoting *Goss v. Lopez* (1975) 419 U.S. 565, 583 [95 S.Ct. 729, 42 L.Ed.2d 725].)

The Supreme Court reversed and remanded for this court to address in the first instance the remaining claims that Boermeester raised on appeal that this court expressly declined to reach. (*Boermeester*, *supra*, 15 Cal.5th at p. 98.)

11

## LEGAL ARGUMENT

I.    **The investigatory model provides fair procedure for university disciplinary proceedings.**

    A.    **The Supreme Court's analysis of the fair procedure doctrine requires courts to defer to a university's decision to use an investigatory model for student disciplinary matters.**

Although the Supreme Court did not directly address the investigatory model in *Boermeester*, its reasoning controls the resolution of the issue.

First, the Court held that the requirements of fair procedure are modest and flexible. "Where it applies, the common law doctrine of fair procedure requires private organizations to provide adequate notice of the charges and a meaningful opportunity to be heard." (*Boermeester*, *supra*, 15 Cal.5th at p. 90.) The Court clarified that it has "never held, however, that any specific or baseline procedures must be followed to satisfy these requirements." (*Ibid.*) To the contrary, fair procedure " 'does not compel . . . adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position.' " (*Ibid.*, quoting *Pinsker II*, *supra*, 12 Cal.3d at p. 555.)

Second, the Court explained that private universities have "primary responsibility for crafting the precise procedures meant to afford a student with notice and an opportunity to respond." (*Boermeester*, *supra*, 15 Cal.5th at p. 90.) The Court recognized that "[p]rivate universities generally know best how to manage

12

their own operations, and requiring a fixed set of procedures they must utilize in every situation when determining student discipline would constitute an improper ' "intrusion into the[ir] internal affairs." ' " (*Ibid.*)

Finally, the Court applied these two principles to hold that private universities need not provide accused students the opportunity to cross-examine their accusers and other witnesses at a live hearing. (*Boermeester*, *supra*, 15 Cal.5th at pp. 92–93.) The Court held that imposing such requirements would "be contrary to our admonition that courts must refrain from fixing rigid trial-like procedures 'that must invariably be observed.' " (*Id.* at p. 93.)

These three aspects of the Supreme Court's holding show that fair procedure does not prohibit private universities from using an investigatory model rather than an adversarial model. Fair procedure does not dictate the procedures that private universities must provide, and universities are responsible for crafting procedures that suit the needs of their communities.[2]

---

[2] In a case decided before the Supreme Court's *Boermeester* decision, Division Four of the Second District held that a live hearing with cross-examination was required, and relatedly criticized USC's investigatory model. (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1070–1071 (*Allee*).) But in *Boermeester*, the Supreme Court expressly disapproved *Allee* "to the extent it is inconsistent with [its] opinion." (*Boermeester*, *supra*, 15 Cal.5th at p. 96.) While the disapproval is stated in the context of the issue on review—the requirement of live cross-examination—the disapproval extends to the *Allee* court's rejection of USC's investigatory model, because *Allee*'s rejection also conflicts with *Boermeester*'s teaching that universities must be given priority

USC's considered determination that an investigatory model best suits the needs of its community is entitled to this court's deference.

Beyond its holding, *Boermeester*'s dicta also points strongly towards upholding USC's investigatory model. " 'It is, of course, axiomatic that it is only the ratio decidendi of a Supreme Court opinion that is fully binding as precedent on the lower courts of this state. [Citations.] . . . It is equally axiomatic, however, that Supreme Court dicta is not to be blithely ignored. Indeed, such dicta is said to be "persuasive" [citation] and to "command[ ] serious respect." ' [Citation.] 'As one appellate court has advised: "Generally speaking, follow dicta from the California Supreme Court." ' " (*People v. Baldwin* (2018) 30 Cal.App.5th 648, 657; see *Aviles-Rodriguez v. Los Angeles Community College Dist.* (2017) 14 Cal.App.5th 981, 990 [" 'To say that dicta are not controlling [citation] does not mean that they are to be ignored; on the contrary, dicta are often followed' "].)

Here, although not essential to its holding, the Supreme Court wrote approvingly about USC's investigatory model:

> In this case, USC provided Boermeester notice of the allegations; *the opportunity to provide his version of events in his interview with the Title IX investigator*; the opportunity to independently review the testimonial and documentary evidence with his attorney-advisor; *the opportunity to submit his own evidence and the names of potential witnesses to the*

---

and flexibility to determine their own student disciplinary procedures.

> *Title IX investigator*; *the opportunity to respond to the*
> *testimonial and documentary evidence through an in-*
> *person evidence hearing . . . conducted by the Title IX*
> *coordinator* (which he declined to attend in favor of
> submitting a written response to the evidence); *the*
> *opportunity to submit questions for the Title IX*
> *coordinator to ask Roe* at her own evidence hearing
> (which he also declined to do); and the opportunity to
> appeal the misconduct sanctioning panel's decision to
> the appellate panel.  *USC was not required to have*
> *gone further* by conducting a live hearing with
> Boermeester in attendance and with Boermeester
> directly or indirectly cross-examining the witnesses
> and asking follow-up questions, either in person or
> virtually.

(*Boermeester*, *supra*, 15 Cal.5th at pp. 94–95, emphasis added.)
This dicta strongly suggests that the Supreme Court would find
that USC's investigatory model satisfies the rudimentary
requirements of fair procedure.

## B.    Subsequent appellate authority does not prohibit the investigatory model.

There were three published appellate opinions related to
university disciplinary proceedings between the issuance of this
court's opinion and the Supreme Court's opinion.  None of them
suggests that an investigatory model shortchanges fair
procedure.

*Alpha Nu Assn. of Theta XI v. University of Southern*
*California* (2021) 62 Cal.App.5th 383 (*Alpha Nu*) concerned a
disciplinary proceeding for a fraternity accused of hazing.  *Alpha*
*Nu* explained that in general, fair procedure is assessed using

15

only general principles of fundamental fairness. (*Id.* at p. 422.)
Those principles, *Alpha Nu* reaffirmed, do *not* mandate any
"separation of investigative and adjudicative functions." (*Ibid.*)
*Alpha Nu* therefore rejected the fraternity's claim that USC's
investigatory model denied it fair procedure. (*Id.* at pp. 418, 421–
422.) *Alpha Nu*'s holding that the fair procedure doctrine does
not prohibit using an investigatory model applies here.

    *Alpha Nu* did state that there is an exception to the general
rule, which would require live witness cross-examination and
other "heightened procedural safeguards" (which might include a
separate investigator and adjudicator) in certain cases such as
sexual misconduct, but caveated that it was only adhering to that
exception pending the Supreme Court's guidance in *Boermeester*.
(*Alpha Nu*, *supra*, 62 Cal.App.5th at pp. 421–422 & fn. 23.) The
Supreme Court's guidance was to prohibit requiring heightened
procedure safeguards, leaving only *Alpha Nu*'s statement of the
general rule in place.

    *Doe v. Regents of the University of California* (2021)
70 Cal.App.5th 521, 524 (*UCSB*) involved a student at UC Santa
Barbara disciplined for committing intimate partner violence.
But that case did not address a challenge to the investigatory
model. *UCSB* is similar to this case, however, in that *UCSB*
found that none of the disciplined student's claimed failings in
the disciplinary procedures could be prejudicial because the
student's own witness statement proved that he had violated the
university's policy against intimate partner violence. (*Id.* at
pp. 536–537, 541.) Here, too, any deficiencies resulting from the

16

use of the investigatory model could not be prejudicial because Boermeester's own testimony establishes that he violated USC's intimate partner violence policy.  (See Part III, *post*.)

Finally, *Knight v. South Orange Community College District* (2021) 60 Cal.App.5th 854, 858 is inapposite, because that case considered what procedure a community college must provide to a student accused of sexual harassment before placing a written reprimand on that student's record.  *Knight* held that to impose this minimal level of discipline, no hearing or other trial-like procedures were required.  (*Id.* at pp. 858, 869–870, 872.) *Knight* contains several statements of broad dicta to the effect that for a student facing expulsion for sexual misconduct or intimate partner violence, there must be a live hearing with cross-examination and the "full panoply of trial-like procedures." (*Id.* at pp. 866, 870.)  This dicta is no longer good law after the Supreme Court's decision in this case.

### C.    Subsequent legislation also supports the use of an investigatory model.

Between the issuance of this court's opinion and the Supreme Court's opinion, the Legislature enacted Senate Bill No. 493 (2019–2020 Reg. Sess.), which became effective on January 1, 2021 (Stats. 2020, ch. 303, § 3), and codified at Education Code section 66281.8.  In *Boermeester*, the Supreme Court explained that while that new statute does not apply here, the Court "nevertheless [found] it noteworthy that the statute does not require universities to conduct live hearings featuring cross-examination."  (*Boermeester*, *supra*, 15 Cal.5th at pp. 90–

17

91.)  The Court found that a new statute can be " 'helpful as indicating what the Legislature believes are the elements of a fair and carefully thought out system of procedure for use in administrative hearings.' "  (*Id.* at p. 91.)

Here, similarly, Education Code section 66281.8, despite being exhaustively detailed, does not prohibit universities from using an investigatory model.  To the contrary, section 66281.8 *prohibits* universities from adopting "an adversarial process between the complainant, the respondent, and the witnesses." (Ed. Code, § 66281.8, subd. (b)(4)(A)(i).)  Instead, universities must "ensure trauma-informed and impartial investigation of complaints."  (*Id.*, subd. (b)(4)(A)(iv).)

### D. Amici supporting USC in the Supreme Court provided helpful background on the benefits of the investigatory model.

A diverse group of amici supported USC's position in the Supreme Court, including other private universities, public interest and gender equality organizations, and the Attorney General of California.  These amici discussed the benefits of using an investigatory model, rather than an adversarial model, when investigating claims of gender-based violence.  These benefits show why universities including USC have decided that using an investigatory model better suits the needs of their academic community, and why courts should respect that decision.

18

The amici supporting USC's position made a number of pertinent observations about the benefits of an investigative model:

- "Investigative models avoid some of the additional and more daunting retellings that adversarial models require, such as a retelling to a school 'prosecutor' or a hearing panel." (AG ACB 43.) Investigative models can be less traumatizing for victims. (Univ. ACB 14; Gender Equality ACB 13.)

- "[I]nvestigative models do less to polarize the parties and enable schools to provide rehabilitative sanctions," which can prevent future violence and encourage healthy interactions among students who may still be on the same campus. (AG ACB 44; Univ. ACB 15.)

- The American Bar Association Commission on Domestic and Sexual Violence recommends that schools employ an investigative rather than an adversarial approach to addressing complaints of gender-based violence. (AG ACB 32–37; Gender Equality ACB 38–41.) "[I]nvestigative models represent the 'clear consensus' among the over-225 higher education professionals that were consulted in preparing the ABA Recommendations." (AG ACB 37.)

- Investigative models are more cost-effective than adversarial models, and they allow universities to

19

rely on expert professional investigators. (AG ACB 36–37; Univ. ACB 14–15.)

Exercising its discretion to select fair procedures that serve the needs of its community, USC had a right to decide that these benefits of an investigatory model justified adopting it when investigating claims of intimate partner violence.

## II.   USC's appellate procedures satisfy fair procedure.

The same analysis that requires holding that USC's investigatory model satisfies fair procedure also requires holding that USC's appellate proceedings do, too. Universities must be permitted the flexibility to design an appellate process for their administrative systems that best meet the needs of all of their constituents. Here, as with the Supreme Court's discussion of USC's investigatory model, the Supreme Court offered some favorable words in dicta about USC's appellate system: "In this case, USC provided Boermeester . . . the opportunity to appeal the misconduct sanctioning panel's decision to the appellate panel. USC was not required to have gone further" by providing live cross-examination. (*Boermeester*, *supra*, 15 Cal.5th at pp. 94–95.) Again, the Court's suggestion that USC was not required to go further than what it provided Boermeester should be given significant weight.[3]

_____

[3]   And for similar reasons, the *Boermeester* opinion's disapproval of *Allee* to the extent the latter conflicts with the former extends to *Allee*'s disparagement and second-guessing of USC's appellate system. (See *Allee*, *supra*, 30 Cal.App.5th at p. 1069; *ante*, p. 11, fn. 2.)

Similarly, the recent *Alpha Nu* case explained that general principles of fundamental fairness "do not mandate . . . any particular administrative appellate procedure" and rejected Alpha Nu's claim that USC's appellate procedure was deficient. (*Alpha Nu*, 62 Cal.App.5th at pp. 421–422.)

It is worth noting that the dissent from this court's original opinion also spoke approvingly of USC's multiple levels of review:

> USC's process involved four layers of review. [¶] First was the investigation. Upon concluding the extensive investigation, the investigator determined Boermeester was responsible for intimate partner violence. [¶] The second layer was a separate panel. The sanctions panel reviewed the record and decided to expel Boermeester. [¶] The third layer was the Misconduct Appellate Panel. Boermeester appealed to this separate panel. Pages 494 and 495 of the Administrative Record spell out the duties of this Misconduct Appellate Panel. These rules empowered the Misconduct Appellate Panel to decide whether substantial evidence supported the investigator's fact finding. The Misconduct Appellate Panel also was to determine whether this fact finding supported the investigator's conclusions about policy violations. [¶] This Misconduct Appellate Panel exercised independent judgment. It recommended a two-year suspension rather than expulsion for Boermeester. [¶] The fourth layer was USC's Vice President for Student Affairs, who was USC's final decisionmaker on student discipline. This USC Vice President overruled the Misconduct Appellate Panel's recommendation and determined the appropriate sanction was expulsion.

21

(Dis. typed opn. 7–8.) These authorities demonstrate that USC's appellate process did not deprive Boermeester of a fair procedure.

## III. Substantial evidence supports USC's findings.

Code of Civil Procedure section 1094.5 governs judicial review of USC's investigation and findings because it applies "to the decisions of private organizations, so long as the private organization was legally required to hold a hearing, take evidence, and make factual determinations in coming to its decision." (*Boermeester*, *supra*, 15 Cal.5th at pp. 85–86.) The Supreme Court explained that "the section 1094.5 'elements of hearing, evidence, and *discretion in the determination of facts* are clearly required by law.' " (*Id.* at p. 86, emphasis added.)

As the recent *Alpha Nu* and *UCSB* cases reaffirmed, under Code of Civil Procedure section 1094.5, courts apply the substantial evidence standard of review to disciplinary decisions involving student sexual misconduct or intimate partner violence at both private and public universities. (*Alpha Nu*, *supra*, 62 Cal.App.5th at p. 409; *UCSB*, *supra*, 70 Cal.App.5th at pp. 532–533.) As is the case with sexual misconduct proceedings, a university determination about intimate partner violence "does not involve a fundamental vested right," and therefore this court "review[s] the agency's decision, rather than the trial court's decision, applying the substantial evidence standard." (*UCSB*, at pp. 532–533; see *Boermeester*, *supra*, 15 Cal.5th at p. 93 [treating claims of sexual misconduct and of intimate partner violence the same for purposes of fair procedure analysis].)

22

The evidence of Boermeester's misconduct, as summarized in the Supreme Court's opinion, is conclusive. Indeed, the Supreme Court relied on the strength of this evidence to conclude that, even if USC had failed to provide Boermeester with fair procedures (which it did not), any such failure was harmless. (*Boermeester*, *supra*, 15 Cal.5th at pp. 97–98.)

"The USC student conduct code in effect at the time of the incident in question prohibited students from engaging in intimate partner violence, which it defined as 'violence committed against a person . . . with whom [the accused student has] had a previous or current dating, romantic, intimate, or sexual relationship.' Violence, in turn, was defined as 'causing physical harm to the person.' " (*Boermeester*, *supra*, 15 Cal.5th at p. 80.)

The Supreme Court summarized the evidence supporting Boermeester's expulsion as follows:

"Shortly after the incident occurred, Roe told the Title IX investigator that Boermeester had physically harmed her. Specifically, Roe said that it 'hurt' when Boermeester grabbed the back of her hair 'hard' and told her to drop her dog's leash; that it 'hurt' when Boermeester grabbed the front of her throat and neck, causing her to cough; and that her 'head hurt' after Boermeester grabbed her by the neck again and pushed her head 'hard,' causing her head to hit the alleyway wall. The video of the incident—though grainy and soundless—is consistent with Roe's initial account. [Citation.] Boermeester himself admitted that he had his hands on Roe's neck and had her against the alleyway wall. In sum, even without considering the third party

eyewitness testimony, USC could have concluded that Boermeester 'caus[ed] physical harm' to Roe and, thus, violated its policy against intimate partner violence." (*Boermeester*, *supra*, 15 Cal.5th at p. 97.)

Intent is irrelevant under USC's policy (*Boermeester*, *supra*, 15 Cal.5th at p. 97), so Boermeester's admission that he put his hand on Roe's neck and pushed her shows a violation of USC's intimate partner violence policy despite his defense that he was being playful or sexual and " 'roughhousing.' " (*Ibid.*) "Moreover, USC, as the finder of fact, was entitled to determine that Roe's first statement was more credible than her later recantation." (*Id.* at pp. 97–98.) Crediting Roe's first statement was sensible because "it is not uncommon for victims of intimate partner violence to recant. Roe's post-incident communications with USC's Title IX office and her friends indicate that she feared retaliation and felt a sense of loyalty towards Boermeester, either of which may have motivated her later recantation." (*Id.* at p. 98.)

As the trial court properly determined, USC had more than enough evidence to conclude that Boermeester violated USC's policy against intimate partner violence. (6 CT 1148–1150.)

## CONCLUSION

For all these reasons, and the reasons stated in USC's opening and reply briefs, this court should affirm the judgment.

October 25, 2023

**HORVITZ & LEVY LLP**
  BETH J. JAY
  JEREMY B. ROSEN
  MARK A. KRESSEL
  SCOTT P. DIXLER
**PAZZANI & SANDHU LLP**
  KAREN J. PAZZANI


By: _____
       Mark A. Kressel

Attorneys for Defendants and
Respondents
**AINSLEY CARRY and THE
UNIVERSITY OF SOUTHERN
CALIFORNIA**

25

**CERTIFICATE OF WORD COUNT**
**(Cal. Rules of Court, rule in 8.204(c)(1).)**

The text of this brief consists of 4,721 words as counted by the program used to generate the brief.

Dated:  October 25, 2023

_____
Mark A. Kressel

## PROOF OF SERVICE

### *Boermeester v. Carry et al.*
### Case No. B290675

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 3601 West Olive Avenue, 8th Floor, Burbank, CA 91505-4681.

On October 25, 2023, I served true copies of the following document(s) described as **SUPPLEMENTAL BRIEF** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Horvitz & Levy LLP's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**
Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission via Court's Electronic Filing System (EFS) operated by ImageSoft TrueFiling (TrueFiling) as indicated on the attached service list:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 25, 2023, at Valley Village, California.

Serena L. Steiner

27

## SERVICE LIST
### *Boermeester v. Carry et al.*
### Case No. B290675

| Individual / Counsel | Party Represented |
|---|---|
| Karen J. Pazzani<br>Pazzani & Sandhu LLP<br>700 North Central Avenue<br>Suite 460<br>Glendale, California 91203-3226<br>(213) 362-1860 • Fax: (213) 362-1861<br>kpazzani@psemploymentlaw.com | Defendants and Respondents<br>**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA**<br><br>*Via TrueFiling* |
| Mark M. Hathaway<br>Jenna E. Parker<br>Hathaway Parker LLP<br>445 South Figueroa Street<br>31st Floor<br>Los Angeles, California 90071<br>(213) 529-9000• Fax: (213) 529-0783<br>mark@hathawayparker.com<br>jenna@hathawayparker.com | Plaintiff and Appellant<br>**MATTHEW BOERMEESTER**<br><br>*Via TrueFiling* |
| Clerk of the Court<br>Hon. Amy D. Hogue, Dept. 7<br>Los Angeles County Superior Court<br>Spring Street Courthouse<br>312 North Spring Street<br>Los Angeles, California 90012<br>(213) 310-7007 | Trial Court Judge<br><br>[Case No. BS170473]<br><br>*By U.S. Mail* |
| Clerk of the Court<br>California Supreme Court<br>350 McAllister Street, Room 1295<br>San Francisco, California 94102-4797<br>(415) 865-7000 | Electronic Copy (CRC, Rule 8.212(c)(2)(A)(i))<br><br>*Via TrueFiling* |

EXHIBIT 8

*In the*

# Court of Appeal

*of the*

# State of California

### SECOND APPELLATE DISTRICT
### DIVISION EIGHT

---

**B290675**

MATTHEW BOERMEESTER,
*Plaintiff and Appellant,*

v.

AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA,
*Defendants and Respondents.*

---

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY
HONORABLE AMY D. HOGUE · CASE NO. BS170473

---

## APPELLANT'S OPENING SUPPLEMENTAL BRIEF ON REMAND ISSUES

---

*Mark M. Hathaway, Esq. (151332)
Jenna E. Parker, Esq. (303560)
HATHAWAY PARKER, INC.
445 South Figueroa Street, 31st Floor
Los Angeles, California 90071
(213) 529-9000 Telephone
(213) 529-0783 Facsimile
mark@hathawayparker.com
jenna@hathawayparker.com

*Attorneys for Plaintiff and Appellant,
Matthew Boermeester*

---



Printed On Recycled Paper 

Document received by the CA 2nd District Court of Appeal.

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................7

II. FACTUAL BACKGROUND ........................................8

    A. MATTHEW BOERMEESTER AND ZOE KATZ .......8

    B. JANUARY 20, 2017 .....................................................9

    C. THE INTERACTION ON JANUARY 21, 2017........ 10

    D. THE SECURITY VIDEO........................................... 11

    E. WHAT DH AND MB2 ACTUALLY SAID THEY SAW AND HEARD. ................................................... 12

        1. Witness DH ...................................................... 12

        2. Witness MB2 .................................................... 13

    F. THE USC TITLE IX INVESTIGATION BEGINS... 15

    G. USC TITLE IX INTERACTIONS WITH ZOE KATZ ........................................................................ 16

        1. Ms. Katz Is Not Apprised of the Reason for Her Meeting with Title IX ........................ 16

        2. Ms. Katz Objects to USC Title IX's Misrepresentations and Mischaracterizations ...................................... 17

        3. No Request for Avoidance of Contact ............ 19

        4. No Fear of Retaliation or Recantation........... 20

    H. USC TITLE IX INTERACTIONS WITH MATT BOERMEESTER ....................................................... 22

        1. Mr. Boermeester Is Summarily Suspended, then Charged ............................... 22

        2. USC Issues Avoidance of Contact Charges........................................................... 24

    I. USC TITLE IX INTERVIEWS 16 OTHER WITNESSES ............................................................. 24

    J. USC TITLE IX ADJUDICATION PROCESS .......... 25

Document received by the CA 2nd District Court of Appeal.

          1.    USC's Evidence Review and Evidence Hearing Processes ............................................. 25

          2.    Both Parties Participate In "Evidence Review" ............................................................. 26

   K.    USC TITLE IX OFFICE ISSUES THE SAR ............ 28

   L.    USC'S SANCTIONING PANEL ORDERS EXPULSION ..................................................... 29

   M.   USC'S APPEAL PANEL DENIES BOTH APPEALS BUT RECOMMENDS SUSPENSION, NOT EXPULSION ........................... 29

   N.    DR. AINSLEY CARRY ORDERS EXPULSION ...... 30

   O.    MR. BOERMEESTER PETITIONS FOR WRIT OF MANDATE ............................................ 31

III.   STANDARD OF REVIEW .................................... 32

IV.   ARGUMENT ..................................................... 33

   A.    INDEPENDENT JUDGMENT, A TRIAL *DE NOVO*, SHOULD BE REQUIRED FOR REVIEW OF PRIVATE LITIGANT DECISIONS ... 33

   B.    USC'S ADMINISTRATIVE DECISION AFFECTS MR. BOERMEESTER'S VESTED FUNDAMENTAL RIGHTS ................................. 37

   C.    USC'S FINDINGS AND DETERMINATIONS ARE NOT SUPPORTED EVEN BY SUBSTANTIAL EVIDENCE ................................. 42

   D.    COMBINING THE INVESTIGATOR AND ADJUDICATOR ROLES WAS UNFAIR IN LIGHT OF INVESTIGATOR'S QUESTIONABLE EXERCISES OF DISCRETION ............................................ 46

V.    CONCLUSION ................................................... 52

CERTIFICATE OF WORD COUNT ........................................... 53

Document received by the CA 2nd District Court of Appeal.

# TABLE OF AUTHORITIES

## Cases

*Berlinghieri v. Department of Motor Vehicles* (1983)
   33 Cal.3d 392............................................................................... 38

*Berman v. Regents of University of California* (2014)
   229 Cal.App.4th 1265 ................................................................. 33

*Bixby v. Pierno* (1971)
   4 Cal.3d 130.......................................................................*passim*

*Boermeester v. Carry* (2023)
   15 Cal.5th 72......................................................................*passim*

*California Youth Authority v. State Personnel Bd.* (2002)
   104 Cal.App.4th 575 ................................................................. 44

*City of Mountain View v. Superior Court* (1975)
   54 Cal.App.3d 72....................................................................... 32

*Clark v. City of Hermosa Beach* (1996)
   48 Cal.App.4th 1152 ................................................................. 32

*Consolidated Edison Co. v. NLRB* (1938)
   305 U.S. 197 .............................................................................. 46

*Doe v. Allee* (2019)
   30 Cal.App.5th 1036 ........................................................... 47, 48

*Doe v. Baum* (6th Cir. 2018)
   903 F.3d 575.............................................................................. 40

*Doe v. Rector & Visitors of George Mason Univ.* (E.D.Va. 2016)
   149 F. Supp. 3d 602 .................................................................. 40

*Doe v. Univ. of Cincinnati* (6th Cir. 2017)
   872 F.3d 393.............................................................................. 39

*Doe v. University of Southern California* (2016)
   246 Cal.App.4th 221 ..................................................... 32, 42, 44

Document received by the CA 2nd District Court of Appeal.

*Fukuda v. City of Angels* (1999)
  20 Cal.4th 805 ......................................................................... 35

*Furey v. Temple Univ.* (E.D. Pa. 2012)
  884 F.Supp.2d 223 .................................................................. 39

*Goldberg v. Regents of University of California* (1967)
  248 Cal.App.2d 867.................................................................. 39

*Gupta v. Stanford University* (2004)
  124 Cal.App.4th 407 .......................................................... 32, 36

*Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980)
  26 Cal.3d 770........................................................................... 38

*JKH Enterprises, Inc. v. Department of Industrial
  Relations* (2006)
  142 Cal.App.4th 1046 ....................................................... 42, 43

*Kim v. Regents of University of California* (2000)
  80 Cal.App.4th 160 .................................................................. 36

*Kuhn v. Department of General Services* (1994)
  22 Cal.App.4th 1627 ................................................................ 42

*In re Lucero L.* (2000)
  22 Cal.4th 1227 ....................................................................... 44

*Mountain Defense League v. Board of Supervisors* (1977)
  65 Cal.App.3d 723.................................................................... 34

*Natarajan v. Dignity Health* (2021)
  11 Cal.5th 1095 ....................................................................... 32

*Pomona College v. Superior Court* (1996)
  45 Cal.App.4th 1716 ......................................................... 32, 36

*Pomona Valley Hospital Medical Center v. Superior
  Court* (1997)
  55 Cal.App.4th 93 ................................................................... 32

*Regents of University of California v. City of Santa
  Monica* (1978)
  77 Cal.App.3d 130............................................................. 36, 37

5

Document received by the CA 2nd District Court of Appeal.

*Roddenberry v. Roddenberry* (1996)
    44 Cal.App.4th 634 ................................................................. 45

*Shuffer v. Board of Trustees* (1977)
    67 Cal.App.3d 208 ................................................................. 34

*Teacher v. California Western School of Law* (2022)
    77 Cal.App.5th 111 ................................................................. 33

*Wences v. City of Los Angeles* (2009)
    177 Cal.App.4th 305 ................................................................. 39

## State Statutes

Code Civ. Proc.
    § 1094.5 .................................................................. 31, 32, 36
    § 1094.5, subd. (b) .................................................. 32, 42
    § 1094.5, subd. (c) .................................................. 34

Evid. Code, § 664 .................................................................. 35, 36

## Constitutional Provisions

Cal Const, Article IX § 9 .................................................................. 36

California Constitution .................................................................. 35

Document received by the CA 2nd District Court of Appeal.

## APPELLANT'S SUPPLEMENTAL BRIEF

### I.    INTRODUCTION

On January 2, 2017, Plaintiff and Appellant, Matthew Boermeester, now 28, was a senior, full-scholarship athlete at the University of Southern California ("USC") who kicked the game-winning 46-yard field goal in the final second of the 2017 Rose Bowl to give USC a 52-49 victory over Penn State. Mr. Boermeester was on track to graduate in May 2017 and was planning to attend USC to obtain his master's degree while continuing to play USC football during the Fall 2017 semester, his final year of eligibility to play college football. Mr. Boermeester's dream was to secure a position as a kicker in the NFL.

Those dreams were dashed when on January 26, 2017, USC ordered Mr. Boermeester escorted off campus by security and banned him from campus, classes, and the USC football team indefinitely, due to an incident of "intimate partner violence" allegedly committed against his girlfriend, Zoe Katz, a nationally ranked tennis champion and captain of the USC women's tennis team. Throughout USC's Title IX proceedings, and to this day, Ms. Katz has vocally and ardently denied that any intimate partner violence occurred. Nevertheless, USC expelled Mr. Boermeester, forever precluding him from obtaining his university degree and ending his burgeoning football career.

Mr. Boermeester hereby submits his Opening Supplemental Brief on Remand Issues, following the California Supreme Court's reversal of this Court's judgment, and remand

7

for the Court of Appeal to determine the remaining claims Mr. Boermeester raised on appeal that the Court of Appeal expressly declined to reach. USC's decision that Mr. Boermeester engaged in intimate partner violence is not supported by findings or evidence, and USC's factual findings rely on uncorroborated hearsay and are, therefore, not supported even by substantial evidence. Further, USC's proceedings were unfair because the Title IX investigator held the dual roles of investigator and adjudicator and exercised discretion in questionable ways.

## II.  FACTUAL BACKGROUND

### A.  MATTHEW BOERMEESTER AND ZOE KATZ

As of January 2017, Mr. Boermeester and Zoe Katz[1] (hereinafter "Ms. Katz") were both undergraduate athlete-scholars attending USC. Ms. Katz was a senior, captain of the USC women's tennis team, and a nationally ranked female singles tennis player. (1AR236.) Mr. Boermeester was also a senior, full-scholarship athlete who kicked the game-winning 46-yard field goal in the final second of the 2017 Rose Bowl to give USC a 52-49 victory over Penn State. (1AR199, n. 5; 2AR396.) Mr. Boermeester expected to graduate in May 2017 and planned to attend USC to obtain his master's degree while continuing to play USC football during the Fall 2017 semester, his final year of eligibility to play college football, in hopes of developing his

---

[1] Zoe Katz has requested to be referred by her true name. Ms. Katz has spoken publicly about the injustice she has faced in this matter, participated in the trial court proceedings in her true name and objects to USC's characterization of her as a "Jane Roe," a name often used for victims of sexual misconduct.

Document received by the CA 2nd District Court of Appeal.

ranking as a draft-eligible college football player for the NFL in the 2017 draft class. (2CT401-402.) Mr. Boermeester had undergone knee surgery on January 10, 2017 and was wearing a knee brace. (1AR171.) Mr. Boermeester was taking anti-inflammatory medication but had refused pain medication. (1AR181.)

Ms. Katz had an on and off relationship with Mr. Boermeester before they began seriously dating in March 2016. (1AR180.) They broke up in October 2016 but saw each other nearly every day. (1AR172-173.) After his knee surgery, Mr. Boermeester spent most nights in Ms. Katz's apartment near the USC campus. (1AR180.)

### B. JANUARY 20, 2017

On January 20, 2017, at about 4:00 p.m. Ms. Katz drove Mr. Boermeester in her car and the two had dinner together for about two hours at the Cheesecake Factory. (1AR15; 1AR171; 1AR179.) After dinner, Ms. Katz left for another commitment and Mr. Boermeester stayed in the area and went shopping at The Grove with a friend. (1AR171.) After shopping, Mr. Boermeester went to hang out with members of the USC water polo team at a friend's house. (1AR175.) Ms. Katz later picked Mr. Boermeester up and they stopped at McDonald's on the way back to her apartment, arriving home about 1:00 a.m. (1AR179.)

9

Document received by the CA 2nd District Court of Appeal.

## C.    THE INTERACTION ON JANUARY 21, 2017

Ms. Katz parked in her parking space in the alley behind her duplex[2] and the two were "playing around like [they] always do." (1AR179.) Mr. Boermeester was not angry and had no reason to be angry; he was yelling about winning the Rose Bowl and trying to be funny. (1AR8.) Mr. Boermeester can be seen on surveillance video limping with his knee brace, holding a white McDonald's bag of French fries in one hand. (1AR190; 1AR171.) Mr. Boermeester explained that he jokingly put one of his hands on Ms. Katz's neck (not around her neck) as they were "laughing and messing around," but he was not rough with Ms. Katz, he did not choke Ms. Katz[3] or hit her head against a wall, and he and Ms. Katz were not arguing. (1AR172-173; 1AR192.) This is supported by witness DH's[4] statement that he saw Mr. Boermeester's "hand [not hands] on her chest/neck" (1AR95) and is consistent with the security video. (1AR190.)

Ms. Katz and Mr. Boermeester agree on the sequence of events, and agree that there was no violence, neither was angry, and that Ms. Katz suffered no harm. (1AR66-69; 1AR192-214.) As Ms. Katz attested,

---

[2] Ms. Katz shared one unit with other members of the women's tennis team and the other unit is occupied by several members of the men's tennis team. (1AR9.)

[3] Mr. Boermeester touched Ms. Katz with one hand and was holding the McDonald's bag in his other hand. (1AR179; 1AR190.) Any allegations or findings that Mr. Boermeester put two hands on or around Ms. Katz's neck are demonstrably false.

[4] The University refers to witnesses by their initials in the Summary Administrative Review investigative report.

Document received by the CA 2nd District Court of Appeal.

> No one was mad at all that night. We were laughing and messing around with each other. The Title IX office jumped to wrong and unsupported conclusions and now implies that [Mr. Boermeester]'s behavior must be because he was mad at something. That is not what happened. As was evidenced by my statements that night, the fact that we spent the entire weekend together, and my clear explanation of what transpired, I was never physically abused.

1AR192.

Ms. Katz had no bruising, no scrapes, nor any signs of physical harm anywhere on her body just two days after the incident. (1AR194.) In fact, there is no evidence that Ms. Katz was harmed by Mr. Boermeester in any way. During her initial interview on January 23, 2017, Ms. Katz was "physically examined [by University personnel] … and there were no bruises or anything else anywhere on my body." (1AR194.) USC does not mention the lack of physical evidence nor Ms. Means examination of Ms. Katz anywhere in its investigation report or in its briefs.

## D. THE SECURITY VIDEO

Unbeknownst to Mr. Boermeester and Ms. Katz, their interaction was recorded by a surveillance camera in the alley. (1AR190.) When USC finally showed them the three-minute and 53-second surveillance video, the video showed what Mr. Boermeester and Ms. Katz described all along: that they could be seen in the alley talking, embracing, kissing, and playing with Ms. Katz's dog. (1AR74; 1AR190; 1AR203.)

11

Document received by the CA 2nd District Court of Appeal.

USC's Title IX investigator's summary of the security video reflects an innocuous encounter. (1AR44-45.) Nowhere, even in the description written by USC's Title IX investigator is there any hitting, choking, punching, or other physical violence or physical harm. (1AR44-45.)

As this Court noted previously, "The surveillance video is not conclusive. The picture is grainy and there is no audio. The video camera is positioned approximately two buildings away from Roe and Boermeester. They are small figures in the frame of the video. Additionally, there is a light on the left side of the frame, which renders the interaction between Boermeester and Roe when they are near the wall barely visible." (*Boermeester*, *supra*, 49 Cal.App.5th at p. 707.)

### E.  WHAT DH AND MB2 ACTUALLY SAID THEY SAW AND HEARD.

Two fellow students, DH and MB, provided the following accounts of the January 21, 2017 "incident":

#### 1.  *Witness DH*

The investigator's notes of DH's interview indicate that DH came back from dinner, and at around 1:00 to 2:00 a.m., he was "half asleep." (1AR95.) He heard a male yelling loudly, and then he heard a female talking, so he went to check by looking out his window. (*Id.*) The notes state that DH saw Mr. Boermeester and Ms. Katz at the wall for "about three seconds," and in those three seconds, DH saw that Mr. Boermeester had Ms. Katz "pinned against the wall with his hand [singular] on her chest/neck" and "Ms. Katz was trying to talk to him." (*Id.*) DH could not see Ms.

Document received by the CA 2nd District Court of Appeal.

Katz's face and could not make out what they were saying. (*Id.*)
Ms. Katz's dog was running around. (*Id.*) DH did not see or hear
any contact of Ms. Katz hitting the wall. (*Id.*)

According to the investigator's notes, DH then told his
roommate TS, "[Ms. Katz] and [Mr. Boermeester] are fighting."
(*Id.*) The investigator's notes indicate that when DH and TS
spoke to Ms. Katz as she was entering her apartment, she said,
"[I]t's fine," but DH and TS told her "it was not ok." (*Id.*) DH said
Ms. Katz "seemed pretty scared" but that she was not "bawling
and freaking out" as DH had expected. (*Id.*) DH and TS both said
that Ms. Katz never expressed fear of Mr. Boermeester. (1AR96;
1AR127.) Ms. Katz agreed that she "never expressed any fear of
being hurt" by Mr. Boermeester to DH or TS. (1AR193.)

TS did not see or hear any of the interaction in the alley.
(1AR125.)

### 2. *Witness MB2*

The investigator's notes of her phone interview with MB2
state that MB2 was inside his apartment in a different building
when he heard an argument and went down to see what was
happening and to take out his trash. (1AR131.) MB2 vaguely
knew the woman as his neighbor but had "never met the guy."
(*Id.*) MB2 could not tell what they were arguing about, but there
was a dog there and it seemed like they were arguing over the
dog. (*Id.*) There was no screaming and MB2 did not see anyone
touch the other; they were just talking. (*Id.*) MB2 thinks he said
hello and gave a wave and the two left after that. (*Id.*) The

Document received by the CA 2nd District Court of Appeal.

security video is consistent with the information that MB2 provided over the phone on February 3, 2017. (1AR190.)

Over a month later, MB2 left a voicemail for the USC Title IX investigator purportedly stating that "the truth is that I saw everything" and that now MB2 wanted to share the truth and say why he had lied to the investigator.[5] (1AR85.) The investigator's notes of MB2's second telephone interview reflect that MB2 heard "laughing and screaming" sounds from the alley, which were playful at first. (*Id.*) MB2 then saw a guy standing around Ms. Katz with both of his hands around her neck, pushing Ms. Katz against the wall, and MB2 heard Ms. Katz make "gagging" sounds. (*Id.*) MB2 claimed, "I could see in her eyes, she was very scared." (*Id.*) MB2 then went downstairs with his trash bag and asked how things were going which "broke it up." (*Id.*) Ms. Katz and Mr. Boermeester then walked back into her house.

The investigator's notes are silent about MB2's vantage point, whether MB2' apartment has a window overlooking the alley, and how MB2 could see what he later claimed, and how he "could see in [Ms. Katz's] eyes." (1AR85.) In his first telephone interview MB2 did not see anyone until he had left his apartment and gone downstairs. (1AR131.) In his second telephone interview MB2 claimed to have witnessed the interaction before he went "downstairs with his trash bag and asked how things were going." (1AR85.) MB2 only vaguely knew "the woman" as his neighbor but said in his second telephone interview that he

---

[5] MB2 said that he had also lied to Mr. Boermeester's attorney. (1AR85.)

Document received by the CA 2nd District Court of Appeal.

lied to the investigator and an attorney "out of respect to her." (*Id.*) MB2 had never seen Mr. Boermeester before but supposedly formed the opinion that, "This guy is violent, he domestically was abusing her" and that he has "a history of violence." (*Id.*)[6]

## F.   THE USC TITLE IX INVESTIGATION BEGINS

On January 21, 2017, at 9:21 p.m., USC Men's Tennis Coach Peter Smith emailed USC's Title IX Coordinator Gretchen Dahlinger Means[7] that TS reported that "Zoe Katz said that her boyfriend was beating her up and throwing her against the wall and choking her." (2AR477.) TS had not seen or heard any part of the interaction in the alley and admittedly "never liked" Mr. Boermeester. (1AR124-126.)

On January 22, 2017, Title IX Coordinator Means spoke with Coach Peter Smith, TS, and DH in undocumented telephone calls. (1AR3.) Ms. Means also contacted Dr. Robin Scholefield,

---

[6] Mr. Boermeester and Ms. Katz were not allowed to question MB2 about his revised account. (1AR6; 1AR48; 2AR315-316.) The Title IX Office arbitrarily determined that MB2 was untruthful in his initial interview but truthful in his second interview. (1AR52.)

[7] Ms. Means is a former sex-crimes prosecutor for the San Diego District Attorney's Office and the U.S. Marine Corps. In a similar mandamus action against USC decided in the student's favor in the trial court, Ms. Means referred to the accused male student and his advisor as "motherfuckers" while describing the female student as "cute" "intelligent" and "a catch." The trial court in that case found such statements to "amply demonstrate an unacceptable probability of actual bias" against the accused student. (*John Doe v. Carry, et al.*, LASC Case no. BS163736, decision at CT903-904.)

Document received by the CA 2nd District Court of Appeal.

Associate Director of Sports Psychology at USC, and Richard Gallien, Coach for USC's Women's Tennis Team. (1AR1.)

On January 23, 20l7, Coach Richard Gallien insisted that Ms. Katz must attend a mandatory meeting with the USC Title IX Office. (See 2AR412 ("it is an expectation (and requirement) for ALL USC students to meet with an administrator upon request.").)

At the time Zoe Katz met with Title IX Coordinator Means, Title IX Investigator Lauren Helsper, and Dr. Nohelani Lawrence, her USC-assigned advisor for the meeting, the USC Title IX officials believed that in the early morning of January 21, 2017 Mr. Boermeester had been angry and had choked Ms. Katz and repeatedly thrown her and hit her head against a wall, and that Ms. Katz was in an abusive relationship with Mr. Boermeester.[8] (2AR477.) From the outset of the investigation, the USC Title IX investigation was focused on establishing their narrative, and any denial or protestation by Ms. Katz was considered confirmation that she was a victim of domestic abuse. (See 1AR53.)

### G. USC TITLE IX INTERACTIONS WITH ZOE KATZ

#### 1. *Ms. Katz Is Not Apprised of the Reason for Her Meeting with Title IX*

On January 23, 2017, Ms. Katz attended a mandatory meeting requested by the Title IX Office. (See e.g., 2AR412.) Title

---

[8] The Title IX officials were all the decision makers against Mr. Boermeester.  (2AR487.)

Document received by the CA 2nd District Court of Appeal.

IX Coordinator Means, Title IX Investigator Helsper, and counsellor Dr. Lawrence were present. (1AR183.) No one told Ms. Katz what Peter Smith had reported to Ms. Means, nor that USC considered the meeting an "intake" interview for a report of prohibited conduct to bring an action against Mr. Boermeester. (1AR67; 1AR183; 1AR193.) As Ms. Katz explained, "I didn't understand the purpose of the meeting or why I was there. Based on things they said and did, I believed that our discussion was like a counseling session where I was free to vent about my relationship or blow off steam." (1AR67.)

### 2. *Ms. Katz Objects to USC Title IX's Misrepresentations and Mischaracterizations*

Although other witnesses in the investigation had their statements re-read to them and were asked to confirm the accuracy of those statements during their meetings with Title IX officials (see e.g. 1AR88; 1AR90-91; 1AR96), Ms. Katz's statements were never re-read to her during her interviews, and she was never asked to confirm the accuracy of the non-verbatim, summarized notes taken by Title IX Investigator Helsper during her interviews. (1AR169; 1AR189.) Ms. Katz did not learn what USC's Title IX Office was claiming she had said during her private, unrecorded meetings with them until the Evidence Review period, at which time she immediately corrected the record:

> The truth is, Matt and I were horsing around in the driveway and alley on the night of January

Document received by the CA 2nd District Court of Appeal.

21. We had been laughing and playing and throwing French fries at each other in the car on the way to my apartment. Matt had had a little bit to drink that night, so he was being a bit loud in the alley. This is what people heard. But we were not in a fight and there was no hostility or anger between us. He did not touch me in a way that was violent, assaultive or in any way unwanted. He did not push me into a wall or otherwise try to hurt me. **I WOULD NEVER TOLERATE THAT.** I can see how these witnesses might have misinterpreted or misunderstood what they saw. But Matt and I were the only ones there and we are the only ones who understood the context, meaning and feelings behind what was going on in the alley. **MATT DID NOTHING TO HURT ME NOR DID HE HURT ME OR TRY TO HURT ME.**

1AR68, emphasis in original.

USC's Title IX Office claimed that Ms. Katz said Mr. Boermeester grabbed her by the neck and pushed her against a concrete wall, causing her to hit her head, that he "hits her," and that "[s]he often has bruises on her legs or arms because 'he is always doing something.'" (1AR184.) Ms. Katz vigorously disputed this:

I never told the Investigator that Respondent hit my head against a wall. He did not. I stated several times throughout the course of this investigation that Respondent and I were mutually rough housing and messing around. (Findings, p. 51). That is the truth. I also have never told the Title IX office that he hurts me when he is mad.

1AR192.

18

Document received by the CA 2nd District Court of Appeal.

### 3. *No Request for Avoidance of Contact*

USC claimed that Ms. Katz requested an Avoidance of Contact directive against Mr. Boermeester. (1AR1.) When Ms. Katz learned USC was making this false claim, she refuted it in her response to the evidence:

> I have never wanted [Mr. Boermeester] to be ordered to stay away from me or not to contact me. In fact, I have requested that this investigation be terminated and that I be permitted to see and speak with Matt. All of my wishes in this matter have been ignored. In short, my voice is not being heard."

> 1AR69.

She also refuted it in her appeal of the findings against Mr. Boermeester:

> I did not request the AOC and housing because I felt I needed it for my safety. The report misrepresents what happened. I didn't understand anything regarding the procedure or how the Title IX investigation worked and thought those were both required of me to make the whole thing go away. In fact, throughout this process, I made repeated requests to remove the AOC as provided for in the policy to no avail. Even my attorney's request to remove it was denied.

> 1AR193.

19

### 4. *No Fear of Retaliation or Recantation*

USC claimed that on January 24, 2017, Ms. Katz contacted the Title IX Coordinator and Investigator and asked to "withdraw her statement in fear of retaliation." (1AR3.) Importantly, there are no notes or records of any such telephone conversation in the record. Because there are no notes or records of this phone conversation, Ms. Katz and Mr. Boermeester had no opportunity to dispute this "evidence" of Ms. Katz supposedly "recanting" her statement in fear of retaliation, prior to USC's investigator determining that she had done so.

Ms. Katz addressed USC's claim that she had "recanted" at the first available opportunity:

> [T]he Investigator's statements from me on January 24, 2017 are simply wrong. The report states that I wanted to withdraw my statement in fear of retaliation. (Summary of Administrative Report, p. 3). This is incorrect. I was not and never have been scared of retaliation from [Mr. Boermeester].

1AR192.

On January 30, 2017, Ms. Katz requested a meeting with investigator Helsper to express that she felt "blindsided" and had been "bullied" and "manipulated" at the initial meeting. (1AR168-169.) Investigator Helsper told Ms. Katz about the security video from the alley. (1AR169.) Ms. Katz offered to provide commentary on the video footage as her official statement, but investigator Helsper responded that reviewing the footage during the investigation "would be a 'privilege' as it is usually not seen until

Document received by the CA 2nd District Court of Appeal.

Ev[idence] Review." (*Id*.) USC refused to allow Ms. Katz and Mr. Boermeester to see the security video during the Title IX investigation.

On February 8, 2017, Ms. Katz publicly tweeted "I am the one involved in the investigation with Matt Boermeester. The report is false. @Deadspin @latimes @ReignofTroy". (1AR56.) Ms. Katz was then summoned to a meeting by the Title IX Office and interrogated about her motives for discussing the investigation on social media. (1AR14; 1AR102-103.) Ms. Katz explained "I felt powerless throughout this whole thing. I was pissed that this was happening and that this was out of my control. So, I wanted to be able to say something coming from me." (1AR102.) When asked whether she had been in contact with Mr. Boermeester since the issuance of the Avoidance of Contact order, Ms. Katz stated, "I am not in danger or feel threatened by him at all." (*Id*.) Ms. Katz asked for the Avoidance of Contact order to be lifted because "he is like my best friend, so it is like you are taking that away too." (1AR13.)

Investigator Helsper advised Ms. Katz that the avoidance of contact directive would not be lifted. (1AR103.) USC effectively barred Ms. Katz, an adult woman who was (and is) perfectly capable of making her own choices and acting in her own best interest, from seeing Mr. Boermeester — even off campus and outside of Los Angeles.

Expressing that it was only the University that was victimizing her, in her response to evidence Ms. Katz stated, "it is insulting that the University believes that I am some sort of

21

Document received by the CA 2nd District Court of Appeal.

'victim' who would tolerate being abused by Matt or by anyone."
(1AR68.) Reiterating her position that the University process was
biased and unjust, Ms. Katz stated, "**I would not tolerate
[abuse]. … MATT DID NOTHING TO HURT ME NOR DID
HE HURT ME OR TRY TO HURT ME.**" (1AR68, emphasis in
original.) Ms. Katz continued:

> [M]y voice is not being heard.
>
> If anyone has been abusive to me or
> disrespectful of me, it has been the University,
> not Matt. I feel that I have been mistreated,
> misled, manipulated, and lied to by the
> University. It is the University and not Matt
> which has hurt me and caused me unbelievable
> pain and distress.
>
> 1AR69.

## H. USC TITLE IX INTERACTIONS WITH MATT BOERMEESTER

### 1. *Mr. Boermeester Is Summarily Suspended, then Charged*

On January 25, 2017, Mr. Boermeester was summarily
suspended indefinitely without prior notice or a fair hearing and
was told that he was not allowed to have any contact whatsoever
with Ms. Katz. (2AR472-473.)

On January 26, 2017, Title IX Coordinator Gretchen
Dahlinger Means notified Mr. Boermeester that a Title IX
investigation was underway into an allegation of "Intimate
Partner Violence," defined as "conduct that causes physical harm
to a person with whom you have had a previous dating, romantic,

22

Document received by the CA 2nd District Court of Appeal.

intimate, or sexual relationship. (2AR470.) Specifically, Mr. Boermeester was accused of "grabbing [Ms. Katz] by the neck, and pushing her head into a cinder block wall multiple times on/or about January 21, 2017." (*Id.*)

On January 30, 2017, Mr. Boermeester and his mother, an attorney, met with investigator Helsper. (1AR171.) Mr. Boermeester agreed that he had placed one of his hands on Ms. Katz's neck but explained that he and Ms. Katz were "'horsing around.' There was zero animosity." (1AR179-181.) Mr. Boermeester expressed, "There was no chance of me causing physical harm. If I did Zoe would be going against me and not with me." (*Id.*) Mr. Boermeester also reported that he and Ms. Katz had spent the next three nights together after January 21, 2017. (1AR172.) Mr. Boermeester suggested two witnesses to be interviewed, BE and LE. (1AR177.) Despite interviewing over a dozen other witnesses who had no relationship to or knowledge of the interaction in the alley, the Title IX Office refused to interview the witnesses suggested by Mr. Boermeester. (1AR3-7.)

Mr. Boermeester requested that the indefinite suspension be modified or lifted so he could complete his degree and continue physical therapy for his injured and swollen knee. (2AR443-444.) The indefinite suspension was derailing Mr. Boermeester's plans to pursue a master's degree and continue to play football at USC in hopes of pursuing a professional NFL career. (See 1AR289.) His appeal of the indefinite suspension was denied by Vice President for Student Affairs, Ainsley Carry, without a hearing

and without any showing that Mr. Boermeester posed a risk to the campus community. (2AR442.)

### 2. *USC Issues Avoidance of Contact Charges*

Within days of Ms. Katz' February 8, 2017 public tweet and her meeting with the Title IX Office, investigator Helsper notified Mr. Boermeester that the Title IX Office was adding a second violation for "contacting and communicating with Zoe Katz via text, phone call, social media, and in-person since the issuance of the Avoidance of Contact Order." (1AR5; 2AR414.) Mr. Boermeester insisted that he had complied with the Avoidance of Contact order by not initiating contact with Ms. Katz, as he was living in San Diego and had not returned to USC or Los Angeles since the imposition of the suspension. (1AR17; 1AR89.)

### I. USC TITLE IX INTERVIEWS 16 OTHER WITNESSES

The USC Title IX Office's efforts to establish the narrative of an ongoing abusive relationship is also seen in the extent of the Title IX Office's investigation. Although DH and MB2 were the only percipient witnesses to any part of the interaction in the alley, other than Mr. Boermeester and Ms. Katz, Title IX investigator Helsper, at times accompanied by Title IX Coordinator Means, interviewed and re-interviewed sixteen witnesses, including Mr. Boermeester's ex-girlfriend who had no connection or insight into the incident that occurred on January 21, 2017 and was not a USC student. (1AR2-4.) Some interviews were conducted in person, though several witnesses were

24

Document received by the CA 2nd District Court of Appeal.

interviewed only by telephone.[9] (See 1AR87 (AB); 1AR92 (SS); 1AR115 (CR); 1AR85 and 1AR131 (MB2); 1AR136 (Richard Gallien), 1AR139 (Peter Smith).) None of the interviews were audio recorded, and there is no record of the actual questions asked or the verbatim responses of the witness. None of the witnesses were permitted to see the Title IX Investigator's summaries of their interview for accuracy.

Many of the witnesses interviewed were influenced by the gossip, media reports, and the public nature of Mr. Boermeester's removal from USC's campus and the USC football team. (See 1AR85-164.) As summarized by one witness, "He wouldn't get suspended over nothing, so they know something happened[.]" (1AR27.)

### J. USC TITLE IX ADJUDICATION PROCESS

#### 1. *USC's Evidence Review and Evidence Hearing Processes*

USC's Title IX policy did not provide for a formal evidentiary hearing or cross-examination. (2AR492-493.) The Title IX Coordinator Gretchen Dahlinger Means oversaw all reports and investigations and Title IX investigator Helsper, in consultation with Title IX Coordinator Means, conducted the

---

[9] Not only was this contrary to USC's Policy, which "requires the Investigator to personally see and hear all parties and witnesses to the investigation, putting him/her in the best position to make determinations as to credibility and relevance" (1 AR 219), but conducting interviews by phone precludes accurate identification of witnesses and evaluation of credibility.

25

Document received by the CA 2nd District Court of Appeal.

investigation, made all relevancy and credibility determinations, and made all findings of fact. (2AR488; 2AR492-493, section X.)

USC's Policy provides that at the conclusion of the initial Title IX investigation, the parties may participate in "Evidence Review," where the parties may view the investigator's summaries of witness interviews and other evidence collected but may not receive copies. (2AR492.) Following "Evidence Review", the policy calls for an "Evidence Hearing" where the parties each meet individually and separately with the Title IX Coordinator and Title IX investigator to respond orally or by written submission to the evidence they are permitted to view during "Evidence Review." (2AR493.) Following the "Evidence Hearing," the Title IX Coordinator and the Title IX Investigator then determine whether the student violated the policy based on the investigator's factual findings.[10] (2AR493.) The Title IX Investigator, in consultation with the Title IX Coordinator, prepares a Summary Administrative Review ("SAR"), "a report that analyzes the information collected and makes findings of fact and policy violation." (*Id.*)

### 2. *Both Parties Participate In "Evidence Review"*

On March 8 and 10, 2017, Mr. Boermeester and Ms. Katz separately participated in "Evidence Review," where they viewed the information gathered or prepared by the Title IX investigator, totaling over 100 pages of documentary evidence, plus video

---

[10] The Title IX Coordinator also sits in on the meeting of the Misconduct Sanctioning Panel. (2AR493.)

Document received by the CA 2nd District Court of Appeal.

footage and an audio recording. (1AR47; 1AR84-191; 2AR 357-358.) Mr. Boermeester and Ms. Katz were permitted to take only "a pencil/pen and notepad" into the room as they reviewed the evidence. (2AR365; 2AR367.)

On March 22, 2017, Mr. Boermeester and Ms. Katz each submitted written responses to the evidence. (1AR3; 1AR59-69.) Mr. Boermeester denied the university's allegations against him and highlighted flaws in the investigation. (1AR59-66.) Ms. Katz reiterated what she had maintained all along:

> **"First, I want to make clear that Matt Boermeester has NEVER hit, choked, kicked, pushed or otherwise physically abused me and he did not do so on January 21, 2017."**

(1AR67-68, emphasis in original.)

On March 22, 2017, Mr. Boermeester's advisor/attorney inquired about the format for submitting questions for the other party. (1AR295.) Investigator Helsper responded, "You send me the questions and we will ask them of [Ms. Katz]. You will get the answers to all of her questions in the SAR (my report)." (1AR294.) Mr. Boermeester's advisor/attorney, recognizing that Ms. Katz "has multiple statements where she has made clear that she is not comfortable with the way her statement has been reported," requested to have a "direct response from [Ms. Katz] without any Title IX filter" by having his questions "sent to [Ms. Katz] and her advisor," to permit Ms. Katz "to review them, write an answer and send them back to you to send to us[.]" (1AR293-

27

294.) Title IX Coordinator Means responded, "The process does not afford that." (1AR293.) All the "process" afforded was for Title IX Coordinator Means to question Ms. Katz again in private with no assurance that Mr. Boermeester's questions would be asked, or how they would be asked, and no mechanism to assure that Title IX Coordinator Means would accurately report Ms. Katz's answers. (2AR493, section IX.A.4.)

Mr. Boermeester declined to submit questions to USC's Title IX Investigator and Title IX Coordinator to ask Ms. Katz in private with no record, given that Ms. Katz had "made clear that she [wa]s not comfortable with the way her statement ha[d] been reported." (1AR293-294.) Mr. Boermeester's advisor noted his concern that, "The failure to record or transcribe any of the interviews and the admission by at least one witness that he lied during his initial interview have shaken our confidence in the accuracy of this investigation." (1AR293.)

### K. USC TITLE IX OFFICE ISSUES THE SAR

On April 27, 2017, Title IX Investigator Helsper and Title IX Coordinator Means issued the SAR, finding Mr. Boermeester "responsible for the charged violations." (1AR 1-80; 1AR257-258.) Investigator Helsper and Title IX Coordinator Means also found that Mr. Boermeester "violated the AOC on multiple occasions" by communicating with Ms. Katz by cell phone, regardless of whether Ms. Katz had initiated the communications. (1AR53-54.) In the SAR, USC raised for the first time the theory that Zoe Katz had recanted. (1AR10 n. 15; 1AR51; 1AR53.)

Document received by the CA 2nd District Court of Appeal.

### L. USC'S SANCTIONING PANEL ORDERS EXPULSION

On May 2, 2017, USC's anonymous Misconduct Sanctioning Panel convened in closed session and decided that expulsion was the most appropriate sanction for Mr. Boermeester. (1AR249; 1AR254.) The Misconduct Sanctioning Panel is trained and overseen by Title IX Coordinator Means, and Ms. Means is present during their deliberations. (2AR493, section XI.B)

### M. USC'S APPEAL PANEL DENIES BOTH APPEALS BUT RECOMMENDS SUSPENSION, NOT EXPULSION

Mr. Boermeester and Ms. Katz both appealed the findings and decisions, urging the Appeal Panel to hold that no Policy violations had occurred. (1AR192-214.) Ms. Katz expounded in her appeal, "Throughout this process, my voice has not been heard. I ask that, now, during this appeal, the appellate panel hears my voice. I request that you overturn Respondent's expulsion and fully reinstate him." (1AR195-196.)

Mr. Boermeester and Ms. Katz each submitted a written response to the other's appeal, expressing support and agreeing that the findings and sanctions against Mr. Boermeester should be overturned. (1AR209-214.) Ms. Katz commented, "Instead of accepting me at my word, the Investigators repeatedly belittle me in their Report and make me sound like a fragile woman who can't think for herself or make decisions on her own." (1AR213.) Ms. Katz called for a new investigation to be performed by a neutral investigator so the truth could prevail. (1AR214.)

Document received by the CA 2nd District Court of Appeal.

Nevertheless, the Appeal Panel found that the SAR conclusions were supported by substantial evidence. (1AR217.) Regarding Ms. Katz's attestations that she was not a domestic abuse victim, the Appeal Panel reiterated investigator Helsper's demeaning finding, made without evidence, that recantation is an "expected, normative behavior for the type of relationship initially described by the Reporting Party to Title IX." (1AR220.) The Appeal Panel, however, determined that expulsion was "grossly disproportionate to the violations found," and recommended a two-year suspension and a 52-week domestic violence batterers program in lieu of expulsion. (1AR218.)

### N.  DR. AINSLEY CARRY ORDERS EXPULSION

On July 7, 2017, Dr. Ainsley Carry, who had summarily denied Mr. Boermeester's appeal of his indefinite suspension five months previously, approved the findings and conclusions reached by Title IX Investigator Helsper and Title IX Coordinator Means. (1AR221-222.)  Dr. Carry also rejected the Appeal Panel recommendation of suspension and ordered Mr. Boermeester expelled. (*Id.*)

Despite no evidence of any physical harm to Ms. Katz, and her strenuous denials, Dr. Carry reasoned that Mr. Boermeester's lack of intent in causing Ms. Katz physical harm was not a mitigating factor, and expulsion was the appropriate sanction "given the nature of the harm inflicted upon the Reporting Party." (1AR 221.)

On July 30, 2018, Ms. Katz released a public statement condemning USC's unjust Title IX proceedings. (1CT415-416.)

Document received by the CA 2nd District Court of Appeal.

Ms. Katz also made declarations under penalty of perjury in support of Mr. Boermeester in the trial court (2CT413-416; 3CT577-582.)

### O. MR. BOERMEESTER PETITIONS FOR WRIT OF MANDATE

On August 11, 2017, Mr. Boermeester filed his Petition for Writ of Mandamus pursuant to Code Civ. Proc. § 1094.5. (1CT6; 1CT11.)

On March 21, 2018, the Honorable Amy D. Hogue issued the trial court's order denying Mr. Boermeester's Petition for Writ of Administrative Mandate. (6CT1129-1150.)

On May 28, 2020, Division Eight of the Second District Court of Appeal issued a published opinion reversing the trial court decision and remanding with directions to the superior court to grant the petition for writ of administrative mandate. (*Boermeester v. Carry* (June 4, 2020, B290675) review granted and opn. ordered nonpub. Sept. 16, 2020, S263180.)

On July 6, 2020, Respondents filed a Petition for Review to the California Supreme Court.

On September 16, 2020, the California Supreme Court granted review and unpublished the Appellate Court opinion.

On July 31, 2023, the California Supreme Court reversed this Court's judgment and ordered the case remanded for the Court of Appeal to determine the remaining claims Mr. Boermeester raised that the Court of Appeal expressly declined to reach. (*Boermeester v. Carry* (2023) 15 Cal.5th 72.)

Document received by the CA 2nd District Court of Appeal.

## III. STANDARD OF REVIEW

Administrative mandamus relief lies in equity. (*City of Mountain View v. Superior Court* (1975) 54 Cal.App.3d 72, 81-82.) The Court may issue a writ of administrative mandate where an agency has deprived a petitioner of a fair hearing or prejudicially abused its discretion. (Code Civ. Proc., § 1094.5, subd. (b); *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152; *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239.)

"'A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law.'" (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 85, quoting *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239.)[11] The fair hearing requirements of Cal. Code Civ. Proc., § 1094.5 apply to USC even though the University is not a governmental entity. (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221; *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411; *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722–1723 (§ 1094.5 applicable to private universities); *Boermeester v. Carry* (2023) 15 Cal.5th 72, 85.)

---

[11] "Whether a hearing officer's procedural rulings give rise to prejudicial error is a question of law reviewed independently on the administrative record (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101), and a finding of prejudicial error would entitle the licentiate to a new hearing." (*Natarajan v. Dignity Health* (2021) 11 Cal.5th 1095, 1111-1112.)

Document received by the CA 2nd District Court of Appeal.

Private universities are required to comply with the common law doctrine of fair procedure by providing accused students with notice of the charges and a meaningful opportunity to be heard, although they are not required in all circumstances to provide accused students the opportunity to directly or indirectly cross-examine the accuser and other witnesses at a live hearing with the accused student in attendance, either in person or virtually. (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 79.)

A university, whether private or public, is bound by its own policies and procedures. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271-72; *Teacher v. California Western School of Law* (2022) 77 Cal.App.5th 111, 111.)

The determination of whether there was a fair trial should also require the trial court to review *de novo* whether the adjudicator appropriately weighed the evidence and met the university's preponderance of evidence standard to establish a policy violation.

## IV. ARGUMENT

### A. INDEPENDENT JUDGMENT, A TRIAL *DE NOVO*, SHOULD BE REQUIRED FOR REVIEW OF PRIVATE LITIGANT DECISIONS

The recent acknowledgement by the California Supreme Court that no state action is involved in private university Title IX administrative decisions brings into question whether the typical deference to public agency decisions also applies equally

Document received by the CA 2nd District Court of Appeal.

to decisions by private litigants. (See, *Boermeester v. Carry* (2023) 15 Cal.5th 72, 87.)

In administrative mandamus, courts apply either the independent judgment rule or the substantial evidence test. (*Mountain Defense League v. Board of Supervisors* (1977) 65 Cal.App.3d 723, 727):

> (c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.

> Code Civ. Proc., § 1094.5, subd. (c).

The independent judgment standard is to be used when the administrative process affects a vested fundamental right. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, hereafter *Bixby*.[12]) "[T]he trial court not only examines the administrative record for errors of law but also exercises its independent judgment based upon the evidence disclosed in a limited trial de novo." (*Id.*; Code Civ. Proc., § 1094.5, subd. (c); *Shuffer v. Board of Trustees* (1977) 67

---

[12] The Supreme Court provided no fixed formula but required trial courts to perform "a precious function in the protection of the rights of the individual" by deciding whether government agency adjudicative decisions affect vested fundamental rights on a case-by-case basis. (*Bixby, supra,* 4 Cal.3d at pp. 146-47.)

Document received by the CA 2nd District Court of Appeal.

Cal.App.3d 208, 219, citing *Greenhill v. Bailey* (8th Cir. 1975) 519 F.2d 5, 7.)

This deference of the judicial branch to governmental agency administrative decisions, however, is born of the doctrine of separation of powers and the official duty presumption. (See *Bixby, supra,* 4 Cal.3d at p. 140 ("The doctrine of separation of governmental powers under the California Constitution provides both independent judgment and substantial evidence review of administrative decisions."); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 812, hereafter *Fukuda* (findings of a state board where formal hearings are held come before courts with a strong presumption of correctness based primarily on the presumption "that official duty has been regularly performed"); Evid. Code, § 664.)

> "The findings of a board where formal hearings are held should and do come before the courts with a strong presumption in their favor based primarily on the [rebuttable] presumption contained in section 1963, subsection 15, of the Code of Civil Procedure [currently Evidence Code section 664] 'That official duty has been regularly performed.' Obviously, considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing, especially in cases involving technical and scientific evidence." (*Drummey, supra,* 13 Cal.2d at p. 86)
>
> (*Fukuda*, *supra,* 20 Cal. 4th at p. 812.)

Private colleges and private universities are not governmental agencies that have been granted judicial powers by the constitution or by the Legislature, nor are their private

35

employees entitled to the official duty presumption under Cal. Evid. Code, § 664. Although Code Civ. Proc., § 1094.5 has been made applicable to faculty tenure and student disciplinary matters conducted by private colleges and private universities (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716; *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407), neither the official duty presumption, nor presumptions based on the separation of powers, are applicable to private colleges and universities.

There is no justification whatsoever for judicial review to attend to USC as if the private university were a co-equal branch of the state government. USC is not a state actor, does not conduct full and formal hearings, and USC serves its own institutional and financial interests, not the interests of the general public, nor the People of the State of California; its administrators and Title IX personnel are not public officials. USC is a private, non-profit corporation, not a statewide administrative agency with constitutionally derived powers, such as the University of California. (See Cal Const, Art. IX § 9; *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, hereafter *Santa Monica*.) In contrast to USC, University of California employees are public employees, and the Regents have rulemaking and policymaking power, and their policies and procedures have the force and effect of statute. (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165.) The Regents have been characterized as "a branch of the

Document received by the CA 2nd District Court of Appeal.

state itself" or "a statewide administrative agency." (*Santa Monica, supra,* 77 Cal.App.3d at p. 135.)

The preference given to one private litigant over the rights of the other, favoring Respondent USC over Matt Boermeester, violates the precept of equal protection under the law embedded in the constitutions of this state and of the United States.

As such, this Court should find that Plaintiff and Appellant was entitled to independent review of the evidence, and that the trial court implemented the wrong standard of review in determining that USC's findings and decisions were supported by substantial evidence. (See 6CT1148.)

### B. USC'S ADMINISTRATIVE DECISION AFFECTS MR. BOERMEESTER'S VESTED FUNDAMENTAL RIGHTS

Where an administrative agency's decision substantially affects a vested, fundamental right, "[T]he trial court not only examines the administrative record for errors of law but also exercises its independent judgment based upon the evidence disclosed in a limited trial de novo." (*Bixby, supra,* 4 Cal.3d at p. 143.) Here, the trial court incorrectly evaluated the evidence under a substantial evidence review standard, rather than an independent judgment review standard. (6CT1138; 6CT1148-1150.)

A court must determine on a case-by-case basis whether an administrative decision affects a vested fundamental right. (*Bixby*, *supra*, 4 Cal.3d at 144.) In a court's case-by-case analysis

of the existence of a vested fundamental right, a court is to consider:

> [T]he nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, whether it is possessed by, and vested in, the individual or merely sought by him. . . . [¶] In determining whether the right is fundamental, courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation.

> *Id.*

To determine whether a vested fundamental right is affected, a court considers rights beyond those determined to be fundamental under the Constitution.[13]

California courts have described the value of higher education as "an interest of almost incalculable value, especially

---

[13] See *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 775 [the right to be free from an erroneous charge against an unemployment insurance reserve account is a vested fundamental right for purposes of mandamus review]; *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 396-397 [the right to retain a driver's license is a vested fundamental right because it has "an impact on the individual sufficiently vital . . . to compel a full and independent review by the court."].) Additionally, "[T]he United States Supreme Court listed the right of the individual 'to engage in any of the common occupations of life' as one of several fundamental liberties, which also include the right of the individual 'to acquire useful knowledge...'" (*Bixby, supra*, 4 Cal.3d at p. 145 n. 12.)

Document received by the CA 2nd District Court of Appeal.

to those students who have already enrolled in the institution and begun the pursuit of their college training." (*Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 876.) The court in *Goldberg* went on to explain that "attendance at publicly financed institutions of higher education should be regarded a benefit somewhat analogous to that of public employment." (*Id.* at 877.) And as noted in *Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 312-318, an administrative disciplinary decision, including a mere reprimand, that affects an individual's "future opportunities for career advancement" affects a fundamental right and must be afforded independent judgment review.

It is an accepted fact that, "Expulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career." (*Furey v. Temple Univ.* (E.D. Pa. 2012) 884 F.Supp.2d 223, 245-48.)

The Sixth Circuit similarly found, "Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest." (*Doe v. Univ. of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 399.) Moreover,

> Being labeled a sex offender by a university has both an immediate and lasting impact on a

> student's life. *Miami Univ.*, 882 F.3d at 600. The student may be forced to withdraw from his classes and move out of his university housing. *Id.* His personal relationships might suffer. See *id.* And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled. *Id.*

> *Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 582.

USC's expulsion decision constitutes an alteration of Mr. Boermeester's legal status as a student. (*Doe v. Rector & Visitors of George Mason Univ.* (E.D.Va. 2016) 149 F. Supp. 3d 602, 613, citing *Sciolino v. City of Newport News* (4th Cir. 2007) 480 F.3d 642, 649 [termination of employment constitutes a qualifying alteration of status].) The California Supreme Court recognizes that USC's expulsion decision affects Mr. Boermeester's property interest in his university education, which he paid for, and the University took away by expelling him. (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 89.) The Court also acknowledged the negative effect the expulsion decision will have on Mr. Boermeester's future employment opportunities: "Given the seriousness of sexual misconduct or intimate partner violence allegations, a student who is expelled from a university for such conduct may find it especially difficult—if not impossible—to complete a postsecondary education elsewhere, thwarting the student's ability to realize 'the economic and professional benefits flowing' from a college degree." (*Id.*, quoting *Ezekial v. Winkley* (1977) 20 Cal.3d 267, 274.)

40

Document received by the CA 2nd District Court of Appeal.

Mr. Boermeester was stripped of his full athletic scholarship and separated from the academic, athletic, and medical resources he received as a USC student when Mr. Boermeester was just two classes shy of earning his undergraduate degree. The expulsion decision has precluded Mr. Boermeester from being admitted to another university to finish his undergraduate degree; thus, his ability to realize the economic and professional benefits that naturally flow from a college degree have been thwarted. As a result of USC's actions, Mr. Boermeester lost the opportunity to play football for USC, a Division I college football team in conversations for a National Championship in 2017, making it impossible for him to develop his ranking as a draft-eligible college football player for the NFL and destroying his chances of recruitment to any professional football team. On top of that, the publicity generated by USC's administrative proceedings, and his public removal from the USC football team, shattered Mr. Boermeester's reputation.

USC's administrative decision substantially affects Mr. Boermeester's vested fundamental right to the education and University resources that were taken away from him by the expulsion decision; his vested fundamental right to his good name and reputation; and his future employment opportunities and career advancement. The Court should reverse the trial court ruling that the administrative decision did not substantially affect a vested fundamental right and remand to the trial court to review the evidence independently.

Document received by the CA 2nd District Court of Appeal.

### C.   USC'S FINDINGS AND DETERMINATIONS ARE NOT SUPPORTED EVEN BY SUBSTANTIAL EVIDENCE

If the Court determines that the substantial evidence standard was correctly employed, it should still decide that USC's decision is not supported by the findings, or the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5 subd. (b).)

The administrative decision must be "supported by the findings," and the findings "supported by the weight of the evidence," or where an administrative action does not affect vested fundamental rights, the findings must be "supported by substantial evidence in the light of the whole record." (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239.) The Court must scrutinize all the evidence in the record, both that supporting and that detracting from the University's findings of fact. The Court cannot sustain the agency's decision based only on the evidence supporting that decision viewed in isolation. (*Bixby, supra,* 4 Cal.3d at pp. 143, 149.) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence'; inferences that are the result of mere speculation or conjecture cannot support a finding." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) A reviewing court does not "blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . It must be reasonable, . . . credible, and of solid value." (*Id*.; see also *JKH*

Document received by the CA 2nd District Court of Appeal.

*Enterprises, Inc. v. Department of Industrial Relations* (2006) 142
Cal.App.4th 1046, 1057.)

USC's decision that Mr. Boermeester committed "intimate
partner violence," defined as "…violence committed against a
person…with whom they have a previous or current dating,
romantic, intimate, or sexual relationship," is not supported by
the findings or the evidence. (1AR50) USC accused Mr.
Boermeester of "causing physical harm" to Ms. Katz by grabbing
her by the neck and pushing her head into a wall. (*Id.*) There are
no findings whatsoever that Mr. Boermeester caused Ms. Katz
any physical harm, and the evidence does not support a finding of
physical harm. (See 1AR51-54.) Ms. Katz had no bruising, no
scrapes, nor any signs of physical harm anywhere on her body
just two days after the incident. (1AR194.) According to Ms. Katz,
and uncontested by USC, during her initial interview on January
23, 2017, Ms. Katz was "physically examined [by University
personnel] … and there were no bruises or anything else
anywhere on [her] body." (1AR194.) No evidence of physical harm
was produced during the investigation. The determination that
Mr. Boermeester committed "intimate partner violence" by
causing "physical harm" to Ms. Katz is simply not borne out by
the findings, nor by the evidence in the record.

USC's factual finding that Mr. Boermeester grabbed Ms.
Katz by the neck and pushed her head into a wall is also not
supported by substantial evidence. (1AR54.) To determine if this
factual finding is supported by substantial evidence, the court
must determine whether USC relied on "relevant evidence that a

Document received by the CA 2nd District Court of Appeal.

43

470

reasonable mind might accept as adequate to support a conclusion." (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584.) As the California Supreme Court has long recognized,

> " '[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence.' There must be substantial evidence to support such a . . . ruling, and hearsay, unless specially permitted by statute is not competent evidence to that end. [Citations omitted.] Except in those instances recognized by statute where the reliability of hearsay is established, 'hearsay evidence alone "is insufficient to satisfy the requirement of due process of law, and mere uncorroborated hearsay does not constitute substantial evidence. [Citation.]" ' "
>
> *In re Lucero L.* (2000) 22 Cal.4th 1227, 1244-1245.

Division Four of this District's Court of Appeal instructs:

> " ' Hearsay evidence that contradicts all firsthand accounts of what occurred is not substantial evidence sufficient to support a finding [in a student discipline administrative proceeding]. Under the substantial evidence test, the quality of the evidence is important. [Citation.] ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' [Citation.]"
>
> *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 253.

Division Two of this District's Court of Appeal advises substantial evidence review cannot rely "on isolated evidence torn

Document received by the CA 2nd District Court of Appeal.

from the context of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.):

> "Substantial evidence is therefore not merely an appellate incantation designed to conjure up an affirmance. To the contrary, it is essential to the integrity of the judicial process that a judgment be supported by evidence that is at least substantial. An appellate court need not 'blindly seize any evidence . . . in order to affirm the judgment. The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.' [Citation.]"

> *Id.*

USC's factual finding relies predominantly on uncorroborated hearsay summaries of what witnesses may have said during private, unrecorded interviews with USC's investigator and Title IX Coordinator. (See 1AR84-189.) The uncorroborated hearsay summaries themselves contain various levels of uncorroborated hearsay, including what witnesses supposedly said they heard from Zoe Katz or other witnesses. These uncorroborated hearsay summaries do not amount to substantial evidence and certainly cannot be deemed weightier or more reliable than the written statements submitted personally by Ms. Katz and Mr. Boermeester. In her written statements, Ms. Katz disputed that she ever made statements indicating Mr. Boermeester hit her head against a wall, and to this day, she denies that any alleged intimate partner violence occurred. (1AR67-69; 1AR192-196; 1AR212-214.) The investigator's notes in

45

Document received by the CA 2nd District Court of Appeal.

the record constitute uncorroborated hearsay, which is not substantial evidence. (*Consolidated Edison Co. v. NLRB* (1938) 305 U.S. 197, 230 ("assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence.").)

The security video is inconclusive but is consistent with Ms. Katz's statements, as well as what Mr. Boermeester's statement that no violence occurred.

The investigator's speculation and opinion of Ms. Katz as a victim of domestic violence who "recanted" cannot possibly be deemed substantial evidence, especially in light of Ms. Katz's repeated assertions that she is not a victim of domestic violence and would never stand for physical or verbal abuse perpetrated by Mr. Boermeester or anyone. (1AR53; 1AR68.)

In light of the whole record, the evidence relied upon is not substantial and cannot support a finding that Mr. Boermeester grabbed Ms. Katz by the neck and pushed her head into a wall.

### D. COMBINING THE INVESTIGATOR AND ADJUDICATOR ROLES WAS UNFAIR IN LIGHT OF INVESTIGATOR'S QUESTIONABLE EXERCISES OF DISCRETION

In a student disciplinary adjudication, the factfinder cannot be an individual with the "divided and inconsistent roles," such as those occupied by the Title IX investigator at USC, who exercises "unfettered discretion to chart the course and scope of

46

Document received by the CA 2nd District Court of Appeal.

the investigation and to determine credibility in questionable ways." (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1069-70.)

In *Allee*, all the administrative findings and decisions were made by the investigator, USC's Dr. Keegan Allee, whose determination was based on "all evidence she deemed relevant, and taking into account her determination as to the parties' credibility." (*Ibid.*) This process, the *Allee* Court ruled, was unfair.

Congruently, the sole Title IX investigator Lauren Elan Helsper decided that the Title IX Office's allegations against Mr. Boermeester were validated. (1AR50-54.) Investigator Helsper's factual findings rely on the determination that her own notes from a private, unrecorded initial interview with Ms. Katz, which Ms. Katz attests do not accurately represent her statements, were more credible than the written submissions of Mr. Boermeester and Ms. Katz themselves. (1AR67) In analyzing the evidence and making her findings, Investigator Helsper disregarded the parties' own written submissions entirely, except to bolster her own unsupported opinion that Ms. Katz is a victim of domestic violence (1AR53), over Ms. Katz's strenuous objections to being cast as the victim, and her undisputed assurances that she would never stand for physical or verbal abuse perpetrated by Mr. Boermeester or anyone. (1AR68.)

The investigator's findings were additionally based on her determination that witness reports—even from witnesses she had never met in person and only interviewed by phone, like MB2 and Peter Smith—were more credible than Ms. Katz's and Mr.

47

Document received by the CA 2nd District Court of Appeal.

Boermeester's descriptions of their own thoughts, feelings, statements, and actions, and objective interactions depicted on a surveillance video. (See 1AR51-52.)

USC's Title IX Office conducted private, separate investigatory interviews, for which there are no verbatim recordings or transcripts, and no mechanism by which to confirm the veracity and authenticity and accuracy of any of the witness statements. (1AR59-69.) Several of the witnesses, even critical witnesses like Peter Smith and MB2, were only interviewed by Investigator Helsper by phone, not in person. (See 1AR139 (Peter Smith); 1AR136 (Richard Gallien); 1AR131 (MB2), 1AR85 (MB2); 1AR115 (CR); 1AR92 (SS); 1AR87 (AB).) This practice contravened USC's Policy, which "requires the Investigator to personally see and hear all parties and witnesses to the investigation, putting him/her in the best position to make determinations as to credibility and relevance" (1AR219.) Conducting interviews by phone precludes accurate identification of witnesses and evaluation of whether their accounts are credible.

The *Allee* Court took also issue with the limited appeal rights USC offers students deemed responsible by the investigator/adjudicator under its Policy. (*Allee*, *supra*, 30 Cal.App.5th at 1069 ["[T]he harm to fundamental fairness created by USC's system is amplified by the limited review of the investigator's factual findings available in the university's appellate process."].) USC's appellate processes described in *Allee* is identical to the appellate process in this case. (2AR493-496.)

48

Document received by the CA 2nd District Court of Appeal.

USC's Appeal Panel, a three-person, anonymous tribunal trained by the Title IX Coordinator, was instructed not to question investigator Helsper's factual findings, unless no reasonable person could come to the same conclusion. (1AR494-495.) Following the appeal process, Dr. Ainsley Carry had unfettered discretion to make findings and impose sanctions based on his independent review of the record. (1AR496.) The appeal process did not provide any procedural protections against the unfair investigation.

Even though USC's Appeal Panel is supposed to hear procedural concerns "[t]hat the Title IX Office or the Misconduct Sanctioning Panel deviated from the process set forth in this policy," here, the Appeal Panel did not address either Ms. Katz's or Mr. Boermeester's concerns about the Title IX Office's mishandling of the Title IX investigation. For instance, in her appeal, Ms. Katz contended, "Title IX abused its own process in this matter" by misreporting, misrepresenting, and manipulating her statements and statements made by witnesses, coercing her into accepting an AOC and emergency housing, failing to adequately explain the Title IX process to her, ignoring her requests that the Title IX Office conduct a fair investigation, trampling her rights, and demeaning her by characterizing her as a victim of domestic violence. (1AR192-196.) Mr. Boermeester also raised significant concerns with the conduct of the investigation. (1AR197-208.) Yet, the Appeal Panel and Dr. Carry made no effort to address any of these very serious claims about the Title IX Office's mishandling of the investigation/adjudication,

49

Document received by the CA 2nd District Court of Appeal.

but instead insulted and infantilized Ms. Katz further by mimicking the investigator's explanation Ms. Katz's behavior as "expected normative behavior" for someone in an abusive relationship. (1AR220.) The opportunity to be heard does not count when the adjudicators and reviewing tribunals are not neutral and refuse to listen.

From the outset, USC's Title IX Office set out to prosecute and punish Mr. Boermeester for misconduct, not to fairly and impartially investigate a report made by a non-percipient witness. On January 25, 2017, Title IX Coordinator Gretchen Dahlinger Means, supervisor to the investigation, ordered Mr. Boermeester suspended and removed from campus. (2AR472.) In deciding that suspension was the appropriate interim measure, the Title IX Coordinator preliminarily determined Mr. Boermeester posed a "substantial threat" to the safety or well-being of the university community. (2AR489; see also 1AR218.) The preliminary determination cannot be squared with USC's obligation to presume an accused student not responsible, and to employ impartial adjudicators.

Just four days later, on January 30, 2017, Ms. Katz assured investigator Helsper, "She does not feel in danger, she does not feel unsafe because of him," and that she had been "bullied" into making a report. (1AR168-169.) Ms. Katz never indicated that Mr. Boermeester's presence on campus would interfere with her safety or well-being, nor that his presence on campus would affect her access to education. (*Id.*) Nevertheless, on February 8, 2017, investigator Helsper informed Ms. Katz that the AOC would

50

remain in place throughout the investigation, and Mr. Boermeester's suspension was not lifted. (1AR102.) USC's Policy allows investigations to proceed without the reporting party's consent only in "limited circumstances . . . for example, when an incident involves a weapon or predatory drug use, when multiple victims are involved, or when there is a danger to the greater community." (2AR482.) Here, in contrast, investigator Helsper continued to investigate even after Ms. Katz requested to stop the investigation and emphasized that she had been manipulated into making false representations during her interview. (1AR102-103; 1AR168-169; 1AR192; 1AR212.) Investigator Helsper's only possible justification for proceeding with an investigation was that she presumed Mr. Boermeester was "a danger to the greater community," a presumption that cannot be reconciled with her obligation to presume Mr. Boermeester not responsible and to remain impartial. (2AR482.)

Moreover, despite USC's Policy requiring "equal treatment" for the Respondent and Reporting Party, the actions taken by USC against the male Respondent, Mr. Boermeester, to deny him access to academic, athletic, and medical resources at USC stand in stark contrast to the efforts taken to provide academic accommodations and assistance to the female "Reporting Party," Ms. Katz. (See 1AR261-277; 2AR442-444; 2AR472-473; 2AR488.)

The investigator's occupancy in "overlapping and inconsistent roles of investigator, prosecutor, fact finder, and sentencer" and questionable exercises of discretion precluded Mr. Boermeester from receiving a fair and impartial hearing.

Document received by the CA 2nd District Court of Appeal.

## V.    CONCLUSION

Mr. Boermeester respectfully requests that this Court issue an order to reverse the judgment and remand the matter to the trial court with directions to grant his petition for writ of administrative mandate to set aside the University's administrative decision and order against him.

DATED: October 25, 2023          Respectfully submitted,

HATHAWAY PARKER

By:    /s/ Mark M. Hathaway
Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.
Attorneys for Plaintiff and Appellant
MATTHEW BOERMEESTER

Document received by the CA 2nd District Court of Appeal.

## CERTIFICATE OF WORD COUNT

Pursuant to California Rules of Court, Rule 8.204, subd. (c)(1), the undersigned certifies that this brief contains 10,806 words, according to the Microsoft Word word count program. The word count includes footnotes but excludes the proof of service.

DATED: October 25, 2023   Respectfully submitted,

HATHAWAY PARKER

By:   /s/ Mark M. Hathaway
   Mark M. Hathaway, Esq.
   Jenna E. Parker, Esq.
   Attorneys for Plaintiff and
   Appellant
   MATTHEW BOERMEESTER

Document received by the CA 2nd District Court of Appeal.

State of California      )                   Proof of Service by:

County of Los Angeles  )                   ✔ US Postal Service

)                   Federal Express

---

I, Kirstin Largent       , declare that I am not a party to the action, am over 18 years of age and my business address is: 631 S Olive Street, Suite 600, Los Angeles, California 90014.

**On** 10/25/2023 declarant served the within: Appellant's Opening Supplemental Brief On Remand Issues **upon:**

| Copies   FedEx   USPS |
| --- |
| ELECTRONICALLY SERVED VIA TRUEFILING:<br>Karen Jean Pazzani<br>YOUNG & ZINN LLP<br>1150 South Olive Street<br>Suite 1800<br>Los Angeles, California 90015<br>kpazzani@yzllp.com<br>  Attorneys for Respondents |

| Copies   FedEx   USPS |
| --- |
| ELECTRONICALLY SERVED VIA TRUEFILING:<br>Jeremy B. Rosen - Beth J. Jay<br>Mark A. Kressel - Scott P. Dixler<br>Horvitz & Levy LLP<br>3601 West Olive Avenue, 8th Floor<br>Burbank, California 91505-4681<br>jrosen@horvitzlevy.com - Bjay@horvitzlevy.com<br>mkressel@horvitzlevy.com - sdixler@horvitzlevy.com<br>  Attorneys for Respondents |

| 1  Copies   FedEx  ✔ USPS |
| --- |
| Clerk for The Honorable Amy D. Hogue<br>SUPERIOR COURT OF CALIFORNIA<br>County of Los Angeles<br>Spring Street Courthouse<br>312 North Spring Street<br>Los Angeles, California 90012<br><br>Trial Court Judge |

| Copies   FedEx   USPS |
| --- |
| ELECTRONICALLY SERVED VIA TRUEFILING:<br><br>SUPREME COURT OF CALIFORNIA<br>350 McAllister Street<br>Room 1295<br>San Francisco, California 94102-4797 |

the address(es) designated by said attorney(s) for that purpose by depositing **the number of copies indicated above,** of same, enclosed in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of California, or properly addressed wrapper in an Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of California

I further declare that this same day the **original and** copies has/have been hand delivered for filing OR the **original and** copies has/have been filed by third party commercial carrier for next business day delivery to:

ELECTRONICALLY FILED VIA TRUEFILING:

CALIFORNIA COURT OF APPEAL
Second Appellate District, Division Eight
Ronald Reagan State Building
300 South Spring Street, Second Floor
Los Angeles, California 90013

I declare under penalty of perjury that the foregoing is true and correct:

| Signature: /s/ Kirstin Largent, Senior Appellate Paralegal, Counsel Press Inc. |
| --- |

Document received by the CA 2nd District Court of Appeal.

# EXHIBIT 9

**B290675**

# IN THE COURT OF APPEAL
# OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT, DIVISION EIGHT

————————

**MATTHEW BOERMEESTER,**
*Petitioner and Appellant,*

*vs.*

**AINSLEY CARRY ET AL.,**
*Respondents and Appellees.*

————————

APPEAL FROM THE SUPERIOR COURT OF CALIFORNIA,
COUNTY OF LOS ANGELES
THE HONORABLE AMY D. HOGUE • BS170473

————————

# APPELLANT'S SUPPLEMENTAL
# RESPONDING BRIEF

————————

**HATHAWAY PARKER**
MARK M. HATHAWAY, ESQ. (STATE BAR NO. 151332)
JENNA E. PARKER, ESQ. (STATE BAR NO. 303560)
445 S. FIGUEROA STREET, 31ST FLOOR
LOS ANGELES, CALIFORNIA 90071
TEL: (213) 529-9000/FAX: (213) 529-0783
mark@hathawayparker.com

ATTORNEYS FOR PETITIONER AND APPELLANT
**MATTHEW BOERMEESTER**

Document received by the CA 2nd District Court of Appeal.

# TABLE OF CONTENTS

I.    ARGUMENT ................................................................4

     A.    USC'S SINGLE ADJUDICATOR MODEL DID NOT AFFORD MR. BOERMEESTER A FAIR PROCESS ................................................................4

     B.    INDEPENDENT JUDGMENT IS REQUIRED .........6

     C.    THE EVIDENCE DOES NOT SUPPORT USC'S FINDINGS ................................................................6

II.    CONCLUSION................................................................7

CERTIFICATE OF WORD COUNT ..............................................8

Document received by the CA 2nd District Court of Appeal.

# TABLE OF AUTHORITIES

## Cases

*Doe v. Allee* (2019)
   30 Cal.App.5th 1036 ...................................................................4

## Federal Regulations

85 Fed. Reg. 30026, 30366-30367 (May 19, 2020)..........................5

87 Fed. Reg. 41390, 41467 (July 12, 2022) ....................................5

Document received by the CA 2nd District Court of Appeal.

**APPELLANT'S RESPONDING BRIEF**

I.    **ARGUMENT**

        **A. USC'S SINGLE ADJUDICATOR MODEL DID NOT AFFORD MR. BOERMEESTER A FAIR PROCESS**

The issue this Court must decide is whether USC's combinations of investigative, prosecutorial, and adjudicatory functions in a single individual provided Mr. Boermeester with a fair process. Although *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (hereafter *Allee*) was disapproved on other grounds, its mandate that the factfinder in a University proceeding cannot be an individual with the "divided and inconsistent roles," such as those occupied by the Title IX investigator at USC, who exercises "unfettered discretion to chart the course and scope of the investigation and to determine credibility in questionable ways" still holds strong. (*Allee*, *supra*, 30 Cal.App.5th at pp. 1069-70.)

The holding in *Allee* is consistent the Department of Education's current Federal Title IX Regulations, which preclude the single investor model because:

> [C]ombining [investigatory and adjudicatory] functions raises an unnecessary risk of bias that may unjustly impact one or both parties in a given Title IX proceeding. Particularly because the stakes are so high in these cases, with potentially life-altering consequences that may flow from a decision in favor of either party, the Department believes that separating investigation from decision making is important to promote the overall fairness of the process."

Document received by the CA 2nd District Court of Appeal.

85 Fed. Reg. 30026, 30366-30367 (May 19, 2020).

Of note, the Federal Title IX Regulations proposed on July 12, 2022 suggested authorizing the single investigator model, but the Department of Education invited comment on the issue, and the proposed Federal Title IX Regulations still have not been approved. (87 Fed. Reg. 41390, 41467 (July 12, 2022).)

USC argues that its single-investigator/adjudicator procedure was authorized by law. USC does not argue that its single-investigator/adjudicator procedure was fair to Mr. Boermeester. For the reasons already set forth on pages 46-51 of Mr. Boermeester Opening Supplemental Brief, USC's use of the single-investigator/adjudicator model was not fair to Mr. Boermeester.

USC's persistent fallacious assertion that Mr. Boermeester admitted to putting his hand (or sometimes hands) on Ms. Katz's neck and pushing her against a wall demands correction. Mr. Boermeester admitted to placing one hand on Ms. Katz's neck and "standing next to" a wall, but Mr. Boermeester never admitted to pushing Ms. Katz's or her head against a wall. He maintained that he "didn't hit her head against [the wall]," and that Ms. Katz was neither hurt nor scared during their interaction. (AR173; AR175.) This is consistent with Ms. Katz's own statements that she was "never hit, choked, kicked, pushed, or otherwise physically abused" by Mr. Boermeester, and that she is not a "victim," as USC continues to falsely represent to the Court over Ms. Katz's ardent objection. (AR67-69; AR192-196;

5

Document received by the CA 2nd District Court of Appeal.

AR212-214.) Mr. Boermeester agreed with Ms. Katz's written statement that he never hit, choked, kicked, pushed, or otherwise physically abused her. (AR209.)

### B. INDEPENDENT JUDGMENT IS REQUIRED

Mr. Boermeester has sufficiently addressed outstanding independent judgment issue in its Opening Supplemental Brief and does not waive any arguments related to this issue that may arise during oral argument.

### C. THE EVIDENCE DOES NOT SUPPORT USC'S FINDINGS

Under USC's policy, "intimate partner violence" requires a finding of "physical harm." (AR2.) To uphold the findings and determination that Mr. Boermeester engaged in "intimate partner violence," this Court will have to decide that despite there being no findings or evidence of any actual physical harm to Ms. Katz, Mr. Boermeester is still responsible for "intimate partner violence." This Court will also have to determine that abbreviated notes compiled by USC's investigator, which are themselves uncorroborated hearsay and contain multiple levels of uncorroborated hearsay, speculation, and guesswork, should be given greater weight over the firsthand accounts Ms. Katz and Mr. Boermeester submitted in their own words during USC's proceedings in the form of written responses and appeals. (See AR67-69; AR 192-196; AR209-211; AR212-214.) This Court cannot subvert well-established legal authority, nor can it ignore the complete record of the proceedings at USC. USC's findings and decisions must be overturned.

Document received by the CA 2nd District Court of Appeal.

## II. CONCLUSION

Mr. Boermeester respectfully requests that this Court issue an order to reverse the judgment and remand the matter to the trial court with directions to grant his petition for writ of administrative mandate to set aside the University's administrative decision and order against him.

DATED: November 9, 2023

Respectfully submitted,

HATHAWAY PARKER

By: _Jenna E. Parker_

Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.
Attorneys for Petitioner and Appellee
MATTHEW BOERMEESTER

Document received by the CA 2nd District Court of Appeal.

## CERTIFICATE OF WORD COUNT

Pursuant to California Rules of Court, Rule 8.204, subd. (c)(1), the undersigned certifies that this brief contains 689 words, according to the Microsoft Word word count program.

DATED: November 9, 2023      Respectfully submitted,

HATHAWAY PARKER

By: _Jenna E. Parker_

Mark M. Hathaway, Esq.
Jenna E. Parker, Esq.
Attorneys for Petitioner and Appellee
MATTHEW BOERMEESTER

Document received by the CA 2nd District Court of Appeal.

## PROOF OF SERVICE
***Matthew Boermeester v. Ainsley Carry et al.***
**Case No. B290675**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.
I am over the age of 18 and not a party to the within action; my
business address is 445 S. Figueroa Street 31st Floor, Los
Angeles, California 90071.

On <u>November 9, 2023</u>, I served the foregoing document
**APPELLANT'S SUPPLEMANTAL RESPONDING BRIEF** on
all interested parties listed below by transmitting to all
interested parties a true copy thereof as follows:

Mark A. Kressel
Scott P. Dixler
HORVITZ & LEVY LLP
3601 West Olive Ave., 8th Floor
Burbank, CA 91505-4681
mkressel@horvitzlevy.com
sdixler@horvitzlevy.com

*Attorneys for Respondents*
*[via Truefiling]*

Beth J. Jay
Jeremy B. Rosen
HORVITZ & LEVY LLP
505 Sansome St., Suite 1550
San Francisco, CA 94111-3149
bjay@horvitzlevy.com
jrosen@horvitzlevy.com

Attorneys for Respondents
[via Truefiling]

Karen J. Pazzani
PAZZANI & SANDHU LPP
700 N. Central Ave., Suite 460
Glendale, CA 91203-1861
kpazzani@psemploymentlaw.com

*Attorneys for Respondents*
*[via Truefiling]*

Clerk of the Court
Hon. Amy D. Hogue, Dept. 7
Los Angeles County Superior Court
Spring Street Courthouse
312 North Spring Street
Los Angeles, CA 90012

*Trial Court Judge*
*[via U.S. Mail]*

Clerk of the Court
California Supreme Court

9

Document received by the CA 2nd District Court of Appeal.

350 McAllister Street, Room 1295
San Francisco, CA 94102-4797

*Electronic copy (CRC, Rule*
*8.212(c)(2)(A)(i))*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission as indicated on the above service list.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 9, 2023, at Los Angeles, California.

By: _____/S/ Adriana Gutierrez_____.
     Adriana Gutierrez

Document received by the CA 2nd District Court of Appeal.

# EXHIBIT 10

Court of Appeal, Second Appellate District
Eva McClintock
Electronically RECEIVED on 11/9/2023 at 11:57:25 AM

Court of Appeal, Second Appellate District
Eva McClintock
Electronically FILED on 11/9/2023 by Maira Figueroa, Deputy Clerk

# B290675

# IN THE COURT OF APPEAL
# OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT, DIVISION EIGHT

---

### MATTHEW BOERMEESTER,
*Plaintiff and Appellant,*

*v.*

### AINSLEY CARRY et al.,
*Defendants and Respondents.*

---

APPEAL FROM LOS ANGELES COUNTY SUPERIOR COURT
AMY D. HOGUE, JUDGE • CASE NO. BS170473

---

# SUPPLEMENTAL RESPONDING BRIEF

---

**HORVITZ & LEVY** LLP
MARK A. KRESSEL (BAR NO. 254933)
*SCOTT P. DIXLER (BAR NO. 298800)
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800 • FAX: (844) 497-6592
mkressel@horvitzlevy.com
sdixler@horvitzlevy.com

**HORVITZ & LEVY** LLP
BETH J. JAY (BAR NO. 53820)
JEREMY B. ROSEN (BAR NO. 192473)
505 SANSOME STREET, SUITE 1550
SAN FRANCISCO, CALIFORNIA 94111-3149
(415) 462-5600 • FAX: (844) 497-6592
bjay@horvitzlevy.com
jrosen@horvitzlevy.com

**PAZZANI & SANDHU** LLP
KAREN J. PAZZANI (BAR NO. 252133)
700 NORTH CENTRAL AVENUE, SUITE 460
GLENDALE, CALIFORNIA 91203-3226
(213) 362-1860 • FAX: (213) 362-1861
kpazzani@psemploymentlaw.com

ATTORNEYS FOR DEFENDANTS AND RESPONDENTS
**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN
CALIFORNIA**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................3

INTRODUCTION ........................................................................5

LEGAL ARGUMENT ...................................................................5

I.    Boermeester's arguments are procedurally barred. .............5

    A.    Boermeester's arguments are barred because they are not limited to matters arising after this court's previous decision. .....................................5

    B.    Several of Boermeester's arguments are barred because they address topics beyond the scope of the Supreme Court's remand. .....................................8

II.    Boermeester fails to show that the investigatory model is unfair for university disciplinary proceedings. ..........................................................................10

III.    Boermeester fails to show that USC's appellate procedures are unfair. ..........................................11

IV.    Substantial evidence supports USC's findings. .................12

    A.    The substantial evidence standard of review applies here. .............................................................12

    B.    The evidence overwhelmingly supports USC's findings. ...................................................................13

CONCLUSION..............................................................................16

CERTIFICATE OF WORD COUNT ...........................................17

2

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpha Nu Assn. of Theta Xi v. University of Southern California*
(2021) 62 Cal.App.5th 383 ................................................. 11, 13

*Boermeester v. Carry*
(2023) 15 Cal.5th 72 ...........................................................*passim*

*Cassim v. Allstate Ins. Co.*
(2004) 33 Cal.4th 780 ............................................................. 15

*Dahms v. Downtown Pomona Property & Business
Improvement Dist.*
(2009) 174 Cal.App.4th 708 ........................................................6

*Doe v. Allee*
(2019) 30 Cal.App.5th 1036 ..................................... 8, 10, 11, 12

*Doe v. Regents of University of California*
(2018) 28 Cal.App.5th 44 ........................................................ 13

*Doe v. Regents of the University of California*
(2021) 70 Cal.App.5th 521 ...................................................... 12

*Floresta, Inc. v. City Council of City of San Leandro*
(1961) 190 Cal.App.2d 599 ..................................................... 14

*Griset v. Fair Political Practices Com'n*
(2001) 25 Cal.4th 688 ................................................................8

*Natarajan v. Dignity Health*
(2021) 11 Cal.5th 1095 ..............................................................8

*People v. Vasquez*
(2022) 74 Cal.App.5th 1021 ......................................................6

*Teacher v. California Western School of Law*
(2022) 77 Cal.App.5th 111 ........................................................8

## Statutes

Education Code
    § 66281.8 ................................................................ 10
    § 66281.8, subd. (b)(4)(A)(i) ................................. 10

## Rules of Court

Cal. Rules of Court, rule 8.200(b)(2) ................................. 5, 6, 8, 10

## SUPPLEMENTAL RESPONDING BRIEF

### INTRODUCTION

The arguments in Matthew Boermeester's 52-page supplemental brief are procedurally barred because they exceed the narrow scope permitted in post-remand briefing.

The arguments are also meritless. Boermeester's objections to USC's investigatory model and internal appellate system violate the Supreme Court's admonition that courts must "give private universities primary responsibility for crafting the precise procedures meant to afford a student with notice and an opportunity to respond." (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 90 (*Boermeester*).) Likewise, Boermeester's challenge to the evidence supporting USC's decision fails to grapple with the Supreme Court's understanding of the facts, let alone the Court's holding that the evidence against him was so strong that any procedural error was harmless.

This court should reject Boermeester's arguments and affirm the judgment for University of Southern California and Dr. Ainsley Carry (collectively, USC).

### LEGAL ARGUMENT

## I. Boermeester's arguments are procedurally barred.

### A. Boermeester's arguments are barred because they are not limited to matters arising after this court's previous decision.

California Rules of Court, rule 8.200(b)(2) (rule 8.200(b)(2)) provides that supplemental appellate briefs filed after a remand from the Supreme Court "must be limited to matters arising after

5

the previous Court of Appeal decision in the cause, unless the presiding justice permits briefing on other matters."  Courts enforce this limitation strictly—"any arguments raised in the supplemental briefs that could have been raised in the parties' original briefs will not be considered."  (*Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, 711, fn. 1; accord, *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033, fn. 10 [disregarding contention in supplemental brief that party could have raised before the previous Court of Appeal decision].)

Boermeester's supplemental brief flouts rule 8.200(b)(2). Not only *could* Boermeester have raised the arguments he makes in that brief before this court's prior decision, he *did* make these arguments, relying on many of the same authorities he cites now. The presiding justice did not permit Boermeester to expand the scope of his supplemental brief, nor did Boermeester seek permission.

Boermeester raises four main arguments in his supplemental brief, and they all violate rule 8.200(b)(2).

- First, Boermeester argues that the trial court should have reviewed USC's factfinding de novo, rather than under the substantial evidence standard of review. (Boermeester Supp. Br. 33–37.)  He made that argument in his original opening brief.  (AOB 56–61.) And this court resolved the issue against him, finding that substantial evidence review was appropriate. (Typed opn. 14.)  While Boermeester now says the

6

Supreme Court's opinion supports his position, he cites only the Court's undisputed observation that USC, a private university, is not a state actor. (Boermeester Supp. Br. 33–34.) That observation has nothing to do with the standard of review.

- Second, and relatedly, Boermeester argues that USC's decision affected his vested fundamental rights, so substantial evidence review is inappropriate. (Boermeester Supp. Br. 37–41.) Again, he already made that argument in his original opening brief (AOB 56–61), and this court already rejected it (typed opn. 14). Boermeester fails to explain how any new authorities affect this issue.

- Third, Boermeester cites nothing new to support his position that substantial evidence does not support USC's findings and determinations. (See Boermeester Supp. Br. 42–46.) Instead, he presents the same skewed recitation of the facts he did in his original opening brief (see AOB 10–35), and he ignores the Supreme Court's understanding of the facts (see *Boermeester*, *supra*, 15 Cal.5th at pp. 80–85).

- Finally, Boermeester rehashes the argument from his opening brief that it was unfair for USC to adopt an investigatory model, rather than adversarial model. (See Boermeester Supp. Br. 46–51; see also AOB 42–43, 46.) Rather than citing new authorities,

7

Boermeester again relies on *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (*Allee*), which the Supreme Court has now disapproved. (See USC Supp. Br. 13, fn. 2, citing *Boermeester*, *supra*, 15 Cal.5th at p. 96.)

A review of the table of authorities in Boermeester's supplemental brief confirms its noncompliance. This court issued its original opinion in May 2020. But, aside from the Supreme Court's opinion here, Boermeester cites only two cases decided after May 2020 in his supplemental brief—*Natarajan v. Dignity Health* (2021) 11 Cal.5th 1095, for the undisputed proposition that a prejudicial procedural error entitles a petitioner to a new hearing, and *Teacher v. California Western School of Law* (2022) 77 Cal.App.5th 111, for the undisputed proposition that a university is bound by its own policies and procedures. (Boermeester Supp. Br. 32, fn. 11, 33.) Otherwise, Boermeester's brief cites many of the same cases he cited in his original appellate briefing, highlighting his violation of rule 8.200(b)(2).

This court should decline to consider Boermeester's improper arguments.

### B. Several of Boermeester's arguments are barred because they address topics beyond the scope of the Supreme Court's remand.

When the Supreme Court remands with instructions, those instructions "define[ ] the scope of the jurisdiction of the court to which the matter is returned." (*Griset v. Fair Political Practices Com'n* (2001) 25 Cal.4th 688, 701.)

8

The Supreme Court remanded to this court with instructions "to determine in the first instance the remaining claims Boermeester raised on appeal that the Court of Appeal expressly declined to reach." (*Boermeester*, *supra*, 15 Cal.5th at p. 98.) As noted in USC's supplemental brief, those issues are whether USC's policy was unfair because the Title IX investigator held the dual roles of investigator and adjudicator; whether USC's policy is unfair because of its appellate procedure; and whether substantial evidence supported USC's findings that Boermeester violated its interim partner violence policy. (USC Supp. Br. 6, citing typed opn. 13.)

Given the Supreme Court's instructions, this court lacks jurisdiction to address other issues. But Boermeester does not confine himself to arguing issues on which this court reserved decision. Instead, he also argues that (1) USC was biased against him, (2) USC's investigation was unfair to Roe, and (3) the trial court improperly applied the substantial evidence standard of review when analyzing USC's findings and determinations. These arguments are improper because this court already resolved them.

In its original opinion, this court rejected Boermeester's argument that USC was biased (typed opn. 13, fn. 6) and held that Boermeester lacks standing to assert Roe's rights (*ibid.*). This court also held that "we review for substantial evidence USC's substantive decisions and factual findings." (Typed opn. 14.) Because this court already resolved these issues, they are

beyond the scope of the Supreme Court's instructions on remand and this court cannot revisit them.

Finally, Boermeester argues that USC's decision impermissibly rested on "uncorroborated hearsay." (Boermeester Supp. Br. 8, 45–46.) This argument is also beyond the scope of the Supreme Court's remand because Boermeester did not raise it in his initial briefing in this court, so this court did not expressly decline to reach it. The argument is also procedurally barred because it does not rely on new authority, in violation of rule 8.200(b)(2).

## II. Boermeester fails to show that the investigatory model is unfair for university disciplinary proceedings.

USC's supplemental brief explained how the Supreme Court's reasoning in *Boermeester* requires this court to defer to USC's decision to use an investigatory model for student disciplinary matters. (USC Supp. Br. 12–15.) The requirements of fair procedure are modest and flexible, and universities have primary responsibility for selecting procedures that give accused students notice and an opportunity to respond. (*Boermeester*, *supra*, 15 Cal.5th at p. 90.) Fair procedure does not require universities to conduct mini-trials (*id.* at p. 93) and, going forward, Education Code section 66281.8 *prohibits* universities from adopting adversarial procedures (Ed. Code, § 66281.8, subd. (b)(4)(A)(i)).

In arguing against the investigatory model, Boermeester ignores these authorities. Instead, he relies on *Allee*, *supra*,

30 Cal.App.5th at pages 1069–1070, but he fails to mention that the Supreme Court disapproved *Allee* in this very case (see *Boermeester*, *supra*, 15 Cal.5th at pp. 95–96). The Court's disapproval of *Allee* extends to *Allee*'s rejection of USC's investigatory model, which conflicts with *Boermeester*'s holding that universities must be given priority and flexibility to determine their own student disciplinary procedures. (See USC Supp. Br. 13, fn. 2.)

## III. Boermeester fails to show that USC's appellate procedures are unfair.

USC's supplemental brief explained that the Supreme Court's holding in *Boermeester* shows that USC's appellate process satisfies fair procedure. (USC Supp. Br. 20–22.) Courts must give universities the flexibility to design fair appellate processes, and the Supreme Court offered favorable dicta about USC's appellate system. (*Boermeester*, *supra*, 15 Cal.5th at pp. 94–95 ["USC provided Boermeester . . . the opportunity to appeal the misconduct sanctioning panel's decision to the appellate panel. USC was not required to have gone further" by providing live cross-examination].) The recent *Alpha Nu* case likewise held that fair procedure does not mandate any specific appellate procedure. (*Alpha Nu Assn. of Theta Xi v. University of Southern California* (2021) 62 Cal.App.5th 383, 421–422 (*Alpha Nu*).)

Boermeester's supplemental brief addresses none of these points. Instead, Boermeester says USC's appeal panel was biased against him, refused to listen to the evidence, and

11

provided insufficient procedural protections. (Boermeester Supp. Br. 48–50.) He cites *Allee* to support his critique of USC's appellate process, but he again neglects to mention that the Supreme Court disapproved *Allee* for reasons that apply equally to *Allee*'s analysis of this issue. (Boermeester Supp. Br. 48.) And this court has already rejected Boermeester's unfounded accusations of bias. (Typed opn. 13, fn. 6.)

Boermeester also neglects to mention the Supreme Court's admonition that courts should not second-guess or micromanage university procedures as long as they provide notice and an opportunity to be heard. (See *Boermeester*, *supra*, 15 Cal.5th at p. 90.) That holding resolves this issue.

## IV. Substantial evidence supports USC's findings.

### A. The substantial evidence standard of review applies here.

As noted above, Boermeester's contention that the trial court should have reviewed USC's findings de novo, rather than under the substantial evidence standard of review, is procedurally barred. Boermeester cites no new authority to support it, and this court already resolved the issue against him.

In any event, his contention is meritless. As USC explained in its supplemental brief (USC Supp. Br. 22), recent Court of Appeal decisions confirm that courts apply the substantial evidence standard of review to disciplinary decisions involving student sexual misconduct or intimate partner violence at both private and public universities. (*Doe v. Regents of the University of California* (2021) 70 Cal.App.5th 521, 532–533;

12

*Alpha Nu*, *supra*, 62 Cal.App.5th at p. 409.)  Boermeester cites no case holding otherwise.

Furthermore, the Supreme Court's direction in *Boermeester* is that courts should be distancing themselves from—rather than enmeshing themselves in—university student disciplinary proceedings.  (See, e.g., *Boermeester*, *supra*, 15 Cal.5th at pp. 79–80.)  Boermeester's argument that courts should begin conducting de novo evidentiary reviews picking through the underlying administrative record conflicts with the Supreme Court's teaching.

### B.   The evidence overwhelmingly supports USC's findings.

The evidence of Boermeester's misconduct, as summarized in the Supreme Court opinion, is conclusive.  (See USC Supp. Br. 23–24.)  The Supreme Court relied on the strength of this evidence to support its holding that, even if USC had failed to provide fair procedures (which it did not), its failure was harmless.  (*Boermeester*, *supra*, 15 Cal.5th at p. 97.)  Boermeester ignores the Supreme Court's recitation of the facts and its harmless error discussion in his supplemental brief.

There is no merit to Boermeester's contention that USC improperly relied on "uncorroborated hearsay" when it found he violated the policy against domestic violence.  (Boermeester Supp. Br. 8, 45–46.)  As noted above, that argument is procedurally barred.  It is also legally and factually incorrect.

Formal evidentiary rules that apply in court are not required in administrative proceedings like USC's.  (*Doe v.*

*Regents of University of California* (2018) 28 Cal.App.5th 44, 56 [formal rules of evidence do not apply in university disciplinary proceedings]; *Floresta, Inc. v. City Council of City of San Leandro* (1961) 190 Cal.App.2d 599, 608 ["rules of admissibility of evidence do not bind administrative agencies"].)  Indeed, Boermeester conceded in his administrative appeal that "this is not a court of law and that the rules of evidence do not apply." (1 AR 202, fn. 6.)

Given the Supreme Court's holding that private universities need not conduct live hearings with cross-examination, it follows that universities may rely on written notes from witness interviews to support their disciplinary decisions.  If only live testimony at a hearing were competent to prove a point, then the Supreme Court's rejection of a live testimony requirement in *Boermeester* would be meaningless.

Moreover, the evidence against Boermeester was hardly uncorroborated.  Several witnesses, including Roe herself, described Boermeester's misconduct (see 1 AR 85, 95, 183–185), which was confirmed by surveillance footage (1 AR 43–45; 6 CT 1161–1162) and Boermeester's own admission (1 AR 60, 172–174, 179).[1]

There is also no merit to Boermeester's contention that he cannot have violated USC's domestic violence policy because he did not injure or bruise Roe.  (See Boermeester Supp. Br. 43.)

---

[1]   Contrary to Boermeester's contention (Boermeester Supp. Br. 25, fn. 9), USC's policy did not prohibit telephonic interviews as part of its investigation (see 2 AR 492).

USC's policy forbade Boermeester from physically harming Roe (2 AR 486), and Roe told USC that Boermeester hurt her when he put his hand on her neck and pushed her head against a wall (1 AR 184). That statement alone is substantial evidence that Boermeester physically harmed Roe, and it is corroborated by witness statements and surveillance footage. As the Supreme Court recognized, USC had a right to credit Roe's statements even though she later recanted, especially because domestic violence victims commonly recant to appease their abusers. (*Boermeester*, *supra*, 15 Cal.5th at pp. 97–98.) "USC, as the finder of fact, was entitled to determine that Roe's first statement was more credible than her later recantation."[2] (*Ibid.*)

---

[2]   Thus, even a de novo evidentiary review (which does not apply here) would show the evidence supports USC's decision. Indeed, the Supreme Court's harmless error analysis in *Boermeester* implicitly involved a de novo review of the entire record, yet the Court found nothing to suggest that USC would have reached a different decision had it done things differently. (See *Boermeester*, *supra*, 15 Cal.5th at pp. 97–98; see also *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802–803 [reviewing court reviews entire record to determine prejudice from civil trial error].)

15

## CONCLUSION

For all these reasons, and the reasons stated in USC's respondents' brief and supplemental brief, this court should affirm the judgment.

November 8, 2023

**HORVITZ & LEVY** LLP
 BETH J. JAY
 JEREMY B. ROSEN
 MARK A. KRESSEL
 SCOTT P. DIXLER
**PAZZANI & SANDHU** LLP
 KAREN J. PAZZANI


By: _____
    Mark A. Kressel

Attorneys for Defendants and Respondents
**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA**

16

## CERTIFICATE OF WORD COUNT
### (Cal. Rules of Court, rule 8.204(c).)

The text of this brief consists of 2,429 words as counted by the program used to generate the brief.

Dated:  November 8, 2023

_____
Mark A. Kressel

## PROOF OF SERVICE

### Boermeester v. Carry et al.
### Case No. B290675

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 3601 West Olive Avenue, 8th Floor, Burbank, CA 91505-4681.

On November 9, 2023, I served true copies of the following document(s) described as **SUPPLEMENTAL RESPONDING BRIEF** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**
Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission via Court's Electronic Filing System (EFS) operated by ImageSoft TrueFiling (TrueFiling) as indicated on the attached service list:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 9, 2023, at Burbank, California.


Gabby Gomez

**SERVICE LIST**
*Boermeester v. Carry et al.*
**Case No. B290675**

| Individual / Counsel | Party Represented |
|---|---|
| Karen J. Pazzani<br>Pazzani & Sandhu LLP<br>700 North Central Avenue<br>Suite 460<br>Glendale, California 91203-3226<br>(213) 362-1860 • Fax: (213) 362-1861<br>kpazzani@psemploymentlaw.com | Defendants and Respondents<br>**AINSLEY CARRY and THE UNIVERSITY OF SOUTHERN CALIFORNIA**<br><br>*Via TrueFiling* |
| Mark M. Hathaway<br>Jenna E. Parker<br>Hathaway Parker LLP<br>445 South Figueroa Street<br>31st Floor<br>Los Angeles, California 90071<br>(213) 529-9000 • Fax: (213) 529-0783<br>mark@hathawayparker.com<br>jenna@hathawayparker.com | Plaintiff and Appellant<br>**MATTHEW BOERMEESTER**<br><br>*Via TrueFiling* |
| Clerk of the Court<br>Hon. Amy D. Hogue, Dept. 7<br>Los Angeles County Superior Court<br>Spring Street Courthouse<br>312 North Spring Street<br>Los Angeles, California 90012<br>(213) 310-7007 | Trial Court Judge<br><br>[Case No. BS170473]<br><br>*By U.S. Mail* |
| Clerk of the Court<br>California Supreme Court<br>350 McAllister Street, Room 1295<br>San Francisco, California 94102-4797<br>(415) 865-7000 | Electronic Copy (CRC, Rule 8.212(c)(2)(A)(i))<br><br>*Via TrueFiling* |